**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| URIEL PHARMACY HEALTH AND WELFARE PLAN; and URIEL PHARMACY, INC., on their own behalf and on behalf of all others similarly situated, | Case No. 2:22-cv-00610 |
| Plaintiffs, | |
| vs. | |
| ADVOCATE AURORA HEALTH, INC. AND AURORA HEALTH CARE, INC., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE CLASS ACTION COMPLAINT**

Date: July 29, 2022

Daniel E. Conley
Nathan J. Oesch
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: 414.277.5000
Fax: 414.271.3552
daniel.conley@quarles.com
nathan.oesch@quarles.com

Matthew Splitek
QUARLES & BRADY LLP
33 E Main St, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Fax: 608.251.9166
matthew.splitek@quarles.com

Jane E. Willis
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Telephone: 617.951.7000
Fax: 617.951.7050
jane.willis@ropesgray.com

Anne Johnson Palmer
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111
Telephone: 415.315.6300
Fax: 415.315.6350
anne.johnsonpalmer@ropesgray.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 4

LEGAL STANDARD .............................................................................................. 5

ARGUMENT .......................................................................................................... 6

    I.      PLAINTIFFS LACK ANTITRUST STANDING, WHICH IS
            REQUIRED FOR THIS ACTION TO PROCEED ................................. 6

          A.     Plaintiffs Do Not Allege Any Antitrust Injury ........................... 7

          B.     Plaintiffs' Claims Fail Because They Do Not Allege They
               Participated in the Geographic Markets Alleged in the Complaint ............ 9

    II.     COUNT I FAILS TO PLAUSIBLY ALLEGE THAT AAH'S
            CONTRACTS WITH NETWORK VENDORS VIOLATE SECTION 1
            OF THE SHERMAN ACT .................................................................. 10

          A.     Plaintiffs Do Not Plausibly Allege that AAH Imposed Unlawful
               Contractual Provisions on All, or Nearly All, Its Network Vendors ........ 11

          B.     Plaintiffs Do Not Plausibly Allege Any Substantial Foreclosure of
               Competition.................................................................................... 14

    III.    COUNT II FAILS TO PLAUSIBLY ALLEGE ANY VIOLATION OF
            SECTION 2 OF THE SHERMAN ACT ............................................. 17

          A.     Plaintiffs Fail to Adequately Allege Relevant Geographic Markets ........ 18

          B.     Plaintiffs Do Not Allege that AAH Unlawfully Acquired or
               Maintained Its Monopoly Power, Nor Do Their "Monopoly
               Leveraging" Allegations State a Claim....................................... 19

    IV.    COUNT III DOES NOT PLAUSIBLY ALLEGE ANY CLAIM FOR
            ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE
            SHERMAN ACT ................................................................................. 22

    V.     PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED ..................... 24

    VI.    PLAINTIFFS' ALLEGATIONS RELATING TO CONDUCT BEYOND
            THE STATUTE OF LIMITATIONS SHOULD BE REJECTED ..................... 25

    VII.   THE COMPLAINT'S COUNT SEEKING INJUNCTIVE AND OTHER
            RELIEF SHOULD BE DISMISSED ................................................. 27

CONCLUSION...................................................................................................... 27

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abcor Corp. v. AM Int'l, Inc.*,
    916 F.2d 924 (4th Cir. 1990) ................................................20

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) ................................................11

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ................................................20

*American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)................................................6, 8, 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................5, 6, 14

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ................................................18

*Car Carriers Inc., v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ................................................15

*Cargill, Inc. v. Monfort of Colo. Inc.*,
    479 U.S. 104 (1986)................................................22

*Cascade Health Sols. v. Peacehealth*,
    515 F.3d 883 (9th Cir. 2008) ................................................17

*Century Hardware Corp. v. Powernail Co.*,
    282 F. Supp. 223 (E.D. Wis. 1968)................................................26

*Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*,
    940 F.3d 971 (7th Cir. 2019) ................................................7

*Endsley v. City of Chicago*,
    230 F.3d 276 (7th Cir. 2000) ................................................17

*FTC v. Tenet Health Care Corp.*,
 186 F.3d 1045 (8th Cir. 1999) ..............................................................17

*Fisher v. Aurora Health Care, Inc.*,
 558 F. App'x 653 (7th Cir. 2014) .................................................7, 8, 10

*Fisher v. Aurora Health Care, Inc.*,
 No. 13-C-152, 2013 WL 12099866 (E.D. Wis. July 16, 2013), *aff'd*, 558 F.
 App'x 653 (7th Cir. 2014) ..........................................................14

*G. Heileman Brewing Co. v. Anheuser-Busch Inc.*,
 676 F. Supp. 1436 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989) ..............23

*Goldwasser v. Ameritech Corp.*,
 222 F.3d 390 (7th Cir. 2000) ..............................................................21

*Great Escape, Inc. v. Union City Body Co.*,
 791 F.2d 532 (7th Cir. 1986) ..............................................................23

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
 790 F. Supp. 804 (C.D. Ill. 1992), *aff'd*, 998 F.2d 391 (7th Cir. 1993)...................6

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
 998 F.2d 391 (7th Cir. 1993) ............................................................7, 9

*Hennessy Indus. Inc. v. FMC Corp.*,
 779 F.2d 402 (7th Cir. 1985) ..............................................................24

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
 864 F.2d 1409 (7th Cir. 1989) ..............................................................24

*In re Indus. Gas Antitrust Litig.*,
 681 F.2d 514 (7th Cir. 1982) ...............................................................7

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) ..............................................................27

*Knutson v. Village of Lakemoor*,
 932 F.3d 572 (7th Cir. 2019) ..............................................................27

*Labor One, Inc. v. Staff Mgmt. Sols., LLC*,
 No. 17 C 7580, 2018 WL 4110676 (N.D. Ill. Aug. 28, 2018)...................................6

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007)........................................................................15

*Lerma v. Univision Commc'ns, Inc.*,
 52 F. Supp. 2d 1011 (E.D. Wis. 1999)...........................................19, 20, 24, 25

*Logan v. Wilkins*,
   644 F.3d 577 (7th Cir. 2011) ...................................................................................26

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) .....................................................................................6

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
   No. 20-1581, 2022 WL 2763502 (7th Cir. July 15, 2022)......................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................11

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
   937 F.3d 1056 (7th Cir. 2019) ...................................................................2, 7, 9, 10

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................12

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) ...................................................................................22

*Methodist Health Servs. Corp. v. OSF HealthCare Sys.*,
   859 F.3d 408 (7th Cir. 2017) ...................................................................................16

*Mullis v. Arco Petroleum Corp.*,
   502 F.2d 290 (7th Cir. 1974) ...................................................................................19

*Nucap Indus., Inc. v. Robert Bosch LLC*,
   273 F. Supp. 3d 986 (N.D. Ill. 2017) ......................................................................19

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) .................................................................................25

*Pacific Bell Tel. Co. v. Linkline Commc'ns*,
   555 U.S. 438 (2009)..................................................................................................3

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ...............................................................................3, 15

