## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

URIEL PHARMACY HEALTH AND WELFARE PLAN;
URIEL PHARMACY, INC.; HOMETOWN PHARMACY;
and HOMETOWN PHARMACY HEALTH AND WELFARE BENEFITS PLAN,
on their own behalf and
on behalf of all others similarly situated,

        Plaintiffs,

        v.

ADVOCATE AURORA HEALTH, INC.
and AURORA HEALTH CARE, INC.

        Defendants.

Case No. 2:22-cv-610

---

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

---

**HANSEN REYNOLDS, LLC**
Timothy Hansen
James Cirincione
John McCauley
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Email: thansen@hansenreynolds.com
jcirincione@hansenreynolds.com
jmccauley@hansenreynolds.com
**Counsel for Hometown Pharmacy, Hometown Pharmacy Health and Welfare Benefits Plan, Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

**BELL GIFTOS ST. JOHN LLC**
Kevin M. St. John, SBN 1054815
5325 Wall Street, Suite 2200
Madison, WI 53718
Ph: (608) 216-7990
Email: kstjohn@bellgiftos.com
**Counsel for Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

**FAIRMARK PARTNERS, LLP**
Jamie Crooks
Michael Lieberman
1825 7th Street NW, #821
Washington, DC 20001
Ph: (617) 642-5569
Email: jamie@fairmarklaw.com
michael@fairmarklaw.com
**Counsel for Hometown Pharmacy, Hometown Pharmacy Health and Welfare Benefits Plan, Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 4

    A.    Hospital and Insurance Markets.................................................................... 4

    B.    Hospital Systems With "Must Have" Facilities Can Charge Supracompetitive Prices Through Tying and Other Restrictions........................... 5

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.    THE COMPLAINT PLAUSIBLY ALLEGES A VIOLATION OF SECTION 1 OF THE SHERMAN ACT ..................................................................... 8

    A.    AAH Imposes Anticompetitive Contractual Restraints on Network Vendors ....................................................................................................... 8

    B.    The Complaint Plausibly Alleges Anticompetitive Effects .................................. 16

II.    THE COMPLAINT PLAUSIBLY ALLEGES A VIOLATION OF SECTION 2 OF THE SHERMAN ACT ................................................................... 20

    A.    The Complaint Plausibly Alleges a Monopolization Claim ................................. 20

    B.    The Complaint Plausibly Alleges Relevant Geographic Markets......................... 22

    C.    The Complaint Plausibly Alleges Market Power................................................. 25

    D.    The Complaint Plausibly Alleges Anticompetitive Conduct ............................... 27

III.    THE COMPLAINT PLAUSIBLY ALLEGES ATTEMPTED MONOPOLIZATION.................................................................................... 28

IV.    PLAINTIFFS HAVE ANTITRUST INJURY AND ANTITRUST STANDING ............ 29

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Andrx Pharm., Inc. v. Biovail Corp.*,
    256 F.3d 799 (D.C. Cir. 2001) ........................................................................ 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 7, 13

*Brown v. Budz*,
    398 F.3d 904 (7th Cir. 2005) ......................................................................... 10

*Davis v. HCA Healthcare, Inc.*,
    2022 NCBC 52 (N.C. Super. Ct. 2022) ............................................... 2, 17, 25

*Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*,
    2017 NCBC 32 (N.C. Super. Ct. 2017) ............................................................ 2

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
    753 F. Supp. 2d 792 (E.D. Wis. 2010) .......................................................... 12

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) ................................................................... 24, 25

*Great Escape, Inc. v. Union City Body Co.*,
    791 F.2d 532 (7th Cir. 1986) ......................................................................... 29

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
    425 U.S. 738 (1976) .......................................................................................... 8

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................................ 10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) .............................................................................................. 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................ 17

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ............................................................................ 8

*Lewis v. City of Chi.*,
    235 F.Supp.3d 1029 (N.D. Ill. 2016) ............................................................ 14

Case 2:22-cv-00610-LA   Filed 12/30/22   Page 3 of 36   Document 27

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016) ........................................................ 17

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ........................................................ 30

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*,
937 F.3d 1056 (7th Cir. 2019) ..................................................... 30

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ................................................ 18, 21

*Md. and Va. Milk Producers Ass'n v. United States*,
362 U.S. 458 (1960) ..................................................................... 22

*Menominee Indian Tribe v. Thompson*,
161 F.3d 449 (7th Cir. 1998) ....................................................... 11

*Methodist Health Servs. Corp. v. OSF HealthCare Sys.*,
859 F.3d 408 (7th Cir. 2017) ....................................................... 19

*Ohio v. Am. Express Co.*,
138 S.Ct. 2274 (2018) ................................................... 8, 16, 17, 18

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
381 F.3d 717 (7th Cir. 2004) ....................................................... 19

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) ................................................. 24, 25

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019) ................................................... 5

*Sidibe v. Sutter Health*,
667 F. App'x 641 (9th Cir. 2016) ......................................... 21, 23, 24

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) ........................................................................... 8

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ..................................................................... 18

*Toys "R" Us v. FTC*,
221 F.3d 928 (7th Cir. 2000) ....................................................... 26

*U.S. v. Anthem, Inc.*,
236 F.Supp.3d 171 (D.D.C. 2017) ............................................... 26

iii

*U.S. v. Charlotte-Mecklenburg Hosp. Auth.,*
 248 F.Supp.3d 720 (W.D.N.C. 2017) ................................................ 2, 6, 16, 17

*U.S. v. Grinnell Corp.,*
 384 U.S. 563 (1966) ................................................................................. 20

*U.S. v. H&R Block, Inc.,*
 833 F.Supp.2d 36 (D.D.C. 2011) ........................................................... 26

*U.S. v. Microsoft Corp.,*
 253 F.3d 34 (D.C. Cir. 2001) ..................................................... 18, 19, 20

*U.S. v. Rockford Mem'l Corp.,*
 898 F.2d 1278 (7th Cir. 1990) .......................................................... 24, 26

*U.S. v. Visa U.S.A., Inc.,*
 344 F.3d 229 (2d Cir. 2003) ................................................................... 27

*UFCW & Emps. Benefit Trust v. Sutter Health,*
 No. CGC-14-538451 (Cal. Super. Ct. Apr. 15, 2016) ............................... 2

*Vasquez v. Ind. Univ. Health, Inc.,*
 40 F.4th 582 (7th Cir. 2022) .......................................................... 3, 23, 24

*Watkins v. United States,*
 854 F.3d 947 (7th Cir. 2017) .................................................................. 11

**Statutes**

15 U.S.C. § 1 ................................................................................................. 8

15 U.S.C. § 15(a) ......................................................................................... 29

15 U.S.C. § 2 ............................................................................................... 20

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................... 7

**Treatises**

J. Kalinowski, *Antitrust Laws and Trade Regulation*, (2d ed. 2022) ........................................... 17

iv

# INTRODUCTION

Milwaukee has the fourth highest prices for healthcare in the entire country—higher even than New York City. Those high prices, and similarly high prices throughout Eastern Wisconsin, directly result from anticompetitive conduct engaged in by defendants Advocate Aurora Health, Inc. and Aurora Health Care, Inc. (collectively, "AAH"), who operate the region's dominant hospital system. AAH's unlawful scheme has caused Wisconsin employers, unions, and local governments to overpay for healthcare by hundreds of millions of dollars each year, and it has allowed AAH—a nominal non-profit—to rake in $1.5 billion in annual profits.

AAH's anticompetitive conduct is enabled by its ownership of several "must-have" hospitals in Eastern Wisconsin. Commercial health plans have no choice but to include these must-have hospitals in their networks because they are the only hospitals in their respective regions. AAH uses these indispensable facilities to operate a textbook tying scheme: It refuses to allow health plans to include its must-have hospitals in their networks unless the plans also include every other AAH hospital, at prices substantially higher than the market would otherwise bear. This "all-or-nothing" requirement frees AAH's hospitals in non-monopolized markets (like Milwaukee) from competitive pressures that would normally drive down their prices. As a result, employers with self-funded health plans, like Plaintiffs and other members of the proposed class, are forced to pay supracompetitive prices whenever their employees receive services at AAH facilities.

