# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**URIEL PHARMACY HEALTH AND
WELFARE PLAN, et al.,**
      Plaintiffs,

v.                                                       Case No. 22-C-0610

**ADVOCATE AURORA HEALTH, INC.,
and AURORA HEALTH CARE, INC.,**
      Defendants.

---

## DECISION AND ORDER

Plaintiffs in this putative class action anti-trust lawsuit are companies that operate health plans that pay for their employees' medical services. In their first amended complaint, plaintiffs allege that defendants, Wisconsin hospital owners, violated the Sherman Act, 15 U.S.C. § 1 et. seq., and the Clayton Act, 15 U.S.C. § 12 et. seq., by unreasonably restraining trade and creating and attempting to create monopolies in the hospital services market. Plaintiffs also bring analogous state law claims. Before me now is defendants' motion to dismiss the first amended complaint.

## I. BACKGROUND

The plans that plaintiffs operate do not directly negotiate with hospitals regarding the price of services. Instead, they contract with network vendors to negotiate rates with a number of hospitals within the region and offer them as a bundle, i.e. "a network." Plaintiffs contract with two network vendors, Cigna and Trilogy. In markets with more than one hospital, network vendors will typically choose to contract with a hospital based on price and quality of service. When only one hospital exists in a market, network vendors must include that hospital in their networks regardless of price or quality because the

networks would otherwise not be commercially viable. Plaintiffs refer to this latter category as "must-have" hospitals. Plaintiffs allege defendants own several must-have hospitals in eastern Wisconsin.

Plaintiffs allege that defendants leverage these must-have hospitals to require network vendors to accept three types of clauses in their contracts. The first type is an "all-or-nothing" clause under which network vendors must include all of the hospitals that defendants own in eastern Wisconsin in their network. For example, if a network vendor wanted to include in its network a hospital owned by defendants in Racine, which has only one hospital, the all-or-nothing clause would require it to also include the hospitals defendants own in Milwaukee, even though other Milwaukee hospitals might offer higher quality services or lower prices. The second type is an "anti-steering" clause. In a competitive market, health plans have the ability to steer some of their members to lower-cost providers that participate in the network, usually by offering lower co-pays. The anti-steering clauses prohibit health plans from doing this. The third type is a gag clause, which prevents network vendors from disclosing to the plans the prices negotiated with the hospitals owned by defendants. If network vendors refuse to accept these clauses, plaintiffs allege that defendants bar them from contracting with defendants' must-have hospitals.

Plaintiffs allege that these clauses prevent them from steering their employees to lower cost hospitals. Plaintiffs allege, for example, that defendants' hospitals in Green Bay and Milwaukee charge significantly higher prices than other hospitals in those cities. But because of the all-or-nothing clauses, network vendors cannot avoid contracting with them. And were it not for the anti-steering clauses, plaintiffs allege that health plans could

2

offer patients information about the price of services at different hospitals and incentives, such as lower co-pays, to use a lower-priced provider within the network. Because the health plans cannot do this, defendants' hospitals are able to raise prices in otherwise competitive markets without losing business to lower priced competitors and contributing to increased health care costs.

Plaintiffs also allege that defendants maintain monopolies in eight markets in Wisconsin: Elkhorn, Burlington, Hartford, Marinette, Two Rivers, Sheboygan, Plymouth, and Port Washington. They allege that, according to Medicare data, defendants' hospitals maintain a market share between 58% and 90% in these markets. Plaintiffs allege defendants use anti-steering and gag clauses to maintain these monopolies. Finally, plaintiffs allege that defendants are attempting to monopolize the Oconomowoc market through the use of anti-steering and gag clauses.

## II. DISCUSSION

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal,* 556 U.S. at 678.

