**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

|   |   |
|---|---|
| URIEL PHARMACY HEALTH AND WELFARE PLAN; URIEL PHARMACY, INC.; HOMETOWN PHARMACY; and HOMETOWN PHARMACY HEALTH AND WELFARE BENEFITS PLAN, on their own behalf and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ADVOCATE AURORA HEALTH, INC. and AURORA HEALTH CARE, INC., <br><br> Defendants. | Case No. 2:22-cv-00610 |

**DEFENDANTS' ANSWER TO THE SECOND**
**AMENDED CLASS ACTION COMPLAINT**

Defendants Advocate Aurora Health, Inc. and Aurora Health Care, Inc. ("Defendants" or "AAH"), by and through their attorneys, respectfully submit the following answer and affirmative defenses to the Second Amended Class Action Complaint (the "Amended Complaint," ECF No. 46) filed by Plaintiffs Uriel Pharmacy Health and Welfare Plan, Uriel Pharmacy, Inc., Hometown Pharmacy, and Hometown Pharmacy Health and Welfare Benefits Plan ("Plaintiffs") on October 2, 2023. Except as expressly admitted below, AAH denies each and every allegation and claim in the Amended Complaint.

## I. "NATURE OF THE ACTION"

1. This is an action for restraint of trade, unlawful monopolization, and unfair methods of competition seeking classwide damages and injunctive and equitable relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

**ANSWER:** The allegations in this Paragraph purport to characterize the nature of the action and require no response. To the extent a response is required, AAH denies the allegations in this Paragraph.

2. For the past several years, AAH has engaged in anticompetitive methods to restrain trade and abuse its market dominance for the purpose of foreclosing competition and extracting unreasonably high prices from the Plaintiffs and other Wisconsin businesses, unions, and taxpayers. These abuses include unlawfully forcing commercial health plans to include in their networks all of AAH's overpriced facilities even if they would rather only include some, and aggressively blocking employers and insurers from directing individuals to higher value care at non-AAH facilities. AAH has gone to extraordinary lengths to suppress innovative insurance products, such as tiered plans, that would reduce costs for employers. And it has used a combination of acquisitions, referral restraints, non-competes, and gag clauses to suppress competition from other healthcare providers and attempt to expand its monopoly over acute inpatient hospital services into other, separate markets.

**ANSWER:** AAH denies the allegations in this Paragraph.

3. Rising healthcare costs have had a significantly negative impact on Wisconsin employers, workers, and taxpayers. According to national academic studies and state-specific research in Wisconsin, those rising healthcare costs are primarily driven by the rapidly increasing prices charged by large hospital systems such as AAH, and these price increases are driven primarily by consolidation among hospital providers.

**ANSWER:** The allegation in the first sentence of this Paragraph purports to characterize the nature of the action and require no response. To the extent a response is required, AAH denies that allegation. AAH further lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding the contents of the unidentified studies and research referenced in the second sentence of this Paragraph, and AAH denies the truth of the statements attributed to these unidentified sources. AAH otherwise denies the allegations in this Paragraph.

4. There is a bipartisan consensus among healthcare policy experts that consolidation of hospitals causes higher prices without resulting in corresponding increases in the quality of care provided to patients or patient satisfaction. This is because hospital systems with greater market power are able to extract higher prices by engaging in anticompetitive behavior, such as imposing vertical restraints that leverage the market power they have over one market to extract supracompetitive profits from other markets in which the systems face greater competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

5. AAH has used its vast market power to engage in anticompetitive behavior that allows it to charge extremely high prices for healthcare services in Wisconsin. These prices would not be possible without AAH's anticompetitive behavior and have resulted in Wisconsin employers, unions, and local governments overpaying for healthcare by hundreds of millions of dollars in recent years.

**ANSWER:** AAH denies the allegations in this Paragraph.

6. AAH's high prices are apparent in routine, high-volume procedures like joint replacements, which at AAH's facilities in Milwaukee cost $21,000 more than a competitor located only minutes away, representing a 50% premium charged by AAH for the same procedure.

And they are manifested in cumulative numbers that show AAH is by far the most expensive hospital system in Eastern Wisconsin.

**ANSWER:** AAH denies the allegations in this Paragraph.

7.     AAH's anticompetitive behavior is a direct contributor to Eastern Wisconsin's high healthcare prices. According to a recent study, healthcare prices in Milwaukee are the fourth highest in the entire country; they are higher even than those in New York City.

**ANSWER:** AAH denies the allegations in the first sentence of this Paragraph. AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of this Paragraph and, on that basis, denies them.

8.     AAH has been able to impose these eye-watering prices on employers in Wisconsin by using its market power to suppress competition. Specifically, AAH:

- Forces commercial health plans to include its overpriced facilities in- network even when they do not want to;

- Goes to extreme efforts to drive out innovative insurance products that save employers and patients money;

- Suppresses competition on price and quality of care through secret and restrictive contract terms that have been the subject of bipartisan criticism; and

- Acquires new facilities to raise prices for the same services.

**ANSWER:** AAH denies the allegations in this Paragraph.

9.     Individually and in combination, this anticompetitive conduct results in higher prices paid by Wisconsin employers for healthcare. This is true throughout AAH's service area, both in the geographic markets in which it has monopoly or near-monopoly power, and in markets like Milwaukee where it nominally faces more competition from other hospitals.

4

**ANSWER:** AAH denies the allegations in this Paragraph.

10.     The purpose of AAH's vertical restraints (*i.e.*, the contractual provisions it forces on Network Vendors) is to inhibit competition, by precluding Network Vendors from removing some AAH facilities from their networks and precluding them from encouraging patients to seek care from nearby cheaper competitor hospitals offering a higher quality of care. If Network Vendors were able to take these actions (or even realistically threaten to), this would lead directly to lower prices. Employers with self-funded plans, like Hometown and Uriel, thus pay substantially more than they otherwise would for healthcare as a direct result of AAH's anticompetitive and monopolistic practices.

**ANSWER:** AAH denies the allegations in this Paragraph.

11.     In 2019, AAH generated $12.8 billion in revenue and earned $1.5 billion in profit. By that same year, AAH had built up about $12 billion in assets. AAH's high profits are a major outlier from other hospital systems.

**ANSWER:** AAH admits that in 2019 it generated approximately $12.8 billion in revenue, earned approximately $1.5 billion in profit, and held approximately $11.7 billion in net assets. AAH denies the allegations in the third sentence of this Paragraph.

12.     AAH has used its unlawfully inflated profits to engage in an acquisition spree of competitor hospitals and independent facilities—a spree AAH has made clear it plans to continue in the years to come. These acquisitions offer AAH two self-reinforcing anticompetitive financial benefits: (1) the ability to impose higher prices at the acquired facilities than the previous owners could, and (2) even greater systemwide power that AAH can leverage to force employers and patients to pay higher prices at all of its facilities.

**ANSWER:** AAH denies the allegations in this Paragraph.

13.     As the Milwaukee Business Journal summarized: "Advocate Aurora Health is embarking on what it calls a 'bold new strategy' to more than double its annual revenue by 2025 via mergers and acquisitions of healthcare systems, health insurers and consumer-facing health products." AAH's CEO speculated that the system's profits could be used to acquire more hospitals "a thousand miles away," and AAH's Executive Vice President publicly stated AAH's business practice is to be a "multi-market consolidator."[1]

**ANSWER:** AAH neither admits nor denies the allegations regarding the contents of the Milwaukee Business Journal article referenced in this Paragraph because the article speaks for itself. AAH respectfully refers the Court to that article for an accurate and complete presentation of its contents.

14.     And that's exactly what happened in December when AAH consummated its merger with Atrium Health, Inc., a multi-billion-dollar hospital system based in Charlotte with operations in North Carolina, South Carolina, Georgia, and Alabama. This merger resulted in the creation of a new entity, Advocate Health, Inc. This new entity is headquartered in Charlotte, even though AAH promised only a few years ago, as part of an effort to push through a previous merger, that it was committed to its Wisconsin community.

**ANSWER:** AAH admits that AAH and Atrium Health combined to form Advocate Health, Inc., which is headquartered in Charlotte, North Carolina. AAH otherwise denies the allegations in this Paragraph.

---

[1] Rich Kirchen, *'Bold' strategy: Advocate Aurora Health plans to more than double revenue by 2025*, Milwaukee Business Journal (January 14, 2020), *available at:* https://www.bizjournals.com/milwaukee/news/2020/01/14/bold-        strategy-advocate-aurora-healthplans-to-more.html

15. That previous merger in 2018 combined Aurora Health Care of Wisconsin and Advocate Health Care of Illinois and created one of the largest hospital chains in the country. The merger created the renamed Advocate Aurora Health. The transaction increased both the new system's market power in Southeastern Wisconsin as well as the system's overall leverage over Wisconsin and Illinois employers who pay for medical services in both states and with the companies that design many commercial health plan networks that must span the Wisconsin-Illinois border.

**ANSWER:** AAH admits AAH was formed in 2018 through the combination of Aurora Health Care, headquartered in Wisconsin, and Advocate Health Care, headquartered in Illinois, and the combined entity was re-named Advocate Aurora Health. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first sentence of this Paragraph and, on that basis, denies them. AAH denies the allegations in the third sentence of this Paragraph.

16. AAH—a nominal "non-profit"—recently established its own investment and buyout fund to engage in further acquisitions, venture capital investments, and other financial transactions where, according to the new fund's president, "there's a lot of growth opportunity." He also stated that the fund would "invest in, acquire, do a transaction with a company where there are synergy or cross-pollination opportunities with our core business." Betraying just how far AAH has strayed from its non-profit status, the "core business" referred to is the supposedly charitable provision of healthcare services to Wisconsin families by AAH. And within that "core business," the buyout fund president was remarkably candid about AAH's goals: "One way we measure that is what we call 'share of wallet,' which is a sort of a retail measure of how many times and in what

ways are we interacting with the people we serve beyond just traditional care delivery, and does that generate more revenue?"

**ANSWER:** AAH admits that it is a non-profit and that it has established Advocate Aurora Enterprises, which strategically invests in consumer health and wellness companies. To the extent that Plaintiffs cite to statements or other sources in this Paragraph, AAH respectfully refers the Court to those statements or other sources for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

17.  By claiming non-profit status despite being a multistate, multibillion-dollar profitable enterprise, AAH avoids paying hundreds of millions of dollars in federal, state, and local taxes on profits by promising to pursue a primarily charitable purpose. However, a study by the independent Lown Institute released in April 2022 comparing non-profit hospital systems' charitable impact found that AAH spent $498 million per year *less* on charity care and community investment than the estimated taxes AAH avoided through its non-profit, tax-exempt status. This "fair share deficit" at AAH was the eighth worst out of 275 non-profit hospital systems evaluated.

**ANSWER:** AAH denies the validity of the methodology, characterizations, and conclusions of the Lown Institute Hospital Index 2022 Fair Share Spending study. AAH denies the remaining allegations in this Paragraph.

18.  In addition to using profits for an aggressive merger-and-acquisition strategy, AAH pays extraordinary amounts to the executives of this supposed charitable institution. The CEO of AAH paid himself over $13.4 million dollars from the charity in 2019, more compensation than most CEOs of Fortune 500 corporations received. Fifteen of AAH's "non-profit" executives were paid over $1 million in 2019. The "Chief Business Development Officer" was paid over $2.5 million.

**ANSWER:** AAH denies the allegations in the first sentence of this Paragraph. AAH denies that its CEO "paid himself over $13.4 million dollars from the charity" in 2019, and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second sentence of this Paragraph and, on that basis, denies them. AAH admits that fifteen of its executives received over $1 million in total compensation in 2019, and that the Chief Business Development Officer received more than $2.5 million in total compensation. AAH otherwise denies the allegations in this Paragraph.

19.     Without intervention, AAH will continue to use anticompetitive contracting and negotiating tactics to raise prices on Wisconsin employers and use those funds for aggressive acquisitions and executive compensation. This will reduce economic growth in Wisconsin, harm patients and taxpayers, and drive employers out of Wisconsin.

**ANSWER:** AAH denies the allegations in this Paragraph.

20.     This case seeks to compensate the employers, unions, local governments, and other payers that have been directly harmed by AAH's past illegal activity, and to enjoin AAH from continuing unlawful practices that harm Wisconsin's economy and healthcare system.

**ANSWER:** AAH admits that Plaintiffs seek damages and injunctive relief in this case. AAH otherwise denies the allegations in this Paragraph.

## II.     "PARTIES"

### A.     **"Plaintiffs"**

21.     Plaintiff Hometown Pharmacy is a business with locations across Wisconsin with a self-funded health plan for its employees. Hometown has paid AAH for healthcare at rates negotiated by its Network Vendor.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

9

22.     Plaintiff Hometown Pharmacy Health and Welfare Benefits Plan is Hometown's self-funded health plan that has paid AAH for healthcare at rates negotiated by its Network Vendor.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

23.     Plaintiff Uriel Pharmacy, Inc. is a business in East Troy, Wisconsin with a self-funded health plan for its employees. Uriel has paid AAH for healthcare at the rates negotiated by its Network Vendor.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

24.     Plaintiff Uriel Pharmacy Health and Welfare Plan is Uriel's self-funded health plan.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

B.     **"Defendants"**

25.     Defendant Advocate Aurora Health, Inc. is a Delaware non-profit corporation. On April 1, 2018, Advocate Aurora Health, Inc. became the sole corporate member of Advocate Health Care Network, an Illinois non-profit corporation and Aurora Health Care, Inc., a Wisconsin nonstock non-profit corporation. It may be served with process through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.

**ANSWER:** AAH admits the allegations in this Paragraph.

26.     Defendant Aurora Health Care, Inc. is a Wisconsin non-profit corporation. Its principal place of business is 750 W Virginia Street, Milwaukee, Wisconsin, 53204. It may be served with process through its registered agent at 301 S Bedford St, Ste 1, Madison, Wisconsin, 53703.

**ANSWER:** AAH admits the allegations in this Paragraph.

### III. "JURISDICTION AND VENUE"

27. This Court has personal jurisdiction over AAH because AAH is a resident of Wisconsin and because the anticompetitive conduct at issue in this litigation took place primarily in Wisconsin.

**ANSWER:** AAH admits that this Court has personal jurisdiction over AAH. AAH otherwise denies the allegations in this Paragraph.

28. This Court has subject matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 15 and 28 U.S.C. § 1331.

**ANSWER:** AAH admits the allegations in this Paragraph.

29. Venue is appropriate in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 15 because AAH is domiciled in this judicial district and/or because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**ANSWER:** AAH admits the allegations in this Paragraph.

### IV. "OVERVIEW OF HOSPITAL/INSURANCE MARKETS AND CONSOLIDATION"

#### A. "Hospital/Insurance Negotiations Within a Functioning Market"

30. The market for hospital services is different from other product/services markets because the person consuming the hospital services (the patient) does not negotiate—and in many cases, does not even know beforehand—the prices of the services they are consuming. Nor does the patient typically pay the vast majority of the costs of the medical services they consume. Instead, for insured individuals, those costs are paid primarily by their health insurance plan.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize the market for hospital services as compared to "other product/services markets," the incentives of patients to take or not take any

action, or patients' knowledge regarding the prices of services those patients consume. AAH denies the allegations in this Paragraph on that basis.

31. Many businesses, local governments, and unions have commercial health plans in which the employers directly pay the vast majority of the healthcare expenses their employees (and their dependents) incur. These "self-funded" plans rely on insurance companies to administer the plans and negotiate on their behalf with hospitals. But the self-funded commercial health plans directly pay bills from hospitals for services used by their employees or members. This is distinct from the more commonly understood "fully insured" commercial health plans, in which companies or individuals pay premiums to an insurance company which, in turn, pays most of the bills from hospitals. For simplicity, this Complaint refers to both types of insurance products collectively as "commercial health plans."

**ANSWER:** AAH admits that some businesses, local governments, and unions have "self-funded" plans and that those plans sometimes use third-party administrators or insurers. AAH otherwise denies the allegations in this Paragraph.

32. The healthcare market is different from most other markets, where the consumer of the good/service knows the price *ex ante* and chooses to purchase the product based on its cost, quality, and the availability of competing options. Instead, patients and their healthcare provider choose the goods or services, usually without knowing the price that the patient's commercial health plan will have to pay for those goods and services.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize the market for hospital services as compared to "most other markets," competition among health care providers, the incentives of

patients to take or not take any action, or patients' knowledge regarding the prices of services those patients consume. AAH denies the allegations in this Paragraph on this basis.

33. Before medical services are consumed, hospitals negotiate the prices that commercial health plans will pay for those services with companies that assemble insurance networks and lease or provide these networks to those commercial health plans. These companies are called "Network Vendors," and the prices they negotiate with hospitals for in-network care are called "allowed amounts."

**ANSWER:** AAH admits that insurers and/or third-party administrators, which the Amended Complaint refers to as Network Vendors, generally assemble networks of hospitals. While AAH admits that the Amended Complaint uses the term "Network Vendor" to describe insurance companies that assemble networks of facilities through negotiation with healthcare providers, AAH denies that "Network Vendor" is a commonly used term in the health care industry. AAH nevertheless uses the term "Network Vendor" to be consistent with the Amended Complaint. AAH otherwise denies the allegations in this Paragraph.

34. When an insurance company, such as Blue Cross or Cigna, manages a self-funded health plan on behalf of an employer—rather than actually underwriting the risk itself, as it does for fully insured plans—the insurance company is acting as a third-party administrator ("TPA"). TPAs are in charge of processing claims and managing the day-to-day affairs of the self-funded health plan. TPAs may also help self-funded health plans select "networks," which are groups of healthcare providers. This leads to the commonly used term of a provider being "in-network" for a health plan—a term that is well-understood by employees to mean facilities where their insurance will be accepted and their costs as an employee will be determined by plan documents they can consult beforehand. Going to an "out of network" provider generally means much higher costs and

uncertainty for both the employee (in terms of out-of-pocket costs, frequent surprise bills, and paperwork burden) and their health plan (in terms of substantially higher prices than those offered to plans that include the provider in-network and significant administrative burden).

**ANSWER:** AAH admits that there are insurers that act as third-party administrators. AAH further admits that some third-party administrators may process claims and/or manage the day-to-day affairs of self-funded health plans. AAH also admits that third-party administrators may assist self-funded health plans in obtaining access to healthcare providers. AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts, the creation and administration of provider networks, or the incentives of patients to take or not take any action. AAH denies the remaining allegations in this Paragraph on that basis.

