UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | | |
|---|---|---|
| URIEL PHARMACY HEALTH AND WELFARE PLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-CV-610 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| ADVOCATE AURORA HEALTH, INC., et al., | ) | December 2, 2025 |
| | ) | 11:10 a.m. |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| PATRICK SHAW, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 24-CV-157 |
| | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE AURORA HEALTH, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

TRANSCRIPT OF TELEPHONIC MOTION HEARING
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Uriel Plaintiffs:         Fairmark Partners, LLP
                                  By:  MR. JAMIE CROOKS
                                  1001 G St. NW, Ste. 400E
                                  Washington, DC  20001
                                  Ph:  619-507-4182
                                  jamie@fairmarklaw.com

                                  Fairmark Partners, LLP
                                  By:  MR. YINKA EZEKIEL ONAYEMI
                                  400 7th St. NW, Ste. 304
                                  Washington, DC  20004
                                  Ph:  708-351-4497
                                  yinka@fairmarklaw.com

                                  Bell Giftos, LLC
                                  By:  MR. KEVIN M. ST. JOHN
                                  5325 Wall St., Ste. 2200
                                  Madison, WI  53718
                                  Ph:  608-216-7993
                                  kstjohn@bellgiftos.com

APPEARANCES (Cont'd.):

For the Shaw Plaintiffs:

Holwell Shuster & Goldberg, LLP
By:  MR. GREGORY DUBINSKY
     MS. EILEEN M. DELUCIA
425 Lexington Ave., 14th Floor
New York, NY  10017
Ph:  646-837-5151
gdubinsky@hsgllp.com
edelucia@hsgllp.com

Stafford Rosenbaum, LLP
By:  MR. DAVID P. HOLLANDER
     MS. ERIN ROME
222 W. Washington Ave. Ste. 900
Madison, WI  53701
Ph:  608-256-0226
dhollander@staffordlaw.com
erome@staffordlaw.com

For the Defendants:

Ropes & Gray, LLP
By:  MS. ANNE JOHNSON PALMER
3 Embarcadero Center 24th Floor
San Francisco, CA  94111
Ph:  415-315-6300
anne.johnsonpalmer@ropesgray.com

Ropes & Gray, LLP
By:  MR. KYLE PATRICK RAINEY
Prudential Tower
800 Boylston St.
Boston, MA  02199-3600
Ph:  617-951-7000
kyle.rainey@ropesgray.com

Quarles & Brady, LLP
By:  MR. DAVID E. CONLEY
411 E. Wisconsin Ave. Ste. 2400
Milwaukee, WI  53202
Ph:  414-277-5000
daniel.conley@quarles.com

ALSO PRESENT:

MS. JANE FOX, In-House Counsel,
Advocate Aurora Health, Inc.

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

TRANSCRIPT OF PROCEEDINGS

THE CLERK:  Hello?

THE COURT:  Hello.  We on here?

UNIDENTIFIED SPEAKER:  We are, your Honor.

THE COURT:  All right.  We've got a lot of -- a lot of lawyers on here.  I don't know.  Well, why don't we start off, who's going to be the talking for the plaintiff?

MR. CROOKS:  Hello, your Honor.  This is Jamie Crooks on behalf of the Uriel plaintiffs, but I'll be speaking for both sets of plaintiffs today.

THE COURT:  All right.  And who's going to speak for the defendants?

MS. PALMER:  Good morning, your Honor.  Anne Palmer for Ropes & Gray.  I'll be addressing the defendants' position today.

THE COURT:  Okay.  Very good.  Okay.  Mr. Crooks, go ahead.

MR. CROOKS:  Thank you, your Honor.  The primary issue we would like to discuss today is Defendant Advocate Aurora's refusal to put up an adequately prepared witness to talk about the Department of Justice and the Wisconsin -- the Wisconsin Attorney General's investigation of them for the very same conduct that this litigation is about.

