# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| URIEL PHARMACY HEALTH AND WELFARE PLAN; and URIEL PHARMACY, INC., on their own behalf and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>ADVOCATE AURORA HEALTH, INC. AND AURORA HEALTH CARE, INC.,<br><br>    Defendants. | Case No. 2:22-cv-00610 |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JEFFREY J. LEITZINGER

Date: June 2, 2026

Daniel E. Conley
Nathan J. Oesch
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: 414.277.5000
Fax: 414.271.3552
daniel.conley@quarles.com
nathan.oesch@quarles.com

Matthew Splitek
QUARLES & BRADY LLP
33 E Main St, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Fax: 608.251.9166
matthew.splitek@quarles.com

Jane E. Willis
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Telephone: 617.951.7000
Fax: 617.951.7050
jane.willis@ropesgray.com

Rocky C. Tsai
Anne Johnson Palmer
ROPES & GRAY LLP
One Maritime Plaza, Suite 1800
300 Clay Street
San Francisco, CA 94111
Telephone: 415.315.6300
Fax: 415.315.6350
rocky.tsai@ropesgray.com
anne.johnsonpalmer@ropesgray.com

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................3

    I.     The Yardstick Model ...................................................................................5

    II.    The Two-Step Method ................................................................................6

LEGAL STANDARD ....................................................................................................7

ARGUMENT.................................................................................................................9

    I.     Dr. Leitzinger's Model Should Be Excluded Because It Fails to Isolate the Effect of the Challenged Provisions on Rates .........................................................9

         A.    Dr. Leitzinger Has Not Selected Proper Yardstick Systems for Comparison to Aurora ..................................................................................10

              1.    Dr. Leitzinger's Chosen Yardsticks Are Not Comparable to Aurora. ...........................................................................................11

              2.    Dr. Leitzinger's Chosen Yardsticks Are Tainted by the Very Conduct Plaintiffs Seek to Challenge Here. .........................15

         B.    Dr. Leitzinger's Regression Has Not Isolated the Price Effects of the Challenged Provisions .........................................................................18

    II.    Dr. Leitzinger's Unreliable Regression Model Produces False Positives When Tested .............................................................................................24

    III.   Dr. Leitzinger's Damages Model Is Riddled with Data Analysis Errors and Faulty Assumptions ...................................................................................26

         A.    Dr. Leitzinger Misreads Data from the Key Insurer in His Yardstick............................................................................................27

         B.    Dr. Leitzinger's Extrapolation of Missing Claims Data Is Unreliable ........................................................................................29

    IV.   Dr. Leitzinger's Two-Step Process Fails Due to His Faulty Yardstick.................30

CONCLUSION............................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ..................................................................................................8

*ATA Airlines, Inc. v. Fed. Express Corp.*,
665 F.3d 882 (7th Cir. 2011) ..............................................................................................7, 30

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ................................................................................................19

*Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ..........................................................................................*passim*

*CDW LLC v. NETech Corp.*,
906 F. Supp. 2d 815 (S.D. Ind. 2012) .............................................................................10, 11

*City of Rockford v. Mallinckrodt ARD, Inc.*,
No. 3:17-cv-50107, 2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) ..................................*passim*

*CMFG Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
No. 14-cv-249, 2017 WL 4792253 (W.D. Wis. Oct. 23, 2017) ..............................................18

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...................................................................................29

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993).......................................................................................................*passim*

*Eleven Line, Inc. v. North Tex. State Soccer Ass'n, Inc.*,
213 F.3d 198 (5th Cir. 2000) ................................................................................................11

*Freeland v. AT & T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................................19, 20, 21

*Fuesting v. Zimmer, Inc.*,
421 F.3d 528 (7th Cir. 2005) ..................................................................................................7

*Gilbert v. Lands' End, Inc.*,
158 F.4th 839 (7th Cir. 2025) ......................................................................................8, 27, 28

*Gilbert v. Lands' End, Inc.*,
No. 19-cv-823, 2022 WL 2643514 (W.D. Wis. July 8, 2022)................................................28

Case 2:22-cv-00610-LA    Filed 06/02/26    Page 4 of 36    Document 208

*Haley v. Kolbe & Kolbe Millwork Co.*,
No. 14-cv-99-bbc, 2016 WL 1180203 (W.D. Wis. Mar. 25, 2016) ...........................................8

*Kleen Prods. LLC v. Int'l Paper*,
2017 WL 2362567 (N.D. Ill. May 31, 2017) ...........................................................................25

*Koehler v. Infosys Techs. Ltd.*,
628 F. Supp. 3d 835 (E.D. Wis. 2022) .....................................................................................8

*Lyman v. St. Jude Med. S.C., Inc.*,
580 F. Supp. 2d 719 (E.D. Wis. 2008) ...........................................................................17, 28

*McKnight v. United Airlines, Inc.*,
No. 23-cv-16118, 2026 WL 879727 (N.D. Ill. Mar. 30, 2026) ..............................................8

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ................................................................................................25

*Sloan Valve Co. v. Zurn Indus.*,
No. 10-cv-204, 2013 WL 3147349 (N.D. Ill. June 19, 2013) .................................................30

*Tagatz v. Marquette Univ.*,
861 F.2d 1040 (7th Cir. 1988) ................................................................................................18

*Team Schierl Companies v. Aspirus Inc.*,
No. 22-cv-580, 2025 WL 3687939 (W.D. Wis. Dec. 19, 2025)....................................*passim*

*United States v. Mire*,
725 F.3d 665 (7th Cir. 2013) ..................................................................................................25

*Werdebaugh v. Blue Diamond Growers*,
No. 12-cv-2724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014).............................................21

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) ..................................................................................................30

**Other Authorities**

Fed. R. of Evidence § 403...........................................................................................................3, 7

Fed. R. of Evidence § 702.................................................................................................3, 7, 8, 26

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs' economist, Dr. Jeffrey Leitzinger, did nothing to rule out the obvious alternative explanations for rate differentials that existed *before* Defendant Aurora Health Care, Inc. negotiated the contract terms that Dr. Leitzinger paints as the differentials' cause. His proposed testimony is unreliable and cannot be admitted as evidence.

Plaintiffs retained Dr. Leitzinger to support their claim that certain terms in contracts Aurora negotiated with sophisticated insurers resulted in higher prices. The insurers, including behemoths such as Anthem, acted as so-called "Network Vendors," negotiating contracts with Aurora and other providers to assemble and market healthcare networks. Beginning in 2003, Aurora's contracts with these insurers included bargained-for terms that Plaintiffs characterize as requiring the insurers to include all Aurora facilities in all plan networks, and as preventing the "tiering" and "steering" of patients to other providers (the "Challenged Provisions").

Dr. Leitzinger created a "yardstick" regression model that he claims shows the "Challenged Provisions" boosted rates.[1] But for three separate reasons, his model is unreliable.

*First*, the model lacks two necessary components: (1) an appropriate "yardstick" to compare against Aurora's rates; and (2) variables to control for all plausible rate determinants *other than* the Challenged Provisions. For his "yardstick," Dr. Leitzinger did not compare the rates that Aurora charged before and after negotiating the Challenged Provisions. Rather, he compared Aurora to two hospitals that all but guaranteed the findings Plaintiffs sought. First, he compared Aurora's rates in Wisconsin to rates that Advocate Health charged in *Illinois*, where

---

[1] Dr. Leitzinger's opinions are set forth in two expert reports: Ex. 1, Expert Report of Jeffrey J. Leitzinger, Ph.D., dated November 21, 2025 ("Leitzinger Rpt.") and Ex. 2, Rebuttal Report of Jeffrey J. Leitzinger, Ph.D., dated March 23, 2026 ("Leitzinger Reb."). All exhibit numbers refer to the corresponding exhibits attached to the June 2, 2026 Declaration of Anne Johnson Palmer, filed concurrently herewith.

rates have long been lower industrywide. Then he compared Aurora's rates to those of ████████, which has long been a low-cost provider in Wisconsin. Dr. Leitzinger ignored the basic question a rigorous economist would have asked: whether his comparator rates were already lower than Aurora's *before* Aurora negotiated the Challenged Provisions. The evidence shows not only that they were, but also that the comparators included Challenged Provisions in their contracts just as Aurora did. Compounding his choice of incomparable "yardsticks," Dr. Leitzinger declined to control for well-established determinants of healthcare pricing, including quality, reputation, "willingness to pay" for Aurora (a measure of patient demand), and the relative bargaining power of insurers. The obvious alternative explanations—which Dr. Leitzinger did not test or rule out— for the rate differentials that he seeks to pin on the Challenged Provisions are (1) that rates in Wisconsin are systematically higher than in Illinois for the same reasons they have *always* been higher; and (2) that Aurora's rates have historically been higher than ████████'s because Aurora is the better and more desired system. Dr. Leitzinger thus cannot reliably isolate the effects of contract terms.

