# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

URIEL PHARMACY HEALTH AND
WELFARE PLAN; URIEL PHARMACY,
INC.; HOMETOWN PHARMACY; AND
HOMETOWN PHARMACY HEALTH and
WELFARE BENEFITS PLAN, on their own
behalf and on behalf of all others similarly
situated,

        Plaintiffs,

    v.

ADVOCATE AURORA HEALTH, INC. and
AURORA HEALTH CARE, INC.,

        Defendants.

Case No. 2:22-cv-610

**REDACTED PUBLIC VERSION**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OFFERED BY MR. JONATHAN ORSZAG**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND ....................................................................................................... 4

      A.     Factual and Procedural History............................................................... 4

      B.     Orszag's Opinions.................................................................................... 8

III.   ARGUMENT........................................................................................................... 10

      A.     Orszag's Opinion About Historical Price Differences Between ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ Is Unreliable................................................................... 11

           1.     Orszag Fails To Connect His Sources To His Conclusion. ...................... 12

           2.     Orszag's Opinion Is Not Based On Reliable Sources.............................. 15

      B.     Orszag's Opinion About "False Positives" is Unreliable. ................................... 17

      C.     Orszag's "Difference-in-Differences" Opinion is Unreliable.............................. 25

IV.   CONCLUSION........................................................................................................ 29

**Page(s)**

**Cases**

*Allgood v. Gen. Motors Corp.*,
2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) ................................................................... 23, 25

*Applied Med. Res. Corp. v. Medtronic, Inc.*,
2025 WL 4052504 (C.D. Cal. Apr. 11, 2025) ....................................................... 2, 11, 15, 17

*ATA Airlines, Inc. v. Fed. Exp. Corp.*,
665 F.3d 882 (7th Cir. 2011) ............................................................................................ 10, 23

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
471 F.3d 745 (7th Cir. 2006) .................................................................................................. 15

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) .................................................................................................. 22

*C.W. v. Textron, Inc.*,
807 F.3d 827 (7th Cir. 2015) ............................................................................................ 11, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................................................................................................................. 2

*Fail-Safe, LLC v. A.O. Smith Corp.*,
744 F. Supp.2d 870 (E.D. Wis. 2010).................................................................................... 16

*Farmer v. DirectSat USA, LLC*,
2013 WL 1195651 (N.D. Ill. Mar. 22, 2013)......................................................................... 23

*Funderburk v. S.C. Elec. & Gas Co.*,
395 F. Supp. 3d 695 (D.S.C. 2019)........................................................................................ 10

*GE v. Joiner*,
522 U.S. 136 (1997).......................................................................................................... passim

*Gilbert v. Lands' End, Inc.*,
158 F.4th 839 (7th Cir. 2025) ................................................................................................ 15

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014)................................................................... passim

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
2022 WL 226130 (D. Kan. Jan. 26, 2022)................................................................................ 2

Case 2:22-cv-00610-LA    Filed 06/02/26    Page 3 of 35    Document 214

*Jones v. Varsity Brands, LLC*,
  2024 WL 457173 (W.D. Tenn. Feb. 6, 2024) .................................................................... 2, 27

*Krik v. Exxon Mobil Corp.*,
  870 F.3d 669 (7th Cir. 2017) ............................................................................... 10, 17

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................................ 10

*Lees v. Carthage Coll.*,
  714 F.3d 516 (7th Cir. 2013) ................................................................................... 11

*Manpower, Inc. v. Ins. Co. of Pa.*,
  732 F.3d 796 (7th Cir. 2013) ..................................................................................... 8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .................................................................................... 19

*Schultz v. Akzo Nobel Paints, LLC*,
  721 F.3d 426 (7th Cir. 2013) .............................................................................. 2, 10

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
  2026 WL 395430 (S.D.N.Y. Feb. 12, 2026) .............................................................. 2

*Smith v. Ford Motor Co.*,
  215 F.3d 713 (7th Cir. 2000) ............................................................................. 16, 17

*Wasson v. Peabody Coal Co.*,
  542 F.3d 1172 (7th Cir. 2008) .................................................................................. 11

*Weir v. Crown Equip. Corp.*,
  217 F.3d 453 (7th Cir. 2000) .................................................................................... 11

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) .................................................................................... 22

**Rules**

Fed. R. Evid. 702 ....................................................................... 10, 17, 23, 25

## I.    <u>INTRODUCTION</u>

For nearly two decades, Defendants Advocate Aurora Health, Inc., and Aurora Health Care, Inc. (collectively "AAH"), imposed anticompetitive contractual restraints on Wisconsin health plans (the "Challenged Conduct" or the "All Plans" provision). Plaintiffs are two employers, Uriel Pharmacy and Hometown Pharmacy, that offer health benefits to their employees through self-funded plans. They allege that AAH's restraints enabled its Wisconsin hospital system ("AAH-Wisconsin") to charge supracompetitive prices to Wisconsin employers, unions, insurers, and patients.

Plaintiffs retained expert economist Dr. Jeffrey Leitzinger to quantify the resulting harms, which take the form of overcharges to insurers and health plans whose members received care from AAH-Wisconsin. Dr. Leitzinger designed a multivariate regression model that compares AAH-Wisconsin's prices to those of AAH's hospital system in ██████████████—a similar system under the same corporate ownership that █████████████████ ██████—while controlling for other factors that might affect their prices. Based on his regression model and the discovery record, Dr. Leitzinger concludes that AAH's anticompetitive conduct inflated its Wisconsin prices by ███%. Dr. Leitzinger also ran a second regression comparing AAH-Wisconsin's prices to those of the most comparable hospital system in Eastern Wisconsin (Ascension) and found similar results.

AAH does not deny that it imposed the challenged restraints on Wisconsin health plans and does not offer its own competing overcharge model. Instead, it retained Mr. Jonathan Orszag merely to criticize Dr. Leitzinger's regression model, seeking to deprive Plaintiffs of their damages expert and avoid accountability on the merits. Orszag's critiques are uniformly unpersuasive, as Plaintiffs will show at later stages of this case. But certain of Orszag's opinions are so untethered from the facts, the data, and accepted methodologies that they fail to satisfy even the liberal

1

standards for admission under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Daubert*, courts play a gatekeeping role, and "the key to the gate is … the soundness and care with which the expert arrived at [his] opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). Here, as he has done repeatedly throughout his career—courts have excluded five of his opinions in just the past five years[1]—Orszag failed to exercise the required level of care.