*Roumann Consulting Inc. v. Symbiont Constr., Inc.*,
   No. 18-C-1551, 2019 WL 3501527 (E.D. Wis. Aug. 1, 2019)..........................24, 25

*Schor v. Abbott Lab'ys*,
   457 F.3d 608 (7th Cir. 2006) ...................................................................................21

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
   950 F.3d 911 (7th Cir. 2020) .......................................................................11, 18, 19

*Simon & Simon, PC v. Align Tech., Inc.*,
    No. 19-506, 2020 WL 1975139 (D. Del. Apr. 24, 2020)........................................................21

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)........................................................................................................23

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ........................................................................................25

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
    309 F.3d 836 (5th Cir. 2002) ........................................................................................18

*Tamburo v. Dworkin*,
    601 F.3d 693 (7th Cir. 2010) ....................................................................................6, 14

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
    305 F. Supp. 3d 1134 (D. Or. 2018) ............................................................................21

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................................................19

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................................................15, 21

*Western Fuels-Illinois, Inc. v. Interstate Com. Comm'n*,
    878 F.2d 1025 (7th Cir. 1989) ......................................................................................21

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
    810 F.2d 243 (D.C. Cir. 1987) ...................................................................................2, 15

## Statutes and Other Authorities

15 U.S.C. § 1 ............................................................................................................ *passim*

15 U.S.C. § 2 ............................................................................................................ *passim*

15 U.S.C. § 15b ..............................................................................................................25

Wis. Stat. § 133.03 ..................................................................................................24, 25

Wis. Stat. § 133.18 ........................................................................................................25

Plaintiffs Uriel Pharmacy Health and Welfare Plan and Uriel Pharmacy, Inc. bring this action alleging various antitrust claims against Advocate Aurora Health, Inc. and Aurora Health Care, Inc. (together, "AAH"). Plaintiffs' seventy-six page Complaint advances a series of groundless attacks against AAH. The Complaint repeatedly espouses the theory that "big is bad." Plaintiffs insist that AAH is a large health system in Wisconsin and allegedly charges high prices, and that this state of affairs "must" be the result of some violation of the federal and Wisconsin antitrust laws. The Complaint, however, is long on mischaracterizations of AAH's business practices and short on well-pled facts. Plaintiffs offer this Court little more than a hodgepodge of stale media reports taken out of context and vague assertions based on unattributed sources—spaghetti thrown against the wall with the hope it somehow sticks. But this Court should dismiss the Complaint for the following reasons.

*First*, the Complaint should be dismissed in its entirety for the fundamental reason that Plaintiffs lack antitrust standing to bring any of their claims. *See* Section I, *infra* at 6–10. Whatever one makes of the Complaint's allegations (and Plaintiffs' claims fail for several other reasons), there are no facts linking Plaintiffs to any of the alleged anticompetitive conduct. The Complaint centers around the assertion that AAH's contracts with "Network Vendors"—that is, insurers and other third parties that assemble networks of health care providers and make those available to employers like Plaintiffs that self-fund health plans—allegedly contain several types of provisions that Plaintiffs cast as unlawful. *See, e.g.*, Compl. ¶¶ 82, 88, 92–100, 123, 132, 134, 138–39, 148, 151, 156–58, 224.[1] But the Complaint does not allege that Plaintiffs themselves

---

[1] The term Network Vendor is not commonly used in the health care industry. Health insurers such as United, Anthem, Cigna, Aetna, and others are more commonly referred to as private payors. These private payors offer health plans to employers and individuals, and, with respect to employers, such health plans can be fully-insured, partially-insured, or self-funded. In this

were affected by any of those supposed provisions or, if so, how. Plaintiffs allege that they have been using Cigna as their particular Network Vendor, but only since 2021. *Id*. ¶ 209. The Complaint does not allege a single fact going to the content of any of the provisions of Cigna's contracts with AAH. Nor do Plaintiffs allege that they ever paid for health care services in any of the nine geographic "markets" allegedly affected by the contractual provisions. *Id*. ¶¶ 62–72, 156. Instead, Plaintiffs invite this Court to allow this case to proceed based solely on their say-so assertions that AAH's contracts generally contained the allegedly unlawful provisions, such that Plaintiffs "must" have been impacted by those provisions and harmed in some unspecified manner as a result. *Id*. ¶ 222. This chain of speculative inferences is easily rejected at the Rule 12 stage. Plaintiffs do not plead the most basic facts that would show they suffered an antitrust injury or that they can most "efficiently vindicate" the alleged antitrust claims. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019).

**Second**, the Sherman Act Section 1 claim (Count 1) fails for other reasons, in particular because Plaintiffs do not allege any facts that plausibly suggest the allegedly unlawful types of contractual provisions foreclosed competition in any alleged market. *See* Section II, *infra* at 10–17. The Complaint repeatedly resorts to deficient "information and belief" pleading about the actual content of those provisions, coupled with assertions that AAH charges "high" or "supracompetitive" prices. The law is well-settled that charging "high" prices "is not, in and of itself, an anticompetitive act." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C. Cir. 1987). The relationship between AAH and the Network Vendors is a vertical one. To state a claim that a vertical restraint is an unreasonable restraint of trade in violation of Section 1, the Complaint must plausibly allege that the contractual provisions

Motion, AAH nevertheless uses the term "Network Vendor" to be consistent with the Complaint.

"foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737–38 (7th Cir. 2004). The Complaint falls well short here. There are no allegations about other health systems or providers that were unable to compete or provide services in the alleged markets. The Complaint does not allege any facts showing that there are potential competitors that decided not to enter or expand services in any of those markets. The Complaint's failure to allege that AAH's relationships with Network Vendors caused any harm to competition in any alleged hospital services market is fatal to Plaintiffs' claims.

*Third*, Plaintiffs similarly fail to plead any violation of Sherman Act Section 2 (Counts II and III, for monopolization and attempted monopolization, respectively). *See* Sections III and IV, *infra* at 17–24. Plaintiffs rely on the same defective allegations as in Count I, and additionally assert that AAH possesses monopoly power in certain rural hospital services markets. But "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2." *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 447–48 (2009). Nowhere does the Complaint allege the required anticompetitive conduct to sustain a Section 2 claim. To the contrary, Plaintiffs remarkably go so far as to allege that AAH's construction and opening of a new hospital—which *expanded* output and *increased* competition—is somehow unlawful. Compl. ¶ 151.

*Fourth*, Plaintiffs' Wisconsin law claims fail for the same reasons as the federal claims, because the Wisconsin Antitrust Act is construed "in conformity" with the federal Sherman Act. *See* Section V, *infra* at 24–25.

*Fifth*, all the claims should be barred insofar as a substantial portion of the Complaint rests on a jumble of allegations that occurred well before the applicable statutes of limitation.