If that were all that AAH did, employers with self-funded health plans might mitigate the harm by incentivizing employees to avoid AAH's overpriced facilities and receive care from a lower-cost rival. But AAH blocks that path too: It forces health plans to accept "anti-steering" and "anti-tiering" restrictions, which prohibit plans from incentivizing employees to seek care from other systems. Thus, even though AAH's facilities are more expensive than rival hospitals and offer no better quality of care, employers cannot steer their employees to cheaper or higher-

1

quality options. The result is that self-funded health plans pay AAH's supracompetitive prices more often than they would absent AAH's mandated contractual restraints.

These all-or-nothing and anti-steering restraints, along with other conduct alleged in the First Amended Class Action Complaint, ECF 21 ("Complaint"), plainly violate the antitrust laws. The purpose of antitrust law is to promote competition and drive prices down; the purpose of AAH's conduct is to suppress competition and keep prices high. Indeed, multiple courts have already held that allegations against dominant hospital systems like those in the Complaint state a Sherman Act claim. *See Davis v. HCA Healthcare, Inc.*, 2022 NCBC 52 (N.C. Super. Ct. 2022); *U.S. v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F.Supp.3d 720 (W.D.N.C. 2017) ("*Atrium*"); *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC 32 (N.C. Super. Ct. 2017); Order, *UFCW & Emps. Benefit Trust v. Sutter Health*, No. CGC-14-538451 (Cal. Super. Ct. Apr. 15, 2016). Contrary to AAH's distorted caricature of the Complaint, Plaintiffs do not allege that merely having monopoly power or being a "big" hospital system, without more, constitutes an antitrust violation. Instead, the Complaint takes aim at AAH's concerted (and successful) effort to leverage its monopoly power to impose vertical restraints on insurers that insulate AAH from the competitive process and allow its hospital system to extract supracompetitive profits throughout its service area, even in areas where it nominally faces competition. Schemes like AAH's are neither novel nor implausible, and they are very much illegal.

AAH's lead argument—that the Complaint does not plausibly allege that the challenged restraints actually appear in its contracts with Network Vendors—is hard to take seriously: The Complaint's factual allegations are detailed, sourced, supported by data, and eminently plausible. They include AAH's in-court admission that it has used the challenged provisions; verbatim quotes of the challenged provisions in AAH's contracts; statements from industry insiders confirming that

AAH insists on the challenged provisions in all its contracts; media reports that AAH currently imposes the challenged provisions; and market conduct that could not otherwise be rationally explained. It is difficult to fathom what more Plaintiffs could allege without inducing a Network Vendor to breach the gag clauses that AAH also imposes. And, of course, if AAH's contracts with Network Vendors really did not contain the alleged provisions, AAH could have attached those contracts to its motion (under seal or otherwise). AAH did not.

AAH's other arguments fare no better. With respect to Plaintiffs' Section 1 claim (restraint of trade), AAH argues that the Complaint does not allege "substantial foreclosure," but such allegations are required only in exclusive-dealing cases. AAH's contrary argument deceptively misrepresents the cases on which it relies. In any event, the Complaint amply alleges foreclosure. With respect to Plaintiffs' Section 2 claim (unlawful monopolization), AAH's nitpicking of the Complaint's geographic markets and market-share allegations is foreclosed by the Seventh Circuit's repeated admonition that "[t]he motion-to-dismiss stage does not lend itself to rigorous [market definition] analysis," *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 586 (7th Cir. 2022), and in any event AAH's arguments are unpersuasive on their own terms.

The most telling part of AAH's brief is in its attempted monopolization argument, where it blithely asserts that its rival might survive if it just "raise[s] its prices." MTD at 23. That is not how competition is supposed to work. Competition between two hospitals should force the overpriced hospital—here, AAH—to lower its prices or lose business. AAH's conduct has turned that dynamic on its head, allowing it to capture market share and force out rivals despite charging higher prices for the same or lower-quality services. The solution is not for rivals to raise their prices and inflict further harm on employers and patients in Eastern Wisconsin, but for AAH to stop abusing its monopoly power and to cease its unlawful restraints of trade.

3

## FACTUAL BACKGROUND

### A.      Hospital and Insurance Markets

The market for hospital services is different from other markets because consumers (*i.e.*, patients) typically do not pay the full cost of the services they consume—and often do not even know the price of those services in advance.  Compl. ¶ 30.  That is because many businesses, local governments, and unions provide health insurance plans to their employees or members, and those health plans pay for hospital services on their behalf.  Some employer-sponsored health plans are "fully insured" plans, in which the employer and/or employee pay premiums to an insurance company, which in turn pays bills from hospitals.  *Id.* ¶ 31.  Other employer-sponsored health plans—including the ones at issue here—are "self-funded" plans, in which employers themselves pay hospital bills for their employees.  *Id.*  Both types of plans are referred to as "commercial health plans."

The prices that commercial health plans pay are determined in negotiations with providers of medical services, like hospitals.  The negotiated prices are called "allowed amounts."  *Id.* ¶ 33.  For obvious practical reasons, employers with self-insured plans cannot negotiate with every medical provider in every geographic region where their employees or members might seek care.  Instead, entities called "Network Vendors" assemble insurance networks by negotiating prices with providers, and self-funded health plans then pay these Network Vendors to "rent" or access their networks.  *Id.* ¶ 36.  This is what it means for a provider to be "in-network" for a health plan—an in-network provider is one that negotiated an "allowed amount" with the health plan or its Network Vendor, and one at which employees know their insurance will be accepted.  *Id.* ¶ 34.  Going to an "out of network" provider, in contrast, means "much higher costs and uncertainty."  *Id.*

Network Vendors tend to be large insurance companies like Aetna, Anthem Blue Cross Blue Shield, and Cigna, which also act as insurers to fully insured plans and thus have the scale

4

and technical knowledge to build networks. *Id.* ¶ 36. When they negotiate prices with hospitals, Network Vendors typically negotiate for bundles of services that will be in-network services for the self-funded health plans that rent the network. *Id.* ¶¶ 39, 40. In competitive markets—markets in which multiple hospitals offer services that health plans need or want to offer their members— Network Vendors will contract with a hospital for a bundle of services only when the hospital's services are competitively priced and of sufficiently high quality. *Id.* ¶ 41. Hospitals therefore compete on price and quality to have their services selected as in-network by Network Vendors. Network Vendors must also build networks with an adequate number of providers. Employees generally insist on receiving their healthcare near where they live or work, so a network will not be commercially viable if employees would have to travel long distances to receive services at in-network rates. *Id.* ¶¶ 37, 41, 42. If a Network Vendor's network is insufficiently extensive, self-funded plans will contract with a different Network Vendor that built a larger network.

**B.    Hospital Systems With "Must Have" Facilities Can Charge Supracompetitive Prices Through Tying and Other Restrictions.**

The competitive dynamics are different when there is only one hospital in a geographic region. In that case, Network Vendors are forced to include that hospital in-network, because networks would not be commercially viable if they did not offer in-network access to the only hospital in a region where a health plan's members work or live. *Id.* ¶ 46. These hospitals are known as "must have" hospitals. *See Sidibe v. Sutter Health*, 333 F.R.D. 463, 470 (N.D. Cal. 2019). AAH owns several such hospitals in Eastern Wisconsin. *See* Compl. ¶¶ 69-82.

When a hospital system like AAH owns one or more must-have hospitals, it has the power to use those facilities as leverage to impose a form of tying called all-or-nothing contracting: The system will not allow Network Vendors to include the must-have facilities in their networks unless they also include the system's other facilities that *do* face competition, at higher allowed amounts

5

than those other facilities could normally demand. *Id.* ¶¶ 4-19, 47-48. Absent the all-or-nothing restraint, Network Vendors would not include these overpriced facilities in their networks (which would force those facilities to lower their prices or improve their quality), but because the hospital system has tied those facilities to its must-have facilities, Network Vendors have no choice but to include them in-network. *Id.* All-or-nothing contracting by a system with must-have facilities raises prices by eliminating the competitive forces that would normally require the system to lower its prices. *Id.* AAH imposes all-or-nothing requirements on Network Vendors. *Id.* ¶¶ 100-09.