3

## A. Unreasonable Restraint of Trade under Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination …, or conspiracy in restraint of trade." 15 U.S.C. § 1. Despite the Act's expansive language, the Supreme Court has interpreted § 1 to prohibit only "unreasonable" restraints of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). To succeed on a claim under § 1, a plaintiff must show (1) a contract, combination or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

Plaintiffs argue that defendants' contracts with Cigna and Trilogy satisfy the first element. Defendants argue that plaintiffs do not plausibly allege that their contracts with Cigna and Trilogy actually contain the challenged clauses. But plaintiffs allege defendants have imposed these provisions "in all or nearly all of its negotiations with Network Vendors during the relevant time period," including Cigna and Trilogy. ECF no. 21 p. 34 of 85. To the extent that defendants are arguing plaintiffs must include language from the actual contracts, their argument fails. Plaintiffs are not a party to the contracts and cannot be expected to have access to them before discovery. *See In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 804 (N.D. Ill. 2017) ("[T]he pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information."). And plaintiffs allege enough facts to allow a reasonable inference that the Cigna and Trilogy contracts include the relevant clauses. For instance, plaintiffs quote from a 2020 contract with a different network vendor that includes the challenged provisions and allege that two other network vendors state they

4

were forced to accept the provisions. Plaintiffs also allege that a consultant who negotiated with defendants states that defendants treat the clauses as "non-negotiable."

Defendants next argue that plaintiffs do not allege that the challenged clauses are unreasonable restraints of trade. The proper framework for analyzing whether the clauses are an unreasonable restraint of trade is the rule of reason. *See Agnew*, 683 F.3d at 335. Under this rule, plaintiffs initially must show that the defendant has "market power," that is the ability to raise prices significantly without going out of business within a given market and that the alleged restraints have an anticompetitive effect in the identified market. *Id.* If plaintiffs meet this burden, defendants may argue that the restraint, on balance, has a procompetitive effect. *Id.* But in considering a motion to dismiss, the focus is on whether plaintiffs have made a prima facie case. *See In re Dealer Mgmt Sys. Antitrust Litigation*, 360 F.Supp.3d 788, 803 (N.D. Ill. 2019) ("[W]hether challenged conduct has a procompetitive effect on balance so as to survive scrutiny" under the rule of reason "presents a factual issue that cannot be resolved" at the pleading stage)*.*

As to the second element, plaintiffs allege that defendants' conduct restrains trade in two relevant markets, the market for hospital services in Milwaukee and the market for hospital services in Green Bay. Anticompetitive effects include increased prices, reduced output, and reduced quality. *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). Plaintiffs allege that the offending clauses result in higher prices for hospital services in the Milwaukee and Green Bay markets by allowing defendants' hospitals to raise prices without losing business. The complaint includes numerous allegations of higher prices making this allegation plausible. Plaintiffs, for example, allege the prices at a defendant-owned hospital in Milwaukee for appendectomies and angioplasties are almost double

5

those of a nearby competitor with similar quality ratings. Similarly, plaintiffs allege that the price of a colonoscopy with a biopsy at a defendant-owned hospital is more than double the price of the same procedure at a nearby competitor with higher quality and safety ratings. Thus, plaintiffs plausibly allege that the clauses have an anticompetitive effect. S*ee U.S. v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F.Supp.3d 720 (W.D.N.C. 2017) (finding allegations of similar anti-steering clauses plausibly alleged anticompetitive effect).[1]

Defendants next argue that plaintiffs do not allege an injury because they do not explain how the challenged provisions have harmed them. Plaintiffs, however, allege that the challenged clauses result in higher prices and that they pay such prices. Thus, plaintiffs allege a "direct link" between the alleged violations and the claimed antitrust injury. *See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 997 F.3d 391, 395 (7th Cir. 1993). Defendants also argue plaintiffs do not allege they are the proper party to bring an antitrust action. Because antitrust violations often have far-reaching effects, a plaintiff must show it is in a position to "vindicate the purpose" of the antitrust laws. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*, 937 F.3d 1056, 1064-65 (7th Cir. 2019). Here, because plaintiffs allege a "direct link" between the market restraints and their injury, they are a proper party. *Id*. Thus, defendants' motion as regards the unreasonable restraint of trade claim will be denied.