35. For both obvious practical reasons and because of contractual restrictions, self-funded health plans can almost never assemble their own "networks" of providers. This is primarily because of the practical impossibility of employers conducting individual negotiations with hundreds of providers across all the geographies where an employer has employees and dependents, and because providers would refuse to negotiate thousands of contracts with individual self-funded health plans.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

36. Therefore, another set of companies assemble networks of facilities through negotiation with healthcare providers. Those "Network Vendors" then allow self-funded health plans to "rent" or access the network they have assembled. Network Vendors tend to be large, well-known insurance companies like Aetna, Anthem Blue Cross Blue Shield, and Cigna that have

the scale and technical knowledge to build networks. In some cases, a Network Vendor and TPA are two divisions of the same company. A self-funded health plan can therefore contract with a company both to use its network and to administer the plan.

**ANSWER:** AAH admits that some Network Vendors may allow self-funded health plans to access the network that they have assembled for a fee. AAH further admits that some self-funded health plans contract with an insurance company as a Network Vendor and as a third-party administrator. AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' creation and administration of provider networks. AAH denies the remaining allegations in this Paragraph on that basis.

37.     Because Network Vendors are typically large, well-known insurance companies, the networks they build often are used by the commercial health plans they offer to fully-insured employers. These plans operate in a similar way to self-funded employer plans: the prices are determined by the Network Vendors' broader negotiations with a provider, the plans are subject to the same AAH restraints described below, the networks of providers used are the same as those for self-funded employer plans, and payments are made directly from the plan to the provider.

**ANSWER:** AAH admits that some Network Vendors assemble networks that are used by the commercial health plans they offer to fully-insured employers. AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts or the creation and administration of provider networks. AAH denies the remaining allegations in this Paragraph on that basis.

38.     Network Vendors negotiate with hospitals and other providers to create networks. For a network to be commercially viable (*i.e.*, for it to be one an employer would choose to offer its employees), it must include enough providers throughout the geography where the network is offered and across the full spectrum of healthcare services patients may need, from primary care to complicated inpatient hospital surgical care to specialty practices.

**ANSWER:** AAH admits that some Network Vendors negotiate with hospitals and other providers to assemble networks.  AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts or the creation and administration of provider networks.  AAH denies the remaining allegations in this Paragraph on that basis.

39.     Network Vendors negotiate with providers on price, attempting to balance the need to build networks with an adequate number of providers and the need to build networks that offer reasonable prices for their potential customers, *i.e.*, commercial health plans.

**ANSWER:**     AAH admits that some Network Vendors negotiate with providers on the price of medical services.  AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts or the creation and administration of provider networks.  AAH denies the remaining allegations in this Paragraph on that basis.

40.     Network Vendors generally do not negotiate with hospitals on a service-by-service basis. Rather, Network Vendors generally negotiate with hospitals for bundles of services that will be available to many commercial health plans that use the network. Those commercial health plans then offer that bundle of services to members as "in-network" benefits. Critically, commercial

health plans are required to pay the prices that have already been negotiated by Network Vendors during their process of building networks.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts or the creation and administration of provider networks. AAH denies the allegations in this Paragraph on that basis.

41. If a commercial health plan's Network Vendor and a hospital reach a deal for a bundle of services (for instance, all acute inpatient hospital services), the hospital will generally be considered in-network for every service in that bundle. This means that for any service in that bundle, if a commercial health plan's member receives that service from the hospital, the plan will pay the hospital the allowed amount that the Network Vendor negotiated for that service, after the patient has paid their required out-of-pocket costs.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize Network Vendors' negotiations of contracts, or the creation and administration of provider networks. AAH denies the allegations in this Paragraph on that basis.

42. In competitive markets—markets with multiple hospitals providing the services commercial health plans need or want to offer their members—a Network Vendor will contract with a hospital for a bundle of services only when the hospital offers services that are competitively priced and of sufficiently high quality. The Network Vendor may include as in-network only some bundles of services at any given hospital. For instance, the network may designate one hospital as the in-network for all acute inpatient hospital services but may choose not to include that hospital in-network for some acute outpatient hospital services (visits not requiring an overnight stay)

because the Network Vendor has identified ways for commercial health plans to purchase higher quality care and/or less expensive versions of those outpatient services from a nearby competing hospital or other outpatient provider. Similarly, in a competitive market, a Network Vendor may decline to include any services from a hospital "in-network" if the Network Vendor determines that the hospital's price or quality of care are not competitive with other nearby providers.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize competition among health care providers, Network Vendors' negotiations of contracts, or the creation and administration of provider networks. AAH denies the allegations in this Paragraph on that basis.

43. If a Network Vendor wishes to offer viable networks, the Network Vendor must construct networks that include a comprehensive bundle of services that employees/members of a commercial health plan can access in their region. Members generally insist on receiving their healthcare near where they live or work. A plan will not be viable—for either employers or their employees—if it does not offer in-network services that individuals commonly desire or need. Similarly, a plan will not be viable if members can only receive services at in-network rates at a hospital that is a long distance from their offices or residences because individuals may not be able or willing to travel so far to receive those services.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize competition among health care providers, Network Vendors' negotiations of contracts, or the creation and administration of provider networks. AAH denies the allegations in this Paragraph on that basis.

44. The commercial health plans directly pay the costs for in-network services at the prices negotiated by the Network Vendor. Self-funded health plans, in addition to paying the prices

negotiated by the Network Vendors, also pay the Network Vendors for access to the network and pay TPAs a fee for the administration of the plan.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

45.     In a competitive market, hospitals compete on price and the quality of patient care to be selected by Network Vendors for inclusion and preferred placement in networks. Then, Network Vendors compete to have their networks selected by commercial self-funded health plans and also use their networks for the commercial health plans they operate.

**ANSWER:** AAH admits that AAH competes on price, quality of patient care, and other attributes, but denies any implication that it does not operate in competitive markets. AAH otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph insofar as they purport to characterize competition among health care providers, Network Vendors' negotiations of contracts, or the creation and administration of provider networks. AAH denies the remaining allegations in this Paragraph on that basis.

      **B.**     **"Hospital/Insurance Negotiations in a Market Distorted by Anticompetitive Behavior"**

46.     The unique mechanics of the healthcare market provide an opportunity for hospital conglomerates with significant market power to anticompetitively restrain trade through unduly restrictive negotiations and agreements with Network Vendors and TPAs in order to extract supracompetitive prices. Supracompetitive prices are rates that are higher than what would be found in the context of normal competition. In the market for hospital services, supracompetitive prices come in the form of inflated allowed amounts, which are negotiated by Network Vendors but paid by commercial health plans.

**ANSWER:** AAH denies the allegations in this Paragraph.

47. When a Network Vendor seeks to construct a network in a region where a significant geographic area is monopolized by a single hospital system, that hospital system is in effect a "must-have" for the network. Commercial health plans with a significant number of members in that area will not use a network that does not include necessary services provided by that hospital system.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about network providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

48. A system with must-have facilities that engages in anticompetitive behavior can cause significant financial harm. First, in negotiations with Network Vendors, a hospital system with must-have facilities can demand allowed amounts that are grossly above what the hospital could obtain if it faced competition. This is true both by virtue of the hospital's extant market power, as well as the enormously high barriers to entry when it comes to many services hospitals provide, such as acute inpatient hospital services. These barriers to entry, which include spending significant time and money to build facilities and hire skilled staff (such as surgeons and anesthesiologists) as well as regulatory hurdles such as obtaining approval from state and local officials before opening a new facility, prevent new entrants from entering the market and reining in prices charged at must-have facilities. Wisconsin requires detailed regulatory oversight and approval of new hospital construction, creating another headwind for new facilities. And Wisconsin has a cap on the total number of hospital beds in the state.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about network providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

49. Second, if the must-have facilities are part of a larger hospital system that has other facilities that *do* face competition, the hospital system can refuse to offer in-network services at the must-have facility unless Network Vendors also agree to include in their networks the system's other facilities, at higher allowed amounts than those other facilities could normally demand standing alone. When negotiating with Network Vendors, a hospital system with must-have facilities can link those facilities to the system's facilities that would normally face more competition, and by doing so extract supracompetitive prices from commercial health plans. Importantly, this results in the commercial health plans paying supracompetitive allowed amounts not only for services obtained at the must-have facilities but also for services at the system's "linked" facilities, which face more competition.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about network providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

50. These factors and others have led to a consensus in the field of healthcare economics that monopolization of hospital markets significantly increase prices for hospital services. As the Kaiser Family Foundation wrote, "A wide body of research has shown that provider consolidation leads to higher health care prices for private insurance; this is true for both horizontal and vertical consolidation." And the economic literature strongly suggests that there are no concomitant improvements in quality from such monopolization.

**ANSWER:** AAH admits that the Kaiser Family Foundation published a brief containing the quoted language, but denies the validity of those characterizations and conclusions. AAH otherwise denies the allegations in this Paragraph.

51.     Another anticompetitive tactic used by dominant hospitals to extract supracompetitive rates is the imposition of "anti-steering" and "anti-tiering" provisions in their contracts with Network Vendors, TPAs, or health plans. In a competitive market, a Network Vendor may include both high-cost and low-cost hospitals in network, but individual TPAs or health plans can take measures to incentivize employees/members to choose the lower-cost, higher-quality provider where possible. These measures can include adding low-cost, high-quality providers to the network, providing truthful information about the cost of care from network providers, and offering financial benefits (*e.g.*, lower co-pays or more preferential risk-sharing) when patients choose lower-cost providers. Such measures undertaken by health plans are called "steering." Another form of steering is the creation of "tiered" networks or "tiered" plans, in which low-cost, high-quality providers are in a higher tier than more expensive and/or lower-quality competitors, and the plan's members are financially incentivized to choose providers in a higher tier. This form of steering is often referred to as "tiering." Another form of steering is the creation of "narrow networks," which consist of a subset of all the healthcare providers that participate in a conventional network, typically excluding higher-priced providers.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about network providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

52.     Academic research by health economists has demonstrated that when commercial health plans, TPAs, and Network Vendors are free to engage in steering and tiering, the plans pay significantly lower costs for healthcare, with no corresponding reduction in health outcomes.

**ANSWER:** AAH denies the allegations in this Paragraph.

53.     When a dominant hospital system—particularly a system with one or more must-have facilities—negotiates with Network Vendors, the system can force the Network Vendor and commercial health plans not to engage in these cost-saving measures by requiring "anti-steering" or "anti-tiering" provisions in their contracts. Such provisions essentially require commercial health plans to grant the dominant provider a "most favored nation" status, preventing the plans from favoring other systems through financial incentives, information sharing, or placing any other system in a plan's higher "tier." As detailed below, AAH engages in this anticompetitive conduct.

**ANSWER:** AAH denies the allegations in this Paragraph.

54.     In 2016, former President Obama's Department of Justice brought a Sherman Act suit against Atrium Health, a dominant North Carolina hospital system that imposed anti-steering and anti-tiering provisions on commercial health plans. (AAH and Atrium have announced that they intend to merge into one multistate system, in a proposed $27 billion deal.) In the lawsuit, the government alleged that the system "prevent[ed] insurers from offering tiered networks that feature hospitals that compete with [the system] in the top tiers, and prevent[ed] insurers from offering narrow networks that include only [the system's] competitors." The government further alleged that these and other "steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers." The government also alleged that the system had the market power necessary to be able to force these provisions on unwilling insurers, because the system controlled approximately 50 percent of the relevant market (acute inpatient hospital services). After a federal court held that the system's use of anti-steering provisions was plausibly anticompetitive under the Sherman Act, the case settled, and the system agreed not to impose anti-steering and anti-tiering provisions on commercial health plans going forward.

**ANSWER:** AAH admits that AAH and Atrium Health announced a transaction to combine in May 2022, and the transaction closed in December 2022. AAH further admits that in 2016, the United States Department of Justice brought an antitrust suit against Atrium Health. To the extent that the allegations in the third, fourth, fifth, and sixth sentences of this Paragraph refer to the Department of Justice's allegations in litigation against Atrium, AAH respectfully refers the Court to the pleadings containing those allegations for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

55. Former President Trump's Assistant Attorney General for Antitrust also criticized anti-steering provisions saying, "Without these provisions, insurers could promote competition by 'steering' patients to medical providers that offer lower priced, but comparable or higher-quality services. Importantly, that practice benefits consumers, but the anti-steering restrictions prevented it."

**ANSWER:** To the extent that the allegations in this Paragraph refer to statements from the former Assistant Attorney General for Antitrust, AAH respectfully refers the Court to those statements for an accurate and complete account of its contents. AAH otherwise denies the allegations in this Paragraph.

56. President Biden's Secretary of Health and Human Services, Xavier Becerra, wrote in his previous role as California Attorney General that contracting practices that "prevented insurers from using steering and tiering" were among types of "anticompetitive conduct" that "discouraged competition, impaired price-conscious consumer choice, and resulted in inflated prices on a system-wide basis that exceed its competitors and exceed the prices its hospitals and its other providers could charge in a free, competitive market."

**ANSWER:**  To the extent that the allegations in this Paragraph refer to written statements from the former California Attorney General, AAH respectfully refers the Court to those documents for an accurate and complete statement of their contents.  AAH otherwise denies the allegations in this Paragraph.

57.    Likewise, Senator Chuck Grassley, then chairman of the U.S. Senate Judiciary Committee, said such anti-steering practices were "restrictive contracts deliberately designed to prevent consumers' access to quality, lower cost care."

**ANSWER:**  To the extent that the allegations in this paragraph refer to statements from Senator Grassley, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents.  AAH otherwise denies the allegations in this Paragraph.

58.    Because of the nature of the healthcare market being one where the person selecting services (a patient in consultation with their providers) is not the same as the entities primarily directly paying for services (self-funded health plans and commercial insurers), there is a consensus in healthcare policy and economics that these types of restraints – which AAH uses in the form of all-plans, all-or-nothing, anti-steering, anti-tiering, gag clauses, referral restrictions, non-competes, suppression of reference-based pricing, and other restraints placed on health plans – block rival providers from their main cost-effective means of competing on cost and quality of care, substantially constrain the choices of consumers and health plans by limiting pricing and quality of care information, remove incentives for new providers to enter the market, bar commercial health plans, Network Vendors, and TPAs from developing lower-cost network options, and have other anticompetitive harms detailed below. And because of the nature of the healthcare market outlined previously, these harms to competition take place even if, on paper,

consumers have still 'choices' among providers. Thus, they foreclose key methods of competition that would normally encourage price and quality of care competition between providers.

**ANSWER:** AAH denies the allegations in this Paragraph.

59.     A May 2022 academic study in Health Affairs concluded that tools like reference-based pricing, steering, tiering, and transparency in pricing are particularly important to preserve competition after mergers like the ones AAH has recently engaged in: "In addition to proactive oversight of mergers, acquisitions, and joint contracting, the actions of policy makers, insurers, and employers to empower healthcare consumers with information and incentives to choose lower-cost providers may help mitigate the price effects of consolidation. To this end, employers and health plans have increasingly offered enrollees access to cost transparency tools and benefit designs that include tiered copayments, reference-based pricing, and incentives to seek care at centers of excellence. Such 'steering' mechanisms have been shown to lower costs and put downward pressure on prices." Yet, those specific tools the study identified as important to maintaining competition – reference-based pricing, steering, tiering, and transparency – are the precise tools that AAH has suppressed through the vertical restraints it has forced on Network Vendors and commercial health plans.

**ANSWER:** AAH denies the validity of the methodology, characterizations, and conclusions of the Health Affairs study referenced in this Paragraph.  AAH otherwise denies the allegations in this Paragraph.

## V.     "RELEVANT MARKETS"

60.     Judgment may be entered against AAH for the illegal conduct described in this complaint without defining the particular economic markets that AAH's conduct has harmed. With respect to Plaintiffs' antitrust claims, AAH's ability to impose anticompetitive contract terms in all, or nearly all, of its agreements with commercial health plans and AAH's ability to persistently

26

charge supracompetitive prices are direct evidence of AAH's market power that obviates any need for further analysis of competitive effects in particular defined markets.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

61. Moreover, AAH's ability to control prices in every market in which it operates is direct evidence of AAH's monopoly power, obviating the need to define relevant markets and assess market power indirectly through the use of market shares.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

62. Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein. For each, the product market includes only the purchase of medical services by commercial health plans. The relevant product markets do not include sales of such services to government payers, e.g., Medicare, Medicaid, and TRICARE (covering military families), because healthcare providers' negotiations with commercial Network Vendors are separate from the process used to determine the rates paid by government payers.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

A. **"Relevant Product Markets"**

63. The primary relevant product markets in this action are the clusters of inpatient and outpatient acute hospital care services offered by AAH. These inpatient and outpatient markets, which are distinct product markets from each other for reasons discussed below, include sales of such services to individual, group, fully insured, and self-funded health plans. AAH sells these services at each of its facilities, although not every facility offers the same bundle of services.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

64. *Relevant Product Market #1: Acute Inpatient Hospital Services*. Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual acute inpatient hospital services are not substitutes for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), Network Vendors typically contract for various individual acute inpatient hospital services as a bundle in a single negotiation with a hospital. Moreover, non-hospital facilities, such as independent outpatient facilities, specialty facilities (*e.g.*, nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services are not viable substitutes for acute inpatient hospital services. Health plans' and consumers' demand for acute inpatient hospital services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. Thus, such inpatient services can be treated analytically as a single product market.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

65. *Relevant Product Market #2: Outpatient Medical Services*. Outpatient medical services encompass all the medical services a hospital provides that are not inpatient medical services (*i.e.*, services that do not require an overnight stay). Although individual outpatient medical services are not substitutes for each other (*e.g.*, a CT scan is not a substitute for an annual physical), Network Vendors often contract for various individual outpatient medical services as a bundle in a single negotiation with a hospital system, and that is how AAH negotiates with Network Vendors with respect to outpatient hospital services.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

66. Unlike for acute inpatient hospital services, non-hospital facilities—such as independent primary care providers, specialty facilities, ambulatory surgical centers, nursing homes, and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services—can be substitutes for outpatient medical services provided at a hospital. Consequently, health plans' and consumers' demand for outpatient medical services *from a hospital* is generally more elastic because, if given the opportunity, they could obtain some of these services from non-hospital providers. But demand for outpatient medical services *in general* is inelastic because such services are often necessary to prevent illness, loss of physical mobility, or long-term harm to health. Thus, outpatient medical services can be treated analytically as a single product market.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

67. These two product markets—acute inpatient hospital services and outpatient medical services—are separate. Health plans often purchase outpatient medical services from different providers (*i.e.*, non-hospital providers) than those from which they purchase acute inpatient hospital services, which can only be purchased from hospitals. The existence of non-hospital competitors would, absent anticompetitive behavior, reduce the price health plans would pay a hospital system for outpatient medical services, but those competitors would not affect the price a hospital could charge for acute inpatient hospital services. There are also numerous procedures that can only be performed in an inpatient setting instead of an outpatient setting. The markets are therefore distinct.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

      B. **"Relevant Geographic Markets"**

68. Patients generally seek inpatient and outpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges. As stated in an FTC study, "In healthcare markets, distance to medical provider is one of the most important predictors of provider choice." Given this, patients do not typically regard hospitals located many miles away from them as substitutes for local ones, particularly when they have little or no financial incentive to travel greater distances. Consequently, an insurance network that does not satisfy patient demand for access to conveniently located hospitals will not be commercially viable.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "FTC study," and, on that basis, denies them.