So just a quick -- a quick overview to situate this, the case is about anti-competitive contracting practices and the

ways in which Advocate Aurora, which is the dominant system in eastern Wisconsin, uses market power to interfere with competition and keep prices elevated.  Our burden at the outset in this case is to prove that the restraint at issue, the contract provision called the All Plans Clause, had anti-competitive effects, that is, it kept prices higher and interfered with competition in the market.

We'll prove that with deposition testimony from insurers, many of which have said that the All Plans provision interfered with their ability to compete.  We'll show it with Advocate Aurora's own documents which show that the health system valued the All Plans Clause at tens or hundreds of millions of dollars per year in the way it kept prices elevated.  And we'll demonstrate it through expert analysis.  We just served our expert reports on Advocate Aurora, and we will be talking about those with you, I'm sure, down the road.

But once we show that the All Plans Clause caused anti-competitive effects, that's not the end of the case. Advocate Aurora has the opportunity to say, hey, well, even if all of that's true, the pro-competitive benefits, the benefits of All Plans Clause outweigh that, outweigh those anti-competitive effects.

So crucially here -- and this is what we're here to talk about today -- Advocate Aurora has to offer actual genuine pro-competitive benefits.  They can't be pretextual.  They have

to be the actual reasons that the All Plans Clause was put in place. You can't have made-for-litigation arguments in this context. So it's highly relevant how Advocate Aurora justified these restraints at the time they were in place.

Fortunately, we have a really good source of evidence for exactly that question, which is the Department of Justice's antitrust division and the Wisconsin Attorney General investigating these very same contractual provisions, the All Plans Clause, two years before we brought this litigation. And the Justice Department specifically asked Advocate Aurora under penalty of perjury the same question that we want to ask and will need to ask in this case, which is: What are the pro-competitive justifications? What are your nominally good reasons for requiring all of the insurers in the Wisconsin market to submit to your All Plans Clause?

So it's crucial for us to understand what the justifications Aurora gave to the Department of Justice were, what their factual basis was for asserting those justifications, and who formulated the justification. Was it just the lawyers who came up with it, or was it actually the contracting parties, the employees of Advocate Aurora who implemented the All Plans Clause.

We also know that Advocate Aurora told the Justice Department not to worry because, lo and behold, after the investigation started, they repealed the All Plans Clause. And

if they did that because the Department of Justice investigated, which is what we believe, that's highly relevant because they have told us in depositions that, oh, the All Plans Clause served its purpose, but we pulled it out because market conditions changed.  If in reality they repealed it just because the Department of Justice was investigating them, that's highly relevant to this pro-competitive justification.

So we listed as one of our 30(b)(6) topics communications -- we wanted to ask a corporate representative to nail this down about what Advocate Aurora told Department of Justice, what its communications and interactions with the Department of Justice were related to this antitrust investigation.  But when we got the witness -- after months of negotiation -- finally in a deposition, again and again he claimed either not to know what the basis was for any of their assertions or that the words on the page speak for themselves.  And we were stuck with a witness who basically disclaimed any knowledge of how Advocate Aurora responded to the Justice Department subpoenas and how they justified this to the antitrust authorities.

And so our motion today is about asking Advocate Aurora to prepare to present a properly prepared witness and to make sure that -- and this is what we could use your help on -- clarify that we are entitled to ask about not just the words on the page of the document that they sent to the Justice Department, but the actual factual basis behind them, who drafted those

statements, whether they were made for litigation or whether they were based on some fact in the world, and not to be burdened, as we were in our deposition, with hundreds of scope objections every time we asked the question. And we're entitled to the corporation's position on these questions.

I can stop there, or I can -- I can answer any questions you might have.

THE COURT: Well, why don't we -- why don't we hear from your opponent, and then -- then we'll see. I don't know.

Ms. Palmer?

MS. PALMER: Thank you, your Honor. So as we've addressed in our papers, this motion to compel additional 30(b)(6) testimony should be denied for two reasons. One is that the Plaintiffs are moving to compel testimony that's far beyond the topics they actually noticed. And, secondly, they're seeking testimony that's not properly sought through a 30(b)(6) corporate representative deposition.