Based on Dr. Leitzinger's similar failure to select a comparable "yardstick" and to use adequate controls, the Western District of Wisconsin recently excluded the yardstick model that the same plaintiffs' attorneys obtained from Dr. Leitzinger in their failed case against Aspirus Health. *See Team Schierl Companies v. Aspirus Inc.*, No. 22-cv-580, 2025 WL 3687939 (W.D. Wis. Dec. 19, 2025) ("*Aspirus*"). Chief Judge James Peterson—exercising the court's gatekeeper role under *Daubert* at class certification—concluded that Dr. Leitzinger's model was improperly constructed and lacked sufficient controls to reliably measure the impact of the challenged conduct. *Id.* The same fundamental flaws require exclusion of Dr. Leitzinger's model here.

*Second*, Dr. Leitzinger failed to test his model. Like the defense expert in *Aspirus*,

Defendants' expert here performed a "placebo" test to see whether Dr. Leitzinger's model shows "damages" where it should not.  Defendants' expert ran the model for Wisconsin systems that did *not* use the Challenged Provisions.  If the model reliably measured the Challenged Provisions' effects, such a test would yield negative results.  Damningly, it instead returned multiple false positives, showing statistically significant rate increases even exceeding those Dr. Leitzinger found for Aurora.  This placebo effect confirms that, far from reliably measuring the Challenged Provisions' impact, Dr. Leitzinger's model consistently hallucinates damages where none exist.

Dr. Leitzinger's response to the placebo test only confirmed his model's flaws.  He dismissed the test on the ground that he designed his model *only* to compare Aurora in Wisconsin to Advocate Health in Illinois—meaning the model cannot be applied to *any* other Wisconsin health system without additional controls.  This contradicts Dr. Leitzinger's choice to use another Wisconsin system (███████) as one of his two yardsticks *without* making such additional adjustments.  It also shows his model is purely ad hoc, not one that has been (or even could be) reliably applied to isolate causes and effects in similar cases.

*Third*, Dr. Leitzinger commits fundamental data interpretation errors.  For the largest insurer in Illinois, he uses the wrong data field to calculate purported damages.  Worse, he resorts to "extrapolation" to calculate results for two insurers for which he lacks *any* data.  These errors allow him to inflate his damages estimate by an additional ████████ and further underscore the unreliability of his model.

For all these reasons, which are discussed further below, Defendants respectfully move this Court to exclude Dr. Leitzinger's opinions and testimony under Federal Rules of Evidence 702 and 403, and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

## **BACKGROUND**

Aurora Health Care ("Aurora") has offered healthcare services to the residents of Eastern

3

Wisconsin through dozens of hospitals and clinics for more than forty years. In April 2018, Aurora merged with Advocate Health Care ("Advocate"). Advocate's facilities operate in the Chicago, Illinois area. While keeping their independent identities and operations in their respective states, Advocate and Aurora formed a new parent entity, Advocate Aurora Health, Inc.

Plaintiffs filed their operative complaint on October 2, 2023. *See* Second Am. Compl. ("Complaint"), ECF No. 46. Plaintiffs dropped most of their initial theories,[2] with their experts focusing solely on AAH's contracts with certain Wisconsin insurers that allegedly require all AAH providers to be "in-network" for all health plans at the highest benefit level. Ex. 1, Leitzinger Rpt. ¶ 5. Plaintiffs have also changed their proposed class definition, including by limiting the number of insurers whose contracts are at issue. Plaintiffs' expert reports now define the Class as all "entities that purchased in-network Healthcare Services directly from AAH providers in Eastern Wisconsin" from May 24, 2018 to December 31, 2022 pursuant to contracts between AAH and seven specific insurers: Anthem/Blue Cross Blue Shield of Wisconsin, United Healthcare, Cigna Healthcare, Humana Inc., Wisconsin Physicians Services, Health Payment Systems, and Trilogy Health Solutions. Ex. 1, Leitzinger Rpt. ¶ 6. These insurers all entered into contracts containing the Challenged Provisions long before the proposed start of the Class Period (2018), mainly in 2003 and 2005.[3]

Plaintiffs offer Dr. Leitzinger as their expert on damages and anticompetitive impact.[4] Dr.

---

[2] Plaintiffs' Complaint initially included allegations, now abandoned, of unlawful conduct relating to claimed tying arrangements, "gag" clauses, employee non-compete clauses, and physician referral restrictions, and predatory pricing. *See, e.g.*, Compl. ¶¶ 131–151, 154–184.

[3] *See* AAHEDWI00627308 (Cigna); AAHEDWI00627738 (United); AAHEDWI00627035 (Anthem); AAHEDWI01512231 (Humana); AAHEDWI00624448 (Health Payment Systems); AAHEDWI00578607 (Trilogy); and AAHEDWI02481839 (Wisconsin Physician Services).

[4] Plaintiffs disclosed other experts, including Dr. David Dranove, an economist who addresses, among other things, market definition and market power.

Leitzinger offers two main analyses: (1) a "yardstick" regression model that purports to estimate aggregate damages for the putative Class, and (2) a "two-step" analysis that uses the same regression model supposedly to assess whether each putative Class member was impacted by the Challenged Provisions.  Ex. 1, Leitzinger Rpt. ¶ 7.

## I.        The Yardstick Model

To attempt to demonstrate classwide anticompetitive impact and calculate classwide damages, Dr. Leitzinger created a "yardstick" regression model.  This model seeks to compare prices from a "treatment" group (here, Aurora) to those charged by a system without the Challenged Provisions (the "yardstick system").  Dr. Leitzinger's primary yardstick compares Aurora's rates for healthcare services in Wisconsin to Advocate's rates in Illinois.  For his Illinois yardstick, Dr. Leitzinger uses claims data for Blue Cross Blue Shield of Illinois ("BCBSIL").[5]  Dr. Leitzinger asserts that his primary yardstick shows that AAH's Wisconsin rates were approximately ▮▮▮▮▮▮ higher than its rates in Illinois, which he attributes to the Challenged Provisions.  *Id*. at ¶¶ 28–31, 40.  Dr. Leitzinger also calculates an alternative yardstick model using ▮▮▮▮▮▮ in Wisconsin, finding damages of approximately ▮▮▮▮▮.  *Id.* at ¶¶ 36–37; 43–45.

Dr. Leitzinger admits that his yardsticks do not include any control variables for quality,

---

[5] BCBSIL is the dominant insurer in Illinois with an ▮▮▮▮▮▮ share of the commercial market. *See* Ex. 7, Orszag Rpt. ¶ 85.  Dr. Leitzinger accords BCBSIL's data special treatment when determining how to calculate the amount paid for Advocate's medical services in Illinois.  Rather than using the "allowed amount" field in the BCBSIL claims data, which is the field that he used for all of the Wisconsin insurers' data, Dr. Leitzinger calculated his own value to represent the amount Advocate in Illinois received for its services.  *See* Ex. 2, Leitzinger Reb. ¶ 6; *see also* Ex. 7, Orszag Rpt., at App'x B.  Dr. Leitzinger used this value based on one email from BCBSIL's outside counsel regarding the treatment of a single BCBSIL claim.  He did not independently investigate whether his methodology was accurate.  *See* Ex. 2, Leitzinger Reb. ¶ 6; Ex. 14, Leitzinger Tr. 127:5–132:21.  This data error overstates damages by ▮▮▮▮▮▮  In his Rebuttal Report, Dr. Leitzinger presents amended results if one calculates the BCBSIL payments adjusting for his error.  *See* Ex. 2, Leitzinger Reb. ¶¶ 6–14, Ex. 5A; Ex. 1, Leitzinger Rpt., Ex. 5A.

reputation for quality, patients' willingness to pay, or the relative concentration of insurers in Wisconsin as compared to Illinois. *See* Ex. 1, Leitzinger Rpt. ¶¶ 37, 39. Dr. Leitzinger also only analyzes data for five of the insurers in the class definition as two insurers, WPS and HPS, did not produce claims data. *See* Ex. 1, Leitzinger Rpt. ¶ 60 n.89. Dr. Leitzinger instead "extrapolates" results for those two insurers. Ex. 1, Leitzinger Rpt. ¶¶ 47–48. To do so, Dr. Leitzinger relies upon documents concerning the proportion of commercial payments associated with WPS and HPS to estimate that approximately █████████ in payments are attributable to those two insurers. He then assumes that because WPS and HPS are smaller insurers, they faced damages at least as high as the larger insurers for which data existed. *See id.* at ¶ 48. Based on this assumption, he applies the same ████████ aggregate damages rate to WPS and HPS, adding approximately ████ ██████ in estimated damages to his total calculation. *See id.* at ¶¶ 47–48; Ex. 5B.