*First*, Orszag claims that Dr. Leitzinger failed to account for the supposed fact that ████ ██████████████████████████████████████████, before the Challenged Conduct began. Even setting aside that any price differences 25 years ago would say little about prices today, this opinion is inadmissible on two independent grounds. The data Orszag relies on is not reliable. ████████████████████████████



████████████████████████████████████████ Even taken at face value, moreover, the data say nothing about ███████████████ or even hospital prices more broadly ███████████████████████████████████████ There is "simply too great an analytical gap," *GE v. Joiner*, 522 U.S. 136, 146 (1997), between a high-

---

[1] *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2026 WL 395430, at *2-*4 (S.D.N.Y. Feb. 12, 2026); *Applied Med. Res. Corp. v. Medtronic, Inc.*, 2025 WL 4052504, at *7 (C.D. Cal. Apr. 11, 2025); *Jones v. Varsity Brands, LLC*, 2024 WL 457173, at *2-*4 (W.D. Tenn. Feb. 6, 2024); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2022 WL 226130, at *11 (D. Kan. Jan. 26, 2022); *Academy of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. SA-17-CA-1122-FB, ECF 280 at 1-2 (Mar. 30, 2021); *see also In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *14-*20 (S.D.N.Y. Mar. 28, 2014).

level statistic about employer healthcare spending across two broad regions and Orszag's conclusions about two specific hospital systems' prices. Orszag never even addressed that gap, let alone bridged it.

*Second*, Orszag contends that Dr. Leitzinger's model █████████████████ ███████████████████████████████. This opinion is inadmissible because Orszag skipped three foundational steps for a valid placebo test. A "placebo" test without a placebo is meaningless, but Orszag never even checked whether the hospitals he used were valid placebos. In fact, the record shows they were not: █████████████████████████████ █████████████████████████████ Orszag also acknowledged that a valid placebo test requires the placebo hospitals to be sufficiently comparable to ███████████ and he identified several metrics an economist should compare before using a placebo. Remarkably, however, Orszag did not consider *any* of those metrics for *any* of his placebo hospitals. His failure to do so makes it impossible to know whether his results show anything meaningful or are simply the consequence of applying a model to hospitals it was never designed to analyze. Lastly, Orszag did not have sufficient data. Instead of gathering his own data, Orszag used Dr. Leitzinger's—but Dr. Leitzinger collected data from the largest payors in Eastern Wisconsin and ███████████, not █████████████████████████████ where Orszag's placebo hospitals operate.

*Third*, Orszag purports to run a "before" and "after" test using a "difference-in-differences" (DID) model, which he says ██████████████████████████████ █████████████████████ Once again, however, Orszag failed to verify the predicates for his methodology. Orszag admitted at his deposition that ████████████████████████ ████████████████████████████████████████████—and when Dr. Leitzinger replicated the test Orszag ██████████████████

███████ . Orszag's shifting explanations, the inconsistency between his testimony and his report, and the statistical realities reveal the unreliability of his test. In addition, Orszag improperly assumed that the "All Plans" provision's effect on prices █████████████████████ ████████████████████████████████████████ That assumption is not just unverified; it directly contradicts the record evidence and accepted economic principles. His "after" period was not an "after" period at all, stripping his test of any meaning.

Orszag's carelessness manifests throughout his entire report. While many of Orszag's shortcomings go to the weight of his opinions rather than their admissibility, the opinions discussed in this motion are so unreliable, and characterized by such lack of rigor, that they should be excluded in their entirety.

## II.      BACKGROUND

### A.      Factual and Procedural History

Plaintiffs filed their complaint on May 24, 2022, alleging that AAH abused its market dominance to engage in anticompetitive conduct and overcharge Class members (self-funded employer health plans and commercial insurers) for healthcare services. The principal restraint at issue is the "All Plans" restraint, which blocked the mechanisms through which price competition normally takes place in this industry. The "All Plans" provision ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ It also ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████ AAH's wrongful conduct reduced competition and allowed it to charge supracompetitive

prices for years█████████████████████████████████████████████████████

█████████████████████████████████████████

Plaintiffs disclosed reports from three experts. Dr. David Dranove[2] performs structural econometric analyses and opines that ███████████████████████████████████████

█████████████████████████████████████████ in the Eastern Wisconsin market. Ex. 2, Expert Report of David Dranove, Ph.D. (Nov. 21, 2025) ("DR1") ¶ 28. Dr. Patrick Romano[3] opines that ████████████████████████████████████████████████████████

█████████████████, ███████████████████████████████████████████. Ex. 3, Expert Report of Dr. Patrick S. Romano, M.D., M.P.H. (Nov. 21, 2025) ("RR1") ¶ 105. He further opines that the "All Plans" language was "████████████████████████████████████

████████████████████████████████." Dr. Jeffrey Leitzinger[4] performs a statistical



[2] Dr. Dranove is the Walter J. McNerney Distinguished Professor of Health Industry Management and Professor of Management and Strategy at the Kellogg School of Management at Northwestern University, where he also serves as Faculty Director of Ph.D. Programs. Ex. 2, DR1 ¶ 1. He specializes in industrial organization and healthcare markets, with over 100 published research articles and eight books, including the textbook *Economics of Strategy* used by leading business schools worldwide. *Id.* ¶ 3. In 2022, Dr. Dranove received the Victor Fuchs Award for Lifetime Contributions to the Field of Health Economics, and in 2024, he was elected to the National Academy of Medicine for his contributions to understanding healthcare market dynamics. *Id.* ¶ 6. Dr. Dranove has three decades of experience in economic analysis for litigation and regulatory actions, including testifying for the U.S. Department of Justice in its lawsuit to block the Anthem-Cigna merger. *Id.* ¶ 4.