*See* Section VI, *infra* at 25–27. For example, Plaintiffs point to acquisitions from 2000 and 2013, the construction of a hospital in 2010, and a lawsuit from 2013. *Id.* ¶¶ 127, 148, 151, 160, 161. None of that supposed conduct is remotely within the four-year Sherman Act statute of limitations, or the six-year limitations period for the Wisconsin law counts. Plaintiffs' failure to separate the allegations that are timely from the old spaghetti thrown against the wall is yet another basis to dismiss the Complaint.[2]

## BACKGROUND

AAH is a non-profit health system that provides inpatient and outpatient hospital services throughout Wisconsin. *See* Compl. ¶¶ 22, 62–77.[3] Uriel Pharmacy, Inc. is a business located in East Troy, Wisconsin with a self-funded health plan for its employees, the Uriel Pharmacy Health and Welfare Plan (together, "Plaintiffs"). *Id.* ¶¶ 19, 206.

Plaintiffs seek to represent a putative class that includes "[a]ll businesses, unions, local governments, or other entities with self-funded health plans that are considered citizens of Illinois, Michigan, and/or Wisconsin" that paid AAH for "general acute care hospital services or ancillary products at an AAH facility" in certain geographic markets alleged in the Complaint. *Id.* ¶ 210.

According to the Complaint, self-funded health plans like Plaintiffs rely on Network Vendors—which are typically large, well-known insurance companies—to negotiate with health care providers to assemble networks of facilities and physicians, and those Network Vendors allow self-funded health plans to use the networks they assemble at the prices they have

---

[2] In addition, the count for injunctive relief (Count VII) should be dismissed because it seeks remedies for Plaintiffs' underlying claims, which fail for the reasons otherwise set forth in this Motion.

[3] For the purposes of this Motion only, AAH has summarized the allegations in the Complaint. To be clear, AAH does not admit that any of the allegations contained in the Complaint are true.

4

negotiated.  *Id.* ¶¶ 28, 31.  After the self-funded plan's employees receive health care services from these "in network" providers and the claim is processed, the employer plan pays the "allowed amounts" (less any amounts paid out-of-pocket by the employee).  *Id.*  ¶ 27, 28, 34. Self-funded plans also pay certain fees to the Network Vendors and third-party administrators ("TPAs") for their services.  *Id.*  ¶ 38.

Uriel Pharmacy operates a self-funded Uriel Pharmacy Health and Welfare Plan.  *Id.* ¶ 207.  Yet it was only in 2021 that Plaintiffs began using a Network Vendor (Cigna).[4]  *Id.* ¶ 209. Plaintiffs do not allege that they purchased services from AAH in any of the purported geographic markets referenced in the Complaint.  *Id.* ¶¶ 62–72, 156.

Plaintiffs now attempt to state a claim based on allegedly unlawful vertical restraints contained in contracts between AAH and (i) Network Vendors or (ii) physicians.  *Id.* ¶¶ 220–24, 229, 237.  Plaintiffs also contend that AAH has held a monopoly in eight purported geographic markets and has attempted to monopolize a ninth region, the Oconomowoc Hospital Service Area ("HSA").  *See id.* ¶¶ 61–72, 156, 236.  Plaintiffs assert that AAH has used its "dominance" in these alleged "markets" to impose the supposed vertical contractual restraints with Network Vendors and physicians.  *See id.* ¶¶ 229.  Plaintiffs further allege that AAH has been able to leverage its power in these "markets" to charge high prices in other "geographic markets" in which it operates, such as Milwaukee and Green Bay, even though it faces substantial competition in those areas.  *See id.* ¶ 75, 231.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead sufficient facts "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[4] Prior to 2021, Plaintiffs allegedly paid providers through "reference based pricing," rather than at rates negotiated by Network Vendors.  *See* Compl. ¶¶ 208–09.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (dismissal appropriate where antitrust claims were "pleaded in a wholly conclusory fashion"); *Lab. One, Inc. v. Staff Mgmt. Sols., LLC*, No. 17 C 7580, 2018 WL 4110676, at *1 (N.D. Ill. Aug. 28, 2018) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (antitrust allegations "will require more detail, both to give the opposing party notice of what the case is all about and to show how . . . the dots should be connected")). It is especially appropriate for a court "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" in an antitrust case, where the costs of discovery are often "enormous." *Twombly*, 550 U.S. at 558–59 (quotation marks omitted).[5]

## ARGUMENT

## I. PLAINTIFFS LACK ANTITRUST STANDING, WHICH IS REQUIRED FOR THIS ACTION TO PROCEED

The Complaint should be dismissed at the threshold because it fails to allege that Plaintiffs have antitrust standing to bring any of their claims. A plaintiff invoking the Sherman Act must show it has "antitrust standing"—*i.e.*, that it is a proper party to bring the cause of action. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347–48 (7th Cir. 2022) (affirming dismissal because plaintiffs were "not the proper parties to bring suit"). Antitrust standing "is more demanding than constitutional standing." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 790 F. Supp. 804, 824 (C.D. Ill. 1992),

---

[5] Throughout this Motion, all internal citations and quotations have been omitted, and all emphasis has been added, unless otherwise indicated.

*aff'd*, 998 F.2d 391 (7th Cir. 1993). "[N]ot all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue under § 4." *In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 516 (7th Cir. 1982).

Plaintiffs bear the burden of pleading antitrust standing. *See Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 654 (7th Cir. 2014) (affirming dismissal of complaint for lack of antitrust standing). To have standing to bring their antitrust claims, Plaintiffs must adequately plead (1) "antitrust injury" and (2) that they are "among those who can most efficiently vindicate the purposes of the antitrust laws." *See McGarry*, 937 F.3d at 1065 (quoting *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995)). The Complaint does not plausibly allege antitrust injury. Nor do Plaintiffs allege that they paid for any health care services in any of the nine alleged geographic markets, or that they are efficient enforcers of the antitrust laws.

## A. Plaintiffs Do Not Allege Any Antitrust Injury

Plaintiffs fail to allege antitrust injury, *i.e.*, an injury "flow[ing] from that which makes the defendants' acts unlawful. . . ." *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 394; *see also Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) ("[P]laintiff must allege an anticompetitive injury that flows from defendant's actions and that the antitrust laws were intended to prevent.").

The central contention in the Complaint, on which each and every count relies, is that AAH uses contractual provisions that allegedly amount to unlawful restraints of trade. These include five types of contractual provisions that Plaintiffs claim are included in AAH's contracts with Network Vendors: (i) "all-or-nothing" clauses; (ii) "all-plans" provisions; (iii) "anti-tiering"

7

provisions; (iv) "anti-steering" provisions; and (v) "gag clauses."[6]  The Complaint further asserts

that AAH allegedly has two types of offending contractual provisions with physicians: (i) "non-

compete agreements" and (ii) "referral restrictions."  The Complaint asserts that these

contractual provisions have resulted in Plaintiffs supposedly paying higher prices to AAH.

Compl. ¶ 221, 225.  But the Complaint fails to plausibly allege any "causal connection," as

antitrust injury and standing principles require, between Plaintiffs' claimed injury and the

supposedly anticompetitive contractual provisions.  *Fisher*, 558 F. App'x at 656 (dismissing

claim of anticompetitive conduct where "connection between his alleged injury and the alleged

antitrust violation is tenuous at best"); *see also Associated Gen. Contractors*, 459 U.S. at 545

(finding that the "tenuous and speculative character of the relationship between the alleged

antitrust violation and the [plaintiff's] alleged injury . . . weigh[ed] heavily against judicial

enforcement of the [plaintiff's] claim").