All-or-nothing provisions do not, standing alone, preclude Network Vendors from including additional hospitals in their networks.[1] In theory, then, Network Vendors could limit the harm caused by all-or-nothing provisions by guiding (or "steering") members in the tied markets toward lower-cost providers that offer the same or higher quality care. Steering typically consists of "offering financial benefits (*e.g.*, lower co-pays or more preferential risk-sharing) when patients choose lower-cost providers." *Id.* ¶ 50. One form of steering is "tiering," in which a Network Vendor creates an insurance plan with multiple "tiers," places high-quality, lower-cost providers in higher tiers than more expensive and/or lower-quality providers, and incentivizes plan members to choose providers in a higher tier. *Id.* Steering "significantly lower[s] costs for healthcare, with no corresponding reduction in health outcomes." *Id.* ¶ 51.

Dominant hospital systems like AAH, however, have prevented Network Vendors and health plans from engaging in these cost-saving measures by imposing anti-steering restrictions in their contracts. *Id.* ¶¶ 50, 52. These restrictions require health plans to grant the dominant system most-favored-nation status, preventing plans from incentivizing their members to choose a different hospital. *Id.* ¶ 52; *see Atrium*, 248 F.Supp.3d at 723-24. There is a bipartisan consensus

---

[1] For this reason, AAH's all-or-nothing contracting is not a form of "exclusive dealing," a different kind of vertical restraint that forbids contracting with competitors.

that anti-steering provisions reduce competition and harm consumers. Compl. ¶¶ 53-56. AAH imposes anti-steering provisions on Network Vendors. *Id.* ¶¶ 118-29.

Dominant hospital systems also engage in other behaviors that suppress competition and harm consumers. AAH, for example, uses "all plans" clauses, gag clauses, referral restrictions, non-competes, and other restraints. *Id.* ¶¶ 100-09, 130-50. Among other anti-competitive effects, these restraints "block rival providers from their main cost-effective means of competing on cost and quality of care, substantially constrain the choices of consumers and health plans by limiting pricing and quality of care information, remove incentives for new providers to enter the market, and bar network vendors and [Third Party Administrators] from developing lower-cost network options to compete with their rivals." *Id.* ¶ 57. These restrictions, especially in the aggregate, inhibit competition, decrease consumer choice, increase prices, and lower quality of care in both the markets in which AAH has monopoly power and the markets in which it faces competition.

## LEGAL STANDARD

To state a claim, a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "formulaic recitation of the elements of a cause of action" is not enough, the complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations simply must give the defendant "fair notice." *Id.* In assessing a motion to dismiss, courts assume the truth of well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). This is a *plausibility* standard, not a *probability* standard: The complaint needs only to "raise a right to relief above the speculative level," and a case may proceed "even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In antitrust cases, "where the proof is largely in the hands of the alleged conspirators,

dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976).

## ARGUMENT

### I. THE COMPLAINT PLAUSIBLY ALLEGES A VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

Section 1 of the Sherman Act prohibits "[e]very contract, combination … , or, conspiracy, in restraint of trade." 15 U.S.C. § 1. Despite the Act's expansive language, the Supreme Court has interpreted § 1 to outlaw only "unreasonable" restraints of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Most Section 1 claims are accordingly analyzed under the "rule of reason," which asks whether "the questioned practice imposes an unreasonable restraint on competition." *Id*. A challenged restraint is *prima facie* "unreasonable" if it produces "anticompetitive effects" in the relevant market. *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). Examples of "anticompetitive effects" include "reduced output, increased prices, or decreased quality." *Id*. In applying the rule of reason, courts "look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). Here, the Complaint alleges that the vertical restraints AAH imposes on Network Vendors and self-funded health plans violate Section 1 of the Sherman Act under the rule of reason.[2]

#### A. AAH Imposes Anticompetitive Contractual Restraints on Network Vendors.

The Complaint plausibly alleges the first element of a Section 1 restraint-of-trade claim—namely, the existence of "a contract, combination, or conspiracy." AAH knows that Network Vendors need to include AAH's must-have hospitals in Elkhorn, Burlington, Hartford, Marinette, Two Rivers, Sheboygan, Plymouth, and/or Port Washington to make their networks commercially

---

[2] The Complaint also alleges that AAH's tying is unlawful *per se*, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), but the Court need not decide now which rule to apply.

viable. *See* Compl. ¶¶ 67-85, 92-99. But AAH does not allow Network Vendors to include those hospitals in their networks unless they *also* include AAH's facilities in areas of Wisconsin where AAH does face competition, including Milwaukee and Green Bay, even though those facilities are supracompetitively priced and Network Vendors would prefer not to include them in their networks. *Id.* ¶¶ 83-85, 100-09. This is the "all or nothing" requirement. AAH then imposes other contractual restraints to enhance the impact of its tying scheme. The all-plans requirement forces Network Vendors to include all AAH facilities in *all* of their plans, preventing them from building lower-priced, narrow-network plans. *Id.* ¶¶ 103-09. AAH's anti-steering/anti-tiering restrictions prohibit Network Vendors and health plans from incentivizing members to use lower-priced, higher-quality facilities. *Id.* ¶¶ 118-29. AAH's gag clauses suppress price competition and prevent scrutiny of AAH's contracting practices. *Id.* ¶¶ 144-50.[3] And AAH's non-competes and referral restrictions prevent lower-cost competitors from entering the market. *Id.* ¶¶ 130-43.

In its discussion of antitrust standing and again in its discussion of Plaintiffs' Section 1 claim, AAH argues that the Complaint "does not plausibly allege that AAH imposed unlawful contractual provisions in its agreements with Network Vendors." MTD at 10; *see* MTD at 7-8. To be clear, AAH does not argue here that its contractual restrictions are lawful, but that Plaintiffs failed to plausibly allege that they *exist*. That argument is meritless. The Complaint does not rely on "threadbare recitals" or "conclusory statements," and it does not just assert that the provisions

---

[3] AAH asserts—remarkably—that Plaintiffs do not "allege that such [gag] clauses were introduced by AAH, rather than the Network Vendor." MTD at 12-13. That assertion, like many similar "no allegation" assertions in AAH's brief, is demonstrably false. *See* Compl. ¶ 144 ("AAH insists on strict gag clauses with Network Vendors."); *id.* ¶ 147 ("AAH has required terms in its agreements with Network Vendors that forbid them from disclosing the allowed amounts that AAH has negotiated … [and] other, non-price terms."); *id.* ¶ 240 ("That market power has enabled AAH to impose … Gag Clauses …."); *id.* ¶ 248 ("[AAH used] its market power in those geographies to impose on Network Vendors … Gag Clauses."); *id.* ¶ 263 ("That market power has enabled AAH to impose anticompetitive vertical restraints such as … Gag Clauses …."); *id.* ¶ 270 ("It did so by using its market power in those geographies to impose on Network Vendors … Gag Clauses.").

exist and leave it at that. As detailed below, the Complaint includes specific allegations showing the plausibility that AAH imposes these restraints in its contracts with Network Vendors, including AAH's admissions that it has used the challenged provisions, Compl. ¶¶ 102-03, 132-33; a Network Vendor's statement that AAH imposes the challenged provisions on all other Network Vendors, *id.* ¶ 105; verbatim language from recent AAH contracts that include the challenged provisions, *id.* ¶ 126; statements from industry insiders about AAH's continued imposition of the challenged provisions, *id.* ¶¶ 106, 120-21, 136-40, 147; and multiple media reports that AAH insists on including the challenged provisions in its contracts, *id.* ¶¶ 101-07, 145, 171. In addition, the Complaint includes allegations of market conduct that can be rationally explained only if the challenged provisions exist, as well as pricing differentials for specific procedures that are possible only with the use of the challenged provisions. *Id.* ¶¶ 107-09, 125-29, 198, 201-203.