---

[1] Defendants argue that plaintiffs are also required to plead "substantial foreclosure" of the relevant market. But this is a requirement only when plaintiffs allege a *per se* violation of the Sherman Act and does not apply under a rule of reason analysis. *See Reifert v. South Cent. Wis. MLS Corp.*, 540 F.3d 312, 319 (7th Cir. 2008).

### B. Monopoly under Sherman Act

Section 2 of the Sherman Act prohibits firms from entrenching existing monopoly power through anticompetitive conduct. 15 U.S.C. § 2. To succeed on a monopoly claim under § 2, plaintiffs must show that defendants (1) possessed monopoly power in the relevant market and (2) sought to maintain that power through predatory or anticompetitive conduct. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). With respect to the first element, a "relevant market" is composed of a product and a geographical area. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020). With respect to the second element, anticompetitive conduct is conduct that impairs "rivals' opportunity to compete in a way that is inconsistent with competition on the merits." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-453 (7th Cir. 2020).

#### 1. Relevant Markets

Plaintiffs allege the product at issue is hospital services, which defendants do not challenge. But defendants argue that plaintiffs do not plausibly allege the geographic areas of the relevant markets. To analyze geographic healthcare markets, the Seventh Circuit applies the "hypothetical monopolist test." *Vasquez v. Indiana University Health, Inc.*, 40 F.4th 582, 585 (7th Cir. 2022). This test asks whether a theoretical monopolist in the proposed geographic area could profitably raise prices above competitive levels or if customers would defeat the attempted price increase by buying from outside the region. *Id.* This determination is fact intensive and the "motion-to-dismiss stage does not lend itself to rigorous hypothetical-monopolist analysis." *Id.* at 586. Rather, plaintiffs need only allege a "plausible" geographic market. *Id.*

7

Plaintiffs plead several geographic markets by reference to "Hospital Service Areas" defined by *The Dartmouth Atlas of Healthcare* ("HSAs"). Plaintiffs allege that these HSAs are a "widely accepted proxy for market definition for inpatient acute care services and are often used in the health care industry to define relevant markets." ECF no. 21 p. 23 of 85. Plaintiffs allege defendants have monopoly power in the following HSAs: Elkhorn, Burlington, Hartford, Marinette, Two Rivers, Sheboygan, Plymouth, and Port Washington. Some of these markets are relatively small, but plaintiffs allege that "distance to a medical provider is one of the most important predictors of provider choice" and that "patients do not typically regard hospitals located many miles away from them as substitutes for local ones." ECF no. 21 p. 23 of 85.

Defendants argue that the HSAs are not appropriate geographical markets because they are calculated based on where patients *currently* go for services, not where patients *would* go if a hypothetical monopolist were to raise prices. But at this stage, plaintiffs are only required to allege a plausible market, and plaintiffs' allegations that distance is the most important predictor of provider choice is plausible. *See FTC v. Advocate Health Care Network*, 841 F.3d 460, 4700 (7th Cir. 2016) ("[M]ost patients prefer to go to nearby hospitals"); s*ee also Sidibe v. Sutter Health*, 667 Fed.App'x 641, 643 (9th Cir. 2016) ("HSAs are areas within which the residents obtain most of their inpatient hospital services; it is not inherently implausible that these residents also would be unwilling to seek treatment elsewhere."). And plaintiffs go beyond alleging that a hypothetical monopolist could raise prices in these markets. They allege that defendants have actually raised their prices to above-market levels. *See Vasquez*, 40 F.4th at 586 (holding that allegations of above-market prices "are by no means necessary in order to

8

adequately plead a geographic market. But they are sufficient."). Thus, plaintiffs plausibly allege the relevant markets.