69. Hospital Service Areas ("HSAs") are one widely accepted proxy for market definition for inpatient acute care services, developed by *The Dartmouth Atlas of Healthcare.* The Dartmouth Atlas defines HSAs as "local healthcare markets for hospital care" and HSAs are often used in the health care industry to define relevant markets.

**ANSWER:** AAH neither admits nor denies the allegations in this Paragraph regarding the contents of the *Dartmouth Atlas of Healthcare* because the document speaks for itself. AAH otherwise denies the allegations in this Paragraph.

70. In the following HSAs ("***AAH Monopolized Inpatient Markets***"), AAH faces little to no competition, and competition from providers of acute inpatient hospital services located outside these HSAs would likely not be sufficient to prevent a monopolist provider of acute inpatient hospital services located in the HSA from profitably imposing small but significant price

increases for those services over a sustained period of time. Indeed, in each of these geographic markets AAH *has* imposed significant, sustained price increases without losing market share, thus satisfying the "hypothetical monopolist" test used to assess the validity of geographic market definitions. For many health plans—and thus Network Vendors—AAH facilities in the following areas are considered "must-have" for a network.

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

71. ***Elkhorn HSA***: In the Elkhorn HSA, AAH controls 60% of inpatient admissions in the HSA.[2] AAH owns the only hospital in Elkhorn, Aurora Lakeland Medical Center. The next nearest hospital for residents of Elkhorn is Mercyhealth Hospital which is not a viable competitor because it lacks certain essential services that Aurora Lakeland offers. For example, dialysis treatment including both hemodialysis (dialysis requiring appointments at a hospital multiple times per week), peritoneal dialysis (self-dialysis done seven days a week), as well as an Extracorporeal ShockWave Lithotripter (to the most common way to treat kidney stones) are available at Aurora Lakeland but not Mercyhealth. Additionally, Mercyhealth Hospital has only 25 inpatient beds total, meaning that it would be an entirely inadequate substitute for AAH for plans in Elkhorn

---

[2] This inpatient market share data is primarily based on Medicare admissions or discharges. According to the federal government's Centers for Medicare & Medicaid Services (CMS), Medicare data can be "a useful proxy" for evaluating provider market saturation for "private insurance" and academic research has "found market share based on the Medicare discharge data to be representative of all discharges, not just those for Medicare beneficiaries. This is because a hospital's volume of Medicare patients in a given area is associated with its total volume of patients." Furthermore, a review of non-Medicare sources indicates Medicare admissions are useful estimates of market share. For example, a broader State of Wisconsin analysis in 2018 indicated that "the [AAH] System operates ten acute care facilities with a 45 percent inpatient market share" in the "Greater Milwaukee South, Southern Wisconsin, and Northern Illinois Region" – the same percentage of inpatient admissions as Medicare numbers for the Milwaukee HSA.

HSA. As discussed below, employers and individuals would be unwilling to accept a plan that excluded 72% of all inpatient beds available in the Elkhorn HSA, which would be the result of a network that did not include AAH. Even in the actual small zip code where Mercyhealth is located, it only accounts for 16% of inpatient admissions, showing that it is simply not a significant check on AAH's monopoly power in the region.

**ANSWER:** AAH admits that it owns Aurora Lakeland Medical Center in Elkhorn, Wisconsin, but denies that it is the "only" hospital in Elkhorn, Wisconsin. AAH denies that Mercy Health Hospital is not a "viable competitor" to Aurora Lakeland Medical Center. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and in Footnote 2 and, on that basis, denies them.

72. For families living north or east of Elkhorn, both of the closest two hospitals are AAH facilities: Aurora Lakeland Medical Center and Aurora Medical Center Burlington.

**ANSWER:** AAH denies the allegations in this Paragraph.

73. The Elkhorn HSA is entirely within Walworth County, Wisconsin. Wisconsin Physicians Services ("WPS")—a prominent TPA and insurance company—has stated that in Walworth County, "the Aurora network is a necessary component of any health insurance product sold to employers or other groups of *any* size." (emphasis in original). Thus, for the Elkhorn HSA, the AAH network is a necessary component of any commercial health plan's network in the Burlington HSA.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

74. ***Burlington HSA***. AAH controls over 78% of inpatient admissions in the HSA with significantly over 80% in some portions. AAH owns the only inpatient facility in Burlington,

Wisconsin. The next nearest inpatient acute care facility for residents of Burlington and nearby towns is about 20 minutes away with no traffic and is another AAH facility, Aurora Lakeland Medical Center. For many residents west of Burlington, the three closest inpatient acute care facilities are all AAH hospitals. To get to a non-AAH facility, a resident of Burlington or nearby towns would need to drive 25 or more minutes (if there is no traffic) to Mercyhealth Hospital, a much smaller facility in Lake Geneva without the inpatient bed capacity for a viable network and without many common hospital services available at Aurora Lakeland Medical Center. For just a few examples, Mercyhealth Hospital does not have a PET scanner, a cardiac catheterization laboratory, cardiac rehabilitation, or an Extracorporeal ShockWave Lithotripter (the most common way to treat kidney stones), all of which are available at AAH's Aurora Medical Center Burlington. Because of this, Mercyhealth would not be a viable competitor for many services even if it were close enough to compete. Additionally for many residents of Salem Lakes (within the Burlington HSA), the closest three inpatient facilities are all owned by AAH. The nearest non-AAH inpatient facility is 30 minutes or more for most Salem Lakes residents and would involve driving past an AAH facility.

**ANSWER:** AAH admits that it owns Aurora Medical Center Burlington. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

75. As described previously, WPS, a leading TPA and insurance company, has stated that AAH is a must-have system in Walworth County. Walworth County has significant overlap with the Burlington HSA. Walworth County is larger than the Burlington HSA and AAH has a smaller inpatient market share in Walworth County than it does in the Burlington HSA. Therefore,

33

WPS's statements reasonably imply that the AAH network is a necessary component of any network for commercial health plans in the Burlington HSA.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

76. ***Hartford HSA:*** AAH owns the only inpatient facility in Hartford, Wisconsin and controls 62% of inpatient admissions in the Hartford HSA overall.

**ANSWER:** AAH admits that it owns an inpatient facility in Hartford, Wisconsin. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

77. ***Marinette HSA:*** AAH owns the only inpatient facility in Marinette, Wisconsin and controls about 90% of inpatient admissions in Marinette, Wisconsin and 86% of admissions in Menominee, Michigan. In the HSA overall, which spans the Michigan-Wisconsin border, AAH controls 82% of inpatient admissions. AAH did not build this monopoly through outcompeting rivals on price and quality as our antitrust laws envision. Instead, in mid-2019, AAH purchased the only hospital in Marinette. The next closest hospital for many residents of Marinette or Menominee is Bellin Hospital in Oconto which is over 30 minutes away—absent traffic—and which fails to offer commensurate services. For example, Bellin Hospital does not have many of the birth-related facilities that are available at AAH in Marinette and lacks many facilities and much equipment necessary for intensive care. Thus, Bellin Hospital would be a non-viable competitor for many services even if it was close enough to compete with AAH in this HSA. For other Wisconsin and Michigan communities farther north, the next closest facility after Aurora Medical Center Bay Area is over an hour away. Commercial health plans in both Wisconsin and

Michigan are significant purchasers of inpatient and outpatient services from AAH's Marinette facilities.

**ANSWER:** AAH admits that it owns an inpatient facility in Marinette, Wisconsin, which it acquired in 2019. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

78. *Two Rivers HSA:* AAH owns the only inpatient facility in Two Rivers, Wisconsin. AAH controls about 68% of inpatient admissions in Two Rivers and over 65% of inpatient admissions in the HSA overall. For many residents of Two Rivers, the next closest non-AAH facility is the smaller Holy Family Memorial Medical Center in Manitowoc, which is about 20 minutes away with no traffic. Furthermore, for residents who live farther north, the two closest facilities are both AAH-owned.

**ANSWER:** AAH admits that it owns an inpatient facility in Two Rivers, Wisconsin. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

79. *Sheboygan HSA:* AAH controls over 58% of inpatient admissions in the Sheboygan HSA and 70% of inpatient admissions in parts of Sheboygan. For some residents living south of Sheboygan, the next-closest facility is also an AAH hospital. This increases the market power that AAH has in Sheboygan and areas south of Sheboygan. AAH's market power in Sheboygan is also demonstrated by its ability to control prices, including charging significantly more for inpatient procedures than the other, much smaller inpatient facility in Sheboygan.

**ANSWER:** AAH admits that it owns Aurora Sheboygan Memorial Medical Center. AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second and third sentences of this Paragraph and, on that basis, denies them. The remaining allegations

in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the remaining allegations in this Paragraph.

80. **_Plymouth HSA:_** AAH controls about 70% of inpatient admissions in the Plymouth HSA.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

81. **_Port Washington HSA:_** AAH controls over 63% of inpatient admissions in the Port Washington HSA, primarily due to its ownership of Aurora Medical Center Grafton, the only hospital in Grafton.

**ANSWER:** AAH admits that it owns Aurora Medical Center Grafton. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

82. In all the **_AAH Monopolized Inpatient Markets_** above, AAH's monopoly market power is also reflected in its ability to control prices for inpatient acute care services.

**ANSWER:** AAH denies the allegations in this Paragraph.

83. In all the **_AAH Monopolized Inpatient Markets_** above, AAH is also a significant provider of outpatient medical services. Through abuse of its monopoly on acute inpatient hospital services, AAH is able to charge supracompetitive prices for outpatient medical services as well, as described in more detail below.

**ANSWER:** AAH denies the allegations in this Paragraph.

84. In the following HSAs, and in other areas of Wisconsin, AAH faces some competition, yet it is able to impose anticompetitive terms on Network Vendors and charge supracompetitive prices for inpatient and outpatient services through anticompetitive conduct.

Some examples of HSAs where AAH has been able to charge supracompetitive prices include: Milwaukee HSA, West Allis HSA, Kenosha HSA,[3] Oshkosh HSA, Manitowoc HSA, Oconomowoc HSA, West Bend HSA, Brookfield HSA, Cudahy HSA, Green Bay HSA, Racine HSA, Sturgeon Bay HSA, Waukesha HSA, Chilton HSA, Watertown HSA, Shawano HSA, Fort Atkinson HSA, Berlin HSA, Kewaunee HSA, Fond Du Lac HSA, and Menomonee Falls HSA. AAH has also been able to impose anticompetitive terms in several other HSAs in Eastern Wisconsin, even where AAH controls less than 5% of inpatient admissions.

**ANSWER:** AAH admits that it faces competition throughout Wisconsin. AAH further admits it is a provider for nearby Illinois communities and self-funded plans based in Illinois. AAH otherwise denies the allegations in this Paragraph and in Footnote 3.

85. These HSAs, combined with those that comprise AAH Monopolized Inpatient Markets, comprise the ***Relevant Geographic Markets.***

**ANSWER:** The allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the allegations in this Paragraph.

86. In the Milwaukee HSA and nearby HSAs, AAH primarily faces competition from two hospital systems: Froedtert and Ascension. Froedtert's flagship facility is Froedtert Hospital and the Medical College of Wisconsin, and Ascension's flagship facility is Ascension Columbia St. Mary's Hospital. Both have higher safety ratings than AAH's flagship St. Luke's Hospital and both are less than 20 minutes away from St. Luke's. Yet, AAH's inpatient and outpatient prices are dramatically higher than either. As explained below, AAH's supracompetitive prices are due

---

[3] AAH is also a provider for nearby Illinois communities and commercial health plans based in Illinois. For example, AAH controls about 47% of inpatient admissions from Winthrop Harbor, Illinois.

to anticompetitive contracting and its abuse of its market power in other markets to extract rents in Milwaukee.

**ANSWER:** AAH admits that it faces competition from Froedtert and Ascension. AAH lacks knowledge or information sufficient to form a belief about the truth of the second and third sentences in this Paragraph, and, on that basis, denies them. The remaining allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the remaining allegations in this Paragraph.

## VI. "AAH'S MARKET POWER"

87. AAH is the largest hospital system in all of Wisconsin and the dominant hospital system in Eastern Wisconsin. AAH built its substantial market power through acquisitions, aggressive contracting and negotiating, and other anticompetitive tactics. As explained below, AAH's market power is manifested in its ownership of specific "must-have" facilities, its ownership of specialty facilities, its overall market share, and its ability to control prices.

**ANSWER:** AAH denies the allegations in this Paragraph.

88. Demand for the care provided by hospitals (and especially acute inpatient care) is particularly inelastic because care is often necessary to prevent permanent injury or death and generally cannot be obtained from far away geographies. While per capita demand for healthcare may vary between markets based on demographics (younger communities require less healthcare, for example), the demand within a specific market is much less variable.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about market demand for providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

89. Similarly, supply for medical care is particularly inelastic because of the difficulties of constructing new facilities that provided such care (especially acute inpatient care facilities) and

the lack of excess capacity (especially acute inpatient care capacity). Therefore, in a region with only a few large providers of acute inpatient care and a lack of significant excess capacity, it is practically impossible for a Network Vendor to indefinitely remove the largest hospital system from its networks; there would simply not be enough alternative inpatient capacity to accommodate all the Network Vendors' plans' members in need of lifesaving care. And individuals would simply not be willing to enroll in a health plan lacking such a dominant hospital system if there was a risk that changes to a network meant they were unable to receive in-network care nearby because of capacity restraints.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about market demand for providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

90. Therefore, unlike in most industries, a hospital conglomerate with anticompetitive goals that controls even a large plurality of inpatient care capacity in a region can force insurers and consumers to accept prices and contractual terms that would only be possible for a monopolist in other product markets. This is evidenced by the fact that hospital systems in other states with only 40-50% of inpatient market share in a specific market but substantial operations across a region have a documented ability to impose anticompetitive contractual provisions on Network Vendors and health plans. For example, the North Carolina system that the U.S. Department of Justice sued for forcing insurance plans to include anti-steering provisions was alleged to have 50% of the market for acute inpatient hospital services. While this is below the normal market-share threshold for monopoly power in other industries, the hospital system nonetheless was able to impose those vertical restraints because, practically speaking, insurance carriers in the Charlotte area could not viably exclude that system from their networks.

**ANSWER:** The allegations in this Paragraph consist of generalized characterizations about market demand for providers in support of Plaintiffs' legal theories, which AAH denies. AAH denies the allegations in this Paragraph on that basis.

91. Similarly, for AAH, two Network Vendors told an employer in the Milwaukee region that AAH was the "dominant player" who was able to force contractual terms on Network Vendors, despite the fact that AAH does not have a majority of inpatient or outpatient market share in the Milwaukee HSA.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the two unidentified Network Vendors made the statements attributed to them and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

92. AAH told a large Network Vendor in the context of a contract discussion that "you need us more than we need you." This indicates that AAH is both aware of its market power and understands it can use that market power to force Network Vendors to accept terms they otherwise would not, which it has done in all or nearly all negotiations with Network Vendors (including those that operate commercial health plans) during the relevant period.

**ANSWER:** AAH denies the allegations in this Paragraph.

A. **"AAH's Ownership of 'Must-Have' Hospitals Provides Its Enormous Market Power"**

93. Separate and apart from the systemwide market power AAH's total regional dominance gives it, AAH also has market power due to its control of several "must-have" facilities. AAH controls a number of facilities that Network Vendors must include in their networks in order to be viable for commercial health plans with significant members living near that AAH facility. AAH hospitals in Burlington, Elkhorn, Hartford, Marinette, Two Rivers, and Sheboygan are "must-have" facilities for many commercial health plans with a significant number of members

living near those facilities, and thus are "must-have" for Network Vendors seeking to offer or operate plans in those geographies. This is evidenced both by their monopoly-level market share of inpatient admissions in those communities and by the unwillingness of patients to travel long distances for healthcare services.

**ANSWER:** AAH denies the allegations in this Paragraph.

94.     A hospital system can obtain effective monopoly power for inpatient acute care in geographic markets while holding a smaller percentage of market share than would be needed to achieve monopoly power in many other industries. Many of these reasons are intuitive barriers to entry: enormous financial, legal, and regulatory barriers to entry to building a new competitor inpatient acute care hospital; difficulty of attracting specialized staff in a tight labor market featuring non-competes (including those used by AAH); referral networks and medical records rules that disadvantage new entrants. Others reasons are specific to the inpatient market: Because there is limited excess capacity in most markets for inpatient acute care services (a large percentage of empty beds can drive a hospital out of business) but demand that varies based on external events (seasonal disorders, disease spikes, natural disasters, new substance abuse trends, etc.), it is generally not practical for Network Vendors to have a hospital system with over 50% of inpatient beds in a specific geographic market out-of-network in the long-term.

**ANSWER:** AAH denies the allegations in this Paragraph.

95.     These facts are borne out by experience. As noted above, Atrium Health, a system in North Carolina that AAH has now merged with, was able to impose anti-steering restrictions despite "only" controlling 50% of the inpatient market.  In Wisconsin, a Network Vendor and TPA stated that it was not possible to assemble a viable network in a geography that excludes a hospital system with only 50-60% inpatient market share in that geography. Insurers, Network Vendors,

TPAs, and self-funded health plans elsewhere have made similar points about the must have nature of systems with only 50-60% inpatient market share in other markets, and leading health care economists have concluded that hospitals can have higher market power relative to their market share than other industries. This means that a hospital system with over 50% inpatient market share can have monopoly power and/or be a "must have" system in specific geographic markets.

**ANSWER:** AAH admits that it merged with Atrium Health. AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations that the unidentified Network Vendors, insurers, TPAs, and self-funded health plans made the statements attributed to them and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

96.     As explained previously, there are also rural communities—like those in Kewaunee County or northern Marinette County, for example—where reaching a non-AAH inpatient facility would involve the practical impediment of driving long distances directly past an AAH hospital.

**ANSWER:** AAH denies the allegations in this Paragraph.

97.     As explained below, AAH has explicitly told Network Vendors that if they want an AAH facility in any one of their networks, they must include all relevant AAH facilities in every plan using any network. It was possible for AAH to make this demand (and the demand is credible with Network Vendors) because (1) AAH owns least some facilities that it knew health plans needed in their networks, i.e., must-have facilities, and (2) AAH has systemwide power throughout Eastern Wisconsin that makes it indispensable to any significant network.

**ANSWER:** AAH denies the allegations in this Paragraph.

B.    **"AAH's Ownership of Many Specialty Services in Eastern Wisconsin Increases Its Market Power"**

98.    For some specialized procedures, AAH touts its regional or statewide status as the "only" provider of many of these services. For commercial health plans, that makes the inclusion of some AAH facilities necessary to accommodate particularized needs.

**ANSWER:** AAH denies the allegations in this Paragraph.

99.    For example, Aurora Healthcare Centers for Comprehensive Wound Care & Hyperbaric Medicine includes the only center in Washington County offering hyperbaric oxygen therapy. And Aurora St. Luke's, in Milwaukee, is the only hospital in the region with a 24/7 on-site heart-care team. AAH operates the only psychiatric hospital in Sheboygan.

**ANSWER:** AAH admits that the Aurora Healthcare Centers for Comprehensive Wound Care & Hyperbaric Medicine offer hyperbaric oxygen therapy and that Aurora St. Luke's has a 24/7 on-site heart-care team.  AAH further admits that AAH operates a psychiatric hospital in Sheboygan. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph.

100.    In other cases, an AAH hospital's specialty services may make it difficult commercial health plans to accept a network that excluded the hospital with those services. For example, one AAH hospital has the equipment necessary for the treatment of most kidney stones whereas the closest non-AAH hospital does not. Members of a health plan who have a history of kidney stones would resist participation in a plan that didn't include the only nearby facility with equipment used to treat kidney stones.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

## VII.  "AAH'S ANTICOMPETITIVE CONDUCT"

### A.  "AAH Imposes 'All Or Nothing' and 'All Plans' Contract Language and Uses Other Tactics to Force Inclusion of Its Overpriced Hospitals in Insurance Networks"

101.    AAH uses its overall market power in Eastern Wisconsin to extract higher prices even at its facilities that face significant competition. If a Network Vendor seeks to include an AAH facility that it needs to build a viable network, AAH forces the network to also include facilities and outpatient providers that the vendor does not want in its network. On information and belief, AAH has done so in all or nearly all of its negotiations with Network Vendors during the relevant period, thus affecting the vast majority of the market.

**ANSWER:**  AAH denies the allegations in this Paragraph.

102.    According to a Milwaukee Journal Sentinel investigation in late 2018, "The variation in prices also has drawn attention to 'all-or-nothing' clauses that require health plans to include all of a health system's hospitals in a network and that bar health plans from placing the hospitals in a tier that requires higher cost-sharing. Aurora Healthcare, now part of Advocate Aurora Health, has long had those clauses in its contracts." Such all-or-nothing clauses are a vertical restraint that AAH has imposed on commercial health plans and Network Vendors, like Anthem, UnitedHealth, Cigna, Quartz, Common Ground Healthcare, Trilogy, Aetna, Humana, and others, and which these firms would not agree to but for AAH's demand that they do so.

**ANSWER:**  To the extent that the allegations in this Paragraph refer to statements from a Milwaukee Journal Sentinel article, AAH respectfully refers the Court to that article for an accurate and complete statement of its contents.  AAH also respectfully refers the Court to its Network Vendor agreements, as those contracts speak for themselves.  AAH otherwise denies the allegations in this Paragraph.

103.     AAH has gone as far as to sue health plans that attempt to only include some of its hospitals in their networks for violating the all-or-nothing clauses that AAH forces Network Vendors to accept in their contracts. In a suit that was confidentially settled in 2007, AAH stated that its contracts require that all AAH facilities be included in all of a Network Vendor's commercial health plans or none of them can be. AAH sued WPS, a commercial health insurer and Network Vendor, for "operating and marketing of plans without Aurora providers in violation of our agreement."

**ANSWER:** To the extent that the allegations in this Paragraph refer to pleadings from decades-old litigation between AAH's predecessors and WPS, AAH respectfully refers the Court to the pleadings in that litigation for an accurate and complete statement of their contents.  AAH otherwise denies the allegations in this Paragraph.

104.     According to that AAH contract, WPS agreed to "Identify all AURORA Participating Providers as Participating Preferred Providers in all WPS Plans within Aurora's defined service area of Eastern Wisconsin." Therefore, not only does AAH force "all-or-nothing" contract language on Network Vendors for any given commercial health plan—it also insists that even if a Network Vendor needs to include just one AAH provider in one network, the Network Vendor must include all AAH inpatient and outpatient providers in *every plan* it offers, including all networks offered to commercial health plans. This "all-plans" condition is a vertical restraint that enables AAH to extract supracompetitive rents even in markets where it does not have a dominant market share. And AAH makes its "all-plans" condition clear in the definitions appendix to its contracts: The WPS/AAH contract stated explicitly that "'Plan' shall include individual health insurance policies, group health insurance certificates issues by WPS and self-insured plans administered by WPS," meaning that the exact same restraints applies to the Network Vendor if it

sells its network to other commercial health plans or if it operates its own commercial health plan. Elsewhere throughout the case, AAH confirmed that it imposed the restraint on WPS with the goal of it applying identically to *all* commercial health plans including commercial self-funded health plans and commercial health plans operated by the Network Vendor. On information and belief, AAH continues to use similar contract language and has used such language in contracts with most Network Vendors during the relevant period. Network Vendors would prefer not to include the all-plans restraint in their contracts with AAH, but AAH is able to force them into accepting the term due to its market power.

**ANSWER:** To the extent that the allegations in this Paragraph refer to pleadings from decades-old litigation between AAH's predecessors and WPS, AAH respectfully refers the Court to the pleadings in that litigation for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

105. But for AAH's all-plans requirement, commercial health plans and Network Vendors would develop plans that did not include AAH (or at least did not include all of its facilities) in-network, which would force AAH to compete with rival providers on price and quality of care. By eliminating that method of competition, AAH has substantially foreclosed competition in the relevant markets.

**ANSWER:** AAH denies the allegations in this Paragraph.

106. This foreclosure is substantial, moreover, because AAH has forced all or nearly all Network Vendors to accept its all-or-nothing and all-plans restrictions for all commercial health plans. According to WPS, AAH forces all or nearly all insurance companies and Network Vendors to agree to the same all-or-nothing terms, and "every other major health insurer with which Aurora has contracted, including United Health Group, Inc., WellPoint Health Networks, Inc., Humana,

Inc., Aetna, Inc., and others, has been forced to accede to Aurora's anticompetitive interpretation of the all-plans requirement, regardless of the specific text of that requirement in their respective contracts." "Others" clearly refer to other smaller network vendors than those named, which includes Cigna, Trilogy, Common Ground Healthcare, Quartz, and other Wisconsin-specific network vendors. Thus, these vertical restraints have foreclosed a substantial amount of commerce in AAH's service area. AAH's forced imposition of the all-plans requirement on just the entities named by WPS represents a restraint that has foreclosed competition for in vast majority of the health insurance market in Eastern Wisconsin.

**ANSWER:** To the extent that the allegations in this Paragraph refer to pleadings from decades-old litigation between AAH's predecessors and WPS, AAH respectfully refers the Court to the pleadings in that litigation for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

107. AAH treats these all-or-nothing and all-plans clauses as non-negotiable and forces them on Network Vendors. A consultant who has negotiated contracts with AAH stated that AAH's negotiating posture on its anticompetitive contractual terms is, "you either sign it or we don't do business."

**ANSWER:** AAH denies the allegations in this Paragraph.

108. A 2006 report by the Milwaukee Journal Sentinel noted that, "Aurora's contracts go further [than most hospital systems]: They generally require Aurora hospitals to be included in every health plan offered by an insurer or administrator." An August 2022 analysis of AAH's currently accepted insurance coverage materials and of several network vendors listed in-network providers indicates that AAH appears to have an all-plans requirement on nearly all network vendors. Additionally, an analysis of several major Network Vendors – including WPS, Trilogy,

Cigna, and others – indicates that Network Vendors continue to either include all overpriced AAH facilities in all their networks/plans or none in any. This structure is contrary to their economic interest and that of their clients and cannot be explained absent AAH's contractual restrictions like its all-plans requirement.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "Milwaukee Journal Sentinel" report and the "August 2022 analysis," and, on that basis, denies them.

109. By virtue of its overall market power and/or its market power over acute inpatient hospital services in certain key regions, AAH can and does impose its all-or-nothing and all-plans conditions to force Network Vendors (and by extension commercial health plans) to include outpatient medical services in their networks at supracompetitive rates. For example, AAH cancelled its entire contract with a Network Vendor because, according to AAH, the Network Vendor sought a "carve-out" for radiology. In a competitive market and absent AAH's restraints, TPAs, Network Vendors, and/or and commercial health plans would normally use these kinds of carve outs to encourage members/employees to seek lower cost outpatient care from non-AAH providers. But AAH forces its all-or-nothing and all-plans vertical restraints on Network Vendors and commercial health plans to suppress this type of competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

110. These terms are forced on Network Vendors who have to accept them because of AAH's market power. As Wisconsin Physicians Service, a prominent Network Vendor and commercial health plan, wrote, "If Aurora had not possessed market power sufficient to condition WPS's access to those markets upon WPS's acceptance of the Agreement's anticompetitive terms and conditions, WPS would not have signed the Agreement."

**ANSWER:** To the extent that the allegations in this Paragraph refer to pleadings from decades-old litigation between AAH's predecessors and WPS, AAH respectfully refers the Court to the pleadings in that litigation for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

B. **"AAH Punishes Innovative Insurance Products to Suppress Competition"**

111. AAH has also aggressively used its market power to suppress the introduction of innovative insurance products in Wisconsin. Absent AAH's successful efforts to foreclose the entrance of these cost-saving products, commercial health plans in Wisconsin would be paying significantly less for health care.

**ANSWER:** AAH denies the allegations in this Paragraph.

112. For example, effective October 1, 2020, AAH implemented a "policy" conveying to TPAs that it refuses to accept payment from or even submit claims to self-funded health plans that use "reference-based pricing." Health plans that use reference-based pricing base their payments to hospital systems on a percentage above the hospital's Medicare rates.[4] Plans with reference-based pricing allow hospitals to make a significant profit but limit the ability of hospitals to charge supracompetitive prices relative to an accepted and government approved baseline (*i.e.*, the Medicare rate, which itself is calculated to ensure a hospital makes a profit on each service). These plans also promote competition by encouraging providers to compete on the basis of their price relative to a well-established baseline.

---

[4] AAH itself makes a profit on Medicare's rates, as detailed in recent comprehensive, independent research that evaluated hospital profitability. Reference-based pricing plans pay a large percentage above Medicare's rates.

**ANSWER:** AAH denies the allegations in the first sentence and in Footnote 4 of this Paragraph. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

113.    In addition to pressuring Plaintiff Hometown, Plaintiff Uriel, other plans, and TPAs to avoid using innovative plans, AAH will actually turn down payment checks sent from health plans using reference-based pricing. On information and belief, AAH forgoes immediate profit because it seeks to make these plans non-viable in the areas where AAH operates. Thus, AAH is consciously forgoing profit in the short term to achieve its long-term goal of suppressing competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

114.    And AAH has created specific administrative burdens for the individual beneficiaries of plans using reference-based pricing, including refusing to provide standard forms and documentation. On information and belief, this action was taken to prevent beneficiaries from accessing their plan benefits in order to undermine innovative plans.

**ANSWER:** AAH denies the allegations in this Paragraph.

115.    AAH has also conveyed to representatives of a self-funded plan that it will not directly negotiate with the plan, creating another barrier to innovative insurance products.

**ANSWER:** AAH denies the allegations in this Paragraph.

116.    In another example, in 2008 AAH allegedly pressured a Network Vendor to stop doing business with a TPA and health plans that AAH disfavored. AAH then falsely told members of plans administered by that TPA that they would be refused service by AAH providers, even if they were existing patients of AAH. On information and belief, AAH engaged in this and other extreme measures that in the short term appear economically irrational and harmful to AAH's

reputation with the goal of eliminating innovative insurance products from the Eastern Wisconsin area. And, on information and belief, the Network Vendor agreed to AAH's demand to cancel a lucrative contract with a health plan only because of credible threats from AAH to use its market power to punish the Network Vendor more broadly. Since then, AAH's market power – and therefore its ability to impose such restraints on Network Vendors – has grown substantially. And it has continued forcing these restraints on them.

**ANSWER:** AAH denies the allegations in this Paragraph.

117. In previous years, AAH has taken other efforts to punish Network Vendors attempting to offer innovative insurance products. In one example, AAH sought to punish a network that did not include AAH facilities. In response to the creation of a narrow network that excluded AAH, AAH created a new insurance product that would cover the costs for members of the narrow network who used AAH's "out-of-network" facilities for only $20. This scheme, which effectively amounts to predatory pricing, would eliminate the incentives for members of plans using the narrow network to visit lower cost non-AAH providers. An insurer alleged that AAH was offering a money-losing product with the intent of eliminating the narrow network: "It's clearly a proposal not designed to be self-sufficient." This is another way AAH appears to engage in non-economic decision making for the purpose of suppressing competition.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the third sentence of this Paragraph and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

118. Given that many employers wish to use reference-based pricing and that they would significantly reduce what employers pay for healthcare, AAH's refusal to accept payment from such plans and discrimination against them forecloses a substantial amount of competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

    C.    **"AAH Engages In 'Anti-Steering' and 'Anti-Tiering'"**

119.    During the relevant time-period, AAH forced most Network Vendors, health plans, or TPAs to accept anti-steering, anti-tiering, and similar exclusionary provisions in contracts that prevent Network Vendors from designing networks that would result in expanded choice and/or significant cost savings for commercial health plans.

**ANSWER:** AAH denies the allegations in this Paragraph.

120.    Through its coercive contracting practices, AAH deliberately limits the use of tiering by commercial health plans in order to lessen the competition it faces from rivals offering lower prices and higher quality.

**ANSWER:** AAH denies the allegations in this Paragraph.

121.    Anthem, one of the largest insurers and Network Vendors in Wisconsin, told a local self-funded health plan that "due to their contracts with the dominant player, which is Aurora," it was barred from allowing local employers to offer tiered health plans that would incentivize employees to seek out lower cost, higher quality care. Through this action, AAH was forcing self-funded health plans to pay AAH's supracompetitive rates more often than they would have otherwise.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that an Anthem representative made the statements attributed to Anthem and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

122.    UnitedHealthcare, also one of the largest insurers and Network Vendors in Wisconsin, told the same health plan that they were barred by AAH from allowing local employers to offer tiered health plans that would incentivize employees to seek out lower cost, higher quality

care. Through this action, AAH was forcing self-funded health plans to pay AAH's supracompetitive rates more often than they would have otherwise.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that a UnitedHealthcare representative made the statements attributed to UnitedHealthcare and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

123. Notably, AAH's ability to force two of the country's largest insurance companies to accept such onerous, anticompetitive terms is itself evidence of the dominant market power AAH enjoys throughout its entire service area. On information and belief, AAH's imposition of these anti-tiering restrictions on large commercial health plans and Network Vendors like Anthem and UnitedHealth (and ones like WPS), reflect its ability to impose these restrictions on all or nearly all Wisconsin commercial health plans and Network Vendors, including Cigna, Common Ground Healthcare, Trilogy, Quartz, Aetna, Humana, and others, thus foreclosing the competition steering would create throughout all or nearly all of the market.

**ANSWER:** AAH denies the allegations in this Paragraph.

124. Indeed, the restraints AAH imposes on insurers foreclose competition in a significant portion of the market, when measured by the market shares of the Network Vendors AAH has coerced into accepting these restrictive terms. Anthem and UnitedHealth control 69% of the commercial health insurance market in Greater Milwaukee-Waukesha (which includes the Milwaukee HSA, West Allis HSA, Hartford HSA, Port Washington HSA, parts of the Oconomowoc HSA, parts of the West Bend HSA, the Cudahy HSA, the Menomonee Falls HSA and the Brookfield HSA); 62% of the commercial health insurance market in Greater Sheboygan (which includes the Sheboygan HSA and the Plymouth HSA), 52% of the commercial health

insurance market in Greater Green Bay (which includes the Green Bay HSA and the Kewaunee HSA); and 57% of the commercial health insurance market in Greater Oshkosh-Neenah (which includes the Oshkosh HSA and parts of the Berlin HSA). As noted above, similar restrictions have been placed on WPS, which controls at least 2% of the statewide health insurance market (higher in Eastern Wisconsin since several WPS networks are not sold in Northwestern Wisconsin). And other data indicates that Anthem, UnitedHealth, and WPS combined control about 50% of the insurance market statewide with a higher percentage in Eastern Wisconsin, covering all Relevant Market HSAs. WPS also stated that it and "every other major health insurer with which Aurora has contracted, including United Health Group, Inc., WellPoint Health Networks, Inc., Humana, Inc., Aetna, Inc., and others, has been forced to accede to Aurora's anticompetitive interpretation of the all-plans requirement, regardless of the specific text of that requirement in their respective contracts."

**ANSWER:** AAH denies the allegations in this Paragraph.

125. Thus, AAH's documented imposition of its anticompetitive restraints on Anthem, UnitedHealth, and WPS foreclose competition in substantially over 55% of the health insurance market in all Relevant Markets in Eastern Wisconsin (and over 70% in the Milwaukee HSA and other nearby HSAs). And the actual foreclosure percentage is much higher based on WPS' statements and other evidence indicating that AAH's restrictions are also imposed every other major health insurer, including Aetna, Humana, WellPoint, Common Ground Healthcare, Trilogy, Cigna, and others. These insurers collectively insure the vast majority of Wisconsinites, and they are prevented by AAH from using normal incentives and innovative insurance products to encourage competition among healthcare providers. AAH's conduct has thus foreclosed a substantial amount of competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

126. Another way AAH limits tiering is by insisting that it be in the top tier of any tiered plan, even if it is a low-value provider relative to others. For example, in a review of several large national and regional commercial health plans, AAH facilities are all listed in the top tier despite being higher-cost than nearby competitors. This can only be explained by AAH forcing Network Vendors and TPAs to include its facilities in a plans top tier, regardless of price or quality — thereby defeating the purpose of creating a tiered plan in the first place. This results in commercial health plans paying AAH's supracompetitive prices more often than they would absent AAH's conduct.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph relating to an unidentified "review of several large national and regional commercial health plans," and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

127. AAH forces commercial health plans to include AAH in the top tier by threatening that it would otherwise not allow any AAH facilities or outpatient providers to be included in the plan at all, which would make the plan non-viable in many key markets. An AAH contract specifically states that for any plan offered by a TPA, the plan "shall . . . [i]dentify all AURORA Participating Providers as Participating *Preferred* Providers." (emphasis added). A separate AAH contract in 2020 stated that: "All participating providers affiliated with Members [defined as including AAH facilities] shall be treated as a Tier 1 (or the equivalent) provider with the highest level of benefit plan paid for reimbursement of healthcare services in all products offered unless a Member opts out of Tier 1 status or participation in such product offerings." The intent and practical impact of these clauses is to limit the ability of health plans to honestly communicate

about the availability of lower-cost, higher value care available at non-AAH providers in Wisconsin, causing health plans to pay AAH's supracompetitive prices for care more often than they would absent AAH's conduct. These provisions also block rival providers from a primary cost-effective means of competing on price and quality since AAH bars Network Vendors from rewarding rival providers that offer higher value services with a higher tier than AAH. And they undermine commercial health plans', Network Vendors', and TPAs' attempts to develop lower-cost tiered network options to compete with their rivals.

**ANSWER:** To the extent that the allegations in this Paragraph refer to AAH's contracts with an unidentified Network Vendor, AAH respectfully refers the Court to the contracts for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

128. AAH also engages in other kinds of anti-steering and exclusionary conduct that prevents Network Vendors from designing networks that would result in expanded choice and/or significant cost savings for commercial health plans. For example, AAH has in the past prevented a Network Vendor that wanted to direct patients to non-AAH radiology centers (presumably because of their lower cost) from accessing any of AAH's network. Based on AAH's uniform imposition of other restrictions like anti-tiering and all-or-nothing on all or nearly all commercial health plans, on information and belief, AAH imposes these same types of anti-steering and exclusionary provisions on all or nearly all Network Vendors and commercial health plans. This includes networks sold by and health plans operated by Aetna, Cigna, Humana, Trilogy, Common Ground Healthcare, Wisconsin Physicians Service, United Healthcare, Quartz, and others.

**ANSWER:** AAH denies the allegations in this Paragraph.

129. In addition to undermining the tiered commercial health plans that do exist, AAH's aggressive anti-tiering practices also mean that Network Vendors will decline to introduce tiered

networks in the first place because they would serve little purpose in a market where AAH is a major provider. For example, Trilogy, Cigna, Wisconsin Physician Service and other network vendors do not offer tiered networks in AAH service areas despite some of them offering tiered plans outside of AAH's service area. This results in commercial health plans paying AAH's supracompetitive prices more often than they would in a competitive market with more tiered plans.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

130.    Because steering practices, tiered plans, and other elements of plan design that AAH's restraints prohibit are common cost-saving tools that most commercial health plans and Network Vendors would engage in absent AAH's restraints, AAH's conduct prohibiting purchasers from engaging in this conduct forecloses a substantial amount of competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

D.    **"AAH Uses Non-Competes, Referral Restrictions, and Other Tactics to Suppress Competition and Increase Prices"**

131.    AAH has forced physicians to agree to onerous non-compete agreements that limit their ability to work for other hospital systems in Wisconsin or to open independent practices. This anticompetitive practice drives up prices for commercial health plans because it precludes numerous potential lower-cost independent providers from operating. It also increases prices by artificially creating a tighter labor market for physicians, creating an impediment to rival hospital systems opening new locations to compete with AAH.

**ANSWER:** AAH denies the allegations in this Paragraph.

132.    AAH's non-competes have been found by a Wisconsin court to be unlawful.

**ANSWER:** To the extent that the allegations in this Paragraph refer to an uncited judicial decision by the Milwaukee County Circuit Court, AAH respectfully refers the Court to the decision of the Milwaukee County Circuit Court for an accurate and complete statement of its holding. AAH otherwise denies the allegations in this Paragraph.

133.     For example, in one case, AAH attempted to enforce an aggressive non-compete against a family practice physician. Family practice is a very competitive market where providers compete for patients. It also is a practice that can generate a significant amount of business for a hospital due to referrals.

**ANSWER:** AAH denies the allegations in this Paragraph.

134.     In this instance, AAH attempted to enforce a non-compete to prevent a family practice doctor from practicing, even though the non-compete only covered urgent care. Despite the physician not having provided urgent care in decades, AAH sought to bar them from practicing even in a different field. The Milwaukee County Circuit Court found AAH's non-compete provisions unenforceable.

**ANSWER:** To the extent that the allegations in this Paragraph refer to an uncited judicial decision by the Milwaukee County Circuit Court, AAH respectfully refers the Court to the pleadings and decision of the Milwaukee County Circuit Court for an accurate and complete statement of its holding. AAH otherwise denies the allegations in this Paragraph.

135.     AAH's non-competes have eliminated or suppressed competition in the family practice market and, on information and belief, the same type of non-competes have eliminated or suppressed competition in other outpatient services.

**ANSWER:** AAH denies the allegations in this Paragraph.

136.    AAH also forces onerous non-competes on physicians it acquires from other practices. For example, as part of its abandoned effort to purchase a hospital chain in Michigan, AAH insisted that many doctors of the acquired hospitals would be required to sign a non-compete preventing them from working for any other hospital system within 35-miles for at least three years. The long duration and broad geographic limitations of such coerced non-competes result in substantial reductions in competition in markets where AAH acquires facilities by preventing the entry of new provider competitors and limiting the options for members of commercial health plans to seek higher value care at non-AAH facilities.

**ANSWER:**  AAH denies the allegations in this Paragraph.

137.    A medical professional who has worked at both AAH and Froedtert remarked in an online post that AAH "is known for problematic non-compete agreements."

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified medical professional made the statements attributed to him or her and, on that basis, denies that allegation.  AAH otherwise denies the allegations in this Paragraph.

138.    Beyond non-competes, AAH also forces anti-competitive terms on independent physicians who work in its facilities.

**ANSWER:**  AAH denies the allegations in this Paragraph.

139.    For example, according to a 2013 lawsuit, in an apparent effort to punish independent physicians who do not agree to directly affiliate with AAH, AAH instituted a policy that required 24-hour a day, 7-day a week continuous call coverage for independent physicians and then denied the independent physicians the ability to seek backup call coverage from another physician. If independent physicians did not agree to these "nearly impossible conditions," AAH

would refuse to renew medical staff privileges. Meanwhile, AAH's own employed physicians were allowed to exchange call coverage or seek backup call coverage.

**ANSWER:** To the extent that the allegations in this Paragraph refer to pleadings from decade-old litigation, AAH respectfully refers the Court to the pleadings in that litigation for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

140. According to a local physician, this policy encouraged the "systematic elimination of independent physicians by Aurora" and "reduced the overall output of family practice physicians for patients" in the Oshkosh market.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified local physician made the statements attributed to him or her and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

141. The American Academy of Family Physicians criticized AAH's policy saying it was "unreasonable and contrary to good practices and federal law."

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported statements of The American Academy of Family Physicians, and, on that basis, denies them.

142. Moreover, in 2018, AAH agreed to settle claims that it illegally overpaid two physicians so that they would keep referrals within the AAH system.

**ANSWER:** AAH admits that in 2018, AAH settled claims alleging violations of the False Claims Act for allegedly submitting claims to Medicare and Medicaid in violation of the Stark law, without admitting liability. AAH otherwise denies the allegations in this Paragraph.

143. AAH has engaged in other practices to aggressively limit physicians from referring outside of the AAH system to competitors. For example, during an acquisition of a group of

outpatient providers, AAH insisted that, as part of the acquisition, it be able to impose a provision that would require the acquired providers to "exclusively" refer to AAH facilities. And as a Wisconsin newspaper columnist wrote, more broadly, "Aurora Health Care has set the standard by buying up physician practices and clinics and forcing doctors to send patients to Aurora's hospitals." These practices drive up costs and reduce quality for commercial health plans by preventing physicians from referring patients to the highest value care. And they limit the ability of independent specialty providers to compete by cutting off a source of referrals. This coercion of physicians to force referrals to overpriced AAH hospitals is an abuse of AAH's market power that raises prices for commercial health plans and is another way AAH forecloses competition.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported statements of a "Wisconsin newspaper columnist," and, on that basis, denies them.

144. Because absent AAH's anticompetitive conduct independent physicians would compete for patients and would assist other hospitals in competing for referrals, AAH's restrictions have foreclosed a substantial amount of competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

E. **"AAH Uses Gag Clauses to Suppress Competition and Further Its Other Anticompetitive Schemes"**

145. AAH insists on strict gag clauses with Network Vendors that limit their ability to disclose anticompetitive contract terms. These gag clauses have also been used by AAH to prevent self-funded health plans from knowing the price for AAH's services before the provision of care. This directly suppresses price competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

146.    The Wall Street Journal identified AAH as among several hospital systems in the United States that use "secret contract terms" to prevent transparency on prices and quality.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "Wall Street Journal" article, and, on that basis, denies them.

147.    In properly functioning markets pricing information is freely available, allowing purchasers to determine the prices they will be obligated to pay their suppliers if they purchase the suppliers' products and services. The ability to determine the amount of the purchase price before the purchase decision is made allows the customer to compare the prices offered by various competitors and allows the purchase decision to be influenced by price competition.

**ANSWER:**  The allegations in this Paragraph consist of generalized characterizations about market demand for providers in support of Plaintiffs' legal theories, which AAH denies.  AAH denies the allegations in this Paragraph on that basis.

148.    AAH has required terms in its agreements with Network Vendors that forbid them from disclosing the allowed amounts that AAH has negotiated. A Network Vendor in Wisconsin stated that negotiated prices between Network Vendors and AAH are, "a closely guarded secret" and "subject to confidentiality restrictions" in AAH's contracts. AAH's gag clauses also forbid disclosure of other, non-price terms.

**ANSWER:** AAH admits that Network Vendor agreements, like many commercial contracts, often contain ordinary course confidentiality provisions.  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified Network Vendor made the statements attributed to it, and, on that basis, denies it.  AAH otherwise denies the allegations in this Paragraph.

149.    On information and belief, these gag clauses are partially intended to prevent knowledge or scrutiny of other anticompetitive contracting terms like all-or-nothing, all-plans, anti-tiering, anti-steering, and contract termination penalties.

**ANSWER:** AAH denies the allegations in this Paragraph.

150.    Because AAH's gag clauses prevented health plans and their enrollees from determining what they will be obligated to pay AAH for healthcare services (and how much those prices exceed the prices charged by AAH's nearby competitors), TPAs and health plans are less able to exert commercial pressure on AAH to moderate its inflated pricing by sending members to other providers.[5]

**ANSWER:** AAH denies the allegations in this Paragraph and in Footnote 5.

151.    AAH's use of gag clauses and other anticompetitive terms has effectively undermined price competition for healthcare in the Wisconsin markets AAH serves and foreclosed a substantial amount of competition. These gag clauses also substantially reduced AAH's rivals' incentives to compete on price because a rival providing a lower price product will not necessarily attract consumers to select the rival's product if consumers are barred from knowing the price of AAH's products relative to the rival.

**ANSWER:** AAH denies the allegations in this Paragraph.

F.    **"The Combination of AAH's Anticompetitive Conduct is Especially Harmful"**

152.    AAH's market power aggravates the anticompetitive nature of its contracting and negotiating tactics. The forced imposition of all-or-nothing and all-plans conditions, as well as

---

[5] These provisions also inhibited Network Vendors' ability to offer cost-efficient products for commercial health plans because AAH's gag clauses prevented Network Vendors from knowing anything about the *relative* prices they are negotiating. Discussing AAH's contracts, a Network Vendor in Wisconsin said that knowing its own negotiated rates are only useful, "assuming it can learn something about its competitors' deals with that same provider." AAH's gag clauses foreclosed that relative comparison and the competition that would result.

anti-tiering and anti-steering provisions is problematic any time it is imposed on Network Vendors, TPAs, and commercial health plans by a dominant provider, because each such contractual term limits the ability of payers, employers, and patients to competitively select healthcare options. However, in the context of a hospital system with both significant market power and monopoly facilities, these contract provisions have an especially harmful impact on price and quality. This is particularly true—and such restrictions are particularly anticompetitive—when they are forced on nearly all commercial health plans, Network Vendors, and TPAs in the region, against their will. That is exactly what AAH has done.

**ANSWER:** AAH denies the allegations in this Paragraph.

153.     Importantly, each of AAH's anticompetitive restrictions on commercial health plans, Network Vendors, and TPAs cause greater harm in concert than any individual vertical restraint would in isolation. For example, if AAH engaged only in all-or-nothing contracting but did not impose anti-steering, anti-tiering, or gag clauses on Network Vendors, commercial health plans could at least mitigate harm caused by AAH's tying schemes by incentivizing patients to obtain in-network care from one of AAH's competitors. Thus, while each contractual restriction described herein is unlawful in isolation, taken together their impact is especially harmful to commercial health plans, as well as to AAH competitors.

**ANSWER:** AAH denies the allegations in this Paragraph.

G.     **"AAH's Acquisition Strategy Suppresses Competition and Allows AAH to Impose Broader Anticompetitive Contractual Terms"**

154.     AAH has gone on an aggressive acquisition spree that increases its market power and the leverage it holds over Network Vendors and commercial health plans. In 2020, AAH's CEO touted a "bold new strategy" to double AAH's annual revenue by 2025 via mergers and

acquisitions. AAH's Executive Vice President actually publicly stated that AAH's intention is to be a "multi-market consolidator."

**ANSWER:** AAH denies the allegations in the first sentence of this Paragraph. To the extent that the allegations in this Paragraph cite statements from AAH officers, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

155. This acquisition strategy has several self-reinforcing anticompetitive benefits for AAH. First, AAH is able to impose higher prices at facilities it acquires than the previous owner because of its use of the anticompetitive contracting terms described above. After AAH takes over a new facility, it employs the anticompetitive contracting terms described above in negotiations with Network Vendors at the newly acquired facility. For example, during a proposed AAH takeover in Michigan, Crain's Detroit Business summarized the arguments from AAH's CEO as: "Advocate Aurora wants Beaumont's physicians to expand its managed care contracting strategy with payers and employers to Michigan." A May 2022 study supports the idea that affiliations and acquisitions of independent physician practices – like those AAH has aggressively engaged in – raise prices: "We found strong evidence that vertical integration and joint contracting between physicians and large health systems during 2013–17 led to large increases in physician prices, particularly for primary care physicians. Our findings complement a literature that has found increases in physician prices associated with hospital acquisitions of physician practices."

**ANSWER:** To the extent that the allegations in this Paragraph refer to an article in Crain's Detroit Business and a May 2022 study, AAH respectfully refers the Court to that article and study for an accurate and complete statement of their contents, while denying the validity (as applicable) of

their methodology, characterizations, and conclusions. AAH otherwise denies the allegations in this Paragraph.

156. Second, the newly acquired facilities further increase AAH's leverage with Network Vendors and health plans, thereby reinforcing AAH's ability to force Network Vendors and health plans to accede to anticompetitive contracting terms. As the CEO of AAH stated in 2020: "Every time we've scaled up, we've gotten stronger."[6]

**ANSWER:** To the extent that the allegations in this Paragraph cite statements from an AAH officer, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

157. Third, AAH leverages its market power to force newly acquired physicians and facilities to refer to AAH, depriving health plans of the benefit of having their members referred to the highest value provider and suppressing competition by eliminating a source of revenue for AAH competitors. AAH executive Pat Trotter was explicit that AAH aims to "leverage" its overall market power to control referrals in new markets it enters. The Appleton Post-Crescent described AAH's public statements: "Aurora, however, can leverage the advantages of its larger size by referring patients to other in-system hospitals for care if they need it, Trotter said."

**ANSWER:** To the extent that the allegations in this Paragraph cite statements from an AAH executive, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

158. This increased leverage is especially true when AAH acquires another "must have" hospital facility. For example, in mid-2019, AAH purchased the only hospital in Marinette,

---

[6] Bruce Murphy, *Aurora Health Care Merger is Bad News,* Urban Milwaukee (March 10, 2020), *available at:* https://urbanmilwaukee.com/2020/03/10/murphys-law-aurora-health-care-merger-is-bad-news/

Wisconsin which is now renamed Aurora Medical Center Bay Area. This facility is a must-have hospital in both Wisconsin and Michigan.

**ANSWER:** AAH admits that in 2018 it opened a new hospital in Marinette, Wisconsin with a joint venture partner, and that in 2019, AAH acquired the remaining equity, resulting in full ownership of the hospital, which is now named Aurora Medical Center Bay Area. AAH otherwise denies the allegations in this Paragraph.

159. AAH has also worked to acquire outpatient facilities and other non-hospital assets that increase its market power. According to Fitch, a leading bonds rating agency, AAH now has one of largest integrations of physicians of any firm in the hospital industry. Or, as a Wisconsin newspaper columnist wrote, "Aurora Health Care has set the standard by buying up physician practices and clinics and forcing doctors to send patients to Aurora's hospitals."[7]

**ANSWER:** To the extent that the allegations in this Paragraph cite to statements by Fitch or from a "Wisconsin newspaper columnist," AAH respectfully refers the Court to those statements for an accurate and complete statement of their contents. AAH otherwise denies the allegations in this Paragraph.

160. This strategy of non-hospital acquisitions adds to AAH's overall market power and is part of its attempt to suppress competition for outpatient medical services in Eastern Wisconsin and to ensure that members of commercial health plans are more likely to be directed to their high-cost inpatient facilities. AAH executives appear to have hinted at this strategy publicly, with the CEO of AAH saying in a 2020 article that growing AAH's number of affiliated or employed physicians is "our secret sauce," with the article noting that the desired outcome for AAH was to

---

[7] Mark Belling, *'Nonprofit' hospital companies chase profits; Low-income patients orphaned as hospitals build suburban palaces*, Oconomowoc Enterprise (Apr. 12, 2018.)

get paid more.[88] In 2021, the President of AAH's buyout fund was remarkably candid about AAH's goals: "One way we measure that is what we call 'share of wallet,' which is a sort of a retail measure of how many times and in what ways are we interacting with the people we serve beyond just traditional care delivery, and does that generate more revenue?"

**ANSWER:** To the extent that the allegations in this Paragraph refer to statements from AAH executives, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

161. In 2008, AAH acquired Comprehensive Cardiovascular Care Group, which was described as "the largest cardiology group in Wisconsin." That acquisition resulted in the U.S. Department of Justice alleging in 2018 that some of the acquired physicians' "compensation arrangements were not commercially reasonable . . . exceeded the fair market value of the physicians' services, took into account the physicians' anticipated referrals, and was not for identifiable services." AAH subsequently settled the case for $12 million for the alleged overcharges to government health programs resulting from its payments to physicians for referrals. On information and belief, the same practice of compensating cardiologists and other specialists in order to obtain more internal AAH referrals also has improperly increased prices for commercial health plans. This occurs because AAH's above-market payments to acquired physicians result in them directing members of commercial health plans to higher-cost care at AAH facilities instead of the best value care.

**ANSWER:** AAH admits that in 2008, it acquired Comprehensive Cardiovascular Care Group. AAH further admits that AAH settled a lawsuit brought by the Department of Justice and the state

---

[8] Jay Greene, *Why Aurora Advocate wants a Beaumont doctor*, Crain's Detroit Business (Sept. 7, 2020)

of Wisconsin, relating to compensation arrangements with two physicians, for $12 million.  To the extent that the allegations in this Paragraph refer to statements from the Department of Justice dating back to 2008, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents.  AAH otherwise denies the allegations in this Paragraph.

162.    In 2007, AAH announced a "broad affiliation agreement" with Advanced Healthcare, a group of "250 primary care physicians and specialists providing care at 14 clinics located in Milwaukee, Ozaukee, Washington and Waukesha counties." On information and belief, part of the reason for this affiliation was to eventually allow AAH to use its market power to substantially raise prices paid by commercial health plans for services at these locations. Shortly after the acquisition, local reporting indicated that AAH would impose its "all-or-nothing" contracting on Network Vendors, forcing commercial health plans to include the facilities built to house the newly acquired physicians from Advanced Healthcare in their networks if they needed access to any part of the AAH system.

**ANSWER:**  AAH admits that in 2007, it announced that it would affiliate with Advanced Healthcare, which at the time had approximately 250 doctors practicing at 14 clinics.  To the extent that the allegations in this Paragraph refer to unidentified local reporting, AAH lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies them.  AAH otherwise denies the allegations in this Paragraph.

163.    After the Advanced Healthcare acquisition, AAH announced plans to build a new hospital in Grafton, Wisconsin that, among other things, would allegedly house some of the newly acquired AAH physicians. Executives from a different hospital system claimed that their analysis of health care data showed that a new hospital was not necessary in the area based on population. AAH built a new 107-bed facility anyway. In the following years, the next closest non-AAH

hospital immediately lost a significant portion of its patients, forcing layoffs and restructuring. This reduction in competition is directly linked to AAH's other anticompetitive conduct: Because of its all-or-nothing, all-plans, anti-steering, anti-tiering, and gag clause provisions, the competitor hospital would have been unable to effectively compete for business from commercial health plans on price and quality. Thus, AAH was able to build a new hospital where adequate demand allegedly did not exist and gain significant market share by leveraging its broader system power and imposing anticompetitive provisions on commercial health plans and Network Vendors. Because of these actions, AAH has gone from being a non-meaningful inpatient provider in Grafton, Wisconsin to controlling nearly 65% of inpatient admissions in the larger *Port Washington HSA*.

**ANSWER:** AAH admits that it built a new 107-bed facility in Grafton, Wisconsin. AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified executives from a different, unidentified hospital system made the statements attributed to them and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

164. This reflects a broader trend of AAH entering markets that do not have adequate demand with the goal of suppressing competition. As the senior associate dean for clinical affairs for the Medical College of Wisconsin stated of AAH's business practices generally: "They say they're bringing in choice . . . . There's a concern they're bringing in duplication of services. I think it's the latter. They have a track record of that. . . . Is this adding choice or unnecessary redundancies, which will raise the cost of care?" This type of expansion into areas that do not have adequate demand can only be successful in the presence of anticompetitive practices imposed on Network Vendors, TPAs, commercial health plans, and independent providers.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the senior associate dean for clinical affairs for the Medical College of Wisconsin made the statements attributed to him or her and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

165. For example, in 2010, AAH opened the Aurora Summit Medical Center in Oconomowoc less than four miles from the existing Oconomowoc Memorial Hospital. At the time, Oconomowoc Memorial Hospital was nowhere near capacity and local reporting indicated there was not adequate demand for a second hospital nearby. Nevertheless, AAH opened the facility and tolerated less than 35% inpatient occupancy. Local reporting indicated that the occupancy percentage would have been even lower had AAH not acquired a number of independent physicians. On information and belief, AAH imposed the same types of non-competes and referral restrictions on those doctors as is its normal business practice in order to reduce business to Oconomowoc Memorial Hospital.

**ANSWER:** AAH admits that in 2010, it opened the Aurora Summit Medical Center in Oconomowoc. To the extent that the allegations in this Paragraph refer to unidentified local reporting, AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified reporters made the statements attributed to them and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

166. The outcome is that AAH has secured 37% of the inpatient market share in the Oconomowoc HSA, up from virtually none ten years ago. That market share has continued to increase in the last several years from 31% in 2016.

**ANSWER:** AAH denies the allegations in this Paragraph.

167.     AAH's growing market power is also reflected in its ability to control prices: According to data released in May 2022, AAH's inpatient prices at Aurora Summit Medical Center are 446% of Medicare compared to only 297% of Medicare less than four miles away at Oconomowoc Memorial Hospital. This is despite Oconomowoc Memorial Hospital having higher quality ratings than Aurora Summit Medical Center from the US Government's Centers for Medicare and Medicaid Services.

**ANSWER:** AAH denies the allegations in this Paragraph.

168.     Despite having lower prices and higher quality than Aurora Summit Medical Center, Oconomowoc Memorial Hospital's inpatient visits have declined almost every year AAH has operated Aurora Summit Medical Center. Oconomowoc Memorial Hospital's inpatient visits have declined from 4,563 in 2009 (the year before AAH opened Aurora Summit Medical Center) to 3,141 in 2010 and now steadily down to 2,948 in 2021, despite the overall number of inpatient visits in the *Oconomowoc HSA* increasing substantially over that time period.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of this Paragraph and, on that basis, denies them.  AAH otherwise denies the allegations in this Paragraph.

169.     Oconomowoc Memorial Hospital has a very slim profit margin per inpatient visit. While Aurora Summit Medical Center makes $4,341 average profit per inpatient visit and the Wisconsin state average is $3,048 profit per inpatient visit, Oconomowoc Memorial Hospital now makes only $1,168 per inpatient visit. Overall, Oconomowoc's margin is only 4%, lower than any other ProHealth or AAH hospital in Wisconsin and lower than AAH's 23% profit margin at Aurora Summit Medical Center. These very thin margins—that have fallen into a loss as recently as 2017—create a dangerous probability that Oconomowoc Memorial Hospital will be forced to

reduce or close inpatient services that account for about 40% of the Oconomowoc HSA, with the resulting benefit to AAH. If Oconomowoc Memorial Hospital closes or downsizes, this will harm commercial health plans because AAH will be able to raise its prices further while reducing quality.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

170.    AAH's attempted monopolization of the Oconomowoc HSA inpatient market has been facilitated by anticompetitive behavior. For example, as explained in greater detail elsewhere, the dramatic price difference for inpatient care between AAH's Aurora Summit Medical Center and Oconomowoc Memorial Hospital would not be possible absent AAH's use of all-or-nothing, all-plans, anti-steering, anti-tiering, and gag clauses. If Network Vendors (like Cigna, Aetna, Anthem, Trilogy, Quartz, Humana, and others), TPAs, and commercial health plans were free to direct people towards lower cost care, Oconomowoc Medical Center would see a substantially higher inpatient market share and inpatient occupancy than Aurora Summit Medical Center. As described earlier, AAH's non-competes and referral restrictions limit both staffing availability and patient flow for competitors like Oconomowoc Medical Center. And, as documented earlier, AAH has taken action to undermine nearby innovative health plans that would foster price competition, including its effort to suppress the reference-based pricing plan of plaintiffs Hometown and Uriel.

**ANSWER:** AAH denies the allegations in this Paragraph.

171.    On information and belief, AAH has pursued a similar strategy of attempted monopolization of inpatient care in other HSAs in Wisconsin using the same types of tactics.

**ANSWER:** AAH denies the allegations in this Paragraph.

172.    Similarly, AAH acquired a large outpatient practice called Family Health Plan, which the Milwaukee Business Journal characterized as, "a transaction that would further add to

Aurora's dominance of the southeastern Wisconsin market." During the acquisition, AAH insisted that, as part of the acquisition, it be able to impose a provision that would require the acquired Family Health Plan providers to "exclusively" refer to AAH facilities. This provision was projected to be "crippling" for other health care providers in the area. On information and belief, it was only possible for AAH to insist on the exclusive referral provision because it knew that Network Vendors and commercial health plans (who would be forced to pay higher costs as their members are exclusively referred to higher cost AAH facilities) could not challenge the clearly anti-competitive provision because of AAH's market power.

**ANSWER:** AAH admits that it acquired an outpatient practice in 2020 called Family Health Plan. AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph that reference an article from the "Milwaukee Business Journal" relating to a decades-old transaction and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

173.    The acquisition worked as AAH appears to have intended: The hospital that press reports predicted "stands to lose the most if Aurora buys Family Health Plan's medical group and clinics" ended up quickly facing "the biggest decline in net income by percentage of any Milwaukee-area hospital" after the AAH transaction. And, about six years later, a competitor hospital was forced to close since it "doesn't have the ability to fund indefinitely the types of losses we've incurred," according to the competitor's CEO. On information and belief, this closure significantly increased costs for commercial health plans over the following years by eliminating an AAH facility that was a lower cost option for healthcare.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to statements from "press reports" relating to

a decades-old transaction and the purported statements of the CEO of an AAH competitor and, on that basis, denies them.

174.     In late 2010, the Milwaukee Journal Sentinel reported that AAH's other recent acquisitions have included "a large radiology practice, and the practices of the heart surgeons and related specialists who practice at Aurora St. Luke's Medical Center." On information and belief, these acquisitions were partly driven by the ability of AAH to impose higher prices for the exact same imaging services on commercial health plans after the radiology acquisition and to control referrals to and from these facilities.

**ANSWER:**  To the extent that the allegations in the first sentence of this Paragraph about "recent" transactions cite to a report from the "Milwaukee Journal Sentinel" relating to transactions that are more than a decade old, AAH respectfully refers the Court to that report for an accurate and complete account of its contents.  AAH otherwise denies the allegations in this Paragraph.

175.     In 2013, AAH acquired The Manitowoc Surgery Center which reduced competition for outpatient services in the region. AAH described the goal of the acquisition as increasing "outpatient surgery services within Aurora's integrated health care system." On information and belief, the acquisition was partly driven by the ability of AAH to impose higher prices for the exact same surgery services, by the desire to reduce competition from outpatient surgery centers that academic literature has indicated provide effective and lower-cost competition to hospitals, and by the desire to use referral restrictions to direct more patients in the *Manitowoc HSA* to AAH inpatient facilities, where AAH now controls over 39% of inpatient admissions.

**ANSWER:**  AAH admits that in 2013 it acquired The Manitowoc Surgery Center.  To the extent that the allegations in this Paragraph refer to statements from an AAH representative, AAH

respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

176. In 2016, the Wisconsin Heart Hospital in Wauwatosa closed. This closure took place after independent providers reported they were "punished" by AAH for investing in or being affiliated with the Wisconsin Heart Hospital, including a well-documented decision by AAH to remove a respected physician from the role of medical director at AAH's Aurora West Allis Hospital because of her affiliation with the Wisconsin Heart Hospital. Physicians and medical associations also expressed concern that AAH was using coercive referral practices to force specialist physicians to refer to AAH instead of competitors, including Wisconsin Heart Hospital. On information and belief, AAH's actions contributed to the closure of Wisconsin Heart Hospital, eliminating a potential competitor that could have contained costs, particularly in the *Milwaukee and West Allis HSAs*.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

177. After the acquisition of a home care company for seniors in 2021, the CEO of AAH's internal buyout fund stated that, "This opens a lot of opportunities for us, thinking about what we can be in the broader healthcare continuum. How do you control the overall continuum? How do you own it? It's very hard for one person, one company or one organization to have all of the parts. Well, I think we're the first organization in the country that now can say *we own the full healthcare continuum*." (emphasis added)

**ANSWER:** To the extent that the allegations in this Paragraph refer to statements from an AAH representative, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

178.     AAH was created by the merger of Aurora Health Care in Wisconsin and Advocate Health Care in Illinois. This merger made AAH one of the largest hospital systems in the country. The transaction both increased AAH's combined market power in Southeastern Wisconsin and Northeastern Illinois[9] and increased AAH's overall leverage over commercial health plans and Network Vendors, especially those operating in both Illinois and Wisconsin. AAH is thus in an even stronger position to impose anticompetitive terms on Network Vendors and to extract supracompetitive prices from commercial health plans.

**ANSWER:** AAH admits that Aurora Health Care in Wisconsin and Advocate Health Care in Illinois merged to form AAH. AAH otherwise denies the allegations in this Paragraph and in Footnote 9.

179.     Even prior to the merger, AAH was acquiring physician groups in Northern Illinois.

**ANSWER:** AAH admits that it has acquired physician groups in Illinois.

180.     The CEO of a Wisconsin company with a self-funded health plan remarked that the merger would raise prices for Wisconsin self-funded health plans like his, writing:

> For the life of me, I [can't] see how the proposed mega-merger between Aurora Health Care of Wisconsin and Advocate Health Care Network of Illinois will benefit payers like my company Serigraph or its co-workers. The main rationale for the executives and boards of the two non-profit corporations must be that bigger is better in a rapidly changing and consolidating industry. They must believe they will have more clout when dealing with the major health insurance carriers. But more clout on the provider side means higher prices, not lower. Do corporations seek more leverage so they can lower prices? Don't be naïve.

---

[9] For example, Aurora controlled about 32% of inpatient admissions in the border community of Winthrop Harbor, Illinois before the merger to about 47% of inpatient admissions after the merger. Commercial health plans based in Illinois paid AAH for services in Wisconsin before the merger and paid AAH for services in Wisconsin and Illinois after the merger.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph regarding the purported statements of the CEO of a Wisconsin company and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

181. After the merger, inpatient prices increased at AAH facilities in Wisconsin. This is reflected in the median net profit margin AAH earned from patients increasing over 20% for its facilities in Wisconsin from 2017 to 2019. This merger and resulting market power growth has already resulted in higher prices for Wisconsin commercial health plans and will continue to as AAH's misuse of its ever-growing market power continues.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

182. Similarly, inpatient prices increased at AAH's facilities in Illinois with the median net profit margin AAH earned from patients increasing from 7.1% in 2017 (the last full year before the merger) to 7.8% (the first full year after the merger). As discussed previously, there is significant evidence that AAH uses its market power to impose supracompetitive prices and anticompetitive contract terms at newly acquired facilities. A nearly 10% growth in inpatient net profit margins for AAH Illinois facilities immediately after a merger fits that well-documented pattern for AAH.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

183. And the academic literature supports the fact that prices have increased at AAH's newly integrated Illinois and Wisconsin facilities because of market power. As the Kaiser Family Foundation wrote, "One reason that prices rise when there are hospital mergers across markets is

that they increase hospital bargaining positions with insurers, which seek to have strong provider networks across multiple areas in order to attract employers with employees in multiple locations."

**ANSWER:** To the extent that the allegations in this Paragraph refer to statements from the Kaiser Family Foundation, AAH respectfully refers the Court to those statements for an accurate and complete account of their contents. AAH otherwise denies the allegations in this Paragraph.

184. AAH has not stopped there. Earlier this month it announced a proposed merger with Atrium Health of North Carolina. This combination would create a conglomerate that would do business in seven states. If permitted to go through, this merger would further increase AAH's market power, especially for the commercial health plans and Network Vendors who operate in both the existing AAH and Atrium markets, according to healthcare economists. Separately, Professor Barak Richman of Duke University said that the proposed merger was "very, very alarming" and would likely lead to higher prices. "This does not point to a new frontier of competition. It points to a new scale of lack of competition. A new scale of monopoly power," Richman said.

**ANSWER:** AAH admits that in May 2022, it announced a proposed merger with Atrium Health of North Carolina with hospitals in seven states. AAH otherwise denies the allegations in this Paragraph.

## VIII. "AAH'S ANTICOMPETITIVE CONDUCT CAUSES ARTIFICIALLY INFLATED PRICES AND SUPPRESSES QUALITY"

### A. AAH's Prices Drive Costs for Commercial Health Plans

185. Prices set by hospital systems like AAH are the primary driver of cost for commercial health plans. And, as explained previously, AAH's anticompetitive conduct allows it to set supracompetitive prices that commercial health plans must pay. Commercial health plans, including self-funded health plans like Hometown and Uriel, have made billions of dollars in direct

payments to AAH at the supracompetitive price levels AAH's unlawful conduct has enabled it to charge.

**ANSWER:** AAH denies the allegations in this Paragraph.

186. A Harvard University analysis concluded that, "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of healthcare services. . . . 70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers."

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "Harvard University analysis" and, on that basis, denies them.

187. In fact, a Milwaukee Journal Sentinel report on AAH's acquisition and negotiation strategy noted that, contrary to Aurora's claims of improved efficiency, studies have found that consolidation gives hospital systems more leverage in negotiating higher prices.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "Milwaukee Journal Sentinel" report, and, on that basis, denies them.

188. As explained below, in Milwaukee specifically healthcare prices are inexplicably high considering the ostensible level of competition in the market. The unjustifiably high prices paid by Eastern Wisconsin businesses, unions, and local governments are made possible by AAH's anticompetitive behavior and are evidence of AAH's market power and ability to control prices in both the inpatient and outpatient markets. The prices described below are the prices at the time Plaintiffs filed their original complaint.

**ANSWER:** AAH denies the allegations in this Paragraph.

189.    These data make clear that AAH's anticompetitive conduct facilitates the supracompetitive prices it bills to commercial health plans in all the HSAs where AAH operates. Under federal antitrust precedents, when vertical restraints like those AAH has forced on commercial health plans and Network Vendors lead to higher prices and lower quality, that is direct evidence that they are anticompetitive.

**ANSWER:** AAH denies the allegations in this Paragraph.

B.    **AAH Charges Supracompetitive Prices in Milwaukee**

190.    Milwaukee employers and residents pay extraordinarily high prices for healthcare. Overall, Milwaukee has the fourth highest prices for healthcare in the entire country with overall prices 44% above the national median. Indeed, Milwaukee's healthcare prices are higher than those in New York City. Overall healthcare spending per person in the Milwaukee metro area is 21% above the national median, making it the seventh highest metro area in the country for per person healthcare spending.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

191.    Moreover, Milwaukee's already high prices are continuing to rise: From 2015 to 2019, hospital prices rose in Milwaukee at the fifth highest rate of the entire country.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

192.    These high prices are despite the existence—on paper—of a healthy level of competition in Milwaukee. This competition should control prices. But the vertical restraints described above that AAH has used to undermine competition have been key drivers of Milwaukee's extraordinarily high healthcare costs.

**ANSWER:** AAH denies the allegations in this Paragraph.

193.    AAH is by far the most expensive hospital system in Milwaukee, charging supracompetitive prices for inpatient and outpatient procedures and significantly driving up the cost of healthcare for commercial health plans, including the self-funded health plans of Plaintiff Hometown and Plaintiff Uriel, that have paid AAH's supracompetitive prices in Milwaukee and nearby HSAs during the last four years.

**ANSWER:** AAH denies the allegations in this Paragraph.

194.    A comparison of inpatient prices shows that AAH's prices are 65% more expensive than an average of the other large hospitals in the Milwaukee area. This dramatic price differential within a market is one of the highest in the country.

**ANSWER:** AAH denies the allegations in this Paragraph.

195.    Overall, AAH's prices at its flagship facility in Milwaukee are 373% of the Medicare rates, compared to a state average of 307%, according to data published in May 2022. This is despite the fact that AAH itself makes a profit on Medicare rates as detailed in a comprehensive independent recent report evaluating hospital profitability.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

196.    For example, prices for common procedures at Aurora St. Luke's Medical Center are dramatically higher than they are at Ascension St. Francis Hospital, a facility only 5 minutes away with similar quality ratings.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

197.    Similarly, prices are higher at AAH's St. Luke's facility than they are at Froedtert Hospital, a different competitor less than 20 minutes away that is generally rated as providing higher quality by patients and safer by independent ratings agencies. US News and World Report ranks Froedtert Hospital as the number one hospital in Milwaukee, and a higher percentage of patients would recommend Froedtert Hospital than would recommend AAH's St. Luke's according to Healthgrades.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

198.    When evaluating prices for specific procedures, academic literature suggests one useful analysis is comparing "narrowly defined" procedures, *i.e.*, those that have little variation within the procedure and occur with sufficient frequency to support empirical analysis.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

199.    One example of a "narrowly defined" procedure that is also a very high revenue procedure for hospitals is a joint replacement. For a major commercial network, AAH's price for a hip or knee replacement in Milwaukee is $62,538, over $21,000 higher than the price for the same procedure five minutes away at a competitor hospital. Charging customers approximately 50% more than a nearby competitor for a common procedure would not be possible in a functioning, competitive market. This price differential cannot be explained by AAH's market power in Milwaukee, where it only controls about 40% of the market for acute inpatient hospital services. Thus, this price differential is the result of the anticompetitive contracting restrictions AAH imposes on commercial health plans and Network Vendors, in Milwaukee, by virtue of its dominant power both systemwide and over the AAH Monopolized Inpatient Markets.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

200. For other very common surgeries, including appendectomies and angioplasties, AAH charges supracompetitive prices. For both procedures, AAH's price is almost double that of Ascension, the other main competitor in Milwaukee. For appendectomies, AAH's price is $46,002 compared to $24,172 at Ascension. For angioplasties, AAH's price is $79,880 compared to $43,319 at Ascension.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

201. For inpatient treatment of other common diseases like sepsis, pneumonia, esophagitis, and heart failure, AAH is also significantly more expensive than other hospitals in Milwaukee. AAH is 54-105% more expensive than Ascension for those procedures and 15-53% more expensive than Froedtert for those procedures.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

202. Additionally, prices for outpatient procedures are significantly higher at AAH's flagship facility in Milwaukee than competitors. This includes substantially higher prices than independent outpatient providers and extends even to its large hospital peers, where AAH's prices for outpatient services average over 22% higher than other large hospitals. These outpatient prices in Milwaukee relative to other providers can only be explained by AAH's abuse of its systemwide

market power in its monopoly power in other markets to control outpatient prices in Milwaukee. Without the vertical restraints that AAH uses to leverage its market power systemwide, AAH would not be able to maintain these supracompetitive outpatient prices.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. The remaining allegations in this Paragraph are legal conclusions for which no response is required. To the extent a response is required, AAH denies the remaining allegations in this Paragraph.

203.    For example, AAH's price for a colonoscopy with biopsy—an extremely common and uncomplicated procedure—is over $10,700 for a common commercial health plan whereas the procedure costs only about $4,700 at Froedtert & the Medical College of Wisconsin for the same plan, a facility that is about 15 minutes away and has generally higher quality and safety ratings. Prices for a routine procedure that are more than double a nearby competitor cannot be explained absent AAH's restraints on competition.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

204.    A CT scan of the head or brain is one of the procedures that drives a large portion of hospital imaging revenue. It is also a procedure that academic literature considers "plausibly undifferentiated" because "there is little variation in how these services are delivered across hospitals or across patients within a hospital." Thus, academic literature considers "plausibly undifferentiated" procedures like CT scans a useful way to compare hospital prices, because any price differential is likely explained by market power and/or anticompetitive restraints rather than quality. While there is no differentiation as to the quality of a CT scan performed at AAH versus a competitor, AAH does find a way to differentiate as to price: Its price is over $300 more than nearby Froedtert & the Medical College of Wisconsin.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

205.    Another important way to compare prices is by looking at low-cost but extremely high-volume procedures like routine blood tests. On this count, AAH's prices are egregious, with a commercial health plan paying *more than double* the price at AAH compared to the nearby Froedtert & the Medical College of Wisconsin. Because these tests are conducted hundreds of

times a day at AAH, the impact of such dramatically supracompetitive prices on commercial health plans is substantial.



**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

206. Since 2015, healthcare prices in Milwaukee have risen at the fifth highest rate in the entire country. AAH's high and rising prices driven by anticompetitive behavior are a major contributor to this increasing financial burden on Milwaukee employers and families.

**ANSWER:** AAH denies the allegations in this Paragraph.

C. **"AAH Charges Supracompetitive Prices in Green Bay"**

207. AAH also charges supracompetitive prices for inpatient and outpatient procedures in Green Bay, including prices paid by Plaintiff Hometown within the last four years, despite facing some ostensible competition from three other non-AAH hospitals. As a result, Green Bay is one of the top five metro areas in the entire country for the price of medical professional services relative to Medicare.

**ANSWER:** AAH denies the allegations in this Paragraph.

208.    As to inpatient care, AAH's Aurora Baycare Medical Center has dramatically higher prices than nearby facilities according to data published in May 2022. Its average inpatient prices are almost 328% of the Medicare rates while the other three hospitals in Green Bay are only 223%, 256%, and 299%.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported "data published in May 2022," and, on that basis, denies them.

209.    As to outpatient care, AAH's average prices across all outpatient procedures are even more inflated, registering at 350% of Medicare. All three other hospitals have lower prices than AAH, with an average markup over Medicare of 311%. These outpatient prices relative to other providers can only be explained by AAH's abuse of its market power in other parts of Wisconsin to control prices in Green Bay and by AAH's contracting practices.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the Plaintiffs' unspecified data, and, on that basis, denies them.  AAH otherwise denies the allegations in this Paragraph.

210.    These high prices are despite AAH's Baycare Medical Center having lower quality ratings from the federal government's Centers for Medicare & Medicaid Services and lower safety ratings from the independent ratings agency Leapfrog than the next two nearest competitor hospitals.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph, including with respect to the purported ratings from the Centers for Medicare & Medicaid Services and Leapfrog, and, on that basis, denies them.

D.    **"AAH Charges Supracompetitive Prices Throughout Wisconsin"**

211.    AAH's supracompetitive prices facilitated by anticompetitive conduct extend to every area where AAH operates. Plaintiffs Hometown and Uriel have paid AAH's supracompetitive prices at locations throughout Wisconsin over the last four years.

**ANSWER:**  AAH denies the allegations in this Paragraph.

212.    For example, in Oshkosh AAH's price for an angioplasty is about double that of the two nearest hospitals, one of which is less than 2 miles away. Similarly, AAH's price for joint replacement is 60% higher than the two nearest inpatient competitors. Plaintiff Hometown has paid AAH's supracompetitive prices in Oshkosh and nearby areas over the past four years.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

213.    In Kenosha, AAH's price for a joint replacement is over $15,000 higher than a Froedtert facility that is less than 7 miles away.  Similarly, the price for an angioplasty is nearly $7,000 higher. Overall, the weighted average price (which accounts for differences in acuity) for an inpatient service is $42,167 for AAH's Kenosha facility versus $32,099 at the nearby Froedtert facility. Like other self-funded plans based in Wisconsin or Illinois, Plaintiff Hometown and Plaintiff Uriel have paid AAH's supracompetitive prices in Kenosha and nearby areas over the past four years.

**ANSWER:**  AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

214.    In Sheboygan, AAH's prices for outpatient procedures are extremely inflated: AAH's prices are 358% of Medicare compared to the nearest competitor with prices of 308% of Medicare. Plaintiff Hometown has paid AAH's supracompetitive prices in Sheboygan and nearby areas over the past four years.

**ANSWER:** AAH denies the allegation that its prices for outpatient procedures are extremely inflated. AAH lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and, on that basis, denies them.

215. In Oconomowoc where AAH opened Aurora Summit Medical Center four miles away from the existing Oconomowoc Memorial Hospital, AAH's prices for inpatient services average 446% of Medicare compared to only 297% of Medicare at Oconomowoc Memorial Hospital. Overall, the weighted average price (which accounts for differences in acuity) for an inpatient service is $44,411 for AAH's Oconomowoc facility versus $23,104 at the nearby Oconomowoc Memorial Hospital, a remarkable 92% higher.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

216. In Marinette, AAH's inpatient and outpatient prices are substantially above the state average and substantially higher than the next nearest non-AAH hospital. Plaintiff Hometown has paid AAH's supracompetitive prices in Marinette and nearby areas over the past four years.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

217. As reflected in specific procedures outlined above and in an analysis of aggregate data, AAH's prices for outpatient procedures overall are substantially more expensive than the Wisconsin and national averages. Plaintiff Hometown has paid AAH's supracompetitive prices for outpatient procedures hundreds of times at facilities across Wisconsin in the current calendar year alone. Similarly, Plaintiff Uriel has paid AAH's supracompetitive prices for outpatient procedures at numerous facilities across Wisconsin in the current calendar year alone.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

218.     A major Wisconsin insurer and Network Vendor stated in 2006 that "Aurora is a high-price healthcare provider relative to other providers." Since then, AAH's prices have increased substantially, both as an absolute matter and as compared to its competitors.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegation that the unidentified insurer and network vendor made the statements attributed to them and, on that basis, denies that allegation. AAH otherwise denies the allegations in this Paragraph.

E.     **"AAH Raised Prices In Illinois Substantially After Merger"**

219.     After the merger of Advocate and Aurora to form AAH, the combined system substantially raised prices in Illinois. This occurred both in the areas previously serviced primarily by Advocate as well as in the areas near the Wisconsin border where Aurora had previously operated.

**ANSWER:** AAH denies the allegations in this Paragraph.

220.     Two sets of data from the highly-respected, independent RAND Corporation indicate the substantial price increases AAH imposed as a result of the merger: During the period of 2016-2018 (almost entirely before the merger was finalized in April 2018), what were then the Advocate hospitals in Illinois had average commercial prices (both inpatient and outpatient) of 231% of Medicare. During the period of 2018-2020 (primarily after the merger), the same hospitals in Illinois, now owned by AAH, had average commercial prices of 253% of Medicare. This substantial increase in prices was on an absolute level, relative to competitors, and compared to the well-accepted baseline of Medicare.

**ANSWER:** AAH denies the validity of the methodology, characterizations, and conclusions of the "RAND Corporation" study referenced in this Paragraph and otherwise denies this paragraph's allegations.

221. The combined power of the two systems gave the merged entity even more ability to continue Aurora's longstanding practice of imposing the anticompetitive contracting restraints and referral restrictions described above that increase prices for commercial health plans in Illinois, Michigan, and Wisconsin.

**ANSWER:** AAH denies the allegations in this Paragraph.

## IX. ADDITIONAL FACTS REGARDING NAMED PLAINTIFFS

222. Hometown Pharmacy is a business with locations across Wisconsin with a self-funded health plan, the Hometown Pharmacy Health and Welfare Benefits Plan. Hometown provides pharmacy services in seventy locations throughout Wisconsin and the Upper Peninsula of Michigan. The Hometown Pharmacy Health and Welfare Benefits Plan provides benefits to about 300 individuals throughout Wisconsin.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and, on that basis, denies them.

223. Hometown has operated a self-funded health plan from 2020 to present. During that period, it made payments to AAH for medical services for plan members at AAH facilities throughout Wisconsin. These payments were made at the supracompetitive prices that AAH forces Network Vendors to accept by virtue of the vertical restraints described above.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

224.    In 2020, Hometown's self-funded plan used Medben as a TPA. Hometown paid providers, including AAH through reference-based pricing. As described previously, AAH took actions to punish and suppress Hometown's reference-based pricing plan in a way that is typical of how AAH has behaved towards others attempting to operate commercial health plans using reference-based pricing.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

225.    Partially because of AAH's actions to suppress reference-based pricing, in 2021 Hometown made changes to its self-funded health plan. It began using Trilogy as a Network Vendor and Aither Health as a TPA. Trilogy is a Network Vendor that has entered agreements with AAH typical of those described previously between Network Vendors and AAH. Hometown does not have the ability to negotiate directly with AAH—instead, it has paid for services its members received at AAH facilities at the rates negotiated between Trilogy and AAH.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations that Hometown made changes to its self-funded health plan in 2021, began using Trilogy as a Network Vendor and Aither Health as a TPA, and paid for services its members received at AAH facilities at the rates negotiated between Trilogy and AAH and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

226.    Since switching to Trilogy, Hometown has made direct payments to AAH for the healthcare services its employees and their dependents have received from AAH. All or nearly all of these payments were at supracompetitive rates that AAH was only able to charge by virtue of the unlawful vertical restraints it has imposed on Network Vendors, including Trilogy.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of this Paragraph and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

227. Uriel Pharmacy is a business located in East Troy, Wisconsin with a self-funded health plan, the Uriel Pharmacy Health and Welfare Plan. Like other businesses in Eastern Wisconsin, it has struggled with the rising cost of health care and the rising prices charged by AAH.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

228. Uriel has operated a self-funded health plan from 2000 to present. During that period, it made payments to AAH for medical services for plan members at AAH facilities. These payments were made at the supracompetitive prices that AAH forces Network Vendors to accept by virtue of the vertical restraints described above.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

229. In 2020 and 2021, Uriel's self-funded health plan used National General (which was purchased by Allstate) as a TPA. Uriel paid providers, including AAH, through reference based pricing. As described previously, AAH took actions to punish and suppress Uriel's reference based pricing actions in a way that is typical of how AAH has behaved towards others attempting to operate commercial health plans using reference based pricing.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first and second sentences of this Paragraph and, on that basis, denies them. AAH denies the remaining allegations in this Paragraph.

230. Partially because of AAH's actions to suppress reference-based pricing, in 2021 Uriel made changes to its self-funded health plan. It began using Cigna as a Network Vendor and Allstate remained the TPA. Cigna is a Network Vendor that has entered agreements with AAH typical of those described previously between Network Vendors and AAH. Uriel does not have the ability to negotiate directly with AAH—instead, it has paid for services its members received at AAH facilities at the rates negotiated between Cigna and AAH.

**ANSWER:** AAH lacks knowledge or information sufficient to form a belief about the truth of the allegations that Uriel made changes to its self-funded health plan in 2021, began using Cigna as a Network Vendor, and paid for services its members received at AAH facilities at the rates negotiated between Cigna and AAH, and, on that basis, denies them. AAH otherwise denies the allegations in this Paragraph.

## X. "CLASS ALLEGATIONS"

### A. "Class Definition"

231. Plaintiffs define the class in this litigation as follows:

All commercial health plans that purchased acute inpatient hospital services and/or outpatient medical services directly from AAH at any time during the period from May 24, 2018, up to the present (the "Class Period").

Excluded from the Class are AAH, and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all federal governmental entities.

**ANSWER:** AAH admits that Plaintiffs purport to seek relief on behalf of the class described in this Paragraph but denies that Plaintiffs have established or can establish the prerequisites to

certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

232. The Class is ascertainable because it is defined to include only entities within the Relevant Geographic Markets that caused at least one individual claim for acute inpatient hospital services or outpatient medical services to be paid to AAH during the Class Period.

**ANSWER:** AAH admits that Plaintiffs purport to seek relief on behalf of the class described in the Amended Complaint but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

B. **"Certification Requirements"**

233. Plaintiffs do not yet know the exact size of the Class; however, based upon the nature of the industry involved, Plaintiffs expect that there are several hundred Class members. Therefore, Class members are so numerous and geographically dispersed that joinder is ultimately impracticable.

**ANSWER:** AAH denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

234. Because AAH has acted in a generally consistent manner applicable to the Class writ large, questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. The common questions include, but are not limited to:

    **a.** Whether Defendant has a monopoly in the *AAH Monopolized Inpatient Markets*;

    **b.** Whether Defendant has acted willfully or otherwise unlawfully in attempting to acquire, maintain, or abuse its monopoly;

**c.**     Whether AAH implemented contract provisions that unreasonably restrain trade by imposing All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Gag Clauses, and/or other conduct that foreclosed competition in the Relevant Geographic Markets for Acute Inpatient Hospital Services and Outpatient Medical Services;

**d.**     Whether AAH's vertical restraints enable it to charge unlawful supracompetitive prices;

**e.**     Whether AAH's ongoing conduct continues to restrain trade and reinforce its market power;

**f.**     Whether AAH's anticompetitive conduct results in the foreclosure and/or substantial lessening of competition; and

**g.**     Whether AAH's conduct violates 15 U.S.C. §§ 1-2 ("the Sherman Act").

**ANSWER:**  AAH denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

235.   Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the other Class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

**ANSWER:**  AAH denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

236. Plaintiffs will adequately represent the interest of all Class members. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting such class action cases. Neither Plaintiffs nor class counsel have any interests in conflict with those of the Class members.

**ANSWER:** AAH denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

237. This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affect only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of the Class is impracticable and class treatment will permit a large number of similarly situated commercial health plans to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, the prosecution of the claims of the Class in part for injunctive relief is appropriate because AAH has acted, or refused to act, on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**ANSWER:** AAH denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this Paragraph.

## XI. "CLAIMS FOR RELIEF"

### COUNT ONE
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)

238. The above-alleged paragraphs are incorporated by reference.

**ANSWER:** AAH incorporates by reference its answers to the above Paragraphs.

239.     Defendant AAH entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** AAH denies the allegations in this Paragraph.

240.     AAH hospitals located in the AAH-dominated markets have overwhelming market power in each of their *AAH Monopolized Inpatient Markets*. Moreover, AAH writ large has systemwide power that gives it market power over its entire service area. That market power has enabled AAH to impose anticompetitive vertical restraints such as All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Gag Clauses, and other exclusionary restraints in written agreements and/or in contract negotiations with Network Vendors.

**ANSWER:** AAH denies the allegations in this Paragraph.

241.     AAH has imposed these vertical restraints in its negotiations with all or nearly all commercial health plans and Network Vendors it negotiates with in Wisconsin that use networks that contain AAH facilities.

**ANSWER:** AAH denies the allegations in this Paragraph.

242.     By compelling commercial health plans and Network Vendors to agree to these anticompetitive terms, AAH unlawfully restrains trade and the limits the ability of competitors to compete in the Relevant Geographic Markets for Acute Inpatient Hospital Services and Outpatient Medical Services. The anticompetitive effects of AAH's conduct far outweigh any purported non-pretextual, pro-competitive justifications.

**ANSWER:** AAH denies the allegations in this Paragraph.

243.     These vertical restraints, together and individually, have foreclosed a substantial amount of competition. Because AAH imposes them on all or nearly all commercial health plans

and Network Vendors, these anticompetitive contracting terms have affected competition as a whole in the relevant markets.

**ANSWER:** AAH denies the allegations in this Paragraph.

244.     As a proximate result of AAH's unlawful conduct, Plaintiffs and members of the Class have paid supracompetitive prices directly to AAH, prices that are higher than they would have been absent AAH's anticompetitive conduct.

**ANSWER:** AAH denies the allegations in this Paragraph.

245.     Thus, Plaintiffs and members of the Class have been injured in their business or property during the last four years in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to AAH for acute general care hospital services and ancillary products during the Class Period. Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendant AAH's unlawful conduct. Under 15 U.S.C. § 1 and 15 U.S.C. § 15, Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**ANSWER:** AAH denies the allegations in this Paragraph.

**COUNT TWO**
**MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 2)**

246.     The above-alleged paragraphs are incorporated by reference.

**ANSWER:** AAH incorporates by reference its answers to the above Paragraphs.

247.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." It is also unlawful to willfully maintain or abuse monopoly power.

**ANSWER:** AAH denies the allegations in this Paragraph.

248.    AAH has monopolized, and continues to monopolize, the *AAH Monopolized Inpatient Markets* alleged herein in violation of 15 U.S.C. § 2. During the pertinent times, AAH engaged in the willful and unlawful attempt to maintain and abuse its monopoly power. It did so by using its market power in those geographies to impose on commercial health plans, Network Vendors, and TPAs anticompetitive vertical restraints, including All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, Gag Clauses, and other exclusionary restraints.

**ANSWER:** AAH denies the allegations in this Paragraph.

249.    These vertical restraints have had the direct effect of inhibiting competition from existing and/or would-be competitors that would compete with AAH on price and quality.

**ANSWER:** AAH denies the allegations in this Paragraph.

250.    These restraints have also allowed AAH to leverage its monopoly power over the *AAH Monopolized Inpatient Markets* to extract supracompetitive prices in the other geographies in which it operates.

**ANSWER:** AAH denies the allegations in this Paragraph.

251.    Plaintiffs and members of the Class have been harmed by AAH's abuse, willful maintenance, and leveraging of its monopoly power. They have paid higher prices at AAH facilities in the Relevant Geographic Markets than they would have absent AAH's unlawful monopolization, both directly due to the vertical restraints themselves and due to the substantial lessening of competition the restraints have facilitated.

**ANSWER:** AAH denies the allegations in this Paragraph.

252.     Thus, Plaintiffs and members of the Class have been injured in their business or property during the last four years in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to AAH for acute general care hospital services and ancillary products during the Class Period. Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendant's unlawful conduct. Under 15 U.S.C. § 2, and 15 U.S.C. § 15 Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory and other equitable relief, as well as attorneys' fees and costs.

**ANSWER:**  AAH denies the allegations in this Paragraph.

## COUNT THREE
## ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT
## (15 U.S.C. § 2)

253.     The above-alleged paragraphs are incorporated by reference.

**ANSWER:**  AAH incorporates by reference its answers to the above Paragraphs.

254.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

**ANSWER:**  AAH denies the allegations in this Paragraph.

255.     During the pertinent times, AAH engaged in the willful and unlawful attempt to maintain or expand its monopoly power. Specifically, AAH attempted to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

**ANSWER:**  AAH denies the allegations in this Paragraph.

256.     During the pertinent times, AAH attempted to acquire or expand its monopoly through illegitimate means, including but not limited to through tying and unlawful restraints such

as All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, Gag Clauses, and other exclusionary restraints.

**ANSWER:** AAH denies the allegations in this Paragraph.

257.    One motivation AAH had in imposing these restraints was its intent to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

**ANSWER:** AAH denies the allegations in this Paragraph.

258.    There is a dangerous probability that AAH will be successful in its attempt to monopolize that market.

**ANSWER:** AAH denies the allegations in this Paragraph.

259.    Plaintiffs and members of the Class have been injured during the last four years by AAH's use of these vertical restraints, and would be further injured if AAH is successful in monopolizing the Oconomowoc HSA.

**ANSWER:** AAH denies the allegations in this Paragraph.

260.    Under 15 U.S.C. § 2 and 15 U.S.C. § 15, Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**ANSWER:** AAH denies the allegations in this Paragraph.

**<u>COUNT FOUR</u>**
**INJUNCTIVE, EQUITABLE, DECLARATORY RELIEF**

261.    The above-alleged paragraphs are incorporated by reference.

**ANSWER:** AAH incorporates by reference its answers to the above Paragraphs.

262.    The Court has authority to award injunctive relief pursuant to 15 U.S.C. § 26 and the Court's inherent authority.

**ANSWER:** AAH denies the allegations in this Paragraph.

263. The Court has authority to award declaratory relief under 28 U.S.C. § 2201.

**ANSWER:** AAH denies the allegations in this Paragraph.

264. Plaintiffs plead that to the extent the facts and law allow for the imposition of equitable, declaratory, or injunctive remedies, they plead recourse to any and all such remedies.

**ANSWER:** AAH denies the allegations in this Paragraph.

265. Plaintiffs request the Court order the reformation of AAH's practices, and/or contractual and agreement terms, including, for example express language against use of the use of All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Gag Clauses, and other exclusionary restraints.

**ANSWER:** AAH denies the allegations in this Paragraph.

266. Plaintiffs and the Class members have standing to and do seek equitable relief against AAH, including an injunction to prohibit AAH's illegal conduct as well as an order of equitable restitution and disgorgement of the monetary gains AAH obtained from its unfair competition.

**ANSWER:** AAH denies the allegations in this Paragraph.

## XII. "JURY DEMAND"

267. Plaintiffs demand a trial by jury.

**ANSWER:** AAH admits that Plaintiffs demand a trial by jury.

## XIII. "PRAYER FOR RELIEF"

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf, and on behalf of those similarly situated, and adjudge and decree as follows:

A.    Certify the proposed Class, designate the named Plaintiffs as class representatives and the undersigned counsel as class counsel, and allow Plaintiffs and the Class to have trial by jury;

B.    Find that AAH has unreasonably restrained trade in violation of 15 U.S.C. § 1 and Wis. Stat. § 133.03(1) and that Plaintiffs and the Class members have been damaged and injured in their business and property as a result of these violations;

C.    Find that AAH has monopolized, and continues to monopolize, the relevant markets alleged herein in violation of 15 U.S.C. § 2 and that Plaintiffs and the Class members have been damaged and injured in their business and property as a result of these violations;

D.    Find that AAH engaged in a trust, contract, combination, or conspiracy in violation of 15 U.S.C. § 1 and that Plaintiffs and the Class members have been damaged and injured in their business and property as a result of this violation;

E.    Order under 15 U.S.C. § 15 that Plaintiffs and members of the class recover treble threefold the damages determined to have been sustained by them as a result of the AAH for the amount so determined;

F.    Enter judgment against AAH and in favor of Plaintiffs and the Class awarding restitution and disgorgement of ill-gotten gains to the extent such an equitable remedy be allowed by law;

G.    Award reasonable attorneys' fees, costs, expenses, prejudgment and post-judgment interest, to the extent allowable by law;

H.    Award equitable, injunctive, and declaratory relief, including but not limited to declaring AAH's misconduct unlawful and enjoining it, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged herein above; and

I.    Award such other and further relief as the Court may deem just and proper.


**ANSWER:** AAH denies that Plaintiffs are entitled to any relief, legal or equitable, from AAH,

as requested in the Amended Complaint or otherwise.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, AAH asserts the following separate and additional defenses, all of which are pleaded in the alternative, and none of which constitute an admission that AAH is in any way liable to Plaintiffs, that Plaintiffs have been or will be injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever. AAH reserves the right to amend or supplement its affirmative defenses and raise counterclaims as additional facts concerning its defenses become known to it. As a defense to the Amended Complaint and each and every allegation contained therein, AAH alleges:

### First Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred because they lack Article III standing to assert their claims against AAH to the extent they have not sustained an injury in fact that is fairly traceable to any act or omission of AAH, and to the extent their alleged injury is not redressable by a remedy the Court may provide.

### Second Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred because they lack antitrust standing to assert their claims against AAH to the extent they are not efficient enforcers of the Sherman Act.

### Third Affirmative Defense

Plaintiffs fail to state a claim upon which relief can be granted. Included in, but not limiting such challenge, AAH reasserts all grounds set forth in its previously filed motion to dismiss the First Amended Class Action Complaint as if fully reasserted here.

### Fourth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because they have not sustained any

107

cognizable injury or antitrust injury.

**Fifth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, to the extent their alleged injury or damages resulted from other causes that were not the result of any act or omission attributable to AAH, or were not the result of any act or omission attributable to AAH that reduced competition.

**Sixth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because any conduct by or on behalf of AAH alleged in the Amended Complaint was taken independently in good faith and was legally or equitably protected by applicable privileges.

**Seventh Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct that is the subject of the Amended Complaint did not lessen competition in any relevant market or markets.

**Eighth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, to the extent the actions or practices of AAH were undertaken for legitimate business reasons, were otherwise economically justified, and/or resulted from a good-faith effort to meet competition or market conditions.

**Ninth Affirmative Defense**

Insofar as Plaintiffs allege that AAH's conduct constituted *per se* violations of the antitrust laws, such claims are barred, in whole or in part, because Plaintiffs do not adequately define two separate products that were "tied" together.

**Tenth Affirmative Defense**

Insofar as Plaintiffs allege that AAH's conduct constituted *per se* violations of the antitrust laws, such claims are barred, in whole or in part, because AAH did not coerce or force Network

Vendors to purchase more than one product or service.

### Eleventh Affirmative Defense

Insofar as Plaintiffs allege that AAH's conduct constituted *per se* violations of the antitrust laws, such claims are barred, in whole or in part, because AAH does not have market or monopoly power over any properly defined "tying" product.

### Twelfth Affirmative Defense

Insofar as Plaintiffs allege that AAH's conduct constituted *per se* violations of the antitrust laws, such claims are barred, in whole or in part, because AAH's conduct did not cause foreclosure of any volume of commerce in any relevant "tied" product market.

### Thirteenth Affirmative Defense

Insofar as Plaintiffs allege that AAH's conduct constituted Rule of Reason violations of the antitrust laws, such claims are barred, in whole or in part, because AAH's conduct did not cause substantial foreclosure in any relevant "tied" product market.

### Fourteenth Affirmative Defense

Insofar as Plaintiffs allege that AAH's conduct violated the antitrust laws under the rule of reason, such claims are barred, among other reasons, because the Amended Complaint does not allege a properly defined relevant market, because any restraints complained of are ancillary to legitimate, procompetitive activities, and because the Amended Complaint does not allege how procompetitive effects of AAH's legitimate activities are outweighed by anticompetitive effects.

### Fifteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because AAH does not have market power or monopoly power in any properly defined relevant market.

## Sixteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because AAH does not have a dangerous probability of achieving market power or monopoly power in any properly defined relevant market.

## Seventeenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because AAH lacks market power in any properly defined relevant market because of the lack of significant barriers to entry.

## Eighteenth Affirmative Defense

Plaintiffs' claims for monopolization and attempted monopolization are barred, in whole or in part, to the extent they are contradictory.

## Nineteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to allege any exclusionary or anticompetitive conduct.

## Twentieth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, to the extent the purported relevant markets alleged in the Amended Complaint are not relevant antitrust markets, and the Plaintiffs cannot carry their burden of defining a proper relevant market.

## Twenty-first Affirmative Defense

With respect to each and every allegation of the Amended Complaint as they relate to the request for class certification, class certification is not appropriate because, among other reasons, there is a lack of:

a) Numerosity;

b) Commonality or community of interest;

c) Typicality;

d) A reasonably ascertainable class;

e) Adequate representation;

f) Appropriateness of relief to the putative class as a whole;

g) Predominance of common questions over questions affecting individual class members;

h) Substantial benefit to the litigants and the court;

i) Superiority of a class action to other available methods for fair and efficient adjudication;

j) Impracticality of joinder of all putative class members.

### Twenty-second Affirmative Defense

Plaintiffs' claims on behalf of themselves and the purported class are barred, in whole or in part, to the extent they are indirect purchasers of the services on which they base their claims.

### Twenty-third Affirmative Defense

Plaintiffs have an adequate remedy at law and no factual or legal basis for the grant of equitable relief.

### Twenty-fourth Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred by the applicable statutes of limitations.

### Twenty-fifth Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred by the doctrine of laches, in that Plaintiffs have unreasonably delayed efforts to enforce their rights, if any.

## Twenty-sixth Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred by the doctrine of estoppel.

## Twenty-seventh Affirmative Defense

All or some of Plaintiffs' claims on behalf of themselves and the purported class are barred by the doctrines of waiver or acquiescence.

## Twenty-eighth Affirmative Defense

Plaintiffs have failed to mitigate their damages, if any, and recovery should be reduced or denied accordingly.

## Twenty-ninth Affirmative Defense

Any damages that Plaintiffs allege to have suffered are too remote, speculative, and/or uncertain to allow for a recovery. Such damages are not capable of ascertainment and allocation.

## Thirtieth Affirmative Defense

Plaintiffs' claims should be dismissed to the extent they are moot.

## Thirty-first Affirmative Defense

Plaintiffs would be unjustly enriched if allowed to recover any relief claimed to be due.

## Thirty-second Affirmative Defense

Plaintiffs' prayer for attorneys' fees should be stricken, in whole or in part, because there is no basis, factual, legal or otherwise, to support an award of attorneys' fees.

### Thirty-third Affirmative Defense

Plaintiffs' claims for injunctive relief are barred, in whole or in part, to the extent Plaintiffs have available an adequate remedy at law and to the extent injunctive relief otherwise is inequitable.

### Thirty-fourth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to state a claim for injunctive relief, insofar as Plaintiffs seek to enjoin alleged events that have already transpired without the requisite showing of threatened harm or continuing harm and insofar as any harm they may have suffered is not irreparable.

### Thirty-fifth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, to the extent any recovery by Plaintiffs would be duplicative of recovery by other parties and other lawsuits, subjecting AAH to the possibility of multiple recoveries; such recovery is barred by the Fifth and Eighth Amendments to the United States Constitution.

### Thirty-sixth Affirmative Defense

Plaintiffs' claims should be barred, in whole or in part, for uncertainty and vagueness and because their claims are ambiguous and/or unintelligible. AAH avers that Plaintiff's claims do not describe the events or legal theories with sufficient particularity to permit AAH to ascertain what other defenses may exist.

### Thirty-seventh Affirmative Defense

AAH hereby gives notice that it intends to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case, and hereby reserves its rights to amend this Answer and assert such defenses.

## PRAYER FOR RELIEF

Wherefore, AAH prays as follows:

1. That Plaintiffs take nothing by reason of the Amended Complaint, and that judgment be rendered in favor of AAH;

2. That the Court dismiss the Amended Complaint in its entirely, with prejudice;

3. That AAH be awarded its costs of suit and attorney's fees incurred in this action (including all costs and fees associated with collecting, processing, and reviewing documents including electronically stored information), to the maximum extent permitted by law;

4. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

AAH demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Date: October 30, 2023

/s/ *Daniel E. Conley*
Daniel E. Conley
Nathan J. Oesch
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: 414.277.5000
Fax: 414.271.3552
daniel.conley@quarles.com
nathan.oesch@quarles.com

Matthew Splitek, SBN 1045592
QUARLES & BRADY LLP
33 E Main St, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Fax: 608.251.9166
matthew.splitek@quarles.com

Jane E. Willis
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Telephone: 617.951.7000
Fax: 617.951.7050
jane.willis@ropesgray.com

Anne Johnson Palmer
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111
Telephone: 415.315.6300
Fax: 415.315.6350
anne.johnsonpalmer@ropesgray.com