The topic, your Honor, that's in dispute here was Advocate Aurora's communications with the DOJ during the course of this governmental investigation that dealt with certain provisions in the organization's pair contracts. So fairly understood, that topic dealt with the communications Advocate Aurora had with the DOJ, what sort of requests did the organization receive and when, who was communicating with the Government on the organization's behalf, how did Advocate Aurora come to

produce certain documents, were there any witness interviews or depositions that occurred. Those are all areas that the witness who testified, Daniel Brzozowski, in fact, addressed during the deposition.

And for just further context here, your Honor, well prior to this deposition occurring, we had asked plaintiffs to identify any specific communications that they thought to explore or to use as exhibits during this deposition. We did that as early as August 1st of 2025, two months prior to the deposition occurring on September 30th. The plaintiffs' counsel waited for nearly two months throughout the course of our various negotiations. They sent certain documents they intended to present the witness two business days prior to the deposition, but those documents did not include the presentations that are the center of this motion and that were the subject of Mr. Crooks' arguments just now.

Instead, plaintiffs' counsel showed up at the deposition and repeatedly asked the witness not about the justifications that Advocate Aurora offered or necessarily isn't even the bases for those, but the deposition devolved into really a memory test and a quiz about individual assertions within particular slides in the presentation and what Advocate Aurora's outside counsel meant by certain words or phrase -- phrases that were used during these presentations that were delivered to the DOJ. And in our view, that questioning really

was tantamount to asking a corporate representative to effectively explain what its outside counsel had meant or what its counsel relied upon during, say, a closing argument in a prior case.

These were not questions that were about the actual communications that occurred with the DOJ, but the substantive language that was used, the import of that, what the intent was behind it, and any sort of underlying support. The witness, to be clear, throughout the deposition confirmed that the materials that Advocate Aurora had produced to the Government supplied the bases for Advocate Aurora's positions in these presentations. Those document productions that went to the DOJ were made available to the plaintiffs in this case very early on during the discovery process back in February of 2024. Your Honor, those document productions, which again support Advocate Aurora's positions before the DOJ, total 620,000 pages of materials. And in our view to ask a witness to be able to testify about particular details or granular aspects of those really goes into the sort of memory test the courts have recognized as not appropriate for a 30(b)(6) deposition.

So, your Honor, to look to avoid the necessity to come back to the Court for additional disputes about these 30(b)(6) depositions, we had offered a compromise proposal to plaintiffs' counsel once we appreciated what they actually intended to explore through this topic, which again was not

something that was fleshed out in any of the negotiations prior to the deposition. And the proposal, your Honor, that we offered to plaintiffs was notwithstanding the fact that we're beyond the close of the discovery period, if he would respond to a combination of either interrogatories or requests for admissions that are geared at and specific to the areas that counsel just identified, what were the justifications that were offered, what is the organization's bases for those, who generated them; because effectively, your Honor, if we're looking at an additional quantity of witness deposition testimony that would be compelled here, the organization is really in a position where either the same internal lawyer or, worse, the organization's outside counsel is going to need to appear to address particular aspects of these presentations in a manner that begins to invade the attorney-client privilege and the work product protection.

We believe and we have cited multiple cases in our papers that written discovery is the far more appropriate mechanism to deal with these issues, in particular either contention interrogatories or requests for admission. Your Honor endorsed that as a mechanism in the *Patzer* decisions that we've all cited in the papers. There is another case that we identified involving SmithKline Beecham and Apotex where the Court refused to compel 30(b)(6) testimony on the defendants' discovery responses or the bases for its claim of patent infringement and

recognized that that was better suited to an interrogatory to allow the defendant to be able to address the sort of wide factual landscapes that the topic embraced and to also navigate any sort of privilege or work product protection concerns. And, your Honor, the plaintiffs' counsel rejected our proposal that we deal with this dispute through written discovery summarily out of hand despite the fact that they had actually propounded interrogatories earlier in the case that asked Advocate Aurora about the bases for portions of these very same presentations.

So that would be our proposal to the Court as to how to resolve these issues, that we do not, you know, face an order compelling additional testimony but, instead, respond to, you know, any amount of additional interrogatories or requests for admission that the plaintiffs propound that actually focus and address these topics. I'd be happy to answer any questions, and thank you, your Honor.

THE COURT: Okay. So, plaintiff, is that -- that, I assume, is not acceptable to you?

MR. CROOKS: You're right, your Honor. It's not. And I think -- I think it's -- from our point of view, it's clear to see why written discovery would not be adequate here in large part because of how Advocate Aurora and its counsel have navigated this 30(b)(6) process. You just heard Ms. Palmer Johnson say that they were prepared to -- only to provide a

witness to talk about "when and how the communications were made and who was involved." But we didn't ask for a 30(b)(6) just to authenticate documents we had already. We're entitled to know what the underlying factual basis for their many representations that they made to the Justice Department were.

And whenever I asked about those in the deposition, I got a scope objection saying we're just here to talk about the words on the page, effectively, and then the witness following counsel's lead saying, oh, I don't know, you'd have to ask outside counsel. So we've been getting the runaround on this. And I think having this done through interrogatories or requests for admissions would lead to similar lawyer-driven results instead of hearing from the people who actually were on the ground and the source of the factual information that went to the Department of Justice.

And just on that last point real quick, they said in their motions and Ms. Palmer just repeated that, you know, their position is what we're asking for is like asking a company to explain what its lawyers said in a closing argument. And I think that right there gives the lie to this whole -- this whole process. This is not -- what they said to the Department of Justice is not like a lawyer in the closing argument. As you know, your Honor, a lawyer in a criminal case -- (Audio disruption.) -- Department of Justice and the company --

THE COURT: Wait. I -- you --

MR. CROOKS: -- has to provide answers.

THE COURT: Counsel, you cut out for about a minute, so can you --

MR. CROOKS: Oh. I'm sorry.

THE COURT: No, it just stopped. There was no sound, and now there's sound. So go back 30 seconds.

MR. CROOKS: Oh, sure. I was saying that I wanted to respond to counsel on the other side saying that what we're asking for is like asking a company to explain its lawyer's closing argument in a case. And I think that right there demonstrates that we're at a huge disagreement about what this is. We're -- a lawyer in a closing argument is allowed to say to the jury, you know, ladies and gentlemen of the jury, my client didn't shoot the victim; and if he did shoot the victim, he had a really good reason. Right? You're allowed to make lawyerly arguments in court like that. But you're not allowed to do that when the Department of Justice subpoenas you and asks for the company's factual response. And we are asking about that. We're asking about the actual reasons that supported factual statements made under penalty of perjury to the Department of Justice. And when I tried to ask about that in this deposition, I got scope objections every time, and a witness --

THE COURT: Well, I --

MR. CROOKS: -- witness who had not talked to anybody.

THE COURT: Let me intervene. I mean, defendants, you don't dispute that the plaintiff is entitled to answers to that question or those -- those questions, do you?

MS. PALMER: Your Honor, I think we're talking about different things here. I mean, counsel is suggesting that there was some sort of factual response under the pains and penalties of perjury. That's not what counsel questioned this corporate representative about at the deposition that we're arguing about. What's at issue are two presentations that the organization's outside counsel delivered in meetings to the Department of Justice to advocate the organization's position as to why the investigation should be closed without any sort of further action taken.

We're not talking about something that's akin to an interrogatory or a factual narrative that sets forth just hard basic information. We are talking about an advocacy piece that the organization's counsel delivered. And the witness identified that where factual support was at issue in these presentations, your Honor, that can be found in the 620,000 pages of documents that the organization produced to the government that the plaintiff has had in this case for, you know, what's approaching two years at this point and it's taken upwards of 30 witness depositions to explore.

THE COURT: All right. Well, I think the plaintiff should get his questions answered, and I want to look now to

the best way to do it.

So what's the best way to do it?  Do you have -- somebody else be deposed, redepose somebody, do -- do written questions and then more oral deposition?  I mean, I don't like these -- I don't like when there's -- there's so much of a sense the evidence is not being disclosed.  So, now, I don't know at what point we get where I feel comfortable that most of the important evidence has been disclosed, but we're clearly not there now.  So let's figure out a way to have this evidence properly disclosed to the plaintiff.

I don't know, Plaintiff, how do you want to do that or, Defendant, either side is free to tell me.  But I'm not satisfied with the level of compliance, Defendant.  That's just the case.  I've read over your material.  So let's solve the problem.  How do we do that?

MR. CROOKS:  So I like the suggestion you just made, your Honor, of -- and I was going to say an iterative process, but I think we could do it in one go, which is a list of factual questions.  And if we get the kinds of lawyerly answers you would normally get from an interrogatory to follow up with live testimony limited just to those questions for which we're not satisfied with the answers.  I think that would be one way to go about it I had not thought of before you mentioned it.

What I had come in here prepared to ask for today was another seven-hour deposition, whether it's of this witness or

another witness, we don't care as long as they're adequately prepared and they don't -- they're not able to hide behind, oh, I don't know what outside counsel told the Justice Department.

So either of those solutions would work for us.

THE COURT: Ms. --

MS. PALMER: And, your Honor --

THE COURT: -- Palmer.

MS. PALMER: -- what counsel proposed -- your Honor, in terms of what counsel just proposed, a two-step process where there are specific written questions that are identified in advance, we respond to those as either interrogatories or requests for admission, and then there's the opportunity to take additional testimony if there's a need to do so, subject to an appropriate time limitation, we are prepared to respond in that manner and, in fact, had at least proposed the first portion of that as a way to try to navigate these issues.

THE COURT: All right. So do we have a tentative agreement, at least, on how to proceed? And assuming everybody complies, it will be -- that will work. If not, I assume you'll be back here.

How much time do we need for this?

MR. CROOKS: I think, your Honor, if you -- if we decided that now, there would be very little chance we'd need to come back to you. I would say that we should be entitled to, if necessary, a seven-hour deposition, but I -- I would

hope that through the written process that you proposed -- and it sounds like both me and Ms. Palmer are on board with -- we could likely not need -- we would likely not need to use all of that. But I think to avoid squabbling about time limits, as we have over this 30(b)(6) process the past couple months, I think if you just let us know now that one typical seven-hour session after written discovery would be available, that would suffice for our purposes.

THE COURT: Okay. Ms --

MS. PALMER: Your Honor, the Plaintiffs --

THE COURT: Go ahead. Go ahead.

MS. PALMER: Your Honor, excuse me. So the plaintiffs have already taken 14 hours of 30(b)(6) testimony, including specific to the amendment of the contract provisions following the DOJ's inquiry. And especially if we can focus this through a written mechanism on the front end, I don't see a need for a full seven hours worth of testimony, especially when this same designee that's initially appeared has testified for two and a half hours. So we'd propose a maximum of three hours, if there is a need for testimony remaining.

THE COURT: All right. Well, I'll make a very wise Solomonic decision. I'll give you five.

All right. Anything else we have to do now, or does that cover it?

MR. CROOKS: That covers it for the plaintiffs, your

Honor.

THE COURT:  All right.

MS. PALMER:  And same here, as well.

THE COURT:  Thanks, everybody.  Thank you.

MR. CROOKS:  Thank you.

MS. PALMER:  Thank you, your Honor.

(At 11:36 a.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of all the proceedings had in the above-titled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 4th day of December, 2025.
Milwaukee, Wisconsin.

Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI  53202

Jennifer_Stake@wied.uscourts.gov

ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____