**II.     The Two-Step Method**

After presenting his regression model, Dr. Leitzinger purports to use that model to show antitrust impact to all or virtually all Class members. This analysis involves a "two-step" process. Dr. Leitzinger first purports to measure damages for a specific individual claim (or claim line)[6] using the results of his Illinois yardstick. In the second step, he calculates the difference between the actual rate charged and the average rate that his model predicts. After revising to address an error relating to how he construed BCBSIL's payments, Dr. Leitzinger reported finding "█ █████████████████████████████████████████████████████████████████ ██████████████████████████" Ex. 2, Leitzinger Reb. ¶ 11. His revised analysis also found that just ████████ of putative Class members incurred statistically significant net damages across

---

[6] A claim reflects the full billing submission for services rendered during a single episode of care. A claim may include multiple claim lines for each individual service or procedure (e.g., an x-ray and a blood test may be included as separate claim lines within a single claim).

all of their claims/claim lines. *Id.* ¶ 12. Dr. Leitzinger also offered an entirely new analysis for the first time in his Rebuttal Report. This so-called "bootstrap" calculation purports to show that the "damages" shown for individual transactions are not attributable to the error rates in his regression. *Id.* ¶ 133.

## LEGAL STANDARD

Under *Daubert*, the Court must ensure that any proffered expert testimony meets the requirements of Federal Rules of Evidence 702 and 403. 509 U.S. at 595. Rule 702 only permits admission of expert testimony when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* Rule 702 requires the proponent to show that the factors "more likely than not" weigh in favor of admissibility. As part of its determination, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" and whether it "can be (and has been) tested." *Daubert*, 509 U.S. at 592–93. The Court should also consider "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," "[w]hether the expert has adequately accounted for obvious alternative explanations," and "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005), *vacated on other grounds*, 448 F.3d 936 (7th Cir. 2006). In considering regression models, the Court must undertake a rigorous screening to ensure the methods are reliably applied and the conclusions drawn are reliable. *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 896 (7th Cir. 2011).

In 2023, Congress and the Supreme Court amended Rule 702 to emphasize that district

courts must fulfill their gatekeeper role by strictly enforcing the rule. Today, the "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" *are questions of admissibility and not just weight*. Fed. R. Evid. Comm. Note to 2023 Amend.; *see Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 848 n.3, 854 (7th Cir. 2025) (affirming exclusion of expert's testimony for "uncritically rel[ying] on faulty data" and noting that "the December 2023 amendments to Rule 702 alter its reliability subsection to require that 'the expert's opinion reflect[] a reliable application of the principles and methods to the facts of the case'") (quoting Fed. R. Evid. 702)). This gatekeeping role is particularly acute at class certification, where failure to strictly enforce Rule 702 could "mean that the unreliable testimony remains in the record, a result that could easily lead to reversal on appeal." *Koehler v. Infosys Techs. Ltd.*, 628 F. Supp. 3d 835, 871 (E.D. Wis. 2022) (citation omitted). "[W]hen an expert's report or testimony is critical to class certification," namely, when it is "relevant to establishing any of the Rule 23 requirements for class certification," a district court "must conclusively rule on any challenge to the expert's qualifications or submissions" and "perform a full *Daubert* analysis before certifying the class if the situation warrants." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010).

Courts in the Seventh Circuit routinely conduct *Daubert* analyses at the class certification stage to exclude unreliable expert testimony and deny motions for class certification. *See Aspirus*, 2025 WL 3687939, at *7–9 (excluding Dr. Leitzinger's yardstick model and denying motion for class certification); *see also, e.g., McKnight v. United Airlines, Inc.*, No. 23-cv-16118, 2026 WL 879727, at *2–6, *9 (N.D. Ill. Mar. 30, 2026) (excluding testimony of plaintiffs' expert as unreliable and denying plaintiffs' motion for class certification due, in part, to exclusion of expert's opinion); *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2016 WL 1180203, at *3–4 (W.D. Wis. Mar. 25, 2016) (granting motion to exclude expert and denying motion for class

certification).  Exclusion is warranted here.

## ARGUMENT

**I.**     Dr. Leitzinger's Model Should Be Excluded Because It Fails to Isolate the Effect of the Challenged Provisions on Rates

The reliability of Dr. Leitzinger's opinions rises and falls on his yardstick regression model. The decision in *Aspirus*—which excluded a yardstick model from Dr. Leitzinger that is highly similar to the one he offers in this case—provides a helpful guide to how *Daubert* applies here. *See* 2025 WL 3687939, at *2–8.  In *Aspirus*, plaintiffs brought a proposed antitrust class action on behalf of a class of self-funded health plans and commercial insurers alleging that Aspirus illegally fixed prices for all providers in the Aspirus clinically integrated network ("CIN") and required all insurers seeking to include *any* CIN member in their network to include *all* CIN members in network.  *Id.* at *1.  Dr. Leitzinger offered a yardstick model in *Aspirus* that, he claimed, measured the alleged impact of these acts by comparing Aspirus's prices to the prices charged by three other Wisconsin providers:  Froedtert, Ascension, and Mayo Clinic.  *Id.* at *4.

The court in *Aspirus* recognized that the purpose of a yardstick model is "to estimate the impact of alleged anti-competitive conduct on prices" by looking to "a market unaffected by the challenged conduct as a yardstick against which outcomes in the affected market can be compared," while also controlling for unrelated factors that might affect price.  *Id.* at *3 (citation omitted). *Aspirus* identified two prerequisites as "key to [the] reliability" of a yardstick model: (1) the yardstick system(s) against which the defendant is being compared must "approximate[] the target market absent the challenged conduct," and (2) the model must "account for factors other than the anti-competitive conduct that might explain differences in price."  *Id.* at *4, *6.  The court found it was incumbent on the expert to "provide sound reasoning for ***both*** the yardstick he selects ***and*** the variables he includes as controls; otherwise, his conclusions that the model estimates the effects

of the challenged conduct is mere *ipse dixit*." *Id.* at \*4 (emphasis added) (citation omitted).

The *Aspirus* court excluded Dr. Leitzinger's model, finding that it failed both prerequisites. First, the court determined that Dr. Leitzinger had not selected a comparable yardstick to approximate the target market. The court found that some of the yardstick systems engaged in the same contracting practices as the defendant, meaning the yardstick was "tainted" by (as opposed to free from) the challenged conduct. *Id.* at \*4–6. Second, the court found that Dr. Leitzinger's model had not accounted for alternative factors that affect healthcare prices—namely, quality and reputation, two of the "most important" factors recognized in the healthcare context. *Id.* at \*6–8. Without those necessary controls, Dr. Leitzinger could not reliably attribute damages to the challenged conduct as opposed to one of the missing variables. *Id.* The court emphasized that these were "not merely debatable shortcomings that go to the weight of his evidence," but went to admissibility because Dr. Leitzinger's model was "not based on reliable methods." *Id.* at \*8.

In short, a reliable yardstick regression model must: (1) use an appropriately comparable yardstick as the comparator *and* (2) control for price effects caused by factors other than the challenged conduct. Dr. Leitzinger's model here does neither.

      A.       <u>Dr. Leitzinger Has Not Selected Proper Yardstick Systems for Comparison to Aurora</u>

The first requirement for a reliable yardstick model is for the yardstick to be comparable to the treatment group. This requirement includes being free from the alleged anticompetitive conduct. *See Aspirus*, 2025 WL 3687939, at \*4. The proponent of a yardstick must provide sound factual support and reasoning for the "extent to which [the yardstick] can stand in for the market under consideration." *See City of Rockford v. Mallinckrodt ARD, Inc.*, No. 3:17-cv-50107, 2024 WL 1363544, at \*7–8 (N.D. Ill. Mar. 29, 2024) (excluding yardstick where reasoning for selecting the yardstick market was "unsound" and supported only by "ipse dixit"); *see also CDW LLC v.*

*NETech Corp.*, 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012) ("A yardstick approach is an acceptably reliable method under *Daubert* . . . only if the benchmarks (or yardsticks) are sufficiently comparable") (citation omitted). Without a baseline of comparability, a model cannot attribute its results to the challenged conduct, as opposed to some other fundamental difference between the treatment and the yardstick system. Dr. Leitzinger's model fails to clear this bar. *First*, his yardstick hospital systems differ from Aurora Wisconsin in fundamental ways. *Second*, his chosen yardsticks are tainted by the same conduct that Plaintiffs claim is anticompetitive. The result is that the yardsticks cannot reliably measure the effect of the Challenged Provisions.

1.      *Dr. Leitzinger's Chosen Yardsticks Are Not Comparable to Aurora*

Dr. Leitzinger's primary yardstick seeks to compare health systems in different states— Aurora in Wisconsin and Advocate in Illinois. Thus, an examination of whether any fundamental differences between those states affect prices is needed to determine whether the yardstick meets the requirement that it be sufficiently comparable and an appropriate proxy for the but-for world. *See CDW*, 906 F. Supp. 2d at 824. If there are distinctions such that the Illinois yardstick does not "approximate[] the target market" in Wisconsin, then this first fundamental premise of a reliable yardstick fails. *Aspirus*, 2025 WL 3687939, at *4; *see also Eleven Line, Inc. v. North Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 209 (5th Cir. 2000) (excluding yardstick on basis that "[n]either the yardstick arenas' rates of return nor their average was shown to be 'as nearly identical to [the target system] as possible.'") (citation omitted). Indeed, Dr. Leitzinger sought to avoid this very issue in *Aspirus*, specifically limiting his yardstick "to Wisconsin providers to 'control for any pricing considerations that may be state specific.'" *Aspirus*, 2025 WL 3687939, at *3 (quoting Dr. Leitzinger's report). Here, Dr. Leitzinger ignores two key distinctions between Wisconsin and Illinois—a pre-existing difference in prices and different payment structures. These fundamental and unaccounted for interstate differences render Dr. Leitzinger's yardstick in this case unreliable.

11

*First*, Dr. Leitzinger did not consider whether healthcare prices in Eastern Wisconsin (where the "affected" system, Aurora, is located) and Chicago (where the yardstick system, Advocate, is located) historically "approximated" each other before the Challenged Provisions went into place.  Record evidence and publicly available government reports indicate that there has in fact been a substantial difference in hospital and physician prices between the two regions dating back decades.  Simply put, healthcare prices in Eastern Wisconsin have far exceeded those in Chicago for a long time, which means that Chicago *cannot* serve as a reliable yardstick.  This long-standing rate difference includes the period in the early 2000s *before* the contracts with the Challenged Provisions were executed beginning in 2003.  In a 2003 report that the actuarial firm Milliman presented to AAH,[7] Milwaukee health care costs were 55 percent higher than comparable Midwestern cities.  *See* Ex. 24, AAHEDWI01645637 at -662–63, 665. Similarly, a report that the U.S. Government Accountability Office (the "GAO") presented to U.S. Congress analyzed 2001 claims data from large national preferred provider organizations across the federal government's employee benefits program.  The GAO consistently found that Wisconsin had substantially higher prices for hospital and physician services both nationally and compared to Chicago.[8]  Evidence of a pre-existing price differential is not confined to Illinois:  it also infects Dr. Leitzinger's ▮▮▮▮▮ yardstick.  For example, a report that Milliman presented to the Greater Milwaukee Business Foundation on Health showed that a pre-existing rate difference existed between Aurora and the Ascension system based on 2003 data.  *See* Ex. 25, AAHEDWI01428224

---

[7] Plaintiffs' experts, including Dr. Leitzinger, rely on Milliman studies to support their own opinions.  *See, e.g.*, Ex. 1, Leitzinger Rpt. ¶ 20 (relying on a 2019 Milliman report); Ex. 9, Dranove Rpt. ¶ 158 (same); Ex. 1, Leitzinger Rpt. ¶ 42 (citing a 2021 Milliman report).

[8] *Compare* GAO Rpt., Ex. 54 at 49, 56 (ranking Milwaukee as the fifth highest and sixteenth highest metropolitan area for hospital and physician prices, respectively) *with id.* at 54, 60 (ranking Chicago as 205 out of 232 metropolitan areas for hospital prices and 173 out of 319 metropolitan areas for physician prices).

at -254 (finding Aurora's rates were 23% above average in 2003, while two systems that later comprised the Ascension system were 4% and 12% below the market average). ███████████ ██████████████████████████████████████████████████████ ███████████ .

Critically, when confronted with this evidence that renders his yardsticks unreliable, Dr. Leitzinger responded not by examining it, but dismissing it. He claimed that the 2003 Milliman study does not provide a comparison of provider prices, *see, e.g.,* Ex. 2, Leitzinger Reb. ¶¶ 18–20, but the study expressly attributes 31% of the pricing differential it found to "provider charges." Ex. 24, AAHEDWI01645637 at -662. Dr. Leitzinger also attacked the Milliman study for only including data from two to three Ascension hospitals, *see* Ex. 2, Leitzinger Reb. at ¶¶ 21–22, when in reality it examined data from 11 hospitals that make up the present-day Ascension system, which Dr. Leitzinger admitted in his deposition, *see* Ex. 14, Leitzinger Tr. 162:15–165:11. When presented with the GAO study, Dr. Leitzinger did not acknowledge the pre-2005 rate differences, but admitted that he "did not go back to that period to determine whether prices in 2018 were inflated as a result of the challenged conduct." *See* Ex. 14, Leitzinger Tr. 182:13–183:3. Dr. Leitzinger has offered no analysis for why, in light of this prior rate differential measured for 2001, before the Challenged Provisions went into place beginning in 2003, Advocate's operations in Chicago are still an appropriate yardstick for Aurora's operations in Eastern Wisconsin.

If the yardstick systems were truly comparable, one would expect that in the years before the Challenged Provisions were in place, the markets would not have widely divergent healthcare prices, and instead would have more closely approximated one another. They do not, and Dr. Leitzinger has offered no reason why these disparities in rates in the early 2000s could not have carried forward into the Class Period. The burden to substantiate the suitability of his yardstick

systems rests with Dr. Leitzinger, who must show their comparability by more than his own say-so, which is classic *ipse dixit*. *City of Rockford*, 2024 WL 1363544, at \*7–8. In light of the evidence on the lack of comparability due to substantially different rates, "and without any opinion of any kind on the issue from Leitzinger" addressing this issue, "the court cannot assume that" the defect in the "yardstick in this case would be harmless." *Aspirus*, 2025 WL 3687939, at \*6.

*Second*, Dr. Leitzinger did not consider whether Advocate is an appropriate comparator given the different payment models that insurers use in Wisconsin and Illinois. Insurers pay Aurora on a "fee-for-service" basis in Wisconsin: the insurer pays Aurora separately for each service or procedure at a set negotiated rate. *See* Ex. 1, Leitzinger Rpt. ¶ 33. By contrast, in Illinois, capitation payment arrangements are broadly prevalent. *See, e.g.*, Ex. 16, Skogsbergh Tr. 78:11–21. In a capitation arrangement, insurers pay providers a fixed monthly amount for every enrolled patient regardless of the amount of care used. *See* Ex. 1, Leitzinger Rpt. ¶ 33.

Dr. Leitzinger was aware of the prevalence of capitation arrangements in Illinois—in fact, he excluded capitation payments and limited his analysis to fee-for-service claims because, as he admitted, capitation payments "involve a different pricing approach." Ex. 1, Leitzinger Rpt. ¶ 33. Dr. Leitzinger, however, did not assess whether capitation payments in Illinois might affect how Illinois insurers negotiated rates with providers overall. He admitted that he did not explore how capitation arrangements affected prices in Illinois and that he "didn't look into" whether capitation "somehow exerted downward pressure on fee[] for service" in Illinois. Ex. 14, Leitzinger Tr. 194:2–7. This failure is stark considering that the presence of capitation in a region is recognized to be correlated with lower provider rates.[9]

_____

[9] *See* Ex. 54, 2005 GAO Report at Cover Page ("Metropolitan areas with the least HMO capitation tended to have hospital and physician prices that were about 10 percent higher than areas with the most HMO capitation.").

"Leitzinger's complete failure to analyze" these two issues is "tantamount to ignoring an obvious alternative explanation for his findings," *Aspirus*, 2025 WL 3687939, at *6, and is even more troubling here because he "failed to re-evaluate his [opinions] in the face of evidence from defendants' expert[s]," *id.* at *10. These failings show the lack of factual support for his yardsticks, requiring exclusion of his model.

2.     *Dr. Leitzinger's Chosen Yardsticks Are Tainted by the Very Conduct Plaintiffs Seek to Challenge Here*

Dr. Leitzinger's model is also unreliable because his chosen yardsticks—Advocate in Illinois and ▉▉▉▉▉ in Wisconsin—engaged in the same contracting practices that Plaintiffs challenge as unlawful. Because the yardsticks had contracts with insurance companies containing terms that Plaintiffs include in their definition of the challenged conduct, they are not proper proxies for a world without the Challenged Provisions. *See Aspirus*, 2025 WL 3687939, at *4.

Dr. Leitzinger's yardsticks are tainted in at least two respects. *First*, both Advocate and ▉▉▉▉▉ contracted with insurers on a system-wide or "all-or-nothing" basis. As Plaintiffs' expert Dr. Dranove recognizes, Plaintiffs are challenging "any of the contract provisions by which AAH required that [insurers] that contracted with AAH *include all AAH providers in all networks at the highest benefit level.*" Ex. 9, Dranove Rpt. ¶ 11 n.8 (emphasis added). In other words, the challenged conduct includes instances where Aurora contracted on a system-wide basis to include all of its facilities in a network offered by insurers. *Id.* ¶ 203. But the record reveals that this system-wide contracting approach is not unique to Aurora. Both of Dr. Leitzinger's chosen yardstick systems, Advocate and ▉▉▉▉▉ are themselves large health systems that negotiated with insurers on a system-wide basis.[10] Testimony from ▉▉▉▉▉ witnesses, for example,

---

[10] *See, e.g.*, Ex. 26, AURORA00003320 (▉▉▉ agreement providing that contract applies to all ▉▉▉▉▉▉▉▉▉▉ as listed at AURORA00003321); Ex. 27, ▉▉Uriel_0000002 at -007 (▉▉▉▉▉▉▉▉ agreement defining Provider to mean "▉▉▉▉▉▉▉▉▉

reinforced that ▮▮▮▮▮ only contracts for the entire system on a state-wide basis and does not contract for individual facilities or providers.  *See* Ex. 11, ▮▮▮▮▮▮▮▮ Tr. 143:10– 144:10.  Testimony from BCBSIL similarly acknowledged that Advocate contracted "for and on behalf of all of the hospital operating divisions of Advocate Health and hospital's corporation, and then it . . . includes all of their hospitals."  Ex. 12, Shelley Turk (BCBSIL) Tr. 209:3–12 (describing the 2003 PPO Agreement between BCBSIL and Advocate).

The system-wide contracting allegations are central to Plaintiffs' case.  Dr. Dranove confirmed in his testimony that a central component of Plaintiffs' but-for world is the ability of insurers "to threaten to exclude *part of AAH* or – or steer/tier away from *part of AAH* that would allow you to get lower prices."  Ex. 13, Dranove Tr. 177:14–19 (emphases added); *see also* Ex. 9, Dranove Rpt. ¶¶ 68, 76.  According to Dr. Dranove, insurers had "no ability to do this in the actual world, only in the but-for world."  *Id.* at 177:21–22.  It is fatal, therefore, to Dr. Leitzinger's opinions that ***both*** of his chosen yardsticks engage in system-wide contracting, meaning neither could approximate the but-for world Plaintiffs hypothesize, where insurers would be contracting for only portions of a given health system.  Dr. Leitzinger has offered no analysis whatsoever as to the effect that this taint from system-wide contracting has on his yardstick.  The result is that his model is not built to isolate the alleged price effect of system-wide contracting, and "Leitzinger's complete failure to analyze the taint issue is therefore tantamount to ignoring an obvious alternative explanation for his findings."  *Aspirus*, 2025 WL 3687939, at *6.

*Second*, ▮▮▮▮▮, as with many other Eastern Wisconsin health systems, engaged in the

───────────────

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ) (emphasis added).

same contracting practices Plaintiffs challenge here.[11]  Thus, the same system that Dr. Leitzinger uses as a "corroborating" yardstick is contaminated by the conduct Plaintiffs allege is anticompetitive.  In seeking to justify ██████ as an appropriate yardstick, Dr. Leitzinger stated that he understood from "counsel that the ██████ hospitals did not include All-Plans language in their Network Vendor contracts." Ex. 1, Leitzinger Rpt. ¶ 43.  This reliance on counsel was misplaced.  Had Dr. Leitzinger reviewed ██████'s contracts (which he did not, *see* Ex. 14, Leitzinger Tr. 52:18–25), he would have seen multiple ██████ agreements that contained the same allegedly anticompetitive anti-steering, anti-tiering, and "all plans" provisions.  *See supra* n.11.  Experts must independently verify assumptions provided by counsel for their opinions to be reliable.  *See Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (excluding opinion based on finding that expert "should have independently verified the reliability of the data" as opposed to accepting counsel's word).

In short, Dr. Leitzinger's selection of yardstick systems is tainted by the same system-wide contracting strategy and provisions that Plaintiffs challenge as anticompetitive.  This taint renders Dr. Leitzinger's model incapable of isolating the effect of the Challenged Provisions.  Without a

---

[11] *See, e.g.*, Ex. 26, AURORA00003320, § 6.4.1 (prohibiting ██ from incentivizing members to seek care at non-██████ providers and requiring inclusion of ██████ in highest tier, including for all new plans); Ex. 27, ██_Uriel_0000002, § IX.D (similar for ██████); Ex. 29, ██ Uriel_0000407, § VI.C. (similar); Ex. 28, AHA_000763, Attachment B (anti-steering for ████████████████████████).  Nor is ██████ alone: other Eastern Wisconsin health systems like ████████████████████, included anti-steering, anti-tiering, and all plan provisions in their contracts.  *See, e.g.*, Ex. 30, Uriel-Sub0002152, § B.6 (anti-steering); Ex. 31, Uriel-Sub0000768, § 3.2 (anti-tiering); Ex. 32, ██████0000785, § 2.12 (anti-steering and anti-tiering); Ex. 33, ██████0002429, § 7.4 (anti-steering); Ex. 35, ██████Uriel_0000002, § 2.5.1 (anti-steering).  To the extent that Dr. Leitzinger argues that these contractual provisions could cause an "umbrella effect" by permitting other providers to increase rates, *see, e.g.*, Ex. 1, Leitzinger Rpt. ¶ 43 n.71, the inclusion of these provisions likewise would cause an umbrella effect on Aurora's rates.  This is another dimension that Dr. Leitzinger's model does not even assess, further highlighting the inability of his model to isolate the effect of the Challenged Provisions in *Aurora's* contracts.

17

proper yardstick against which to measure the alleged anticompetitive conduct, Dr. Leitzinger's damages model is unreliable and should be excluded. *See Aspirus*, 2025 WL 3687939, at \*8 (excluding Dr. Leitzinger's yardstick in part because his yardstick group was "tainted by the same anti-competitive behavior charged against" the defendant); *CMFG Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 14-cv-249, 2017 WL 4792253, at \*6 (W.D. Wis. Oct. 23, 2017) (excluding regression where expert failed to have "clean control group" devoid of the challenged conduct).

### B. Dr. Leitzinger's Regression Has Not Isolated the Price Effects of the Challenged Provisions

To measure the effect of the challenged conduct reliably, a regression must control for factors other than the Challenged Provisions that affect price. "If a model fails to properly control for alternative factors, then it cannot support a reasonable inference that any price differences between the defendant and the yardstick are caused by the anti-competitive conduct." *Aspirus*, 2025 WL 3687939, at \*6. In other words, it is not enough for an expert just to select comparable systems for a yardstick. The expert must also add control variables that account for other factors that can affect price. *See, e.g.*, *Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (expert's "failure to control for" variables that "can be controlled for" made the opinion "essentially worthless.").

A regression that does not "control for market share and quality" is particularly problematic because the "Seventh Circuit has recognized [these] as two of 'the most important factors' affecting the price of healthcare services." *Aspirus*, 2025 WL 3687939, at \*6 (quoting *Marshfield Clinic*, 152 F.3d at 593). As Chief Judge Peterson concluded in excluding Dr. Leitzinger's model

in *Aspirus,* omitting quality and market share controls is "fatal." *Id.* at *7 ("Leitzinger doesn't explain why [other providers'] overcharges [under his model] could be due to quality, but [Defendants'] overcharge is due to the challenged conduct. . . . [I]t seems just as reasonable that the overcharge the model calculated for [Defendant] could have been due to quality effects."); *see also Freeland v. AT & T Corp.*, 238 F.R.D. 130, 145–46, 149 (S.D.N.Y. 2006) (concluding failure to include "significant variables that are quantifiable," including a quality variable, rendered analysis "essentially worthless" and finding expert's qualitative reasons for the exclusion "utterly without merit").

Here, Dr. Leitzinger's regression excludes at least four critical variables: quality, reputation for quality, so-called "willingness to pay," and insurer concentration. Dr. Leitzinger's failure to control for any of these key variables means his model could be detecting price differences due to these factors, as opposed to isolating any impact attributable to the Challenged Provisions.

*__Quality.__* Dr. Leitzinger's model does not include any control variable for quality. The Seventh Circuit recognizes quality as one of the most important factors affecting healthcare prices. *See Marshfield Clinic*, 152 F.3d at 593; *see also Aspirus*, 2025 WL 3687939, at *6–7. The reason is simple: a firm offering a high-quality service (e.g., a Four Seasons hotel) can charge a higher price than competitors offering a lower-quality service (e.g., a Holiday Inn Express). And if they charge the same, the quality-adjusted price, what matters in antitrust, differs. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (recognizing that "[o]ne HMO may charge higher prices . . . not because it has a monopoly but because it is offering better service than the other HMOs in its market. . . . Generally you must pay more for higher quality."). Both in his deposition in this case and in previous cases, Dr. Leitzinger has recognized that differences in quality can affect providers' rates. *See* Ex. 14, Leitzinger Tr.

117:25–118:22; Ex. 57, Decl. of Jeffrey Leitzinger at ¶ 59 ("*Sutter* Declaration"), *UEBT v. Sutter Health*, No. CGC 14-538451 (Cal. Super. May 3, 2017) (including control variables for quality).

Despite the importance of quality, Dr. Leitzinger did not include a quality control variable in his regressions. *See* Ex. 14, Leitzinger Tr. 224:24–225:3; 231:19–25. This omission is "a fatal problem," *Aspirus*, 2025 WL 3687939, at \*7, that renders the regressions "worthless," *Marshfield Clinic*, 152 F.3d at 593. Dr. Leitzinger sought to salvage his regression by claiming he did not need to control for quality because he determined quality was similar between Aurora and his yardsticks. Ex. 1, Leitzinger Rpt. ¶¶ 39, 43. But this justification does not hold water. Dr. Leitzinger has not asserted quality at Aurora and the yardsticks is identical—at most, he contends quality not materially different based on anecdotal evidence. Ex. 1, Leitzinger Rpt. ¶¶ 39, 43. Such qualitative observations about claimed similarities in quality cannot replace quantitative analysis. *See Freeland*, 238 F.R.D. at 147–49 (rejecting expert's qualitative justifications for omitting a quality variable); *City of Rockford*, 2024 WL 1363544, at \*8 (excluding damages model where expert asserted without quantification that buyers' willingness to pay would be "much lower" in the but-for world). This is particularly true where even the anecdotal evidence Dr. Leitzinger cites shows that the quality metrics are not the same. *See, e.g.*, Ex. 1, Leitzinger Rpt. ¶ 43 n. 75 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Dr. Leitzinger, moreover, does not claim that he could not have controlled for quality. Quality is a frequently used control variable; indeed, Dr. Leitzinger previously included quality control variables in other damages models, including in the *Sutter Health* case that also dealt with a health system accused of all-or-nothing contracting. *See generally* Ex. 57, *Sutter* Decl. If Dr. Leitzinger is correct that differences in quality have no price effect, he could have proven that by including quality control variables in his model and showing that the results were not statistically

significant. But he failed even to explore this possibility despite Plaintiffs' burden to demonstrate the admissibility of his model. *See, e.g.*, *City of Rockford*, 2024 WL 1363544, at *7–8. Dr. Leitzinger's cursory suggestion that there is "no single, broadly constructed quality measure" that could be used here, Ex. 1, Leitzinger Rpt. ¶ 39, is also unpersuasive. That variables cannot be measured "does not mean that a more easily quantified proxy for quality could not be included," *Freeland*, 238 F.R.D. at 148, and Dr. Leitzinger did use such proxies for quality in the *Sutter* case. *See Sutter* Decl. ¶¶ 62–64 (including variables to track patient outcomes and mortality).

**_Reputation for Quality._** A separate but related variable missing from Dr. Leitzinger's regression is a provider's reputation for quality. A hospital or system with a well-recognized brand or reputation associated with high quality may command higher rates from insurers. A reputation for higher quality of care also might attract "patients who are sicker than average and so require longer treatment," which may in turn affect the hospital's costs and rates. *Marshfield Clinic*, 152 F.3d at 594; *cf. Werdebaugh v. Blue Diamond Growers*, No. 12-cv-2724, 2014 WL 7148923, at *10–11 (N.D. Cal. Dec. 15, 2014) (as a result of the omission of a brand variable, the regression failed to isolate the price premium attributable to the alleged mislabeling claims from any price premium attributable to the value of the brand). Dr. Leitzinger himself has recognized that a provider's reputation for providing high-quality care can affect rates and may be picked up by a damages model that does not account for reputation. *See Aspirus*, 2025 WL 3687939, at *7 ("[Dr. Leitzinger] also opined that these two providers [ThedaCare and Mayo Clinic] might show overcharges because they have a reputation for providing particularly high-quality care."). Yet Dr. Leitzinger's damages model in this case does not include any control variable for reputation. Here too, he dismissed the need to include any control based on qualitative evidence without conducting any econometric analysis to verify it. *See* Ex. 14, Leitzinger Tr. 250:17–251:3. Dr.

Leitzinger cannot show that his damages model isolates the effect of the Challenged Provisions as opposed to reputation for quality.

*__Willingness to Pay.__*  Another factor bearing on healthcare rates that Dr. Leitzinger fails to address is a patient's willingness to pay (or "WTP") for Aurora.  WTP, in the words of Plaintiffs' expert, Dr. Dranove, measures "how much worse off patients would be if they could no longer receive care from a given health system"—in essence, how much do patients want Aurora in their plans.  Ex. 9, Dranove Rpt. ¶ 164.  Dr. Dranove calls WTP a "widely used" variable in economic literature studying healthcare rates.  Ex. 9, Dranove Rpt. at ¶ 110. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████  *See* Ex. 9, Dranove Rpt. at ¶¶ 110, 117, 124, 164–65.

Despite Dr. Dranove's opinions that ████████████████ and that WTP affects rates, Dr. Leitzinger did not include a WTP control variable.  Instead, Dr. Leitzinger waves this omission away by claiming that WTP is "grounded in the same information as market shares," such that if his regression controls for market shares, then there is no need for an additional control for WTP.  Ex. 2, Leitzinger Reb. ¶¶ 62–64.  But Dr. Leitzinger's model *also does not control for market shares*.  *See* Ex. 14, Leitzinger Tr. 254:21–23.  Dr. Leitzinger points to his "Patient Flow HHI" control variable as a supposed substitute.  Ex. 2, Leitzinger Reb. ¶ 65.  That variable measures "provider concentration" at the "typical ZIP code for which each of the [AAH] facilities operate."  Ex. 14,  Leitzinger Tr. 253:6–17; Ex. 2, Leitzinger Reb. ¶ 65.  Dr. Leitzinger admitted in his deposition that "Patient Flow HHI" does not necessarily track market share and in fact would be the same for Aurora as a small provider that obtains a similar portion of claims from the same ZIP codes in which Aurora operates.  Ex. 14, Leitzinger Tr. 253:18–254:5.  Dr. Leitzinger also did

nothing to show that "Patient Flow HHI" is correlated with WTP across his Wisconsin-to-Illinois comparison throughout the Class Period. WTP for Aurora relative to its competitors in Wisconsin may differ substantially from the WTP for Advocate as compared to its competitors in Illinois. These cross-state differences are ones that Dr. Leitzinger's model must—but does not—capture.

***Insurer Concentration.*** Lastly, Dr. Leitzinger's model warrants exclusion because it does not control for insurer concentration. This omission is independently fatal to admissibility because how concentrated the insurer market is affects the insurers' bargaining power relative to providers. This dynamic is particularly relevant for Dr. Leitzinger's Illinois yardstick. Illinois is dominated by a single, large insurer, BCBSIL, with approximately ███████████ market share. *See* Ex. 7, Orszag Rpt. ¶ 85. The concentration, as numerous witnesses testified, provides BCBSIL with substantial bargaining leverage in provider negotiations.[12] No similar dynamic exists in Eastern Wisconsin, which features a number of major national and regional insurers, each with their own meaningful share of the market. The state-level insurer Herfindahl–Hirschman Index (HHI), which Dr. Leitzinger recognizes is a "widely-accepted measure of concentration," *see* Ex. 57, *Sutter* Decl. ¶ 58, was approximately ████ in Illinois and just ████ in Wisconsin. Ex.7, Orszag Rpt. ¶ 85. But despite this stark difference, Dr. Leitzinger confirmed he did not include any control variable for insurer concentration. *See* Ex. 14, Leitzinger Tr. 188:3–19. The omission of this variable is another reason why his regression cannot distinguish the effects of the Challenged Provisions from other relevant differences that produce differences in healthcare prices.[13]

---

[12] *See* Ex. 15, Muzi Tr. 45:9–17 ("████████████████████████████████████ ████████████████████"); Ex. 16, Skogsbergh Tr. 36:10–12 (███████████████ ███████████████████████████████████████████████████████"); Ex. 17, Hanson Tr. 67:24–68:1 (████████████████████████████████████████████████ ███████████████████").

[13] Dr. Leitzinger's claim that his Network Vendor Share variable accounts for insurer bargaining leverage, Ex. 2, Leitzinger Reb. ¶¶ 50–54, is incorrect. Market share does not tell the whole story

In the end, as the court in *Aspirus* held, "Leitzinger's failure to account for [these] alternative explanation[s] makes his conclusions fundamentally unreliable." *Id.* at *15. Here too, these errors and omissions are so pervasive that Dr. Leitzinger's damages model is fundamentally unreliable and should be excluded. *See also Marshfield Clinic*, 152 F.3d at 593 ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *City of Rockford*, 2024 WL 1363544 at *7 (while "[t]here is nothing mechanically faulty with this [yardstick] procedure[,] the problems lie in, first, the *assumptions* that undergird it and, second, *the factors not accounted for* in arriving at the putative but-for price.").

II.  Dr. Leitzinger's Unreliable Regression Model Produces False Positives When Tested

Unsurprisingly given its structural flaws, the unreliability of Dr. Leitzinger's model is confirmed by the fact that it fails a basic check on its soundness in the form of a placebo test. A "placebo" test is an analytical method used to evaluate the validity of an empirical model by testing it in a setting where no anticompetitive conduct is claimed. The goal is to see whether the model incorrectly detects a price effect where none should exist. Ex. 2, Leitzinger Reb. ¶ 73. To examine whether Dr. Leitzinger's model was actually measuring the effect of the Challenged Provisions, AAH's expert, Jonathan Orszag, tested Dr. Leitzinger's model by replacing Aurora with three large health systems— ███████████████████████████████ —that were outside of the alleged geographic market and did not have the Challenged Provisions in their agreements. *See* Ex. 7, Orszag Rpt. ¶¶ 95–96.

If the yardstick reliably isolated the impact of the Challenged Provisions, it should have

_____

as it only measures the size of participants in the market, not the relative distribution of bargaining power among them; bargaining power, instead, is analyzed through market *concentration*.

found no damages for the placebo systems. *Id.* at ¶ 96. Instead, the model estimated statistically significant damages for all three systems, with ████████████████████, ████████████, ████████████, and ████████████████████, all far exceeding the ████████ damages Dr. Leitzinger estimated in his Illinois yardstick.[14] *Id.* at ¶ 98. These false positives powerfully demonstrate that Dr. Leitzinger's regression model is incorrectly labeling the difference in rates as attributable to the Challenged Provisions. Because the model finds damages where they should not exist, Dr. Leitzinger's model does not reliably measure the purported classwide anticompetitive impact of the Challenged Provisions. *See United States v. Mire*, 725 F.3d 665, 676 (7th Cir. 2013) (describing whether "the rate of error in the testing was low" as a "critical guidepost under *Daubert*"); *Kleen Prods. LLC v. Int'l Paper*, 2017 WL 2362567, at *6 (N.D. Ill. May 31, 2017) ("[A] method that produces false results the majority of the time cannot be reliable."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) (vacating certification where the district court failed to address similar false positives).

Dr. Leitzinger's attempt to explain away these false positives is unavailing. Dr. Leitzinger argued that Mr. Orszag's placebo test was not "proper" because the yardstick model was designed to compare only Aurora and Advocate, such that substituting other health systems introduces uncontrolled differences into the equation. *See* Ex. 2, Leitzinger Reb. ¶¶ 79–80. This argument only confirms Dr. Leitzinger's failure to include the requisite control variables. The fact that, by his own concession, the model cannot be applied to any other Wisconsin health system without

---

[14] In dismissing the ████████ placebo test, Dr. Leitzinger wrongly asserts that the result was not statistically significant. *See* Ex. 14, Leitzinger Tr. 211:18–212:4. But when employing Dr. Leitzinger's original methodology, the placebo test found a statistically significant result. *See* Ex. 7, Orszag Rpt. ¶ 98. Only when correcting for Dr. Leitzinger's BCBSIL data error, an error Dr. Leitzinger does not concede, do ████████'s estimated damages lack statistical significance. *See* Ex. 2, Leitzinger Reb. ¶ 77.

requiring ***additional*** controls is proof that Dr. Leitzinger does not control for all factors affecting rates unrelated to the Challenged Provisions. Moreover, the assertion that the yardstick can only measure Aurora and Advocate because they are both part of the same AAH corporate family is a contrivance, as Dr. Leitzinger has not undertaken any empirical analysis to show that Aurora and Advocate operated comparably and he also applies the same model to compare Aurora to ███████ in Wisconsin to "corroborate" his Illinois yardstick. Ex. 2, Leitzinger Reb. ¶¶ 90–91. Dr. Leitzinger's concession that changing the health system from AAH to another Wisconsin system would require additional control variables, Ex. 14, Leitzinger Tr. 200:25–203:10, 208:2–210:16, demonstrates that the model is lacking variables necessary to control for differences between systems even within Wisconsin.

Worse still, Dr. Leitzinger admitted that he does not know what a proper placebo test of his model "would look like" and could not identify a single system that he would consider an adequate placebo. Ex. 14, Leitzinger Tr. 201:20–22. He has thus not created a testable model. But *Daubert* requires testability. *See* 509 U.S. at 593 ("[A] key question to be answered in determining whether a theory or technique is . . . knowledge that will assist the trier of fact will be whether it can be (and has been) tested," including "to see if [it] can be falsified."); *see also* 2000 Amend. Advisory Comm. Notes to Rule 702 (the "testability" inquiry considers "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability"). Because Dr. Leitzinger attempted to avoid this requirement entirely and the placebo tests that were run do in fact show his model returns significant false positive results, his model should be excluded.

**III.** <u>Dr. Leitzinger's Damages Model Is Riddled with Data Analysis Errors and Faulty Assumptions</u>

The unreliability of Dr. Leitzinger's methodology is further highlighted by two errors and

unsupported assumptions in his damages calculations.  *First*, Dr. Leitzinger misinterpreted the BCBSIL claims data, which resulted in damages being overstated by ▮▮▮▮▮▮.  *Second*, he extrapolated more than ▮▮▮▮▮▮ in damages despite not analyzing data for two insurers.  These issues require, at a minimum, exclusion of these portions of his opinions to avoid jury confusion.

A. <u>Dr. Leitzinger Misreads Data from the Key Insurer in His Yardstick</u>

A reliable damages model requires an expert to analyze and interpret data properly.  *See Gilbert*, 158 F.4th at 849–50 (affirming exclusion where expert based causation opinion on data that was "riddled with design flaws").  Dr. Leitzinger's Illinois yardstick fails this low bar because he used the wrong values in BCBSIL's data to calculate what it actually paid to Advocate.  For every other insurer, Dr. Leitzinger used a specific data field—the "allowed amount"—to calculate what the insurer paid to the provider.  But for BCBSIL, the insurer responsible for the vast majority of Advocate's claims, Dr. Leitzinger abandoned the "allowed amount" field and instead calculated the amount that BCBSIL paid to Advocate by subtracting the "discount amount" field from the "eligible amount" field.  *See* Ex. 2, Leitzinger Reb. ¶ 6.

Dr. Leitzinger's anomalous treatment of the BCBSIL data rests on an incorrect understanding of how BCBSIL's reimbursement process works.  BCBSIL pays providers through its Uniform Payment Program ("UPP"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮" Ex. 36, AAHEDWI00343476.  ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[15]  Simply put, the data Dr. Leitzinger

---

[15] *See* Ex. 36, AAHEDWI00343476 ( ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27

analyzed did *not* reflect the amounts that BCBSIL ultimately paid Advocate for the claims he was analyzing.  The magnitude of his error is staggering, reducing damages by ███, from ██████ to ███████, or approximately ████████.  *See* Ex. 2, Leitzinger Reb. ¶ 10.

This error is yet another example of Dr. Leitzinger's faulty methodology and failure to rely on sufficient record facts.  Dr. Leitzinger conceded that he was not even familiar with the UPP reconciliation process even after Mr. Orszag addressed it at length in his report.  *See* Ex. 14, Leitzinger Tr. 132:17–21.  An expert who intentionally declines to investigate a crucial data source cannot reliably opine on what that data shows.  *See Gilbert v. Lands' End, Inc.*, No. 19-cv-823, 2022 WL 2643514, at *9 (W.D. Wis. July 8, 2022) (excluding opinion where expert "did not review any [record evidence] or take any steps to confirm whether the information in the [data sets] was accurate" because this "admitted failure to account for potentially unreliable information undermines all of his opinions"), *aff'd* 158 F.4th at 850.  Dr. Leitzinger's erroneous claim that BCBSIL's counsel instructed Plaintiffs' counsel to interpret the data in this manner does not excuse this failure.  *See* Ex. 2, Leitzinger Reb. ¶ 6.  It was incumbent on Dr. Leitzinger to investigate in the record how the data should be read.  *See Lyman*, 580 F. Supp. 2d at 726 (expert "should have independently verified the reliability of the data" rather than taking counsel's word).

Even when faced with clear evidence of his error, Dr. Leitzinger did not concede that his treatment of BCBSIL data was improper.  Instead, he hedged by offering a second calculation assuming that AAH's position is correct.  This requires exclusion because, beyond Dr. Leitzinger's work being unreliable, permitting Dr. Leitzinger to present the jury with two contradictory damages figures would sow confusion and unfairly prejudice AAH by inviting the jury to anchor

---

████████); Ex. 55, Blue Cross Blue Shield of Illinois, "2026 Provider Manual – Billing and Reimbursement," at 23–4 (BCBSIL manual explaining the UPP process).

their assessment of harm on the grossly inflated, and inaccurately calculated, damages number.

<strong>B.     <u>Dr. Leitzinger's Extrapolation of Missing Claims Data Is Unreliable</u></strong>

Dr. Leitzinger did more than misapprehend key data—he also improperly extrapolated data for two insurers, WPS and HPS, that did not produce any claims data in the case, inflating his damages calculation by another $▮▮▮▮▮▮. Because Dr. Leitzinger's extrapolation for WPS and HPS rests on nothing more than faulty assumptions and conjecture, it must be excluded.

As Dr. Leitzinger admitted, WPS and HPS "have not produced data." Ex. 1, Leitzinger Rpt. ¶ 47. Despite Plaintiffs failing to obtain any of their data, Dr. Leitzinger was "asked by counsel to estimate" damages for the two insurers' agreements with AAH. Ex. 1, Leitzinger Rpt. ¶ 47. To do so, Dr. Leitzinger combined data from the other insurers with isolated "payor mix" information from AAH's internal documents to "extrapolate" the claim payments. Ex. 1, Leitzinger Rpt. ¶¶ 46–47.

Dr. Leitzinger has not shown his extrapolation process is based on sufficient facts or data. He offered only a passing justification for assuming that WPS and HPS paid rates comparable to the other insurers: that WPS and HPS are "▮▮▮▮▮▮▮▮▮▮," and so there is no "▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 14, Leitzinger Tr. 125:5–9. But these assertions are based on pure speculation, as Dr. Leitzinger admitted that he was not opining on relative bargaining power of insurers. Ex. 14, Leitzinger Tr. 74:25–75:4. Dr. Leitzinger did not examine whether WPS and HPS ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮," nor did he analyze whether their bargaining position or other factors may have led to variations in their rates. This speculation about the missing data for WPS and HPS cannot support extrapolation, let alone a reliable impact or damages estimate. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319–20 (S.D.N.Y. 2009) (excluding extrapolation where the expert "ha[d] no basis in fact or reality" for his assumption that the data

29

was representative of the non-producing entities other than his response that "there [was] no reason to assume that it wasn't"); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419–20 (7th Cir. 2005) (affirming exclusion of expert's opinion based on "expert intuition," holding that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (citations omitted).

**IV.**     Dr. Leitzinger's Two-Step Process Fails Due to His Faulty Yardstick

The other analysis that Dr. Leitzinger offers—a so-called "two-step" analysis in which he purports to show that the Challenged Provisions impacted most of the putative Class members— must also be excluded.  The first step of this analysis involves Dr. Leitzinger using his yardstick model to calculate the damages for individual claims, which he then uses in a second step to "estimate" amounts for each claim absent the Challenged Provisions. Ex. 1, Leitzinger Rpt. ¶ 56. This two-step analysis is premised entirely on the yardstick isolating the effects of the Challenged Provisions.  Because, as set forth above, the yardstick is so flawed that it must be excluded, Dr. Leitzinger's two-step analysis is equally unreliable and must also be excluded.  *See ATA Airlines*, 665 F.3d at 893 (requiring damages model to be "built on a rational foundation").[16]

**CONCLUSION**

For all of the foregoing reasons, the Court should exclude Dr. Leitzinger's opinions and testimony predicated on his yardstick damages model—including his calculation of aggregate damages and his "two-step" method that purports to show classwide impact.

---

[16] To attempt to substantiate his two-step model, Dr. Leitzinger offered an additional "bootstrap analysis" in his Rebuttal Report.  *See supra* Background, § II.  This "bootstrap" analysis should be excluded as untimely.  Dr. Leitzinger could have done this analysis from the outset, as it is based on data fully available to him before he served his initial report.  Springing this wholly new analysis in a rebuttal report is precisely the kind of sandbagging courts prohibit.  *See, e.g.*, *Sloan Valve Co. v. Zurn Indus.*, No. 10-cv-204, 2013 WL 3147349, at *4 (N.D. Ill. June 19, 2013) (excluding an expert's "new opinion regarding damages" in reply report).

Date: June 2, 2026

/s/ *Anne Johnson Palmer*
Daniel E. Conley
Nathan J. Oesch
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: 414.277.5000
Fax: 414.271.3552
daniel.conley@quarles.com
nathan.oesch@quarles.com

Matthew Splitek, SBN 1045592
QUARLES & BRADY LLP
33 E Main St, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Fax: 608.251.9166
matthew.splitek@quarles.com

Jane E. Willis
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Telephone: 617.951.7000
Fax: 617.951.7050
jane.willis@ropesgray.com

Rocky C. Tsai
Anne Johnson Palmer
ROPES & GRAY LLP
One Maritime Plaza, Suite 1800
300 Clay Street
San Francisco, CA 94111
Telephone: 415.315.6300
Fax: 415.315.6350
rocky.tsai@ropesgray.com
anne.johnsonpalmer@ropesgray.com

31