[3] Dr. Romano is a Professor of Medicine and Pediatrics at the University of California Davis (UC Davis) School of Medicine. Ex. 3, RR1 ¶¶ 1, 3. He has authored over 240 peer-reviewed publications, 15 book chapters, and over 80 other publications on a wide range of healthcare issues, with a particular focus on health care quality measures and comparing health system performance. *Id.* ¶ 2. As a result of his expertise in healthcare quality evaluation, he leads several applied research projects on health care quality, serves in numerous consulting and technical assistance roles, and has held advisory positions with several organizations. *Id.* ¶¶ 2-6. He has extensive experience evaluating the quality implications of hospital mergers and other anticompetitive conduct, both in the litigation context and on a consulting basis. *Id.* ¶ 10.

[4] Dr. Leitzinger is the founder and Managing Director of Econ One Research, Inc., an economic research and consulting firm. Ex. 4, LR1 ¶ 1. He holds doctoral degree in economics from the University of California, Los Angeles. *Id.* During his 45-year professional career, antitrust

regression analysis of millions of insurance claims and concludes that the Challenged Conduct raised AAH-Wisconsin's prices by █ percent. Ex. 4, Expert Report of Jeffrey J. Leitzinger, Ph.D. (Nov. 21, 2025) ("LR1") ¶ 9 & Ex. 4. Because the opinions at issue in this motion all relate to Dr. Leitzinger's analysis, a more detailed description of his work is provided here.

To measure overcharges, Dr. Leitzinger used a "yardstick" regression that compares AAH-Wisconsin's prices to the prices charged for the same services during the same time period by two comparator (or "yardstick") providers. His primary yardstick is AAH's own hospital system █ █ his second yardstick is the Ascension hospital system in Wisconsin. Ex. 4, LR1 ¶¶ 26-45. Dr. Leitzinger's regression model includes several control variables designed to isolate the effects of the Challenged Conduct on AAH-Wisconsin's prices. Ex. 4, LR1 ¶ 26; *see id.* ¶¶ 36-37 (listing 15 such variables). For example, Dr. Leitzinger controls for demographic characteristics in the service area, the type of facility where a service was provided, labor costs, provider concentration, and Network Vendors' market shares. *Id.* ¶¶ 36-37. Dr. Leitzinger also explains that his selection of █ as his yardstick automatically controlled for the many factors that AAH-Wisconsin and █ already had in common:

> I had the fortuitous circumstance of two hospital systems, AAH Wisconsin █ and █ █, both serving large metropolitan areas █ and both were in the same corporate family. Testimony and other evidence indicates █ …. From an overcharge estimation standpoint, the situation was ideal…. Much of what might normally have required multiple external control variables was dealt with simply by using █ for the control experience.

economics has been the principal focus of his work, including frequent analysis of damages and impact in both individual and class action antitrust litigation. *Id.* ¶ 2. Dr. Leitzinger has testified as an expert economist in state and federal courts, before regulatory commissions, and in international treaty arbitrations, and has previously analyzed anticompetitive conduct in numerous cases involving healthcare markets, including as the testifying expert in the similar *UEBT v. Sutter* case. *Id.*

6

Ex. 5, Rebuttal Report of Jeffrey J. Leitzinger, Ph.D. (Mar. 23, 2026) ("LR2") ¶¶ 82-83.

With respect to hospital quality specifically, Dr. Leitzinger accounted for quality through his selection of ███████ —a hospital system of similar quality to AAH-Wisconsin—as the yardstick. Specifically, Dr. Leitzinger noted ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ .

Dr. Leitzinger's analysis finds that the Challenged Conduct allowed AAH to overcharge Class members in Eastern Wisconsin by ███ %. Ex. 4, LR1 ¶ 40. His results were statistically significant at the 99 percent confidence level and "consistent with Plaintiffs' claims about overcharges stemming from the Challenged Conduct." *Id.*[5]

Dr. Leitzinger's second yardstick analysis used Ascension as the yardstick. *Id.* ¶ 45. ███ ████████████ , Dr. Leitzinger selected Ascension as an appropriate yardstick because it shared "several common factors" with AAH-Wisconsin. Specifically, he determined that Ascension

████████████████████████████████████████████████████████████

---

[5] Orszag contends that Dr. Leitzinger used the wrong data field when analyzing one Network Vendor's Illinois data. *See* Ex. 5, LR2 ¶ 7. Dr. Leitzinger does not find Orszag's position persuasive, *see id.* ¶ 14, but shows that even when using Orszag's preferred data treatment, his regression model shows substantial overcharges that are statistically significant at the 99 percent confidence level, *id.* ¶ 7.

██████████████████████████████████████████

██████████████████████████████████████████

███████████ Ex. 5, LR2 ¶ 91. These common factors allowed him to apply the same model to a different hospital system without "the need for additional control variables that would have been needed" if he used other, less similar hospitals. *Id.* The Ascension regression corroborated the results of Dr. Leitzinger's primary regression, showing a substantial overcharge that is statistically significant at the 99 percent confidence level. Ex. 4, LR1 at Ex. 6, ¶ 40.

### B.      Orszag's Opinions

AAH proffered the opinion of Mr. Jonathan Orszag, tasking him with critiquing Dr. Dranove and Dr. Leitzinger. *See* Ex. 1, Expert Report of Jonathan Orszag ("Ex. 1, OR1") ¶ 9 ("█

████████████████████████████████████████████

████████████████████████████ ."). As relevant to this motion, Orszag opines that Dr. Leitzinger's yardstick regression ████████████████████████████████

████████████████████████████████████████████

███████████████████████ . Orszag's critiques are unpersuasive, as Dr. Leitzinger fully details in his Rebuttal Report, and as Plaintiffs will show at trial. *See* Ex. 5, LR2 ¶¶ 5-134; *see also, e.g.*, *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury."). Three of Orszag's opinions, however, fail to meet even the liberal standards for admissibility and should be excluded entirely.

First, Orszag opines ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ Ex. 1, OR1 ¶ 84. Orszag's opinion ████████████████████

Second, Orszag opines that Dr. Leitzinger's regression model ███████████████ ████████████████████████████████████████████████████████ ██████████████ Ex. 1, OR1 ¶ 97, 99. In contrast to Dr. Leitzinger's detailed explanation of why it was appropriate to use the Ascension system as a corroborating yardstick, *see supra*, Orszag's report ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ and did not analyze whether he had sufficient data to run the tests at all.

Third, Orszag purports to run a "difference-in-differences" ("DID") test comparing "before" and "after" periods. He claims ████████████████████████████ ██████████████████████████████████████████████████ Ex. 1, OR1 ¶ 12. Orszag's report, however, does not discuss whether the required preconditions for a DID analysis were satisfied, including ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ The record evidence, in fact, shows otherwise.

## III.    <u>ARGUMENT</u>

Under the Federal Rules of Evidence and *Daubert*, a district court must make a preliminary determination that an expert's testimony is reliable. *ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 896 (7th Cir. 2011). While the threshold for admissibility is not particularly high, courts must ensure that the expert's "testimony is based on sufficient facts or data" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Although this "places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions." *Schultz*, 721 F.3d at 431. Instead, the "key to the gate" is "the soundness and care with which the expert arrived at her opinion." *Id.* AAH, as the party proffering Orszag's testimony, "bears the burden of demonstrating that the [his] testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).

These standards apply regardless of whether an expert is offering affirmative testimony or only rebutting another party's expert. Even as to rebuttal experts, defendants "do[] not have the right … to call an expert economist to present opinions unless those opinions are the product of the expert's rigorous application of economic methods." *In re Elec. Books*, 2014 WL 1282298, at *20; *see also, e.g.*, *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 716 (D.S.C. 2019) ("[A] rebuttal expert is still subject to the scrutiny of *Daubert* and must offer both relevant and reliable opinions."). Even rebuttal experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

### A. Orszag's Opinion About Historical Price Differences ▮▮▮▮▮▮▮▮▮ Is Unreliable.

An expert opinion passes muster only if the expert "consulted reliable sources and provided reasoned explanations connecting the source material to his conclusions." *Lees v. Carthage Coll.*, 714 F.3d 516, 524 n.3 (7th Cir. 2013); *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 465 (7th Cir. 2000) ("For testimony based on reports to be admissible, the reports themselves must be reliable sources of information."). Experts must "connect the dots" from the studies to their ultimate conclusions, *C.W. v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015), and may not offer opinions that are "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also Wasson v. Peabody Coal Co.*, 542 F.3d 1172 (7th Cir. 2008). In *Joiner*, for instance, an expert was excluded because he extrapolated from animal studies to a conclusion about cancer in humans without explaining how or why it was scientifically valid to make that inferential leap. *Joiner*, 522 U.S. at 144-46.

Orszag has been excluded before for making such unexplained inferential leaps. In *Applied Medical*, for example, Orszag opined about the percent of the market that Medtronic's conduct foreclosed. 2025 WL 4052504, at *7. Orszag's conclusions relied critically on a "figure from a Medtronic's Quarterly Business Review slide deck," but the court held that he had no basis to extrapolate from the figure on the slide deck to his foreclosure analysis. Because he "provide[d] no explanation for the methodology used" to conclude that the figure was relevant, and instead offered only his "*ipse dixit* conclusion," the court found "Orszag's foreclosure figure fundamentally unreliable." *Id.* Similarly, in *In re Elec. Books*, certain of Orszag's opinions were excluded because instead of "undertak[ing] an examination of [the] market and perform[ing] a study, … [h]e simply took a single, general remark about Amazon's goals from an Amazon executive and extrapolated from that." 2014 WL 1282298, at *17.

11

### 1. Orszag Fails To Connect His Sources To His Conclusion.

AAH cannot satisfy its burden to show that Orszag's opinion about historical price differences ███████████████████████████ satisfies *Daubert*'s requirements. Orszag seeks to offer an opinion comparing ██████████████████████████████ ████ Unlike Dr. Leitzinger, *see* Ex. 4, LR1 ¶ 32, he did not use ████████████ Nor did he use data on hospital prices from third-party entities like RAND, as Prof. Dranove did, *see* Ex. 2, DR1 ¶¶ 152-54. ████████████████████████████████

████████████████████████████████████

███████████████████████████████. *See* Ex. 7, AAHEDWI01645637 at 662-63, 665. Even setting aside that those studies are unreliable, *see infra* Part I.B, they do not measure what Orszag needed them to measure: ████████████████████████ ██████████████████████[6] ████████████████████████

████████████████████████████████████

████████████████████████████████ *See* Ex. 5, LR2 ¶¶ 17- 20 (████████████████████████████████████ ██████████████████████████); *see id.* ¶ 19 (noting that employer healthcare spending is driven by factors unrelated to provider prices, including "the amount of services consumed, … the frequency and seriousness of health problems, the plan coverage terms, and a host of items beyond health care service charges.").

Orszag never explained how or why he could extrapolate from ████████████████ ████████████████████████████████████ ████████████████████ He did no statistical work to bridge the gap. He simply

───────────────

[6] ████████████████████████████████████ ████████████████████

█████████████ and asserted his conclusion, never "connect[ing] the dots between the …

studies … and the opinions that he offered." *Textron*, 807 F.3d at 832; *see* Ex. 1, OR1 ¶ 84. "This

is a *Joiner* problem," *Textron*, 807 F.3d at 832, as there is far "too great an analytical gap between"

what these slides say and the conclusion Orszag draws from them, *Joiner*, 522 U.S. at 146.

It is no wonder Orszag failed to provide an explanation: ████████████████

████. Ex. 8, Deposition of Jonathan Orszag ("Orszag Tr.") at 99:16-17 ("██████████

████████████████"); *id.* at 115:3-5 ("████████████

████████████████"); *id.* at 117:22-24 ("████████████

████████████████"). Orszag thus ██████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████:

- "████████████████████████." *Id.* at 105:11-14.

- "████████████████████." *Id.* at 116:6-7.

- "████████████████████████
████." *Id.* at 101:18-19.

- "████████████████████████
████." *Id.* at 102:2-4.

- "████████████████████████
████." *Id.* at 102:21-24.

- "████████████████████████
████" *Id.* at 109:11-15.

- "████████████████████████
████" *Id.* at 108:17-20.





- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " *Id.* at 119:12-16.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 115:8-9.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 110:6-7.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 110:17-18.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 120:17-19.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 118:21-23.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 115:13-15.

- " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at 118:15-18.

Without any of this basic knowledge, Orszag could not reliably draw inferences from the studies to his conclusions about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For example, Orszag admitted that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . *Id.* at 114:6-10 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ."); *see also id.* at 113:2-7 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ."); *id.* at 116:20-22 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ."). Drawing inferences with ▮▮▮▮▮ is precisely what *Joiner* prohibits, and a conclusion "connected to existing data only by the *ipse dixit* of the expert" is not admissible expert testimony. *Joiner*, 522 U.S. at 146;

*see also Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (excluding expert who opined on a software program without examining the program).

Orszag has been excluded on nearly identical grounds before. In *Applied Medical*, Orszag sought to opine on the percentage of the market the defendant's conduct foreclosed. 2025 WL 4052504, at \*7. Like here, he eschewed rigorous analysis of foreclosure in favor of ███████████ ███████████████████████████████████ And like here, Orszag "provide[d] no explanation for the methodology used to reach the conclusion" █████████████████████ █████ ████████████████████████████████████████████████████████████████ — could be reliably used to estimate market foreclosure. *Id.* Because he failed to connect the dots from ████████ to the opinion he offered, Orszag's "methodology-free conclusion" was excluded. *Id.*; *see also In re Elec. Books*, 2014 WL 1282298, at \*17 ("Orszag therefore has no basis for the central assumption in his string of assumptions."). The same result is warranted here.

### 2.     <u>Orszag's Opinion Is Not Based On Reliable Sources.</u>

████████████████████████████████████████████████████████ is enough to warrant exclusion. *Joiner*, 522 U.S. at 146. But Orszag's opinion fails for the independent reason that ██████████████████████████████████████ ████████████ . AAH and Orszag have effectively conceded as much.

First, AAH itself ███████████████████████████████████ . Expert opinions are inadmissible if they rely on studies "riddled with design flaws" and the expert does not do even the "minimal amount of identifying or controlling for error." *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 850 (7th Cir. 2025). The Mercer Study fits that description precisely—████ ████████████████████████████████████ . ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 9,

AAHEDWI01501491 at 491, "█████████████████████████████████████████ ██████████," Ex. 10, AAHEDWI01587785 at 788, used a "█████████████ ███████████████████████████████," *id.*, and fails to reflect that "█████████ ███████████" for employer healthcare costs, *id.* at 787. AAH's own documents referred to █ ██████████████████—the very figures Orszag now relies on for his opinion in this case—as "████████," Ex. 11, AAHEDWI00311317 an "████████," Ex. 10, AAHEDWI01587785 at 786, and a "████████," *id.* at 787. AAH cannot satisfy its burden to show ██████████ ███████████████████████████.

Second, Orszag's deposition made clear that ████████████████████



██████████████████████████████████████████████████████ Expert opinions that so uncritically rely on dubious sources are inadmissible. In *Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp.2d 870 (E.D. Wis. 2010), for example, an expert's opinion was excluded because it was founded on a statistic he "adopt[ed] wholesale from a single, undated … PowerPoint slide" that he did not scrutinize. *Id.* at 887. The court deemed his use of that data "extremely suspect, as was [his] scrutiny of that data." *Id.* Orszag's █████████████████████████ is just as suspect, and just as inadmissible. While econometric experts are free to consult a variety of sources in forming their opinions, a reliable analysis would not rest *exclusively* on ████████████████ ███████████████████████████. Accordingly, Orszag's opinion fails Rule 703's reliability requirement. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) ("[T]he district court functions as a gatekeeper whose role is to keep experts within

their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves.").

*　　*　　*

Finally, the absurdity of Orszag's overall position warrants emphasis. Orszag claims, on the one hand, that he can reliably opine about ███████████████████████████ ███████████████████████████████████████████████████████, including one that ██████████████████████████." Yet while swearing to the reliability of his own "methodology-free conclusion," *Applied Med.*, 2025 WL 4052504, at *7, Orszag claims that Dr. Leitzinger's multivariate regression model—which analyzes millions of lines of actual claims data from AAH-Wisconsin and ██████████, controls for numerous important variables, and is so statistically robust that it explains 93% of the variation in prices—cannot reliably compare AAH-Wisconsin's and ██████████ prices. That is simply not credible. An expert who holds his own work to no standard while demanding impossible standards of others is not offering reliable analysis—he is offering advocacy, and advocacy dressed up as expertise is precisely what Rule 702 exists to exclude.

### B.　Orszag's Opinion About "False Positives" is Unreliable.

Even when an expert uses an accepted methodology, he must demonstrate that the conditions that make the methodology work are actually present. Fed. R. Evid. 702(d) (expert opinion must "reflect[] a reliable application of the principles and methods to the facts of the case"); *Krik*, 870 F.3d at 674 ("[A] trial judge must make a preliminary assessment that the testimony's underlying reasoning or methodology is … properly applied to the facts at issue."). Here, Orszag's purported "placebo test" is inadmissible because he failed to evaluate, much less demonstrate, that the preconditions for a valid placebo test were satisfied. A placebo test that is

17

run without first confirming the conditions that give its results meaning is not a reliable application of the method.

A placebo test is an econometric technique used to check whether a regression model is working correctly. The idea is that a regression model should usually find no overcharge when applied to a group of "placebo" hospitals known to be unaffected by any of the Challenged Conduct. Ex. 5, LR2 ¶ 73 (citing P.J. Gertler, et al., *Impact Evaluation in Practice*, World Bank Group and Inter-American Development Bank (2d ed. 2016) at 332). If a sufficient number of placebo tests show overcharges at appropriate placebo hospitals, that may be a reason the model's results are due less weight. But this test only works if the right kinds of hospitals are chosen as the placebos. Specifically, the placebo hospitals must be ones where you would genuinely expect no overcharge to appear—ones that (1) were not affected by the Challenged Conduct and (2) are similar enough to the hospitals in the original analysis that the model's existing controls are sufficient to account for any pricing differences between them. *See* A.C. Eggers, et al., *Placebo tests for causal inference*, American Journal of Political Science 68(3) (2024), at 1106 to 1121. If those conditions are not met, a finding of an "overcharge" at the placebo hospital proves nothing— it may simply reflect that an invalid placebo hospital was chosen, not that the model is wrong. *Id.*; *see also* Ex. 5, LR2 ¶¶ 74-75.

Orszag committed three fundamental errors in purporting to run a placebo test: (1) he ignored record evidence that his placebo hospitals were engaged in or affected by the Challenged Conduct; (2) he failed to consider, let alone show, that his placebo hospitals were sufficiently comparable to ▮▮▮▮▮▮ for the placebo test to be valid; and (3) he failed to ensure that he had sufficient data about his placebo hospitals.

18

*First*, Orszag failed to ensure that his placebo hospitals were not "

." Ex. 5, LR2 ¶ 75. As Dr. Leitzinger explains, if the placebo

hospitals are engaged in or affected by the Challenged Conduct, "any positive result would not be

a 'false' one" but rather an accurate detection of the presence of Challenged Conduct. *Id.* Orszag

acknowledged as much: he

.[7] Ex. 1, OR1 ¶ 97 n.145. In short, a placebo test without

an actual placebo is meaningless.

Despite relying on record evidence

,

Orszag ignored record evidence that

As to                    , Network Vendors testified that

See Ex. 5, LR2 ¶¶ 94-96. Ex. 12,

); Ex. 13, Deposition of Eric Stotlar (Cigna) ("Stotlar Tr.") at

166:3-168:6                                          ); *see also* Ex. 14,

,

yet Orszag's report reflects no awareness of it—he either failed to review this evidence or chose

---

[7] "Umbrella effects arise when anticompetitive restraints imposed by a dominant market actor diminish the incentives for other market participants to lower their own prices, thereby interfering with the competitive forces that would normally drive price reductions. As a result, prices across the market are likely to remain elevated under the 'umbrella' of the antitrust violator." Ex. 4, LR1 ¶ 43 n.71; *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 675 (9th Cir. 2022) (en banc) ("[Umbrella effects] refers to an economic observation that when many suppliers engage in a conspiracy to raise prices, non-conspirators may raise their prices to supra-competitive levels.").

to ignore it. Orszag's omission is even more glaring given that ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████. *See* Ex. 1, OR1 ¶¶ 65 n.97, 97 n.145. Orszag also admitted that he

did not "███████████████████" with ████. Ex. 8, Orszag Tr. at 164:10-166:20. Because

Orszag cannot show that ████ was a valid placebo, his "placebo" results for ████ have no value.

A similar problem taints Orszag's selection of ████████ and ████████, which both

operate substantially within ████ service area—meaning that their prices are likely impacted by

the umbrella effects of ████████. Ex. 5, LR2 ¶¶ 97-98. ████████ also has facilities within

the service area of ████, another hospital system that Orszag acknowledges was alleged to

engage in similar conduct. *See* Ex. 5, LR2 ¶ 97; Ex. 1, OR1 ¶ 97 n. 145. But while Orszag rejected

the ████████ as a placebo because of the potential for umbrella effects, *see* Ex. 1, OR1

¶ 97 n.145, he included ████████ and ████████ even though they faced the same problem. He

never explained why umbrella effects disqualified ████ but not two hospitals operating in ████

and ████ backyard. Because these two "placebo" hospitals' prices may have been affected by

conduct like that alleged here, Orszag cannot show that they are valid placebos either.

**Second**, Orszag failed to ensure that his placebo hospitals were sufficiently comparable to

████████ As Dr. Leitzinger explains, "a placebo test is informative only if the yardstick group

and the placebo group are sufficiently comparable such that, when the challenged conduct is

absent, the estimated effect should be zero." Ex. 5, LR2 ¶ 75; *see also* American Bar Association

(ABA) Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* (3d. ed.

2017), at 93 ("The yardstick employed must be comparable."). Without that assurance, a positive

result "does not demonstrate that the model is producing a false positive," but may show only that

"the comparator is not a proper yardstick." Ex. 5, LR2 ¶ 75.

Orszag agreed with this point, testifying that ██████████████ ██████████████████████████████████████████████████ ████████████████████████████. Ex. 8, Orszag Tr. at 170:24-175:14. Orszag made the same point in the similar *Sidibe v. Sutter Health* case, where he stated that "[c]omparisons across hospitals that vary significantly in size and sophistication likely reveal price differences that have nothing to do with the challenged conduct." Ex. 15, Corrected Expert Report Declaration of Dr. Robert T. Willig[8] In Support of Defs.' Opp. to Class Cert., *Sidibe v. Sutter Health* ("Sutter Report"), No. 12-cv-4854 (N.D. Cal. Nov. 8, 2018), at ¶ 197. Orszag thus acknowledged here that before choosing a hospital as a placebo, an economist should consider ████████ ██████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 173:3-9.

Orszag failed to follow his own standard. ██████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████ Ex. 1, OR1 ¶ 97. ██████████ ██████████████████████████████████████████████████ ██████ *See* Ex. 8, Orszag Tr. at 173:3-9. ████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████."

Ex. 5, LR2 ¶ 80. As Orszag himself acknowledged in *Sutter*, the results may reflect "price differences that have nothing to do with the challenged conduct." Ex. 15, Sutter Report, at ¶ 197;



---

[8] In *Sidibe*, Dr. Willig fell ill after submitting his report. Orszag then took over as the defense expert and expressly adopted Dr. Willig's opinions.

*see Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (testimony unreliable where expert "deviated from his own stated" methodology).

Orszag's fly-by-night selection of placebos stands in stark contrast to Dr. Leitzinger's selection of ▮▮▮▮▮ as a corroborating hospital for his analysis. As described *supra*, Dr. Leitzinger did not select ▮▮▮▮▮ until he analyzed its characteristics and concluded that it was similar to the AAH systems on numerous relevant dimensions: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4, LR1 ¶ 43; Ex. 5, LR2 ¶ 91. Orszag did not conduct any analysis of this kind—he neither employed any analytically rigorous method to ensure these hospitals were sufficiently comparable to ▮▮▮▮▮ "nor explained why he hadn't." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). He simply cannot say whether this fundamental precondition to a placebo test is satisfied.

Faced with this contradiction, Orszag tried to backtrack. He suddenly claimed ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because he was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 8, Orszag Tr. 177:24-178:2. But that argument is circular. The whole point of a placebo test is to check whether the model finds an overcharge *where no overcharge should exist*. As the literature makes clear and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (and years earlier in the *Sutter* case), a placebo test can do that only if the placebo hospital is comparable enough to the original hospitals that the model would be expected to show no overcharge. Orszag skipped that step entirely, which means his placebo test cannot tell the difference between a flaw in Dr. Leitzinger's model and a flaw in his own choice of hospitals. *See, e.g.*, Eggers, *supra*, at 1108 (explaining that the "placebo analysis

[must] mirror[] the original research design closely enough to reproduce a possible violation of the core assumptions").

Nor can Orszag escape by arguing that Dr. Leitzinger's model should have automatically controlled for any differences between the placebo hospitals and ███████ Dr. Leitzinger designed his model specifically to compare AAH-Wisconsin and ██████—two hospital systems in the same corporate family, ██████████████████ ████████ ███████ Ex. 5, LR2 ¶ 82. Because those two hospital systems were so similar, Dr. Leitzinger did not need to build in explicit controls for many characteristics they already shared. Ex. 5, LR2 ¶¶ 75, 79-83, 85-89; *see supra*. When Orszag swapped in ████████████████████ for AAH-Wisconsin, those commonalities disappeared. His "placebo" test then lumped all of those uncontrolled differences into the "overcharge" figure, making it impossible to know whether the "positive" results reveal anything about Dr. Leitzinger's model or are simply the predictable consequence of applying that model to hospitals it was never designed to analyze. *See* Ex. 5, LR2 ¶¶ 80, 86-88.

***Third,*** Orszag failed to ensure that he had sufficient data to run the placebo tests. *See* Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data"). Courts reject expert opinions for failing to ensure that the data used is "appropriately representative of the larger entity or population being measured." *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006); *see also, e.g.*, *ATA Airlines*, 665 F.3d at 895 (finding expert unreliable where model used sample that was "less representative of the population being sampled"); *Farmer v. DirectSat USA, LLC*, 2013 WL 1195651, at *6-7 (N.D. Ill. Mar. 22, 2013) (excluding testimony where expert "conducts no analysis to … demonstrate the appropriateness of extrapolating results" from a limited data set). Orszag himself acknowledged that "█████████████████████

█████████████████████████████████████████████████." Orszag Tr. 89:23-25; *see id.* at 90:1-2

("████████████████████████████████████████████.").

Orszag made no effort to satisfy his own standard. Instead of collecting any data of his own, he relied exclusively on Dr. Leitzinger's data. *See* Orszag Tr. at 183:24 ("█████████████ ████████████"). That shortcut created a major problem: Dr. Leitzinger collected data from the largest Network Vendors in Eastern Wisconsin and ████████████ (AAH-Wisconsin's and ████████████ service areas), but Orszag's placebo hospitals operate almost entirely elsewhere— ████████████████████████████████. *See* Ex. 1, OR1 ¶ 97; *see* Ex. 8, Orszag Tr. 178:7-8 ("████████████████████████████████████"). Orszag thus had no data from the many Network Vendors with a substantial presence in the service areas for ████████████ ████████ but not in Eastern Wisconsin. For example, ████████████████████ does not have a significant presence in Eastern Wisconsin but is a very substantial payor to ████████ ██, accounting for "████████████████████████████." Ex. 16, Expert Reply Report of David Dranove, Ph.D ("DR2") at ¶ 136 n.206. Yet at his deposition, ████████████████████ ████████████████████ *See* Ex. 8, Orszag Tr. at 181:8-182:4 ("████████████████████ ████████████████████████████████████████████████████████ ████████████").[9]

████████████████████████████████, Orszag failed to investigate this issue. Despite testifying ████████████████████████████████████████, Ex. 8, Orszag Tr. at 90:1-2, he ████████████████████████████████████████████████ ████████, *see* Ex. 8, Orszag Tr. at 179:17-180:25. ████████████████████

---

[9] Other payors with a substantial presence in Western Wisconsin and not in the dataset Orszag used include Group Health Cooperative of Eau Claire, Group Health Cooperative of South Central Wisconsin, and Dean Health.

███████████████████████████████████, *see id.* at 181:1-7, █████████████

███████████████████████. He thus had no basis to conclude that the data he used for his

placebo hospitals was representative of anything. ██████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ An expert who

███████████████████████████████████████████████████████████████████

cannot satisfy Rule 702's requirement that his testimony be "based on sufficient facts or data,"

Fed. R. Evid. 702(b), or that it reflects data "appropriately representative of the larger entity or

population being measured," *Allgood*, 2006 WL 2669337, at *11.

### C.    Orszag's "Difference-in-Differences" Opinion is Unreliable.

Orszag also misapplied another methodology, once again failing to ensure that necessary

predicates were satisfied. Orszag purports to "██████████████████████████

███████████████████████████████████████████████████████████████████

███████████." Ex. 1, OR1 ¶¶ 103, 109. He uses ███████████ as his control group. *Id.* ¶ 110.

The idea behind Orszag's DID model is to study whether AAH-Wisconsin's rates decreased

relative to ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████" Ex. 1, OR1 ¶ 102.

For a DID test to be valid in this context, two conditions must be satisfied—and neither

was satisfied here.

***First***, a DID analysis is valid only if it satisfies the "parallel trends" condition. As both

experts agree, and the literature reflects, one of the "foundational condition[s] for the causal

validity of a DID model is that outside of the treatment period, price trends for the treatment and

control groups should be similar." Ex. 5, LR2 ¶ 36 (citing Joshua Angrist, *Mostly Harmless Econometrics: An Empiricist's Companion*, Princeton University Press (2009), at 218-220). If the treatment and control groups were not moving in parallel prior to the treatment period, "the DID results are likely biased." Ex. 5, LR2 ¶ 37. ███████████████

████████████████████████████████████

████████████████████████████████ Orszag Tr. at 364:1-25.

Orszag's DID failed to satisfy this foundational condition, and he did not have his story straight. Orszag's report ██████████████████████████ *See* Ex. 5, LR2 ¶ 38. He claimed at his deposition that ██████████████████████

███████████████████████████ Orszag Tr. at 368:12-19. That was not true: ██████████████████████████. *See* Ex. 5, LR2 ¶ 38. ██████

████████████████████████████████████

████████████████████████████████████

███████████████████████ Ex. 8, Orszag Tr. at 365:6-9.[10] ████████

████████████████████████████████████

███████████████████████████████. *See* Ex. 5, LR2 ¶ 39. ████

████████████████████████ *Id.*; *see id.* ¶¶ 40-43. Because



---

[10] Orszag testified that ████████████████

███████████████████████. *See* Ex. 8, Orszag Tr. at 365:8-12 ("

██████████████████████████████). He did not cite any authority ████████ and the academic literature is to the contrary. *See* Ex. 5, LR2 ¶ 42 ("[T]he literature discussing these tests states that researchers should be comparing the trends for a period that is long enough to show underlying trends, as far back as possible." (citing sources)).

26

this foundational requirement for a DID test was violated, and in any event because Orszag failed to satisfy his burden to show that it was satisfied, this opinion must be excluded.

*Second*, Orszag's DID rests on the incorrect assumption that ███████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ Indeed, Orszag admitted at his deposition that ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████

Orszag did not provide any evidence to support this critical predicate for his DID analysis—he just assumed it was true. His willingness to assume convenient facts without evidentiary support is not new. In *In re Electronic Books*, 2014 WL 1282298, Orszag's opinion was excluded because he assumed a specific useful life for Amazon's Kindle devices with "no evidence" to support that figure—and when a different assumption was substituted, his entire damages offset calculation "would be wiped out." *Id.* at *18. Similarly, in *Jones v. Varsity Brands*, 2024 WL 457173, a court excluded Orszag's opinions because instead of "apply[ing] any economic modeling, regression, statistical, or econometric analysis," he simply asserted facts without support. *Id.* at *4. Here, Orszag's assumption that the All Plans provisions' price effects ███████████████████████████ is precisely that kind of unsupported assertion.

Not only does Orszag's analysis rest entirely on an unexamined assumption, but the assumption was untrue, contradicted by record evidence and economic realities. ███████ ███████████████████████████████████████████████████

Ex. 1, OR1 ¶ 112 ████████████████████████████████████████████



█████ . *See* Ex. 16, DR2 ¶ 196 n.311. More important, removing the All Plans provision does not itself affect prices; prices would not change until after a new round of price negotiations outside the shadow of the All Plans provision. Orszag claims that ████ █████ but the evidence shows otherwise. Orszag states that ██████████ ████████ Ex. 1, OR1 ¶ 113 n.155, but in reality, ████████ ██████████████ Ex. 16, DR2 ¶ 197 & n.316. ███████

████████████

████████████

*Id.* (quoting Ex. 17, AAHEDWI02143440 at 442) ██████

████████████

██████████

Orszag's assumption ██████████████ also fails to account for basic market dynamics. ████████ , the "All Plans" provision ████████

████████████

████████ . *See* Ex. 5, LR2 ¶ 34; Ex. 2, DR1 ¶ 194 n. 348. ██

████████████

████████████

████████ and more time still "for Network Vendors to use the leverage from selective contracting to negotiate prices for new networks or renegotiate existing contracts."

Ex. 2, DR1 ¶ 194 n. 348; *see also id.* (detailing "economic research show[ing] that anticompetitive conduct can result in lingering price effects that can last for years.").

The record evidence bears this out: ██████ Network Vendor executives testified that building a new network can take at least one or two years. *See* Ex. 13, Stotlar Tr. (Cigna) at 40:13-23; Ex. 18, Deposition of Paul Maxwell (Humana) at 37:3-17; ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

Orszag's decision to treat ██████████████████████—made without investigating whether the competitive price effects had fully materialized or confronting the record evidence saying otherwise—renders his DID analysis unreliable. A "before" and "after" test without an "after" period offers nothing of value.

## IV.     **CONCLUSION**

Defendants do "not have the right … to call an expert economist to present opinions unless those opinions are the product of the expert's rigorous application of economic methods." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *20. The opinions highlighted in this motion are not the product of a rigorous economics, but of unexamined assumptions and unwarranted shortcuts. Plaintiffs' motion should be granted.

Dated: June 2, 2026

Eric L. Cramer
David F. Sorensen
Caitlin G. Coslett
Michaela L. Wallin
Sarah Zimmerman
BERGER MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com
dsorensen@bergermontague.com
ccoslett@bergermontague.com
mwallin@bergermontague.com
szimmerman@bergermontague.com
**Counsel for All Plaintiffs**

Timothy Hansen
James Cirincione
**HANSEN REYNOLDS, LLC**
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Tel: (414) 455-7676
thansen@hansenreynolds.com
jcirincione@hansenreynolds.com
**Counsel for All Plaintiffs**

/s/ Michael Lieberman
Michael Lieberman
Jamie Crooks
Yinka Onayemi
**FAIRMARK PARTNERS, LLP**
400 7th Street, NW, Ste. 304
Washington, DC 20004
Tel: (617) 642-5569
jamie@fairmarklaw.com
michael@fairmarklaw.com
yinka@fairmarklaw.com
**Counsel for All Plaintiffs**

Kevin M. St. John, SBN 1054815 5325
**BELL GIFTOS ST. JOHN LLC**
5325 Wall Street, Suite 2200
Madison, WI 53718
Tel: (608) 216-7990
Email: kstjohn@bellgiftos.com
**Counsel for Uriel Pharmacy Inc., Uriel Pharmacy Health and Welfare Plan**

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 2, 2026, a true and correct copy of the foregoing, with redactions for information designated as confidential, was filed with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.  In addition, a true and correct copy of the sealed version was served upon counsel of record for AAH via email.

Dated:   June 2, 2026

  _/s/ Michael Lieberman_
  Michael Lieberman

2