    The Complaint's factual allegations specific to Plaintiffs themselves are exceptionally

thin.  A review of those allegations demonstrates that the Complaint does not plausibly allege

that Plaintiffs were actually impacted by any of the alleged contractual provisions included in

AAH's agreements with any Network Vendor.  Plaintiffs allege that they only began using a

Network Vendor, Cigna, in 2021.  Compl. ¶ 209.[7]

---

[6] As discussed below in Section II, although Plaintiffs adopt these monikers for "types" of contractual provisions, they do not allege any facts about what these purported contractual terms say or how the provisions allegedly are anticompetitive.

[7] Before Plaintiffs began using Cigna as their Network Vendor in 2021, the Complaint alleges that Plaintiffs used a third-party administrator and made payments directly to providers using "reference based pricing."  Compl. ¶¶ 208–09.  Plaintiffs' antitrust claims are predicated on contractual provisions alleged to exist in AAH's contracts with Network Vendors (or physicians), not on payments that Plaintiffs offered or made separate and apart from their use of any Network Vendor.  Such vague, speculative allegations do not suffice to establish antitrust standing.  *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S.

The Complaint goes on to declare that Cigna has "entered agreements with AAH typical of those described previously between Network Vendors and AAH." *Id.* Plaintiffs do not offer any plausible factual allegations that would support this assertion. The Complaint does not address anything about AAH's contracting with Cigna in any respect. Quite to the contrary, the Complaint is silent in regard to Cigna. Critically, Plaintiffs do not allege any facts regarding the content of any Cigna/AAH agreements. Nor does the Complaint make any attempt to allege how Cigna's agreements with AAH harmed Plaintiffs in any manner, let alone caused harm of the type that the antitrust laws are intended to prevent. Although Plaintiffs complain about high prices for health care services, they do not explain how those high prices are linked to any foreclosure or other harm to the competitive process caused by Cigna's agreements with AAH. The Complaint should be dismissed because it fails to supply any "direct link" between the purportedly anticompetitive contractual provisions and Plaintiffs' alleged injury, which is vital to establish antitrust standing. *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 395.

### B. Plaintiffs' Claims Fail Because They Do Not Allege They Participated in the Geographic Markets Alleged in the Complaint

It is well-settled that a plaintiff lacks antitrust standing unless they are a consumer or competitor in the market in which the plaintiff claims competitive injury. *See, e.g.*, *Associated Gen. Contractors*, 459 U.S. at 539; *McGarry*, 937 F.3d at 1065–66 (citing *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (collecting cases)). Here, the Complaint lacks any allegation suggesting that Plaintiffs have participated in any of the nine geographic markets alleged in the Complaint in which antitrust violations purportedly occurred. Plaintiffs do not allege that they have paid for any health care services in those alleged

---

519, 545 (1983) (antitrust standing requires a non-speculative injury directly caused by the complained-of conduct).

geographic markets. Based on Plaintiffs' location near East Troy, Wisconsin, it is *possible*, in theory, that Plaintiffs' health plan has paid for services in the alleged Elkorn HSA. *See, e.g.*, Compl. ¶ 62. But the Complaint does not plead any facts to this effect. And in any event, there is no reason to believe that Plaintiffs' health plan has participated in the other eight geographic markets and therefore the antitrust claims predicated on those markets should be dismissed. *See also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.").

An additional, separate requirement for establishing antitrust standing is that the plaintiff is among those "who can most efficiently vindicate the purposes of the antitrust laws." *Fisher*, 558 F. App'x at 655 (quoting *Serfecz*, 67 F.3d at 598). The Complaint nowhere connects Plaintiffs to either the allegedly unlawful contractual provisions or the alleged geographic markets. Indeed, nowhere do Plaintiffs allege that they were harmed, or how they were harmed, in these alleged geographic markets by these contractual provisions. Instead, the Complaint identifies, by name, several likely market participants who could more efficiently enforce the antitrust laws if there were reason to do so, including several Network Vendors who are believed to contract with AAH, *see* Compl. ¶¶ 111–12, 209 (Anthem, UnitedHealthcare, and Cigna), and health systems that compete with AAH, *see id.* ¶ 77 (Froedtert and Ascension). Because Plaintiffs are not situated like others to efficiently enforce the antitrust laws, *see McGarry*, 937 F.3d at 106, their claims should be dismissed for lack of antitrust standing.

## II. COUNT I FAILS TO PLAUSIBLY ALLEGE THAT AAH'S CONTRACTS WITH NETWORK VENDORS VIOLATE SECTION 1 OF THE SHERMAN ACT

Count I of the Complaint claims that AAH uses its market power in eight purported geographic markets to "compel" Network Vendors to accept "anticompetitive terms" that

amount to unlawful vertical restraints in violation of Section 1 of the Sherman Act.[8]  Compl.

¶¶ 220–24.  A violation of Section 1 requires: (1) a contract, combination, or conspiracy; (2) a

resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury.

*Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *cf. Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Here, the Complaint fails to plausibly allege: (i) the contents of the allegedly unlawful

contractual provisions that AAH imposed in its contracts with Network Vendors; and (ii) that

those alleged provisions harmed competition by foreclosing competitors.  The Complaint's

failure to supply well-pled facts going to both of those elements is fatal and requires dismissal of

Count I.

### A.  Plaintiffs Do Not Plausibly Allege that AAH Imposed Unlawful Contractual Provisions on All, or Nearly All, Its Network Vendors

The alleged vertical restraints underlying the Section 1 claim in the Complaint—the same

contractual provisions addressed above in the context of Plaintiffs' lack of antitrust standing—

rest on innuendo and speculation drawn from outdated media reports and unattributed sources.

The Complaint does not plausibly allege that AAH imposed unlawful contractual provisions in

its agreements with Network Vendors, or even Cigna, Plaintiffs' own Network Vendor.  As to

vendors beyond Cigna, Plaintiffs invoke isolated instances of alleged conduct to declare that "all

or nearly all" Network Vendors are subject to allegedly unlawful provisions in their agreements

---

[8] For the purposes of this Motion only, AAH refers to the geographic and product markets as posited in the Complaint.  AAH does not concede that the markets are properly defined or that Plaintiffs' allegations suffice to show that AAH possesses the requisite market power or has foreclosed competition in any relevant market.  As addressed in Section III, *infra* at 17–22, Plaintiffs' failure to plead a plausible relevant market warrants dismissal of both their Section 1 and Section 2 claims.  *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (affirming dismissal of both Section 1 and Section 2 claims for failure to define a relevant geographic market or product market).

with AAH. Compl. ¶ 222. Assessing each type of alleged contractual provision in turn, it is apparent that the Complaint does not supply the factual matter necessary to support Plaintiffs' sweeping, generalized assertions.

Two provisions that Plaintiffs feature in the Complaint are the "all-or-nothing" and "all plans" clauses. These are alleged to be unlawful provisions in AAH's agreements with Network Vendors that, according to Plaintiffs, require those vendors to include all of AAH's facilities in all of their provider networks. In this regard, Plaintiffs call out one Network Vendor, Wisconsin Physician Services ("WPS"). The Complaint's allegations regarding an "all-or-nothing" provision in AAH contracts with WPS arise from a lawsuit that was resolved in 2007, *fifteen years ago*. Compl. ¶¶ 94–95. Relying solely on this litigation with WPS, the Complaint alleges "on information and belief" that "AAH continues to use similar contract language and has used such language in contracts with most Network Vendors" during the alleged class period. *Id.* ¶¶ 95–96.

The Complaint's only other allegations about "all-or-nothing" and "all plans" clauses involve (i) passing references to an unidentified consultant who claims that AAH drew a hard line in negotiating its agreements and (ii) newspaper reports, including an article from 2006. Compl. ¶¶ 97–98. Those allegations do not supply any meaningful factual enhancement. *See, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."). Indeed, there are no facts pled in the Complaint as to *which* Network Vendors the allegedly unlawful provisions have been imposed upon, *how* they have been affected, and *whether and when* any such impact occurred during the alleged class period.

The Complaint's allegations regarding the other alleged contractual provisions are no different. As to the alleged "anti-tiering" clauses, Plaintiffs point to the existence of a single alleged contract with an unidentified TPA, which the Complaint claims required AAH providers to be identified as "Participating Preferred Providers." Compl. ¶ 115. Similarly, with respect to "anti-steering," Plaintiffs allege that at some point "in the past" AAH prevented one unidentified Network Vendor from accessing *any* of AAH's facilities because the Network Vendor wanted to direct patients to non-AAH radiology centers. *Id.* ¶ 116. The Complaint also offers hearsay-based accusations that two Network Vendors told an unidentified self-funded health plan that they "w[ere] barred by AAH" from offering health plans that would "incentivize employees to seek out lower cost, higher quality care." *Id.* ¶¶ 111–12. With each of these allegations, it is unclear what the alleged "anti-tiering" and "anti-steering" provisions actually say. Plaintiffs' "gag clause" allegations, Compl. ¶ 132, are even less detailed, with the Complaint pointing only to an unidentified *Wall Street Journal* article supposedly identifying "AAH as among several hospital systems in the United States that use 'secret contract terms,'" *id.* ¶ 133. Once again, Plaintiffs do not include any specific allegations about whether Cigna's contracts with AAH include such terms. And at an even more basic level, Plaintiffs do not allege that the alleged provisions are anything but ordinary confidentiality provisions. Nor do Plaintiffs allege that such clauses were introduced by AAH, rather than the Network Vendor, or that any Network Vendor sought to reject a confidentiality provision.

And with respect to each of these different types of provisions, the Complaint does not allege any facts that would suggest any of these provisions have been included in "all or nearly all" Network Vendor contracts as Plaintiffs claim. Compl. ¶ 222.

The two provisions allegedly included in AAH's agreements with some unspecified physicians—"non-competes" and "referral restrictions"—are similarly devoid of supporting factual allegations. Plaintiffs cite two purported examples of non-compete agreements: one in which AAH was unsuccessful in enforcing the agreement, Compl. ¶¶ 121–22, and another instance where AAH never actually entered into non-compete agreements following an "abandoned effort to purchase a hospital chain in Michigan," *id.* ¶ 124. Plaintiffs' examples of "referral restrictions" are likewise threadbare and consist of a 2018 settlement involving two physicians, a passing reference to an acquisition of an outpatient practice that allegedly involved an exclusive referral provision, and another "information and belief" allegation that AAH has engaged in "other practices" to limit physicians from referring patients to non-AAH facilities. *Id.* ¶¶ 130, 158.

This patchwork of scattershot allegations does not supply the "specificity in pleading" that *Twombly* mandates before allowing a "potentially massive factual controversy" of the sort Plaintiffs attempt here. 550 U.S. at 558; *see also, e.g.*, *Tamburo*, 601 F.3d at 699 (affirming dismissal of antitrust claims that were "pleaded in a wholly conclusory fashion" so as to "sweep in the entire gamut of federal antitrust violations").[9]

## B. Plaintiffs Do Not Plausibly Allege Any Substantial Foreclosure of Competition

Count I's Section 1 claim fails for the separate reason that the Complaint fails to allege that any of the purported contractual provisions have caused competitive harm in the alleged

---

[9] Plaintiffs also reference "other tactics to suppress competition," and allege that "AAH also forces anti-competitive terms on independent physicians [with medical staff privileges at] its facilities." Compl. ¶ 126. The sole example that Plaintiffs provide relates to an alleged AAH policy requiring 24/7 continuous call coverage. *Id.* ¶ 127. The allegations appear to refer to a case that was dismissed at the pleading stage because of the plaintiff's failure to allege an antitrust injury or violation. *See Fisher v. Aurora Health Care, Inc.*, No. 13-C-152, 2013 WL 12099866, at *5 (E.D. Wis. July 16, 2013), *aff'd*, 558 F. App'x 653 (7th Cir. 2014).

relevant product markets: inpatient hospital services and outpatient hospital services. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[It is a] fundamental requirement . . . to sufficient[ly] alleg[e] . . . anticompetitive effects that would result or have resulted from the defendants' actions; the absence of such allegations is ordinarily fatal to the existence of a cause of action."). Rather than providing specific factual allegations regarding the adverse effect of the purported contractual provisions, Plaintiffs allege only that AAH charges high prices for certain services, Compl. ¶ 52, or that these prices are higher than other health systems or as compared to national averages or other geographies, *id.* ¶¶ 6–7, 179, 183, 185–91, 194–95, 198–201.

It is well-settled, however, that high prices do not suffice to establish anticompetitive conduct. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896–97 (2007) (reasoning that "[m]any decisions a [company] makes and carries out through concerted action can lead to higher prices . . . [y]et no one would think these actions violate the Sherman Act because they lead to higher prices"); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly price, is not only not unlawful; it is an important element of the free-market system."); *Williamsburg Wax Museum*, 810 F.2d at 252 ("[I]mposition of a high price is not, in and of itself, an anticompetitive act."). Rather, the antitrust laws only prohibit "high" prices resulting from conduct that harms or forecloses competition in the product markets and geographic markets in which the defendant participates. *See Republic Tobacco Co.*, 381 F.3d at 737–38 ("[Vertical restraints] violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue.").

Here, while the Complaint recites the legal conclusion that the alleged vertical restraints have foreclosed competition, *see* Compl. ¶ 224, Plaintiffs do not offer any plausible factual allegations that would suggest that competition in the hospital inpatient or outpatient services markets has been substantially foreclosed as a result of the challenged provisions. *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, No. 20-1581, 2022 WL 2763502, at *4 (7th Cir. July 15, 2022) ("[L]abels are not enough."). There are no allegations that AAH's rivals in the purported relevant geographic markets have been marginalized due to the alleged contractual provisions. Plaintiffs do not allege that competing hospitals or health systems are excluded from the networks offered by Network Vendors, or that AAH's rivals were somehow prevented from negotiating with Network Vendors.[10] The Complaint does not, and cannot, allege that Network Vendors do not offer (i) health plans which include multiple health systems in-network and (ii) health plans that exclude AAH. Plaintiffs also do not allege that any Network Vendor sought to introduce some different type of network but AAH's contractual provisions prevented them from doing so.

Notably, though the Complaint goes to lengths to recount the supposed "high" prices that AAH allegedly charges for specific services, Plaintiffs elsewhere tacitly acknowledge that specific prices for specific procedures or treatments are not probative of anything because Network Vendors "negotiate with hospitals for bundles of services that will be available." Compl. ¶ 34. As courts have widely recognized, negotiations based on volume of purchases or bundles of services can provide procompetitive benefits. *See Methodist Health Servs. Corp. v.*

_____

[10] Indeed, the Complaint's own allegations suggest that many of the providers in "AAH Monopolized Inpatient Markets" cannot compete for patients because their facilities are smaller and do not offer services equivalent to those at AAH facilities, contradicting Plaintiffs' suggestion that it is the purportedly unlawful contractual provisions that have foreclosed competition. Compl. ¶¶ 62, 65, 67–69, 90–91.

*OSF HealthCare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (contracts that "limit the network of providers from which [insureds] obtain . . . health care" are "common[] and legal"; such agreements give payors "better rates from a hospital in exchange for agreeing" to the contract).[11]

Plaintiffs' failure to plead any facts suggesting that the allegedly unlawful contractual provisions have foreclosed competition in a substantial portion of any of the Complaint's alleged markets requires dismissal of the antitrust claims.

## III. COUNT II FAILS TO PLAUSIBLY ALLEGE ANY VIOLATION OF SECTION 2 OF THE SHERMAN ACT

In Count II of the Complaint, Plaintiffs allege a violation of Section 2 of the Sherman Act, which prohibits unlawful monopolization. Plaintiffs' Section 2 claim relies on the same failed vertical allegations as Count I and thus fails to state a viable antitrust claim for the same reasons addressed above.

In Count II, however, Plaintiffs additionally allege that AAH has monopoly power in eight purported geographic markets in rural Wisconsin counties, and that AAH uses the same vertical contractual provisions to maintain its monopoly power in those eight rural markets, and to leverage its monopoly power into other geographic markets where it faces substantial competition, such as Milwaukee, to charge higher rates. Compl. ¶¶ 229–31. But Plaintiffs fail to plausibly allege any relevant geographic market, or that AAH unlawfully acquired or maintained its monopoly power, both of which are requisite elements. *See Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (monopolization claim requires "the possession of monopoly power in the relevant market," as well as "the willful acquisition or maintenance of that power").

---

[11] *See also, e.g.*, *Cascade Health Sols. v. Peacehealth*, 515 F.3d 883, 895 (9th Cir. 2008) (all-or-nothing provisions can yield cost savings and buyers get discounts that allow them to "get more for less"); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1049 (8th Cir. 1999) ("Hospitals are willing to discount their stated rates to managed care payers in order to entice the managed care entity to send its enrollees to that hospital.").

Nor do Plaintiffs allege that AAH's "leveraging" has resulted in AAH obtaining monopoly power in the supposedly "leveraged" markets. The Complaint's monopolization claim should accordingly be dismissed.

### A. Plaintiffs Fail to Adequately Allege Relevant Geographic Markets

A plaintiff claiming monopolization must first define the relevant geographic market. *Sharif Pharmacy, Inc. v. Prime Therapeutics LLC*, 950 F.3d 911, 916 (7th Cir. 2020). The Complaint invokes hospital service areas drawn from *The Dartmouth Atlas of Healthcare* (the "Dartmouth HSAs"), a third-party source. Compl. ¶ 60. The Dartmouth HSAs are "a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area."[12] The HSAs are "defined by assigning ZIP codes to the hospital area where the greatest proportion of their Medicare residents were hospitalized." *Id*.

The Dartmouth HSAs are not plausible antitrust geographic markets. Referencing the ZIP codes where local residents *receive* most of their hospitalizations does not account for whether or where patients *could turn* for acute inpatient hospital services. *Sharif Pharmacy*, 950 F.3d at 917 ("The [geographic] market must correspond to the commercial realities of the industry.") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)). As other courts have recognized, a hospital's "trade area is not necessarily the relevant geographic market for purposes of antitrust analysis because geographic market evidence must take into account where consumers could practicably go, not on where they actually go." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir.

---

[12] FAQ, Dartmouth Atlas Project, https://www.dartmouthatlas.org/research-methods (last visited June 10, 2022). The contents of the *Dartmouth Atlas* website are properly before the Court on this Motion because they are incorporated by reference in the Complaint, which relies on the website's definition of HSAs. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (addressing the incorporation-by-reference doctrine).

2002).  Zip codes and other arbitrary boundaries cannot define the relevant market without some indication that "there are any legal or economic barriers to competition from areas immediately adjacent" to them.  *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 296 (7th Cir. 1974).

Moreover, Plaintiffs' allegations of "market share" in "AAH Monopolized Inpatient Markets," Compl. ¶¶ 59–72, make no sense and only underscore the deficient nature of the Complaint's market definition.  The percentage of admissions in a given region will automatically be artificially high in a narrowly drawn area that includes only one or two hospitals, such as a Dartmouth HSA, and consists, by definition, of zip codes where a majority of patients receive care from these one or two hospitals.[13]  The Complaint's failure to define a relevant geographic market with reference to the competitive options or substitutes that exist to which consumers can reasonably turn requires dismissal.  *See, e.g.*, *Sharif Pharmacy*, 950 F.3d at 916–17, 919 (dismissing complaint where plaintiff's proposed relevant market was not "comprised of the commodities reasonably interchangeable by consumers for the same purposes"); *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1012 (N.D. Ill. 2017) (same).

> **B.**     **Plaintiffs Do Not Allege that AAH Unlawfully Acquired or Maintained Its Monopoly Power, Nor Do Their "Monopoly Leveraging" Allegations State a Claim**

The Section 2 claim should also be dismissed because Plaintiffs fail to allege that AAH acquired or maintained its monopoly power "through anticompetitive conduct or exclusionary means."  *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1018 (E.D. Wis. 1999).  Only actual "anticompetitive" behavior can satisfy this element of a Section 2 claim.  *United States v.*

---

[13] Notably, the Complaint alleges those percentages based on Medicare data, even though Medicare and Medicaid services are explicitly excluded from Plaintiffs' proposed class definition.  Compl. ¶¶ 53, 62 n.1.

*Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *compare with Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir. 1990) ("A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient."). Here, Plaintiffs fail to plead any anticompetitive conduct, for multiple reasons.

***First***, the Complaint's allegations that AAH's prices are "higher" or "too high" or "supracompetitive" as compared to rivals do not, as a matter of law, constitute anticompetitive conduct. The law is clear that "setting a high price . . . is not in itself anti-competitive" within the meaning of Section 2 of the Sherman Act. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979)); s*ee also Lerma*, 52 F. Supp. 2d at 1020 (allegations that plaintiff will pay higher prices does not "equal anticompetitive conduct").[14]

***Second***, Plaintiffs unsuccessfully attempt to bolster their claim with allegations of other supposed "anticompetitive conduct," *e.g.*, charging a high price for a specialty service, building a new hospital to compete with an existing hospital in an area, acquiring the only existing hospital in a rural area, and encouraging intra-system referrals. Compl. ¶¶ 78, 89–91, 143–44, 149. These allegations get the Complaint no closer to alleging a viable Section 2 claim, as Plaintiffs merely cite several examples of conduct that is lawful on its face. *See, e.g.*, *Lerma*, 52 F. Supp. 2d at 1018 ("The Supreme Court has indicated that neither growth or development as a consequence of a superior product, nor business acumen, nor historic accident can be considered

---

[14] Plaintiffs' assertion that AAH charges high prices is not borne out by the Complaint either. The Complaint alleges high rates for certain *procedures*—such as appendectomies, angioplasties, and knee replacements—that Plaintiffs cherry pick based on amounts allegedly paid by an unnamed "major commercial network" and a "common commercial health plan." Compl. ¶¶ 185, 189. These allegations are entirely untethered from Plaintiffs' purported product market, which instead consists of a *bundle* of "broad group of medical and surgical diagnostic and treatment services" that Network Vendors contract for together. *Id.* ¶¶ 54–55.

illegal.").[15]   Because the Complaint fails to allege that AAH's prices are the result of anything other than ordinary competitive dynamics and otherwise lawful conduct, the Section 2 claim should be dismissed.  *See Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("[E]ven a monopolist is entitled to compete; it need not lie down and play dead . . . . Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal.").

**Third**, Plaintiffs' assertion that AAH "leverages" its market power over the eight defined inpatient markets in rural regions in order to charge "supracompetitive" prices in other markets where it faces substantial competition, such as Milwaukee and Green Bay, is not only illogical, but it fails to state a claim.  Compl. ¶¶ 77, 188, 231.  "Monopoly leveraging" is "not a standalone theory of liability under Section 2."  *Simon & Simon, PC v. Align Tech., Inc.*, No. 19-506, 2020 WL 1975139, at *9 (D. Del. Apr. 24, 2020).  Instead, Plaintiffs must plausibly allege that AAH attained a monopoly position in a second market through anticompetitive conduct.  *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1150 (D. Or. 2018) (requiring allegations that defendant "obtained monopoly power in the second market"); *see also Verizon Commc'ns Inc.*, 540 U.S. at 415 n.4; *Schor v. Abbott Lab'ys*, 457 F.3d 608, 613 (7th Cir. 2006) ("As long as rivals continue to sell, and no second monopoly is in prospect, the search for the rare situation in which that second monopoly just might allow the firm to gain a profit by injuring consumers is not worth the candle.").  Such allegations are wholly absent from the Complaint and, if anything, Plaintiffs' own averments are at odds with any such theory.

---

[15] Similarly, confidentiality provisions, which Plaintiffs pejoratively label as "gag clauses," protect competitively sensitive information from competitors, such as prices and negotiation tactics.  As such, these provisions actually *enhance* competition and decrease the likelihood that competitors can coordinate on prices. *See, e.g.*, *W. Fuels-Ill., Inc. v. Interstate Com. Comm'n*, 878 F.2d 1025, 1030 (7th Cir. 1989) (recognizing "the possible collusive effects of the disclosure of contract price terms").

Plaintiffs themselves allege that AAH confronts a "healthy level of competition" in Milwaukee from other major health systems, Compl. ¶ 178, such as Froedtert, Ascension, and ProHealth, that AAH faces "ostensible competition from three other non-AAH hospitals in Green Bay," *id.* ¶ 193, and that AAH faces "some competition" in the remaining markets, *id.* ¶ 75. Plaintiffs' half-baked monopoly leveraging theory is easily rejected.

## IV. COUNT III DOES NOT PLAUSIBLY ALLEGE ANY CLAIM FOR ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT

Count III alleges that AAH has "attempted" to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA by imposing vertical contractual restraints in its contracts with Network Vendors, as referenced earlier in the Complaint. Compl. ¶ 236–37. For purposes of this Section 2 claim, Plaintiffs must allege "(1) . . . specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

As a threshold matter, Count III fails for several obvious reasons. Although Plaintiffs assert that Count III arises from the same purported contractual provisions that form the basis of Counts I and II, Plaintiffs' actual allegations center on the opening of AAH Summit in 2010 in the Oconomowoc HSA. *See* Compl. ¶ 151–56. Such conduct cannot form the basis of an antitrust claim because the facility was opened ***twelve years ago***—well beyond the statute of limitations. And, of course, opening a new hospital *increases* competition, and is precisely the type of conduct that antitrust law seeks to protect. *See Cargill, Inc. v. Monfort of Colo. Inc.*, 479 U.S. 104, 116 (1986) ("[C]ompetition for increased market share, is not activity forbidden by the antitrust laws. It is simply . . . vigorous competition."). Moreover, Plaintiffs do not allege they

are a customer in the Oconomowoc HSA, and therefore Plaintiffs have no standing to assert this claim. *See* Section I, *supra* at 9–10.

In addition, Plaintiffs do not sufficiently allege the elements of a claim for attempted monopolization. To begin with, Plaintiffs fail to adequately allege that the Oconomowoc HSA is a properly defined relevant geographic market for the same reasons discussed in Section III, *supra* at 18–19. In addition, opening a new facility—increasing output—is procompetitive conduct that fails to meet the anticompetitive conduct element as a matter of law. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 448 (1993) ("The law directs itself only against conduct that unfairly tends to destroy competition, and, thus, courts have been careful to avoid constructions of § 2 which might chill competition rather than foster it.").

Nor do Plaintiffs allege plausible facts that would show AAH had a "specific intent" to monopolize the Oconomowoc HSA. The Complaint offers nothing more than a rote legal conclusion, that by "imposing [the alleged vertical restraints]," AAH allegedly somehow has demonstrated "its intent to monopolize the market for acute hospital care in the Oconomowoc HSA." Compl. ¶ 238. This conclusory assertion does not suffice to allege that AAH intended to "destroy competition [or] build monopoly." *G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436, 1473 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985 (7th Cir. 1989).[16]

---

[16] The Complaint's allegation that AAH's entry into the Oconomowoc HSA is part of some "broader trend of AAH entering markets that do not have adequate demand with the goal of suppressing competition," Compl. ¶ 150, does not fill this gap. Plaintiffs are asking this Court to infer AAH's anticompetitive intent to suppress competition from AAH opening a hospital in 2010 where a market allegedly lacked "adequate demand." *See id.* ¶ 151. But the Complaint supports no such inference: the overall number of inpatient visits in the Oconomowoc HSA is alleged to have increased substantially over the last twelve years since AAH opened the hospital. *See id.* ¶ 154. It is well-settled that AAH's entrepreneurial prudence to "expand [its] business," *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986), is lawful under the Sherman Act.

Finally, Plaintiffs do not adequately allege AAH has a "dangerous probability" of obtaining monopoly power in Oconomowoc. *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989) (plaintiff must allege sufficient market power to threaten actual monopolization). According to the Complaint, AAH's allegedly anticompetitive contractual provisions have been in effect since AAH first built a new hospital in the Oconomowoc HSA in 2010. Plaintiffs aver that AAH's rival, Oconomowoc Memorial, has "lower prices" but "very thin margins," and may close or downsize as a result. *See* Compl. ¶ 155. But Plaintiffs do not allege how the purported contractual provisions or AAH's other alleged conduct has caused Oconomowoc Memorial's supposed financial distress. Indeed, the Complaint offers no reason why Oconomowoc Memorial cannot raise its prices. Plaintiffs accordingly fail to allege any facts that would plausibly suggest AAH has developed sufficient market power to create a monopoly. *See Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir. 1985).

## V.     PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED

Plaintiffs assert in Counts IV, V, and VI of Complaint that AAH violated the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1) and (2), based on the same meager allegations underpinning their federal claims. The Wisconsin Antitrust Act was intended to be a state-level analog of the Sherman Act. *Lerma*, 52 F. Supp. 2d at 1015–16. The analysis of Plaintiffs' claims for restraint of trade, monopolization, and attempted monopolization under the Wisconsin statute thus tracks the analysis of Plaintiffs' claims under federal law. *See Roumann Consulting Inc. v. Symbiont Constr., Inc.*, No. 18-C-1551, 2019 WL 3501527, at *11 (E.D. Wis. Aug. 1, 2019) (noting that Wisconsin courts have construed "Wis. Stat. § 133.03(1) . . . in conformity with federal cases decided under the Sherman Act"); *Lerma*, 52 F. Supp. 2d at 1015–16 (Wisconsin's antitrust law

for monopolization and attempted monopolization under Wis. Stat. § 133.03(2) "is generally controlled by federal court decisions regarding [§ 2 of] the Sherman Act").

Because the analyses are the same in all material respects, Plaintiffs fail to state a claim for restraint of trade, monopolization, or attempted monopolization under the Wisconsin Antitrust Act for the same reasons discussed in Sections II–IV, *supra* at 10–24. Counts IV, V, and VI of the Complaint should accordingly be dismissed. *See, e.g.*, *Roumann Consulting Inc.*, 2019 WL 3501527, at *11 (dismissing Wisconsin law claim for failure to plead anticompetitive conduct); *Lerma*, 52 F. Supp. 2d at 1015–16 (same).

## VI. PLAINTIFFS' ALLEGATIONS RELATING TO CONDUCT BEYOND THE STATUTE OF LIMITATIONS SHOULD BE REJECTED

Lastly, the Complaint runs afoul of the statute of limitations by invoking alleged conduct that took place well outside the relevant limitations period. The relevant statute of limitations is four years under federal law, and six years under state law.[17] *See* 15 U.S.C. § 15b; Wis. Stat. § 133.18(2). Yet Plaintiffs assert a variety of allegations concerning AAH's conduct that fall well outside the limitations periods, in some cases by decades.

For example, each and every count of the Complaint relies on the theory that AAH's contracts include allegedly unlawful provisions. That assertion relies, in turn, on alleged conduct or events that in most instances occurred well beyond the relevant limitations period, *see, e.g.*:

- **2013**: lawsuit related to call coverage policy filed, Compl. ¶ 127;

- **2008**: AAH allegedly pressured Network Vendor to cease doing business with a TPA, *id*. ¶ 106;

---

[17] These same time periods are applicable to Plaintiffs' request for injunctive relief even though the doctrine of laches applies, rather than the statute of limitations. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085–86 (9th Cir. 2014) ("four-year statute of limitation" serves as the "guideline" for "computing the laches period."); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 717 n.13 (4th Cir. 2021) (same).

- **Pre-2008**: AAH allegedly sought to pressure a network that did not include AAH facilities, *id*. ¶ 107;

- **2007**: AAH settled lawsuit with WPS related to "all-plans" provisions, *id*. ¶ 94;

- **2006**: Milwaukee Journal Sentinel reported on "all-plans" language in AAH contracts, *id*. ¶ 98.

Similarly, Plaintiffs attempt to bolster their claims for monopolization and attempted monopolization by citing to conduct that occurred nearly a decade or more ago, *see, e.g.,*:

- **2013**: AAH acquired Manitowoc Surgery Center, *id*. ¶ 161;

- **2010**: AAH acquired physician practices, including radiology practice, *id*. ¶ 160;

- **2010**: AAH opened Aurora Summit Medical Center in Oconomowoc, *id*. ¶ 151;

- **2008**: AAH acquired Comprehensive Cardiovascular Care Group, *id*. ¶ 147;

- **2007**: AAH announced affiliation agreement with Advanced Healthcare, *id*. ¶ 148.

All of this alleged conduct is outside the statute of limitations period under both federal and state law. The Court should bar Plaintiffs from pursuing their claims insofar as they are based on conduct from outside the relevant limitations periods. *See Logan v. Wilkins*, 644 F.3d 577, 582–83 (7th Cir. 2011) (affirming district court's dismissal of claim as time-barred, noting that when "allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim"); *Century Hardware Corp. v. Powernail Co.*, 282 F. Supp. 223, 225 (E.D. Wis. 1968) (dismissing antitrust complaint on the pleadings where "the action would be barred by limitations" based on "the facts stated in the complaint").

## VII. THE COMPLAINT'S COUNT SEEKING INJUNCTIVE AND OTHER RELIEF SHOULD BE DISMISSED

The Complaint's final count, Count VII, seeks injunctive, equitable, and/or declaratory relief. The Court should dismiss this count, because it is not a standalone claim, but rather an attempt to obtain remedies on the Complaint's underlying causes of action, which fail for all of the reasons addressed above. *See* Sections I–V, *supra* at 6–25; *Knutson v. Village of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("[I]njunctive relief . . . is a remedy, not a cause of action, and thus should not be pleaded as a separate count."); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) (Clayton Act's provision allowing private antitrust plaintiffs to seek injunctive relief "does not furnish an independent cause of action . . . . [r]ather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws").

## CONCLUSION

Plaintiffs fail to plausibly allege that they are the proper parties to bring this case or that they were injured by allegedly unlawful provisions in contracts between AAH and Network Vendors or physicians, let alone that their injury is of the type that the antitrust laws are intended to prevent or that such conduct foreclosed competition in any market in which AAH participates. Plaintiffs' failure to plead any of the basic facts that would sustain their antitrust theories requires that the Complaint be dismissed in its entirety, with prejudice.

Date: July 29, 2022

/s/ Daniel E. Conley
Daniel E. Conley
Nathan J. Oesch
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: 414.277.5000
Fax: 414.271.3552
daniel.conley@quarles.com
nathan.oesch@quarles.com

Matthew Splitek, SBN 1045592
QUARLES & BRADY LLP
33 E Main St, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Fax: 608.251.9166
matthew.splitek@quarles.com

Jane E. Willis
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Telephone: 617.951.7000
Fax: 617.951.7050
jane.willis@ropesgray.com

Anne Johnson Palmer
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111
Telephone: 415.315.6300
Fax: 415.315.6350
anne.johnsonpalmer@ropesgray.com