One point before delving into those details: To the extent AAH suggests the Complaint is deficient because its allegations with respect to Cigna's and Trilogy's contracts are made on "information and belief," *see* MTD at 2, 10, that suggestion is triply misguided. First, the only reason Plaintiffs could not quote verbatim from those contracts is because "AAH insists on strict gag clauses with Network Vendors," and those gag clauses forbid disclosure of the anti-competitive provisions at issue here. Compl. ¶¶ 144, 147-48. AAH cannot avoid antitrust scrutiny simply by keeping its contracts under lock and key. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("If private plaintiffs … are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information."). Second, "information and belief" pleading is precisely what the Federal Rules encourage where, as here, "pleadings concern matters peculiarly within the knowledge of the defendants." *Brown v. Budz*, 398 F.3d 904, 914

(7th Cir. 2005). Third, AAH's criticism is especially odd given that AAH has these contracts in its possession and was free to attach them to its motion. *See Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). If AAH's contracts really did not contain the anticompetitive provisions that AAH's prior admissions, numerous media reports, statements from other Network Vendors, statements from industry insiders, market conditions, and pricing data indicate they do, AAH could have simply attached those contracts to its motion, as they are clearly incorporated into the Complaint by reference.

In any event, the Complaint's detailed allegations about AAH's imposition of multiple contractual restrictions more than suffice to plead "a contract, combination, or conspiracy":

***All-or-Nothing and All-Plans***. The Complaint alleges that AAH imposes these requirements "in all or nearly all of its negotiations with Network Vendors," including Cigna and Trilogy. *Id.* ¶¶ 100-01. That is not speculation. AAH admitted, in prior litigation against a Network Vendor (WPS), that its contracts require *all* AAH facilities to be included in every one of a Network Vendor's networks. *Id.* ¶¶ 102-103. Indeed, AAH sued WPS specifically because WPS allegedly violated such a provision—*i.e.*, for "operating and marketing of plans without Aurora providers in violation of our agreement." *Id.* ¶ 103.[4] Within the context of that and related litigation, WPS confirmed that "every other major health insurer with which Aurora has contracted" has been forced to accede to the same terms. *Id.* ¶ 105. The fact that AAH has admitted to using all-or-nothing and all-plans contracting in the past—and that it considered those

---

[4] AAH notes that it settled its lawsuit against WPS in 2007, but the contract at issue ran for a 15-year term starting in 2001, making it direct evidence of all-or-nothing and all-plans contracting as recently as 2016. That contract is attached as Exhibit A. *See Watkins v. United States*, 854 F.3d 947, 949 (7th Cir. 2017) ("[I]n considering a motion to dismiss, courts may take judicial notice of facts readily ascertainable from the public court record.").

provisions sufficiently important to its business model that it sued a Network Vendor for allegedly violating them—makes it more than plausible that AAH uses such provisions today.[5]

The Complaint goes much further still, refuting several times over any suggestion that AAH's contract with WPS was unique or that AAH has stopped imposing such restraints. For example, the Complaint quotes from a 2020 AAH contract that includes materially identical all-or-nothing and all-plans language (along with anti-tiering restrictions). That contract demands that *all* AAH providers "shall be treated as a Tier 1 … provider … in *all* products offered." *Id.* ¶ 126 (emphasis added). That is precisely the kind of provision being challenged here. Media reports confirm that these provisions are ubiquitous in AAH contracts. For example, a recent Milwaukee Journal Sentinel investigation reported that AAH "has long used," and continues to use, "'all-or-nothing' clauses that require health plans to include all of a health system's hospitals in a network." *Id.* ¶ 101. An earlier article in the same newspaper similarly noted that "Aurora's contracts … require Aurora hospitals to be included in every health plan offered by an insurer or administrator." *Id.* ¶ 107. And a consultant with experience negotiating contracts with AAH likewise confirmed that AAH continues to treat its all-or-nothing and all-plans clauses as non-negotiable and forces them on Network Vendors—"you either sign it or [they] don't do business." *Id.* ¶ 106.

Market realities confirm these reports. As the Complaint alleges, "several major network vendors – including WPS, Trilogy, Cigna, and others – … continue to either include all overpriced AAH facilities in all their networks/plans or none in any." *Id.* ¶ 107. Absent the restraints alleged

---

[5] AAH argues that allegations about conduct outside the limitations period cannot add plausibility to allegations of unlawful conduct within the limitations period. MTD at 8 n.7, 10, 24-25. But AAH's cases say only that a plaintiff cannot *obtain relief* for violations from outside the limitations period. AAH cites no case holding that conduct outside the limitations period cannot enhance the plausibility of the allegations on which the plaintiff's claims are actually based—and it is for that purpose that they are offered here. *Cf. Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 753 F. Supp. 2d 792, 797 (E.D. Wis. 2010) (relying in part on 2003 and 2004 newspaper articles in holding that complaint filed in 2009 plausibly alleged Sherman Act violation).

here, Network Vendors would not include every overpriced AAH facility in their plans, as doing so makes their networks less attractive to their customers, who are stuck paying AAH's inflated rates even in markets where ample alternatives exist. *See id.* ¶¶ 83, 85, 103, 107. But that behavior is perfectly explained by AAH's imposition of all-or-nothing and all-plans requirements, which leave Network Vendors no choice. *See id.* ¶ 109. These marketplace realities *alone* represent a substantial improvement on the allegations in *Twombly*: Whereas the *Twombly* plaintiffs alleged parallel market conduct for which there was an "obvious alternative explanation," 550 U.S. at 567, the Complaint here alleges market conduct that makes *no sense* unless the alleged provisions exist. And, of course, the Complaint's market-related allegations do not stand alone.

***Anti-Steering and Anti-Tiering.*** AAH also imposes anti-steering and anti-tiering provisions to prevent Network Vendors and health plans from guiding their members toward lower-cost, higher-quality providers. Compl. ¶ 118-19. The Complaint alleges that AAH imposes these restrictions on Anthem, UnitedHealth, and "all or nearly all network vendors including Aetna, Cigna, Humana, Trilogy, Common Ground Healthcare, Wisconsin Physicians Service, United Healthcare, Quartz, and others." *Id.* ¶ 127. Once again, this is not speculation. Two of the largest insurers and Network Vendors in Wisconsin—Anthem and United HealthCare—independently confirmed that their contracts with AAH prohibit them from allowing employers to offer tiered health plans that would incentivize employees to seek out lower cost, higher quality care. *Id.* ¶¶ 120, 121. AAH's success in imposing those onerous restrictions on the largest Network Vendors undoubtedly makes it plausible that it also imposes them on smaller Network Vendors with far less bargaining power. *Id.* ¶ 122.[6]

---

[6] AAH repeatedly disparages the Complaint's sources as "unidentified" or its allegations as "hearsay," *see* MTD at 8, 11, 12, but it cites no rule or case requiring the identification of sources or prohibiting hearsay evidence at the pleading stage. No such rule exists. Rather, because the Court "must accept as true all factual statements alleged in the complaint …, whether the

Furthermore, when AAH does not outright prohibit tiering, it demands that it be placed in every plan's highest tier. *Id.* ¶¶ 125-26. This has the same effect—it prevents Network Vendors and health plans from using truthful information to steer patients toward non-AAH providers. *Id.* For example, an AAH contract executed in 2020 states that all AAH facilities "shall be treated as a Tier 1 (or the equivalent) provider." *Id.* ¶ 126. Similarly, the Complaint alleges that AAH prevented a Network Vendor from accessing *any* of AAH's facilities just because the "Network Vendor … wanted to direct patients to non-AAH radiology centers." *Id.* ¶ 127. This direct evidence of anti-steering and anti-tiering confirms the plausibility of Plaintiffs' allegations.

Once again, market realities confirm this evidence. In a recent review of several large commercial health plans, "AAH facilities are all listed in the top tier despite being higher-cost than nearby competitors." *Id.* ¶ 125. Health plans would not place AAH's highly overpriced facilities in the top tier—let alone do so uniformly—unless they were being forced to do so by contractual anti-steering/anti-tiering restrictions. AAH's imposition of these restraints is also clear from Network Vendors' use of tiered networks in markets in which AAH is *not* a provider. While "Trilogy, Cigna, Wisconsin Physician Service and other network vendors do not offer tiered networks in AAH service areas," several of them do so "outside of AAH's service area." *Id.* ¶ 128. Network Vendors' embrace of cost-saving tiered plans in other markets, but not in markets where AAH operates, indicates that AAH prohibits them from doing so. *Id.* ¶¶ 126-29. Finally, detailed data on procedure-level pricing differentials for joint replacements, colonoscopies, and CT scans cannot be explained absent anti-steering and similar vertical restraints. *Id.* ¶¶ 198, 201-203.

***Gag Clauses, Non-Competes, Referral Restrictions, and Other Tactics.*** AAH uses other tactics to suppress competition and increase prices. These tactics include insisting on strict gag

statements ... might constitute inadmissible hearsay when relied upon for the truth of the matters asserted is simply irrelevant." *Lewis v. City of Chi.*, 235 F.Supp.3d 1029, 1031 (N.D. Ill. 2016).

clauses that limit Network Vendors' ability to disclose contract terms to self-funded health plans, *id.* ¶ 144, forcing physicians into non-compete agreements that impede rivals from entering the marketplace, *id.* ¶¶ 130-35, retaliating against physicians who refuse to affiliate with AAH, *id.* ¶¶ 137-40, illegally paying physicians to keep referrals within the AAH system, *id.* ¶¶ 141-42, and suppressing innovative insurance products that would increase competition and lower prices, *id.* ¶¶ 110-117.  The Complaint thoroughly documents these tactics, supporting its allegations with factual detail about Plaintiffs' own experiences with AAH; statements by Network Vendors; AAH's own efforts to enforce a non-compete;[7] a lawsuit filed by physicians; statements from the American Academy of Family Physicians; reports from leading newspapers; and AAH's settlement of claims alleging the exact kinds of illegal referral payments alleged here.  *Id.* ¶¶ 130-47, 222-29.

AAH repeatedly denigrates these allegations as "threadbare."  Yet AAH's own brief makes clear what that term actually means: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  MTD at 6 (quoting *Iqbal*, 556 U.S. at 678).  AAH acts as if the Complaint alleges, without more, that "AAH imposes vertical restraints that are unlawful, and this caused Plaintiffs' injury."  But the Complaint does no such thing; far from threadbare assertions, the Complaint contains a tapestry of allegations showing that AAH's restraints exist, including pages of factual detail documenting AAH's own conduct, insider information, investigative reports, and the actual contractual language.  Given that "the pleading standard Rule 8 announces does not require detailed factual allegations," *Iqbal*, 556 U.S. at 678, Plaintiffs have more than met their burden to plausibly allege that AAH imposes these restraints.

---

[7] AAH suggests that this evidence—a lawsuit filed by AAH to enforce a non-compete of the very kind alleged here—is not probative because AAH lost the lawsuit.  But the question here is not whether the doctor in that specific case violated the non-compete; it is whether the Complaint plausibly alleges that AAH imposes such non-competes.  AAH's lawsuit surely proves that it does.

**B.      The Complaint Plausibly Alleges Anticompetitive Effects.**

The Complaint alleges, again with extensive factual detail, that these contractual restrictions have produced anticompetitive effects—namely, "increased prices" and "decreased quality." *Am. Express Co.*, 138 S.Ct. at 2284; *see* Compl. ¶¶ 184-220. Supported by pages and pages of pricing data, the Complaint alleges that AAH is by far the most expensive hospital system in Milwaukee, charging supracompetitive prices and significantly driving up the cost of healthcare throughout Eastern Wisconsin. *Id.* ¶ 192; *see id.* ¶¶ 10, 184, 206, 210-212, 213, 215-216, 222, 225, 227. For example, AAH's prices at its St. Luke's Hospital in Milwaukee for common surgeries like appendectomies and angioplasties are almost double those of Ascension St. Francis Hospital, a facility only 5 minutes away with similar quality ratings. *Id.* ¶¶ 195, 199. Similarly, AAH's price for a colonoscopy with biopsy—an extremely common procedure—is *more than double* the price at Froedtert Hospital, a competitor 15 minutes away with higher quality and safety ratings. *Id.* ¶ 200. Overall, AAH's prices at St. Luke's are 65% higher than the other large hospitals in the Milwaukee area, *id.* ¶ 193, resulting in Milwaukee having the fourth highest prices for healthcare in the country, *id.* ¶ 189; *see also id.* ¶¶ 189-205 (price data for Milwaukee); *id.* ¶¶ 206-20 (price data for other regions). These anticompetitive effects are glaring, pervasive, and unquestionably harmful to patients and health plans.

AAH does not presently dispute any of the Complaint's pricing data and does not deny that its own prices are substantially higher than its competitors' prices, even in areas like Milwaukee where it does not have a dominant market share. Nor does AAH deny that the Complaint plausibly alleges that the challenged restraints have resulted in decreased quality of care for patients, another classic antitrust harm. *See* Compl. ¶¶ 8, 10, 57, 104, 119, 120-21, 142, 151, 162, 166-68, 188, 196, 202, 209. Plaintiffs have therefore satisfied their burden to plead anticompetitive effects. *See, e.g.*, *Atrium*, 248 F.Supp.3d at 728-31 (holding that allegations of increased prices from anti-

steering provisions adequately pleaded anticompetitive effects); *Davis*, 2022 NCBC 52, at ¶¶ 64-69 (same).

AAH appears to question—or at least tries to create confusion about—whether increased prices qualify as an anticompetitive effect. *See* MTD at 14. To the extent AAH is actually making that argument, it is mistaken. Under the rule of reason, supracompetitive prices resulting from vertical restraints are prototypical "anticompetitive effects." This is not controversial. *See, e.g.*, 1 J. Kalinowski, *Antitrust Laws and Trade Regulation*, § 12.02[2][a] (2d ed. 2022) ("Whether a restraint has had an actual adverse impact on competition is determined by considering evidence of increased prices, … among other things."); *Am. Express Co.*, 138 S.Ct. at 2284 (listing "increased prices" as "proof of [a restraint's] actual detrimental effects on competition"); *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices.").

The cases AAH cites do not say otherwise. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896 (2007), *see* MTD at 14, simply explains why the rule of reason, instead of *per se* illegality, applies to most vertical restraints—namely, because some restraints that increase prices also have pro-competitive effects and thus might not violate the Sherman Act. AAH will have the opportunity to prove any such pro-competitive effects at trial. But at the pleading stage, Plaintiffs need only allege a *prima facie* case of anticompetitive effects, which they have done by alleging that the challenged restraints cause higher prices. *See Atrium*, 248 F.Supp.3d at 730. The other two cases AAH cites (at MTD 14 n.11), say only that high prices *alone* are not illegal—*i.e.*, that a plaintiff does not state a claim by asserting that a defendant's prices are high without also alleging anticompetitive conduct causing those high prices. Here, of course, Plaintiffs have alleged

not just high prices but that those high prices result from AAH's unlawful abuse of its monopoly power over must-have hospitals to impose multiple vertical restraints on Network Vendors.

AAH argues that that even if the Complaint plausibly alleges anticompetitive effects in the form of increased prices and decreased quality, it remains deficient because it does not *also* allege a *third* type of anticompetitive effect: "substantial foreclosure." *See* MTD at 14-16. The "substantial foreclosure" requirement, however, is a special rule that applies only to exclusive-dealing cases, which this case is not. The requirement applies in exclusive-dealing cases because in some instances, exclusive dealing can achieve pro-competitive benefits, like a guaranteed supply or a volume discount. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (for exclusive-dealing arrangement to be unlawful, "the opportunities for other traders to enter into or remain in that market must be significantly limited"); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (foreclosure requirement serves a "useful screening function" in exclusive-dealing cases because "exclusivity provisions ... may serve many useful purposes"). But the rule does *not* apply to restraints like AAH's, which do not preclude dealing with rivals but rather inhibit the competitive process by forcing Plaintiffs to purchase something they otherwise would not. Thus, as the Eleventh Circuit has explained, "[t]he difference between the traditional rule of reason and the rule of reason for exclusive dealing is that in the exclusive dealing context, courts are bound by *Tampa Electric*'s requirement to consider substantial foreclosure." *McWane, Inc. v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015). Outside the exclusive-dealing context, showing "substantial foreclosure" is not required; a plaintiff need only allege that the challenged restraints resulted in "reduced output, increased prices, or decreased quality." *Am. Express Co.*, 138 S.Ct. at 2284.

AAH does not cite a single case holding that the "substantial foreclosure" requirement applies outside the exclusive-dealing context. Instead, AAH misrepresents its own authorities in

an attempt to impose that requirement here. The case on which it principally relies, *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004), states that "*exclusive dealing arrangements* violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue." *Id.* at 737-38 (emphasis added). Both times AAH quotes the case, however, it omits the phrase "exclusive dealing arrangements" and uses a broader term—"a vertical contract," MTD at 2, or "vertical restraints," MTD at 14. AAH then repeats the gambit a third time with a different case, *Methodist Health Servs. Corp. v. OSF HealthCare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017), exchanging the phrase "an exclusive contract" for "the contract." MTD at 16. AAH's felt need to deceptively misrepresent its own authorities underscores the weakness of its position.

In any event, the Complaint is replete with allegations that AAH substantially foreclosed competition. Substantial foreclosure occurs not only when competitors are *entirely* excluded, but also when the restraint forecloses the primary means of competition. *See, e.g.*, *Microsoft Corp.*, 253 F.3d at 70 (finding foreclosure where Microsoft's exclusive arrangements "severely restricted [its rival's] access to those distribution channels leading most efficiently to the acquisition of browser usage share"). The Complaint alleges exactly that, demonstrating how AAH's restrictions foreclose competition on price and quality. AAH's all-or-nothing requirements substantially foreclose competition between hospitals for inclusion in insurance networks, as they force Network Vendors to include all AAH facilities in-network even if they are more expensive or lower quality than rival facilities. Compl. ¶¶ 100-09. AAH's all-plans requirements, moreover, foreclose rivals from competing to be made the exclusive provider in a "narrow network" plan, as Network Vendors cannot design and offer innovative insurance plans that do not include AAH in-network. *Id.* ¶¶ 104-09. AAH's anti-steering requirements further foreclose competition between different

in-network hospitals, because they preclude AAH's rivals from using their lower-priced, higher-quality care to win a spot as a network's preferred or "Tier 1" provider. *See id.* ¶¶ 57, 118-29, 150-52. And AAH's gag clauses eliminate Network Vendors' incentives to negotiate with providers for lower prices because Network Vendors can neither "disclos[e] the allowed amounts … to self-funded commercial health plans" nor learn about their rivals' allowed amounts so that they can provide comparative pricing data. *Id.* ¶¶ 147-150 & n.5. AAH's restraints thus all "harm the competitive *process* and thereby harm consumers," *Microsoft*, 253 F.3d at 58, who all pay more for healthcare than they would absent AAH's unlawful scheme, *see* Compl. ¶ 57. Even if the substantial foreclosure requirement applied, therefore, the Complaint has met it.

## II.    THE COMPLAINT PLAUSIBLY ALLEGES A VIOLATION OF SECTION 2 OF THE SHERMAN ACT.

### A.    The Complaint Plausibly Alleges a Monopolization Claim.

Section 2 of the Sherman Act prohibits firms from entrenching their existing monopoly power through anticompetitive means. 15 U.S.C. § 2. The monopoly offense under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

With respect to the first element, a relevant market is composed of both a product market and a geographic market. The product market here, which AAH does not challenge, is the market for acute inpatient hospital services—*i.e.*, the "broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital." Compl. ¶ 63. The geographic markets here are pleaded by reference to Hospital Service Areas ("HSAs") developed by *The Dartmouth Atlas of Healthcare*. Dartmouth HSAs are a "widely accepted proxy for market

definition for inpatient acute care services" and "are often used in the health care industry to define relevant markets." *Id.* ¶ 68. They have also been approved as acceptable geographic markets in other hospital antitrust litigation involving similar conduct. *See Sidibe v. Sutter Health*, 667 F. App'x 641, 643 (9th Cir. 2016). The Complaint defines the monopolized geographic markets as including the following HSAs: Elkhorn, Compl. ¶¶ 70-72, Burlington, *id.* ¶¶ 73-74, Hartford, *id.* ¶ 75, Marinette, *id.* ¶ 76, Two Rivers, *id.* ¶ 77, Sheboygan, *id.* ¶ 78, Plymouth, *id.* ¶ 79, and Port Washington, *id.* ¶ 80. The Complaint refers to these markets collectively as the "AAH Monopolized Inpatient Markets." *Id.* ¶ 69.

The Complaint alleges that AAH has monopoly power—the power to exclude competition or control prices—in each of these markets, where it "faces little to no competition" and owns "must-have" facilities. *Id.*; *see also id.* ¶¶ 86, 94. The Complaint supports those allegations with factual detail about AAH's share of inpatient admissions in each HSA, the closest hospital to AAH's facility in each HSA, various statements from market participants, and AAH's own statements and conduct demonstrating its market power. *Id.* ¶¶ 69-82, 86-99. For example, with respect to the Burlington HSA, the Complaint alleges that AAH controls over 78% of inpatient admissions; that AAH owns the only inpatient facility in Burlington; that the next closest inpatient facility is *also* owned by AAH; and that an insurance company in the region has stated that the AAH network "is a necessary component of any network sold to self-funded health plans in the Burlington HSA." *Id.* ¶¶ 73-74.

The Complaint also plausibly alleges the second element of a monopolization claim. Unlawful maintenance of a monopoly "is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." *McWane*, 783 F.3d at 837. Because Sections 1 and 2 of the Sherman Act

"closely overlap, … the same kind of predatory practices may show violations" of both. *Md. and Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 463 (1960). Here, the Complaint alleges that AAH has abused and maintained its monopoly power through many of the same anticompetitive restraints underlying the Section 1 claim, including all-or-nothing, all-plans, and anti-steering/tiering restrictions. Compl. ¶ 248. AAH's anti-steering and all-plans restrictions, for example, allow it to maintain monopoly power in the AAH Monopolized Inpatient Markets by stifling competition for both inpatient hospital services and outpatient services that can be provided outside of a hospital setting. Providers of such services could otherwise compete for preferred or "Tier 1" placement within networks or for exclusive placement in a narrow network, but AAH's restrictions foreclose both possibilities while allowing AAH to continue charging supracompetitive prices without losing market share. *See Id*. ¶¶ 82, 88, 104, 108, 125-29, 151-52.

The Complaint also alleges that AAH has used other anticompetitive tactics, including non-competes and referral restrictions, to abuse and maintain its monopoly power. For example, AAH has acquired outpatient facilities and then used them to suppress competition by requiring the doctors at the acquired facilities to refer patients exclusively to AAH facilities, thereby "eliminating a source of revenue for AAH competitors." *Id.* ¶ 156; *see id.* ¶ 158 (quoting report that AAH "has set the standard by buying up physician practices and clinics and forcing doctors to send patients to [its] hospitals"). In one case, AAH purchased a cardiology group and then paid those cardiologists to refer patients to higher-priced AAH facilities instead of its competitors' lower-priced and/or higher-quality facilities. *Id.* ¶ 160; *see also id.* ¶¶ 153, 159, 162-63.

## B. The Complaint Plausibly Alleges Relevant Geographic Markets.

AAH contends that the Complaint fails to plausibly allege relevant geographic markets. MTD at 17-18. At this stage of a case, such an argument faces a steep uphill battle: Because identifying a geographic market requires a fact-intensive analysis of consumer patterns and

preferences—an analysis invariably conducted by experts—it "is more appropriately addressed at summary judgment or trial" than on a motion to dismiss. *Sidibe*, 667 F. App'x at 643. Indeed, the Seventh Circuit recently reversed a district court's dismissal of an antitrust claim against a hospital based on the complaint's geographic-market definition, emphasizing that "[t]he motion-to-dismiss stage does not lend itself to rigorous [geographic market] analysis," because "the determination of the area of effective competition poses a question of fact, not one of law." *Vasquez*, 40 F.4th at 585-86. Thus, a motion to dismiss based on the complaint's geographic-market definition should be granted only in the rare case where the "geographic market allegations [are] inherently implausible." *Sidibe*, 667 F. App'x at 643. That does not describe this case.

AAH takes issue with the Complaint's use of the Dartmouth HSAs to define the relevant geographic markets. AAH's objection is that the Dartmouth HSAs track where patients live and receive hospital services rather than cataloguing where patients might reasonably turn for those services. MTD at 17.[8] The core problem with that argument is that there is no meaningful difference between those two measures. As the Complaint alleges, hospital services are inherently local, and patients prefer to "seek inpatient and outpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges." Compl. ¶ 67; *see id.* ¶ 42. Patients therefore "do not typically regard hospitals located many miles away from them as substitutes for local ones." *Id.* ¶ 67. Multiple court decisions have recognized exactly that. Most notably, the Ninth Circuit in *Sidibe* approved the exact same Dartmouth HSAs at issue here: "[I]t is not inherently implausible that these residents also would be unwilling to seek treatment

---

[8] To identify geographic markets, the Seventh Circuit uses the hypothetical-monopolist test, which asks "what would happen if a single firm became the only seller in a candidate geographic region." *Vasquez*, 40 F.4th at 585. If that hypothetical monopolist could profitably raise prices in a "small but significant" amount, the region is a properly defined geographic market. *Id.* But if "customers would defeat the attempted price increase by buying from outside the region, it is not a relevant market; the test should be rerun using a larger candidate region." *Id.*

elsewhere, and that health plans therefore could not purchase hospital services outside of the alleged HSAs." 667 F. App'x at 643. Similarly, in rejecting an argument much like AAH's, the Seventh Circuit recognized that "[p]eople want to be hospitalized near their families and homes, in hospitals in which their own–local–doctors have hospital privileges." *U.S. v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990); *see also Vasquez*, 40 F.4th at 587 ("Patients … expect to get most medical care close to home"); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 470 (7th Cir. 2016) ("[M]ost patients prefer to go to nearby hospitals.").

Because of these market realities, Network Vendors seeking to serve health plans with members in, *e.g.*, the Marinette HSA could not defeat a hypothetical monopolist's small but significant price increase by instead contracting with the small Bellin Hospital in Oconto—the closest hospital outside the Marinette HSA—because it is more than 30 minutes away. Compl. ¶¶ 69, 76. The Complaint thus plausibly alleges that the Marinette HSA is a proper geographic market—and the same holds true for every other HSA, though a "complaint need[s] to allege only one plausible geographic market to survive a motion to dismiss." *Vasquez*, 40 F.4th at 584. Indeed, the Complaint not only pleads that a hypothetical monopolist in these geographies *could* impose a small but significant price increase; it alleges that AAH *has* imposed supracompetitive prices, *see, e.g.*, Compl. ¶¶ 189-205, making it all the more clear that Plaintiffs have plausibly pled these markets, *Vasquez*, 40 F.4th at 586 (holding allegations of actual price increases "are by no means necessary in order adequately to plead a geographic market. But they are sufficient.").

While AAH tries to liken this case to *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911 (7th Cir. 2020), the geographic markets rejected there were facially absurd: The plaintiff pharmacy claimed that a "five-block radius around its location" was a relevant geographic market for prescription drugs, but "[i]t defies belief to suggest that a hypothetical retail pharmacy

could raise its drug prices substantially without losing customers to competitors outside that tiny area." *Id.* at 917. The geographic markets here contain full municipalities and townships, not tiny areas a few blocks across. *Sharif* is also distinguishable because consumers are far more willing to shop around for prescription drugs than for hospital services. While one dose of a drug "is as good as another, no matter where they are bought," the opposite is true for hospital services, as consumers care deeply about who their surgeon will be, the hospital's reputation, and how accessible the hospital is to friends and family—making a proper geographic market relatively small. *Advocate*, 831 F.3d at 470-76.

### C. The Complaint Plausibly Alleges Market Power.

AAH claims that the Complaint's market-power allegations are not plausible because Plaintiffs, in calculating market share, relied in part on Medicare data, even though Medicare patients are not part of the class. MTD at 18. This argument fails, for multiple reasons.

First, Medicare market shares are widely accepted proxies for commercial market shares (for which there is no centralized dataset). The Centers for Medicare & Medicaid Services (CMS), which calculates the Medicare data, calls the data "a useful proxy" for evaluating provider market saturation for private insurance. Compl. at 20 n.2. Academic research has likewise "found market share based on the Medicare discharge data to be representative of all discharges, not just those for Medicare beneficiaries." *Id.* And to dispel any doubt, the Complaint alleges that non-Medicare data sources confirm the Medicare data's accuracy in estimating commercial market shares in Eastern Wisconsin. For example, a State of Wisconsin analysis found that "the [AAH] System [has] a 45 percent inpatient market share" in a region corresponding to the Milwaukee HSA, which is the same share the Medicare data reflect. Compl. at 20 n.2.[9] The reason for the equivalence is

_____

[9] This confirmatory data distinguishes the allegations here from those in *Davis*, 2022 NCBC 52, and in any event, *Davis* decided this issue incorrectly—it mistakenly relied on cases

straightforward:  Patients using Medicare and patients using private insurance do not differ in their desire "to be hospitalized near their families and homes."  *Rockford*, 898 F.2d at 1285.

Second, even if there were reason to think the Medicare data might differ by a few percentage points from commercial market shares, that minor discrepancy would be immaterial. Especially at the pleading stage, "plaintiffs need not present market shares … with the precision of a NASA scientist.  The closest available approximation often will do."  *U.S. v. Anthem, Inc.*, 236 F.Supp.3d 171, 207 (D.D.C. 2017).  Nothing turns on whether AAH's exact market share in Burlington is 76%, 78%, or 80%; what matters is whether the Complaint's allegations of market power are plausible.  AAH has not identified any reason to think the CMS data is not a sufficiently "reasonable, close approximation of relevant market share" to cross that threshold.  *U.S. v. H&R Block, Inc.*, 833 F.Supp.2d 36, 72 (D.D.C. 2011).  To the contrary, Plaintiffs have supported their allegations of monopoly-level market shares with data compiled by the federal government, which the federal government and academics studying this field say can be used exactly as Plaintiffs have used them: to estimate commercial market shares.

Third, the Complaint alleges market power in multiple ways other than market share. Plaintiffs can plead market power even without "the usual showing of a precisely defined relevant market and a monopoly market share" if they allege "direct evidence of anticompetitive effects," because a party without market power could not, *e.g.*, successfully force prices upward.  *Republic Tobacco*, 381 F.3d at 737.  The Complaint alleges such anticompetitive effects in spades, detailing the various ways in which AAH's vertical restraints have increased prices and decreased quality. *See supra* Part I.B.  The Complaint also alleges numerous other facts that courts have treated as sufficient evidence of market power.  In *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), for

---

distinguishing between the *product* markets for Medicare and private insurance; the issue here is about *geographic* markets.

example, the Seventh Circuit held that Toys "R" Us had market power (with only a 20% share of the national market) because "[i]t was remarkably successful" in imposing contractual restraints on "the 10 major toy manufacturers," who composed 40% of the toy market. *Id.* at 937. Likewise here, AAH was remarkably successful in imposing its restraints on all or substantially all network vendors, Compl. ¶¶ 105-07, 120-22, including Anthem and United Healthcare, who alone control 50 to 70 percent of the relevant markets, *id.* ¶¶ 120-24. Similarly, the Second Circuit held that MasterCard had market power with a 26% market share because merchants "could not refuse to accept … MasterCard, even if faced with significant price increases, because of customer preference." *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003). Here too, the Complaint alleges that network vendors cannot offer a viable insurance product if they do not include AAH's must-have hospitals in their networks, despite their high prices. *See, e.g.*, Compl. ¶¶ 72, 92.[10]

### D. The Complaint Plausibly Alleges Anticompetitive Conduct.

AAH's objections to the Complaint's allegations about AAH's anticompetitive conduct have no merit whatsoever. First, AAH returns to its refrain that supracompetitive pricing "do[es] not … constitute anticompetitive conduct." MTD at 19. Plaintiffs do not allege otherwise. The anticompetitive *conduct* here is AAH's imposition of vertical restraints on Network Vendors. AAH's ability to maintain supracompetitive prices is the *effect* of that anticompetitive conduct. *See supra* Part I.B. Second, AAH cherry-picks passages from the Complaint and asserts that the conduct described in those passages is "lawful on its face." MTD at 20. But the conduct that that AAH cherry-picks is not the basis—let alone the *sole* basis—for the Complaint's Section 2 allegations. For example, Plaintiffs are not alleging that AAH violated Section 2 by "building a

---

[10] In some markets, AAH's market power is enhanced by it being that market's only provider of certain essential services. *See, e.g.*, Compl. ¶ 70 (noting AAH's Elkhorn hospital is the only nearby hospital offering necessary dialysis treatments). Because insurance plans must provide dialysis coverage, Network Vendors must include AAH's Elkhorn hospital in their networks.

new hospital to compete with an existing hospital in an area." MTD at 20. Plaintiffs allege that AAH violated Section 2 by building that hospital *and then*, instead of competing on the merits, "impos[ing] its 'all-or-nothing' contracting on Network Vendors, forcing them to include [the new hospital] in their networks if they needed access to any part of the AAH system." Compl. ¶ 161; *see id.* ¶ 162; *supra* Part II.A. AAH's selective quotation does not make the rest of the Complaint disappear. Third, AAH argues that "[m]onopoly leveraging is not a standalone theory of liability," MTD at 20, but the Complaint does not rely on any such theory. The Complaint alleges that AAH violated Section 2 by abusing its monopoly power within the AAH Monopolized Inpatient Markets to maintain its monopoly power *within those same markets*.

## III.  THE COMPLAINT PLAUSIBLY ALLEGES ATTEMPTED MONOPOLIZATION.

The Complaint alleges that AAH is attempting to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA. Compl. ¶ 255. AAH opened the Aurora Summit Medical Center despite a lack of demand, offered higher-priced but lower-quality care than its closest competitor (Oconomowoc Memorial), but has nonetheless pushed Oconomowoc Memorial to the brink of closure because AAH's restraints prevent Network Vendors from taking AAH's facility out of network or steering patients to Oconomowoc. *Id.* ¶¶ 164-69, 214. AAH argues— remarkably—that the Complaint fails to explain why Oconomowoc Memorial cannot simply "raise its prices." MTD at 23. This reveals AAH's disdain for competition: When two nearby hospitals compete, that should force the overpriced hospital to *lower* its prices, not the opposite. But Oconomowoc Memorial cannot win patient flow the old-fashioned way, because AAH's restraints prevent Network Vendors from rewarding lower prices and higher quality. Compl. ¶ 167-69.

AAH argues that Plaintiffs lack standing because "they do not allege that they participated in the Oconomowoc HSA." MTD at 21. That is both wrong and irrelevant. It is wrong because the Complaint alleges that Plaintiffs "have paid AAH's supracompetitive prices at locations

throughout Wisconsin over the last four years." Compl. ¶ 210; *see also id.* ¶ 259. It is irrelevant because when AAH monopolizes one market it uses that power to raise prices in *other* markets, through its unlawful restraints. AAH's monopolization of the Oconomowoc HSA would thus directly injure Plaintiffs regardless of whether they receive care there.

AAH argues that the attempt claim is time-barred because AAH opened its hospital twelve years ago, and that "opening a new hospital … *increases* competition." MTD at 22. But Plaintiffs do not seek to hold AAH liable for opening the hospital, but because AAH continues to impose vertical restraints in its ongoing attempt to gain market share *without* competing on the merits— indeed, even though it would lose a competition on the merits. AAH argues that the Complaint does not plausibly allege "specific intent," MTD at 22, but "[s]pecific intent may be inferred from predatory conduct." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986); *see* Compl. ¶¶ 164-69 (alleging such conduct). In any event, the Complaint directly alleges specific intent, including that AAH imposed its restraints "to reduce business to Oconomowoc Memorial," *id.* ¶ 164, and that it entered the Oconomowoc HSA "with the goal of suppressing competition," *id.* ¶ 163. Finally, the Complaint adequately alleges a "dangerous probability" that AAH will obtain monopoly power in Oconomowoc—namely, that AAH's conduct has pushed Oconomowoc Memorial to the brink of financial ruin and that Oconomowoc Memorial's closure would leave AAH's facility as the only hospital in the Oconomowoc HSA. *See, e.g., id.* ¶ 167-69.

## IV. PLAINTIFFS HAVE ANTITRUST INJURY AND ANTITRUST STANDING.

Federal antitrust law confers standing on "any person … injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Under this provision, plaintiffs have standing if (1) their injury is attributable to an anticompetitive aspect of the challenged practice ("antitrust injury") and (2) they can "efficiently vindicate the purposes of the antitrust laws" ("antitrust standing"). *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*, 937 F.3d

1056, 1064-65 (7th Cir. 2019). These inquiries can sometimes be complex, but one thing is crystal clear: The consumers who directly pay inflated prices caused by anticompetitive conduct have antitrust injury and standing. *Id.* at 1065 ("We usually presume that competitors and consumers … suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws."). Indeed, every standing case on which AAH relies says exactly that. *See, e.g.*, *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022) ("[A] direct purchaser from an alleged monopolist … is the proper party to bring suit."). Here, Plaintiffs are direct purchasers of AAH's overpriced healthcare services. Compl. ¶¶ 225, 227. The financial harms they have suffered result directly from AAH's anticompetitive conduct and they are optimally positioned to vindicate the purposes of the antitrust laws. Antitrust standing is not a close question here.

AAH suggests that Network Vendors or other hospitals would be more efficient enforcers. MTD at 8-9. But Network Vendors (in that capacity) are neither customers nor competitors of AAH, and thus are not presumed to suffer antitrust injury. *Marion Diagnostic*, 29 F.4th at 347. Moreover, because AAH imposes its restraints on *all* Network Vendors, *e.g.*, Compl. ¶¶ 105, 127, the forced inclusion of AAH's overpriced facilities does not put any one of them at a competitive disadvantage. As for competing hospitals, they likely do have antitrust standing, but that does not mean that purchasers *don't*: It is black-letter law that competitors and consumers *both* "suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws." *McGarry*, 937 F.3d at 1065; *see also Andrx Pharm., Inc. v. Biovail Corp.*, 256 F.3d 799, 816-17 (D.C. Cir. 2001) (consumers and competitors suffer distinct injuries and can both be proper antitrust plaintiffs).[11]

## CONCLUSION

For the foregoing reasons, AAH's motion to dismiss should be denied.

---

[11] AAH's other "antitrust standing" arguments, *see* MTD at 7-8, are addressed in Parts I.A and I.B, respectively. AAH's arguments for dismissal of Counts IV, V, VI, and VII are derivative of its other arguments, and should be rejected for the same reasons.

Respectfully submitted,

**FAIRMARK PARTNERS, LLP**

/s/ *Jamie Crooks*
Jamie Crooks
Michael Lieberman
1825 7th Street NW, #821
Washington, DC 20001
Ph: (617) 642-5569
Email: jamie@fairmarklaw.com
michael@fairmarklaw.com
**Counsel for Hometown Pharmacy, Hometown Pharmacy Health and Welfare Benefits Plan, Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

**HANSEN REYNOLDS, LLC**
Timothy Hansen
James Cirincione
John McCauley
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Email: thansen@hansenreynolds.com
jcirincione@hansenreynolds.com
jmccauley@hansenreynolds.com
**Counsel for Hometown Pharmacy, Hometown Pharmacy Health and Welfare Benefits Plan, Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

**BELL GIFTOS ST. JOHN LLC**
Kevin M. St. John, SBN 1054815
5325 Wall Street, Suite 2200
Madison, WI 53718
Ph: (608) 216-7990
Email: kstjohn@bellgiftos.com
**Counsel for Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan**

December 30, 2022