**2. Monopoly Power and Anticompetitive Effect**

As to whether plaintiffs allege that defendants have monopoly power in the defined markets, monopoly power may be inferred when a single entity controls a predominant share of the market. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000). Plaintiffs allege that, according to Medicare data, defendant-owned hospitals control between 58% and 90% of the market share in the identified markets. What constitutes a "predominant share" of a market is a fact intensive question, *see id.*, and defendants do not argue that these numbers are insufficient to show a predominant market share at this stage. Instead, they argue the allegations are not plausible because they are based on Medicare data and therefore do not reflect the private insurance market. But plaintiffs allege that academic research has shown that a hospital's share of the Medicare market is "representative of" its total market share. Thus, the Medicare data at least allows a reasonable inference that defendants' hospitals control a predominant share of the market.

Finally, plaintiffs plausibly allege defendants maintain their monopolies through anticompetitive conduct. They allege that defendants do so by requiring network vendors to accept anti-steering and gag clauses in their contracts. As discussed, these provisions prevent other hospitals from competing with defendants based on price. "[I]mpairing rivals' opportunity to compete in a way that is inconsistent with competition on the merits" is quintessential anticompetitive conduct. *Viamedia*, 951 F.3d at 452-453. Thus,

9

defendants' motion to dismiss as regards plaintiffs' § 2 of the Sherman Act claim will be denied.

### C. Attempted Monopolization under Sherman Act

Plaintiffs bring a claim for attempted monopolization of the Oconomowoc market for acute inpatient hospital care under § 2 of the Sherman Act. To state a claim for attempted monopolization, plaintiffs must allege (1) specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

Plaintiffs allege that a hospital owned by defendants in Oconomowoc currently controls 37% of the acute inpatient hospital services market and charges rates 60% higher than the only other hospital in the area, Oconomowoc Memorial. Plaintiff further alleges that although Oconomowoc Memorial offers lower prices and higher quality services than the defendants' hospital, its share of the market is steadily decreasing and it is in danger of closing or downsizing. According to plaintiffs, Oconomowoc's steady decrease in market share is attributable to defendants' anti-steering and gag clauses, which prevent the hospital from competing based on price.

Defendants argue that plaintiffs lack standing to bring this claim because they do not allege they participate in the Oconomowoc market. But plaintiffs allege they pay for hospital services "throughout Eastern Wisconsin" and confirm in their brief that this includes Oconomowoc. Defendants next argue that plaintiffs fail to allege "specific intent to monopolize." But specific intent to monopolize may be inferred from anticompetitive

10

Case 2:22-cv-00610-LA   Filed 04/28/23   Page 10 of 12   Document 31

conduct, *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986), and, as explained, plaintiffs allege defendants engaged in anticompetitive conduct in the form of the anti-steering and gag clauses. Thus, plaintiffs plausibly allege specific intent to monopolize.

Defendants also argue that plaintiffs do not allege a dangerous probability that the attempt at monopolization will succeed. To determine whether there is a dangerous probability of monopolization, I "consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). Plaintiffs allege that Oconomowoc Memorial's share of the market has steadily dropped even though it offers lower prices and higher quality services. This suggests that defendants are able to weaken or destroy competition. Additionally, plaintiffs allege that high barriers to entry in the hospital market, including the significant cost of building new facilities, make it unlikely that other providers will enter the market in an attempt to compete with defendants. Thus, plaintiffs plausibly allege a dangerous chance of defendants achieving a monopoly in Oconomowoc. I will deny defendants' motion as regards this claim.

### C. State Law Claims

Plaintiffs' claims under the Wisconsin Antitrust Act are analogous to their claims under the Sherman Act. *Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*, 265 Wis.2d 128, 140-41 (2003). Defendants argue that they should be dismissed for the same reasons as the federal claims. Because I decline to dismiss the federal claims, I will not dismiss the analogous state law claims.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion to dismiss at ECF no. 24 is **DENIED**.

Dated at Milwaukee, Wisconsin, this 28th day of April, 2023.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge