# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

URIEL PHARMACY HEALTH AND
WELFARE PLAN; URIEL PHARMACY,
INC.; HOMETOWN PHARMACY; AND
HOMETOWN PHARMACY HEALTH and
WELFARE BENEFITS PLAN, on their own
behalf and on behalf of all others similarly
situated,

     Plaintiffs,

   v.

ADVOCATE AURORA HEALTH, INC. and
AURORA HEALTH CARE, INC.,

     Defendants.

Case No. 2:22-cv-610

**REDACTED PUBLIC VERSION**

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 2

    A. Competition in the Health Insurance Industry ......................................... 3

    B. AAH's Imposition of the All Plans Provision Suppressed Price
    Competition ................................................................................................. 5

    C. AAH Had Power to Charge Supracompetitive Prices .............................. 9

    D. The Challenged Conduct Caused Higher Prices ..................................... 12

III. ARGUMENT ...................................................................................................... 14

    A. Standard for Class Certification .............................................................. 14

    B. Plaintiffs Satisfy the Requirements of Rule 23(a) and 23(b)(3) ............ 15

        1. Rule 23(a)(1)'s Numerosity Requirement is Met ....................... 15

        2. Rule 23(a)(2)'s Commonality Requirement is Satisfied ............. 15

        3. Rule 23(a)(3)'s Typicality Requirement is Met .......................... 16

        4. Rule 23(a)(4)'s Adequacy Requirement is Met .......................... 16

        5. Rule 23(b)(3)'s Predominance Requirement is Met .................... 17

            a. Plaintiffs Will Prove AAH's Violation With Common
            Evidence ............................................................................ 18

            b. Class-Wide Impact Can Be Proven With Common
            Evidence ............................................................................ 22

                i. Plaintiffs' Common Evidence Includes Evidence of
                High Prices and the Nature of the Market ........................ 24

                ii. Plaintiffs' Robust, Class-Wide Quantitative
                Evidence ........................................................................... 25

                    a) Step 1: The Challenged Conduct Inflated
                    Prices ...................................................................... 26

                    b) Step 2: There was Class-wide price inflation ....... 28

i

c. Aggregate Damages Are Provable Through Common Evidence ................................................................ 29

6. Rule 23(b)(3)'s Superiority Requirement is Met ...................................... 29

IV. CONCLUSION ................................................................................................ 30

Case 2:22-cv-00610-LA Filed 06/02/26 Page 3 of 41 Document 220

Page(s)

**Cases**

*Abbott v. Lockheed Martin Corp.*,
725 F.3d 803 (7th Cir. 2013) .............................................................................................. 1

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) ............................................................................................ 19

*Alexander v. Q.T.S. Corp.*,
1999 WL 573358 (N.D. Ill. July 30, 1999)...................................................................... 17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................... 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...................................................................................... 15, 17, 18, 22

*Bazemore v. Friday*,
478 U.S. 385 (1986)......................................................................................................... 27

*Bell v. PNC Bank, Nat. Ass'n*,
800 F.3d 360 (7th Cir. 2015) ..................................................................................... 15, 18

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)......................................................................................................... 29

*Black v. Occidental Petrol. Corp.*,
69 F.4th 1161 (10th Cir. 2023) ........................................................................................ 25

*Bruzek v. Husky Oil Operations Ltd.*,
520 F. Supp. 3d 1079 (W.D. Wis. 2021) ......................................................................... 30

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ..................................................................................... 18, 30

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) .................................................................................. 25

*Chavez v. Don Stoltzner Mason Contractor, Inc.*,
272 F.R.D. 450 (N.D. Ill. 2011)....................................................................................... 15

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*,
797 F.3d 426 (7th Cir. 2015) ........................................................................................... 14

Case 2:22-cv-00610-LA    Filed 06/02/26    Page 4 of 41    Document 220

*Corzo v. Brown Univ.*,
2026 WL 91424 (N.D. Ill. Jan. 12, 2026) .................................................................... 20

*Doster Lighting, Inc. v. E-Conolight, LLC*,
2015 WL 3776491 (E.D. Wis. June 17, 2015) ............................................................. 18

*DSM Desotech Inc. v. 3D Sys. Corp.*,
2009 WL 174989 (N.D. Ill. Jan. 26, 2009) ................................................................. 19

*Eastman Kodak Co. v. S. Photo Materials Co.*,
273 U.S. 359 (1927) ..................................................................................................... 29

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
2016 WL 3579953 (E.D. Wis. June 24, 2016) ........................................... 18, 22, 25, 26

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
2016 WL 756568 (E.D. Wis. Feb. 26, 2016) ............................................................... 27

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969) ..................................................................................................... 20

*Gaertner v. Commemorative Brands, Inc.*,
2026 WL 248292 (S.D. Ill. Jan. 30, 2026) .................................................................... 1

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ..................................................................................................... 18

*Hanover Shoe v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ................................................................................................ 16, 23

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) ..................................................................................................... 14

*Tyson Foods, Inc. v. Bouaphakeo,*
577 U.S. 442 (2016) ..................................................................................................... 18

*In re Automatic Card Shufflers Litig.*,
2026 WL 892509 (N.D. Ill. Mar. 31, 2026) ............................................................ 21, 23

*In re Blood Reagents Antitrust Litig.*,
2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ............................................................... 25

*In re Broiler Chicken Antitrust Litig.*,
2022 WL 1720468 (N.D. Ill. May 27, 2022) ........................................................ passim

*In re Broiler Chicken Growers Antitrust Litig. (No. II),*
2024 WL 2117359 (E.D. Okla. May 8, 2024) ......................................................... 25, 28

*In re Capacitors Antitrust Litig.*,
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ........................................................ 28

*In re CRT Antitrust Litig.*,
308 F.R.D. 606 (N.D. Cal. 2015) ........................................................................... 25

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) ..................................................................... 19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
2024 WL 3509668 (N.D. Ill. July 22, 2024) ........................................................... 29

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ................................................................................ 25

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012) ................................................................................. 16

*In re Pkg. Seafood Prods. Antitrust Litig.*,
332 F.R.D. 308 (S.D. Cal. 2019) ........................................................................... 28

*In re Potash Antitrust Litig.*,
159 F.R.D. 682 (D. Minn. 1995) ............................................................................ 22

*In re Ready-Mixed Concrete Antitrust Litig.*,
261 F.R.D. 154 (S.D. Ind. 2009) ........................................................................... 16

*In re Restasis Antitrust Litig.*,
335 F.R.D. 1 (E.D. N.Y. 2020). ............................................................................. 25

*In re Turkey Antitrust Litig.*,
2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ..................................................... passim

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) ........................................................................ passim

*Kleen Prods., LLC v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015) ................................................................. 22, 25, 29

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ................................................................................ 23

*Le v. Zuffa, LLC*,
2023 WL 5085064 (D. Nev. Aug. 9, 2023) ............................................................ 28

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) .......................................................................... 26, 27

Case 2:22-cv-00610-LA    Filed 06/02/26    Page 6 of 41    Document 220

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ................................................................................... 19

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012). ...................................................................... passim

*Moehrl v. Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023)............................................. 15, 16, 26

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ....................................................................... 23, 25, 28

*Panache Broad. of Pa., Inc. v. Richardson Elecs., Ltd.*,
1999 WL 342392 (N.D. Ill. May 14, 1999)........................................................... 22

*Paper Sys. Inc. v. Mitsubishi Corp.*,
193 F.R.D. 601 (E.D. Wis. 2000) .......................................................................... 26

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010) ............................................................................ 16, 23

*Ramirez v. Palisades Collection LLC*,
2007 WL 4335293 (N.D. Ill. Dec. 5, 2007)...................................................... 16, 17

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................................................................... 14

*Ross v. Gossett*,
33 F.4th 433 (7th Cir. 2022) .................................................................................. 17

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ................................................................................... 4

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009)............................................................................. 16

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019)................................................................... 5, 6, 19

*Sidibe v. Sutter Health*,
2020 WL 4368221 (N.D. Cal. July 30, 2020)......................................................... 5

*Spray-Rite Serv. Corp. v. Monsanto Co.*,
684 F.2d 1226 (7th Cir. 1982) ............................................................................... 29

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)............................................................................................... 29

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ...................................................................................... 23

*Toys "R" Us, Inc*. v. F.T.C.,
221 F.3d 928 (7th Cir. 2000) ....................................................................... 19, 20, 21

*U.S. v. Grinnell Corp.*,
384 U.S. 563 (1966)........................................................................................................ 19

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)........................................................................................................ 14

*Zenith Radio Corp. v. Hazeltine Research*, *Inc*.,
395 U.S. 100 (1969)........................................................................................................ 23

## Rules

Federal Rule of Civil Procedure 23 ...................................................................... passim

## Other Authorities

6 Newberg & Rubenstein on Class Actions §20:54 (6th ed. 2025) ............................................ 29

Case 2:22-cv-00610-LA    Filed 06/02/26    Page 8 of 41    Document 220

## I. **<u>INTRODUCTION</u>**

Uriel Pharmacy Health and Welfare Plan, Uriel Pharmacy, Inc. (together, "Uriel"), Hometown Pharmacy, and Hometown Pharmacy Health and Welfare Benefits Plan (together, "Hometown", and collectively with Uriel, "Plaintiffs") respectfully move under Federal Rule of Civil Procedure 23 for certification of the following "Class:"

> All entities that purchased in-network Healthcare Services directly from Advocate Aurora Health, Inc. or Aurora Health Care, Inc. ("AAH") providers in Eastern Wisconsin at any time during the period from May 24, 2018 up to and including December 31, 2022 (the "Class Period"), to the extent such purchases were made pursuant to contracts between AAH and any of the following Network Vendors: Anthem/Blue Cross Blue Shield of Wisconsin, United Healthcare, Cigna Healthcare, Humana Inc., Wisconsin Physicians Services, Health Payment Systems, and/or Trilogy Health Solutions.[1] Excluded from the Class are AAH, and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all federal governmental entities.[2]

Defendant AAH operates the most hospitals and the most hospital beds of any health system in Eastern Wisconsin. It abused that market dominance, however, to engage in anticompetitive conduct and overcharge Class members (self-funded employer health plans and commercial insurers) for Healthcare Services. ███████████████████

████████████████████████████████████████████████████

████████████████████████

---

[1] "Healthcare Services" are inpatient and outpatient facility claims (for use of a facility) and claims for professional services (for treatment by a healthcare professional). "Eastern Wisconsin" comprises the following Health Service Areas: Appleton, Brookfield, Burlington, Chilton, Cudahy, Elkhorn, Fond Du Lac, Fort Atkinson, Green Bay, Hartford, Kenosha, Kewaunee, Manitowoc, Marinette, Menomonee Falls, Milwaukee, Neenah, Oconomowoc, Oconto Falls, Oshkosh, Plymouth, Port Washington, Racine, Shawano, Sheboygan, Sturgeon Bay, Two Rivers, Watertown, Waukesha, West Allis, and West Bend. Ex. 3, Dranove Rpt. ("DR1") ¶11 n.7 (defining Eastern Wisconsin). All Exs. are attached to the accompanying Wallin Declaration.

[2] The Class definition is narrower than the definition in the complaint (2d Am. Compl., ECF 46, ¶231) and includes an end date for the Class Period. Such revisions are permitted. *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 814 (7th Cir. 2013); *Gaertner v. Commemorative Brands, Inc.*, 2026 WL 248292, at *3 (S.D. Ill. Jan. 30, 2026) (certifying class where "[b]oth sides acknowledge that the proposed class definition differs from" the definition in the complaint).



(Ex. 8, AAHEDWI00597913-27 at 916),

███████████████████████████████

AAH's wrongful conduct reduced competition and allowed it to charge supracompetitive prices for years—████████████████████████████████████████ ████████████████████████████████. Ex. 10, Lenz 30(b)(6) Dep. (AAH) 21:2-27:21 (citing Ex. 85, AAHEDWI00630685-732 at 689). That the Challenged Conduct inflated AAH's prices is clear, and will be proven with common evidence, including multiple benchmarks, economic analyses, and documents and testimony from market participants, ████████████████████████████████ Ex. 53, AAHEDWI00082436 at 438. AAH's unlawful conduct caused all or virtually all Class members ("Payors"[3]) to be overcharged. The evidence at trial will focus on AAH's antitrust violation and will be entirely or primarily common and Class-wide. Class certification should be granted.

## II. FACTUAL BACKGROUND

The key facts are summarized below. All are common to the Class and will be proven with Class-wide evidence. Additional Class-wide evidence supporting Plaintiffs' claims is set forth in

---

[3] "Payors" include (1) commercial health insurers that offer coverage for fully-insured plans, and (2) self-funded Plan Sponsors that pay claims on behalf of their members, typically employees and their families. "Plan Sponsors" are entities that establish and manage health insurance plans for groups, such as employers that offer health insurance plans to their employees and unions that offer plans to their members. Plaintiffs are Plan Sponsors and self-funded Payors for Healthcare Services. Ex. 3, DR1 ¶9 & n.1.

Plaintiffs' expert reports (Exs. 1-6), is incorporated by reference, and can be supplied to the Court.

### A. Competition in the Health Insurance Industry

Many businesses, local governments, and unions provide health insurance plans to their employees and members, acting as "Plan Sponsors." Some sponsor "fully insured" plans, whereby they pay premiums to a commercial insurance company, which then pays healthcare providers. *See* Ex. 3, DR1 ¶50. Others sponsor "self-funded" plans, whereby they pay providers and bear the insurance risk themselves. *Id.* Commercial insurance companies who pay bills for fully insured plans and self-funded employers who pay bills themselves are "Payors," because they pay healthcare providers for covered Healthcare Services. *Id.* ¶52.

The prices that Plaintiffs and Class members (Payors) pay for medical services are determined in negotiations between healthcare providers and Network Vendors,[4] which are entities that negotiate with providers and assemble "insurance networks"—networks of healthcare providers that have agreed to provide services at negotiated prices. *Id.* ¶¶9 n.1, 44. An "in-network provider" has agreed to provide services at prices negotiated with the Network Vendor. Ex. 1, Leitzinger Rpt. ("LR1") ¶¶13-14, 16. Plan Sponsors can select a Network Vendor's network with the Plan Sponsor's desired price and non-price characteristics. Ex. 3, DR1 ¶49.

Some networks are "broad" with many providers; others are "narrow" with fewer. *Id.* ¶44. Network breadth reflects a tradeoff between access and cost: broader networks usually provide access to more providers across multiple categories—such as primary care physicians, specialists, and hospitals—while narrow networks offer fewer options but lower prices. *Id.* ¶45. Patients have

---

[4] Some entities function as both Network Vendors and Payors: a commercial health insurer, like Anthem, acts as a Network Vendor and a Payor when offering fully-insured plans. Entities may act as Network Vendors without acting as Payors: Anthem acts as a Network Vendor but not a Payor when contracting with providers to create an insurance network for self-funded Payors. Ex. 3, DR1 ¶9 & n.1

3

financial incentives to use in-network providers, so providers will get more patient volume if they are selected as an in-network provider. *Id.* ¶¶46, 62.

Price competition in healthcare occurs through a process known as "selective contracting," whereby healthcare providers compete on price for inclusion and placement within provider networks. *Id.* ¶¶17, 54, 68, 74. Selective contracting increases competition at three stages of competition within the healthcare insurance market. At **stage 1**, providers compete on price for network inclusion and placement (*i.e.*, which "tier" they will be on, which impacts the level of patient cost sharing).[5] At **stage 2**, Network Vendors compete to sell insurance networks to Plan Sponsors and their members, which seek networks offering (a) a wide enough variety of providers, (b) in every specialty, (c) close to where their members live and work, (d) at affordable costs. At **stage 3**, providers compete for patient volume, with patients choosing providers based on factors such as cost sharing (which depends on whether the provider is in-network and in what tier), convenience, location, and prior experience. *Id.* ¶¶55-56, 61-69.

A Network Vendor's willingness to agree to higher prices in stage 1 depends on whether excluding that provider would make the network less attractive to Plan Sponsors and their members in stage 2. *Id.* ¶¶64, 69. Conversely, a provider's willingness to offer lower prices to a Network Vendor in stage 1 depends on how much patient volume the provider would lose if it were not included in the Network Vendor's network or if it were steered away from. *Id.* ¶¶68, 78-82.

Because Network Vendors represent large numbers of prospective patients, they typically

---

[5] Courts have found that, because the prices Payors pay to healthcare providers are negotiated between Network Vendors and providers in stage 1, "antitrust analysis focuses on the first stage." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 n.10 (9th Cir. 2015) (citation omitted). But as described herein, AAH's All Plans provision interfered with stages 2 and 3 as well, thus worsening the harm inflicted by the Challenged Conduct.

negotiate discounted prices from healthcare providers in exchange for the increased patient volume for being in-network. *Id.* ¶76; LR1 ¶13. Network Vendors also use narrow networks and "steering" or "tiering" to encourage providers to lower their prices. DR1 ¶77. With **narrow networks**, a provider can obtain more volume because the network includes fewer competing providers. *Id.* ¶¶62, 78-80. With **steering**, Network Vendors use financial incentives or informational tools to encourage patients to obtain care from specific providers at lower prices. *Id.* ¶¶47, 188 & nn.326, 327. One method of steering is through **tiered** networks, which rank providers by price and quality: providers ranked higher have lower patient cost sharing, incentivizing patients to choose them. *Id.* ¶48. As with narrow networks, providers are incentivized to offer lower prices in exchange for placement in a higher tier to obtain more patients. *Id.* ¶¶81-82. Even when Network Vendors do not implement such programs, the credible threat of doing so helps keep prices down. Ex. 4, Dranove Rebuttal ("DR2") ¶21. For example, a high-priced provider may lower its prices to prevent a Network Vendor from implementing a steering program that would disfavor it. DR1 ¶¶193-96.

**B.    AAH's Imposition of the All Plans Provision Suppressed Price Competition**

The All Plans provision ███████████████████, decreased price competition, and allowed AAH to impose inflated prices on Plaintiffs and the proposed Class. The All Plans provision is ██████████ even more onerous than, the restraints at issue in antitrust litigation involving Sutter Health, a health system in California. *See* Ex. 3, DR1 ¶198 & n.359. In that litigation, in which the State of California also pursued antitrust claims, classes were certified in state and federal cases, leading to eve-of-trial settlements of $575 million and $228.5 million, respectively, along with injunctive relief requiring the removal of the challenged restraints.[6]

---

[6] *See Sidibe v. Sutter Health*, 2020 WL 4368221 (N.D. Cal. July 30, 2020) (certifying damages class); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 475 (N.D. Cal. 2019) (certifying injunctive-relief

 . Ex. 3, DR1 ¶¶34, 40, 169-74, Tables 2, 7-9. ████████████████████████████████████████

████████ Ex. 11, AAHEDWI00756315-58 at 318; Ex. 12, HURON_054337-47 at 341; Ex. 75, HURON_068476-82 at 78. ███████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Ex. 13, AAHEDWI00450873-98 at 882; Ex. 48, Klein 30(b)(6) Dep. (AAH) 15:5-10 ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████ Ex. 48, Klein 30(b)(6) Dep. (AAH) 39:10-19, 40:6-42:4. ██

████████████████████████████████████████████████

████████████████ *Id.* 41:7-42:4. █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ *Id.* 40:3-43:6, 52:23-53:8. ███████████████████████████████████

████████████████████████████████████ Ex. 3, DR1 ¶84.

████████████████████████

class); Ex. 26, Order Granting in Part Motion To Strike, Granting Class Certification, and Setting Case Management Conference, *UEBT v. Sutter Health*, No. CGC-14-538451 (Sup. Ct. Cal. Aug. 14, 2017) ("*UEBT v. Sutter* Class Order"); Ex. 55, Press Release, Cal. Dep't of Justice, *Attorney General Bonta Announces Final Approval of $575 Million Settlement with Sutter Health Resolving Allegations of Anti-Competitive Practices* (Aug. 27, 2021), at 2 ("Sutter will no longer have free rein to engage in anticompetitive practices that force patients to pay more for health services."); *Sidibe v. Sutter Health*, No. 12-CV-04854, ECF 1763 (N.D. Cal. Nov. 6, 2025) (granting final approval of $228.5 million settlement).



███████████████████████████████████████████████████████[7]

Ex. 15, AAHEDWI00658806-07 at 806.

The All Plans provision ███████████████, suppressed competition among providers and Network Vendors, and increased prices and limited provider choices at each stage of market competition. *See* Ex. 3, DR1 ¶¶58, 184-86.

***Stripping Network Vendors of bargaining leverage (Stage 1).*** ███████████

███████████████████████████████████████████████████████

███████████████████.[8] ████████████████████████████

██████████████████████, AAH had no incentive to offer competitive rates, creating "upward rather than downward pricing pressure." *Id.* ¶203. The All Plans provision also suppressed competitive incentives among AAH's rivals by raising the AAH prices against which any price competition occurred and limiting or eliminating the competitive benefits of reducing prices (the "umbrella" effect). *Id.* ¶¶196, 203. One Network Vendor confirmed this impact of the restrictions, noting ██████████████████

---

[7] Ex. 3, DR1 ¶85 (citing Ex. 14, AAHEDWI00621359-63 at 360; Ex. 15, AAHEDWI00658806-07 at 806; Ex. 13, AAHEDWI00450873-98 at 882; Ex. 48, Klein 30(b)(6) Dep. (AAH) 33:19-34:9; Ex. 57, AAHEDWI00630735-72 at 751-52, 754; Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 332:15-333:4; Ex. 86, Beck 30(b)(6) Dep. (UnitedHealthcare) 272:12-273:9); Ex. 3, DR1, Tables F.8, F.9.

[8] Ex. 3, DR1 ¶¶193-95 ███████████████
████████████████████████████████████ (citing Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 50:16-53:21; Ex. 62, AAHEDWI01188952; Ex. 79, AURORA00011858-63 at 862; Ex. 24, Ott 30(b)(6) Dep. (WPS) 83:1-21; Ex. 19, AAHEDWI00007080-85 at 080; Ex. 87, Skogsbergh Dep. (AAH) 241:24-243:14, 286:9-16; Ex. 61, AAHEDWI00983339-64; Ex. 88, Anderson Dep. (AAH) 90:25-90:14, 139:5-23; Ex. 54, AAHEDWI00127810-18 at 810).

████████████████████████████████████████████████████ this was not possible "in southeast Wisconsin because of [the All Plans] contractual provision." Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 50:16-53:21, 335:15-336:12.

*Foreclosing competition among networks (Stage 2).* ████████████████

████████████████████████████████████

██████████████████████████████ Ex. 3, DR1 ¶¶197-99. ██████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ *Id.* ¶199. As Dr. Dranove explains, this component of the All Plans provision makes it even "more anticompetitive than" the restraints in the *Sutter Health* litigation (where he was also an expert): █████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* ¶198 (emphasis in original).

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████.[9] ████████

---

[9] Ex. 3, DR1 ¶¶190-92████████████████

██████ (citing, *inter alia,* Ex. 87, Skogsbergh Dep. (AAH) 101:3-12; Ex. 48, Klein 30(b)(6) Dep. (AAH) 52:23-53:8; Ex. 62, AAHEDWI01188952 at 952; Ex. 71, Alliance_UrielPharm_00001585 at 585; Ex. 63, AAHEDWI01373683-84 at 683; Ex. 67, AAHEDWI02574179-21 at 184; Ex. 89, Turk 30(b)(6) Dep. (BCBS-IL) 26:2-10, 33:13-21, 89:19-90:2, 93:19-94:6; Ex. 88, Anderson Dep. (AAH) 98:11-24, 139:5-23).

8

[█████████ redacted █████████]

[██████ redacted ██████] [10]  [████████ redacted ████████]

[████████████ redacted ████████████]

[███ redacted ███].[11]  [████████ redacted ████████]

[██████████ redacted ██████████].[12]

## C.    AAH Had Power to Charge Supracompetitive Prices

Common evidence will show that AAH had substantial market power vis-à-vis Network Vendors that compete for commercial plan sponsors in Eastern Wisconsin.  DR1 §VI. [██ redacted ██]

[██████████████ redacted ██████████████]

[██████████████ redacted ██████████████]

[███ redacted ███] (Ex. 11, AAHEDWI00756315-58 at 318); [██████ redacted ██████]

---

[10] Ex. 3, DR1 ¶¶188-89.  Anthem, a Network Vendor, determined a site of service policy would "violate the contract with Aurora."  Ex. 16, BCBSWI AAH 00022781-82 at 781-82; Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 137:7-138:16 [█████ redacted █████] (discussing Ex. 17, BCBSWI_AAH_00024689-91 at 690); *see also* Ex. 72, BCBSWI AAH 00024854-55 at 854; Ex. 73, BCBSWI AAH 00025759-60 at 759-60. [████████ redacted ████████] Ex. 18, AAHEDWI00299219-20 at 219; Ex. 19, AAHEDWI00007080-85 at 083. [██████ redacted ██████] Ex. 20, AAHEDWI00095705-07 at 707; Ex. 21, AAHEDWI00023436-42 at 436-47.

[11] Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 128:13-131:2 [████ redacted ████]; Ex. 23, UHG-Uriel-00000494-95 [███ redacted ███]; Ex. 24, Ott 30(b)(6) Dep. (Wisconsin Physician Services ("WPS")) 55:4-22, 60:11-16 [████ redacted ████]

[12] *E.g.*, Ex. 56, Klein Dep. (AAH) 49:13-50:7 [████ redacted ████] Ex. 21, AAHEDWI00023436-42 at 437, 436 [████ redacted ████].

9

███████████████████████████████ (Ex. 7, HURON_068646-49 at 648 ███████████████

████████████████ ); █████████████████████████████████ (Ex. 8,

AAHEDWI00597913-27 at 916); ███████████████████████████ (Ex. 25,

AAHEDWI00598196 at 196). █████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 9, Klein Dep. (AAH)

287:21-288:7.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Ex. 3, DR1 ¶¶136-37, 176. **Anthem** testified

it could not remove AAH from all its products and remain commercially viable because

"employers wouldn't want to only offer insurance plans that don't include Aurora" and agreed that

"Aurora is the most dominant system in southeastern Wisconsin" due to "the size and magnitude

of the health system."[13]  **Common Ground** "viewed [AAH] as a necessary provider" and

identified AAH contract termination as its number one network risk.[14] ████████████████

███████████████████████████████████████████[15] █████

████████████████████████████████[16]  **WPS** understood excluding AAH would be

"detrimental" ██████████████████████████████████████████████[17]

███████████████████████████████████████████████████

---

[13] Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 323:4-324:20; 316:24–318:1.

[14] Ex. 27, Jackson 30(b)(6) Dep. (Common Ground) 77:18-78:1, 62:16-63:12.

[15] Ex. 28, Maxwell 30(b)(6) Dep. (Humana) 56:21-57:9, 57:22-58:2; Ex. 29, HUMANA019081 at slide 4 (AAH contract termination is the "biggest risk"); Ex. 31, HUMANA019080 at slide 4 (same).

[16] Ex. 32, UHG-Uriel-00000368 at slide 14; *see* Ex. 33, UHG-Uriel-00020038-46 at 038-40 (similar).

[17] Ex. 24, Ott 30(b)(6) Dep. (WPS) 200:13-201:8.



Ex. 3, DR1 ¶¶139, 175 (citing, *inter alia*, Ex. 66, AAHEDWI02574124-62 at 125; Ex. 68, AAHEDWI02602381-422 at 385; Ex. 76, HURON_080281-351 at 304; Ex. 70, AAHEDWI02613840-61 at 854-56).

*Id.* ¶139 (citing Ex. 66, AAHEDWI02574124-162 at 125, 138; Ex. 74, Blomeyer Dep. (AAH) 136:4-141:10)).

*Id.* ¶137. Three other systems (Ascension, Bellin, ProHealth) testified that they were unable to impose restraints similar to All Plans because they lacked AAH's "leverage." *Id.* ¶147.[18]

Dr. Dranove conducted structural analyses evaluating AAH's importance to patients, Plan Sponsors, and Network Vendors, analyzing both "willingness to pay"—a well-established concept in health economics that evaluates how much worse off patients would be if they could no longer receive care from a given health system—and patient volumes. Ex. 3, DR1 §VI(E)-(F). Dr. Dranove found that AAH is by far the most powerful health system in Eastern Wisconsin and that its high share of patient volume indicates that Network Vendors would face significant challenges if they lacked all AAH providers in all their networks. *Id.*

Ex. 3, DR1 ¶¶142-46.[19]

---



[18] Ex. 3, DR1 ¶138 (citing Exs. 49, 51, 90).

[19] Ex. 30, AAHEDWI00573956-57 at 956; *see also* Ex. 34,

[blackbar] [20] [blackbar]

[blackbar] DR1 ¶149 (citing evidence).

### D. The Challenged Conduct Caused Higher Prices

Class-wide evidence—including AAH's admissions—shows that the Challenged Conduct caused inflated prices, [blackbar]

[blackbar] (Ex. 40, AAHEDWI00435658-69 at 667 [blackbar]), [blackbar] (Ex. 41, AAHEDWI00025038-40 at 038-39 [blackbar]), [blackbar] (Ex. 53, AAHEDWI00082436-40 at 438 [blackbar]

[blackbar]), [blackbar] (Ex. 42, AAHEDWI00868418-20 at 418 [blackbar]),

---

AAHEDWI00573958-64 at 959 (similar). **Anthem** repeatedly sought removal of the language. Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 351:10-352:4. Anthem viewed the provision as "problematic, punitive, or limit[ing] care choices for consumers," Ex. 35, BCBSWI AAH 00025938-39 at 938, [blackbar] Ex. 36, AAHEDWI00158954-60 at 956. [blackbar] Ex. 37, AAHEDWI00573949-50 at 949. [blackbar] Ex. 38, AAHEDWI00008411-14 at 411-12.

[blackbar] Ex. 3, DR1 Table F.9; Ex. 39, AAHEDWI00152452-63 at 459; Ex. 40, AAHEDWI00435658-69 at 659. **WPS** alleged in a counterclaim against AAH in 2006 that the provision was an illegal restraint "imposed on all Network Vendors." Ex. 3, DR1 ¶146 (citing Ex. 81, WPS's Answer to Amended Compl., Amended Counterclaims, and Reply to Counter-Counterclaims, ¶¶18, 69, 71). WPS sought removal "multiple times over the years" but could not get the All Plans provision removed until 2023. Ex. 24, Ott 30(b)(6) Dep. (WPS) 191:20-192:8.

[20] Ex. 3, DR1 ¶¶147-48 [blackbar]

[blackbar] (citing, *inter alia*, Ex. 82, Squier Dep. (Ascension) 122:8-123:17; Ex. 83, Wedin 30(b)(6) Dep. (Bellin) 68:21-69:9, 75:25-76:13, 93:24-94:7; Ex. 84, Bacon 30(b)(6) Dep. (ProHealth) 240:1-241:11, 262:9-263:23; Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 343:14-344:6, 349:14-350:5; Ex. 24, Ott 30(b)(6) Dep. (WPS) 192:16-25).

12



███████ (Ex. 65, AAHEDWI02010094-96 at 95), and ██████████████████

(Ex. 43, AAHEDWI00083070-74 at 072 ████████████████████).[21] ████████

████████████████████████████████████████████████████

██████████████████████████[22]

████████████████████████████████████

██████████████████ Ex. 3, DR1 ¶¶156-57; LR1 ¶23.[23] ████████████

████████████████████████ Ex. 3, DR1 ¶151. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Ex. 44, AAHEDWI00450947-69 at 961.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████[24] ██████████████████████████

██████████████████ Ex. 1, LR1 ¶20 & n.25 (citing Ex. 64, AAHEDWI01378772-03 at

772, 776), ████████████████████████████████████████

████████████████ Ex. 11, AAHEDWI00756315-58 at 318.

AAH was the highest priced system in Wisconsin for both inpatient and outpatient services.

---

[21] *See* Ex. 3, DR1 ¶155; Ex. 1, LR1 ¶21 (citing evidence of AAH's high prices); Ex. 4, DR2 ¶74 & n.104 (citing, *inter alia*, Ex. 60, AAHEDWI00947831-41 at 838).

[22] Ex. 52, AAHEDWI00082402-04 at 404.

[23] *E.g.*, Ex. 45, CG_0063481 at 482 (AAH was "a more expensive provider"); Ex. 22, Lathers 30(b)(6) Dep. (Anthem-BCBS) 77:22-24 ("Aurora had a higher reimbursement rate in southeast Wisconsin compared to their peers."); Ex. 46, Spencer 30(b)(6) Dep. (Froedtert) 266:14-268:3 ████████████████████████████████; Ex. 47, UHG-Uriel-00006550, slide 2 ████████████ Ex. 80, Uriel-Sub0002739-50 at 745 ████.

[24] Ex. 3, DR1 ¶158 (citing Ex. 78, ProHealth_Uriel_0007534-36 at 534); Ex. 1, LR1 ¶20 (citing Ex. 77, MILLIMAN_00001-39 at 011; Ex. 78, ProHealth_Uriel_0007534-36 at 534).

13

Ex. 1, LR1 ¶25.  For 2020-22, each of AAH's Wisconsin hospitals was in the highest-priced 10% of all hospitals nationwide, and AAH's hospital in Kenosha was the fourth highest-priced hospital in the country.  Ex. 3, DR1 ¶¶152-54.  In 2021, commercial healthcare prices in the Milwaukee and Racine metropolitan areas—AAH strongholds—were almost 50% higher than national median prices. Ex. 1, LR1 ¶24.  Dr. Dranove confirmed that AAH's high prices are not attributable to alternative cost or demand factors.  Ex. 3, DR1 ¶¶160-63.

Finally, as discussed further below, Plaintiffs' expert economist Dr. Leitzinger—as he did in the *Sutter* litigation—conducted econometric analysis, which showed in this case that the Challenged Conduct raised prices substantially, ████████████████████████████ and that all or virtually all Class members were overcharged.  *Infra* §III.B.5.b; Ex. 1, LR1 ¶¶9, 40 & at Ex. 4.

## III.  ARGUMENT

### A.  Standard for Class Certification

Class actions play an important role in antitrust enforcement.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343-44 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262-66 (1972).  At class certification, "[t]he district court's task [is] to determine if the plaintiffs[] presented a scenario in which judicial efficiency would be served by allowing their claims to proceed en masse through the medium of a class action rather than through individual litigation." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015).  Plaintiffs must demonstrate numerosity, typicality, commonality, and adequacy of representation under Rule 23(a) and, here, the Rule 23(b)(3) requirements of predominance and superiority.  *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922-23 (7th Cir. 2016).  The Court's determination of whether Plaintiffs have met these prerequisites requires a "rigorous analysis" that may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied" and only by a preponderance of evidence.[25]

**B.     Plaintiffs Satisfy the Requirements of Rule 23(a) and 23(b)(3)**

**1.       Rule 23(a)(1)'s Numerosity Requirement is Met**

Proposed classes of "more than forty members generally satisf[y] the numerosity requirement." *Chavez v. Don Stoltzner Mason Contractor, Inc.*, 272 F.R.D. 450, 454 (N.D. Ill. 2011). There are at least 6,809 Class members. Ex. 1, LR1 ¶9(a) & at Ex. 3. Rule 23(a)(1) is met.

**2.       Rule 23(a)(2)'s Commonality Requirement is Satisfied**

Rule 23(a)(2) asks whether class members' claims "depend upon a common contention that is capable of classwide resolution." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015). Commonality requires only "a single common question of law or fact." *Id.* In antitrust cases, "'antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke.'" *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023) (citation omitted).

There are numerous common questions, including whether: (1) AAH engaged in the Challenged Conduct; (2) the Challenged Conduct was an unreasonable restraint of trade; (3) AAH had market power and used it to impose and maintain the Challenged Conduct; (4) the Challenged Conduct had anticompetitive effects that outweigh any cognizable procompetitive benefits; (5) antitrust impact (i.e., an overcharge) to the Class can be proven with common evidence; and (6)

---

[25] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Messner*, 669 F.3d at 811 ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits").

aggregate Class-wide damages can be reliably measured. *See* Proposed Trial Plan (filed herewith).

### 3. Rule 23(a)(3)'s Typicality Requirement is Met

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Under Rule 23(a)(3)'s "liberal[]" standard, typicality is satisfied "when the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010). "In the antitrust context, typicality 'will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.'"[26] Plaintiffs and the Class all claim an overcharge injury from the same Challenged Conduct. Ex. 1, LR1 ¶¶9.c, 55, 64. Typicality is met.

### 4. Rule 23(a)(4)'s Adequacy Requirement is Met

Adequacy requires: "(i) the class representatives must not have claims in conflict with other class members, and (ii) the class representatives and proposed class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike." *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *3 (N.D. Ill. May 27, 2022). Those requirements are satisfied here. First, Plaintiffs' interests are fully aligned with those of the Class in proving that AAH violated the antitrust laws and thereby overcharged them for Healthcare Services. Here, "because *Hanover Shoe* sets the amount of the overcharge as plaintiffs' damages, all of the class members have the same financial incentive for purposes of the litigation—*i.e.* proving that they were overcharged and recovering damages based on that overcharge."[27]

---

[26] *Moehrl*, 2023 WL 2683199, at *12; *see In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) ("factual differences in date, size, manner, or conditions of purchase, the type of purchaser, or other concerns do not make named plaintiffs atypical") (citation omitted).

[27] *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 223 (3d Cir. 2012) (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)). *See Ramirez v. Palisades Collection LLC*, 2007 WL

Plaintiffs have demonstrated that they will litigate vigorously on behalf of the proposed Class.  In the more than four years of this litigation, they have conducted extensive work on behalf of the Class, including giving deposition testimony and producing documents. *See* Wallin Decl. ¶¶1, 4.

Second, Plaintiffs retained skilled counsel with experience prosecuting antitrust and class action litigation.  Proposed Co-Lead Counsel Fairmark Partners, LLP (https://fairmarklaw.com/) and Berger Montague PC (https://bergermontague.com/) are experienced counsel in antitrust class actions and have diligently and zealously represented the interests of the Class.  They have committed tens of thousands of hours and considerable resources, taking dozens of depositions, engaging in years of discovery, collecting and reviewing hundreds of thousands of documents, briefing dispositive and discovery motions, and engaging economic experts, among many other tasks. *Id*. ¶¶1-3.  Adequacy is met.

### 5.      Rule 23(b)(3)'s Predominance Requirement is Met

Predominance is "readily met" in cases alleging violation of the antitrust laws.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).  "Predominance is satisfied when 'common questions represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication.'"  *Kleen Prods.*, 831 F.3d at 925 (quoting *Messner*, 669 F.3d at 815).  "[C]ourts routinely have found that common questions predominate where the case claims the existence of a widespread or uniform practice."  *Ross v. Gossett*, 33 F.4th 433, 439 (7th Cir. 2022).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Amgen*, 568 U.S. at 469 (cleaned up;

---

4335293, at *6 (N.D. Ill. Dec. 5, 2007) (plaintiff adequate where "she and putative class members have suffered the same injury as a result of the same conduct"); *Alexander v. Q.T.S. Corp.*, 1999 WL 573358, at *8 (N.D. Ill. July 30, 1999) (same).

emphasis in original); *Kleen Prods.*, 831 F.3d at 922. The inquiry is whether common questions predominate as to the case *as a whole*, not as to individual elements. *Id*; *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). "Common issues predominate if they have a direct impact on every class member's effort to establish liability, and if that impact is more substantial than the impact of individualized issues in resolving the claims." *Doster Lighting, Inc. v. E-Conolight, LLC*, 2015 WL 3776491, at *8 (E.D. Wis. June 17, 2015). Individualized issues do not defeat predominance unless they "overwhelm common ones." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014); *see Tyson Foods*, 577 U.S. at 453 (common issues may predominate "even though other important matters will have to be tried separately") (citation omitted).

Plaintiffs need not prove that the common "questions will be answered, on the merits, in favor of the class," *Amgen*, 568 U.S. at 459, but simply that the common questions are "*capable* of" class-wide resolution. *Messner*, 669 F.3d at 818 (citation omitted) (emphasis in original). *See also Bell*, 800 F.3d at 377 (plaintiffs not required to demonstrate that they "will ultimately prevail on the merits" of common questions); *Broiler Chicken*, 2022 WL 1720468, at *7 (whether the "evidence is sufficient to survive summary judgment or to demonstrate liability at trial is not at issue" at class certification).

Here, common questions are abundant and predominate over any individual questions.

### a. Plaintiffs Will Prove AAH's Violation With Common Evidence

Plaintiffs allege that the Challenged Conduct violated Sections 1 and 2 of the Sherman Act. "To allege a valid claim under § 1 of The Sherman Act, a plaintiff must prove that (1) defendants had a contract, combination, or conspiracy; (2) the conspiracy impacted the market; and (3) it was injured." *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 2016 WL 3579953, at *6 (E.D. Wis. June 24, 2016). Plaintiffs' Section 1 claim is subject to Rule of Reason analysis, whereby a

18

"plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area" and "that the defendant has market power ... without which the defendant could not cause anticompetitive effects on market pricing."[28]

Plaintiffs' proof of AAH's antitrust violation is entirely common to the Class. *E.g.*, *supra* §II.B; Ex. 3, DR1 ¶¶83-85. ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *Supra* §II.B; Ex. 3, DR1 ¶85; *cf. Sidibe*, 333 F.R.D. at 492 ("common questions will predominate with respect to the alleged antitrust violations"); *UEBT v. Sutter* Class Order at 14 (finding predominance where "[t]here is evidence that Network Vendors (and consequently, their self-funded payor members) were subject to the same or substantially similar restrictive contract provisions with Sutter, which consequently inhibited price competition in the marketplace.").

Likewise, whether AAH had substantial market power is a common question, to be addressed through common evidence. Plaintiffs' proof of AAH's market power is all common to the Class and includes both direct evidence of anticompetitive effects and indirect evidence of market definition and market share. *See Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (both forms of evidence can be used to prove market power).

---

[28] *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). Section 2 similarly requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power[.]" *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Attempted monopolization under Section 2 requires "(1) specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed." ECF 31, Decision and Order at 10 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011)). "Monopoly power" is "synonymous in most respects" and "sometimes used interchangeably" with market power, though "'monopoly power' generally denotes some higher threshold of market power[.]" *DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 WL 174989, at *7 (N.D. Ill. Jan. 26, 2009). Monopoly power can be proven with the same evidence as market power. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 902 (N.D. Ill. 2011).

Plaintiffs' direct evidence includes Class-wide expert analysis showing that AAH charged prices ███ higher than it would have absent the Challenged Conduct, and that the All Plans provision harmed competition. Ex. 1, LR1 §§V, VI; Ex. 3, DR1 ¶¶152-63, 184-99; Ex. 4, DR2 §VI. ████████████████████████████████████████████████████ ████████████████████████████████ Ex. 3, DR1 ¶89, §VI(A)-(C) (citing evidence); *supra* §§II.B-C; *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969) (direct evidence includes the power to "impose other burdensome terms ... with respect to any appreciable number of buyers within the market"); *Toys "R" Us*, 221 F.3d at 937 (same). Dr. Dranove's market analyses confirm AAH's importance to patients, Plan Sponsors, and Network Vendors, proof of AAH's market power. Ex. 3, DR1 §VI(E)-(F).

Plaintiffs also will prove AAH's market power indirectly, with Class-wide evidence. This market evidence is, by definition, market-wide, and thus common across the Class. *See* Ex. 3, DR1 §§V, VI; Ex. 4, DR2 §IV; *supra* §II.C (citing evidence). Dr. Dranove, a preeminent healthcare economist, found that "the healthcare services that AAH offers to Network Vendors in Eastern Wisconsin is a well-defined antitrust market for this matter. This market includes as market participants AAH and other providers of competing healthcare services in Eastern Wisconsin." Ex. 3, DR1 ¶100 & §V.C-D. That this is a well-defined antitrust relevant market is undisputed and supported by overwhelming evidence, all common to the Class, including Dr. Dranove's application of the Hypothetical Monopolist Test from the U.S. Department of Justice and Federal Trade Commission's "Merger Guidelines," and business documents and testimony from AAH and other market participants. *Id.* ¶¶101-29.[29] Dr. Dranove also opines, again based

---

[29] Application of the Hypothetical Monopolist Test is a well-recognized way to define a relevant antitrust market. *See, e.g.*, *Corzo v. Brown Univ.*, 2026 WL 91424, at *10-11 (N.D. Ill. Jan. 12, 2026) (denying defendants' relevant market summary judgment motion).

on entirely Class-wide evidence and methodology, that "this market encompasses narrower well-defined antitrust markets (submarkets): inpatient GAC [general acute care] services offered to Network Vendors in Eastern Wisconsin; outpatient services offered to Network Vendors in Eastern Wisconsin; and physician specialty services offered to Network Vendors in Eastern Wisconsin." Ex. 3, DR1 ¶100.

As Dr. Dranove opined, AAH had sufficiently large shares of patient volume, above 30%, in these well-defined relevant antitrust markets to give it substantial market power, DR1 ¶¶166-74, and other evidence supports it, such as (a) ███████████████████████████████ ████████████████████████████████████████████████ (*id.* ¶¶134-46, 175-76[30]; *supra* §II.C), (b) ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ (Ex. 3, DR1 ¶¶147-49), and (c) ████████████ ████████████████████████████████████████████████ (*id.* ¶¶150-63), and significant barriers exist to providers' entry and expansion in the Healthcare Services market in Eastern Wisconsin (*id.* ¶¶177-83). *See also, e.g.*, Ex. 4, DR2 §IV; *Toys "R" Us*, 221 F.3d at 937 (defendant had market power with a 20% share because "[i]t was remarkably successful" in imposing contractual restraints on "the 10 major toy manufacturers" comprising 40% of the toy market).

Common evidence in the form of Class-wide expert analysis and evidence "can be used to define the relevant product market[s]"[31] and to prove AAH's market power. Even if AAH could

---

[30] Dr. Dranove showed empirically that willingness to pay for AAH, "measured by evaluating how much worse off patients would be if they could no longer receive care from a given health system" was much higher than AAH's competitors. *Id.* ¶164; *see also id.* ¶¶165-76.

[31] *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *26-27 (N.D. Ill. Jan. 22, 2025); *In re Automatic Card Shufflers Litig.*, 2026 WL 892509, at *21 (N.D. Ill. Mar. 31, 2026) ("[Q]uestions of market definition ... are classwide issues.").

show it lacked market power, this would not defeat predominance because its evidence is also common. *See Amgen*, 568 U.S. at 470 (alleged "failure of proof as to an element" of plaintiffs' claim is a "fatal similarity" supporting certification). The same is true of AAH's purported procompetitive justifications for the All Plans provision, ████████████████████

███.[32]

Plaintiffs also have overwhelming Class-wide evidence of anticompetitive effects: (a) Dr. Leitzinger's analysis of overcharges caused by the All Plans provision, (b) Dr. Dranove's opinion and explanation of how the All Plans provision undermines price competition, (c) Dr. Romano's opinion that ██████████████████████████████████████

█████████████ and (d) extensive record evidence consistent with these findings. Ex. 1, LR1 §V, ¶¶19-25; Ex. 3, DR1 §§III(D), VI(D)-(E), VII; Ex. 5, Romano Rpt. ¶17[33]; *supra* §II.

Courts have repeatedly found in cases such as this that common issues predominate as to violation, holding that the question of antitrust violation "relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members."[34]

    **b.**  <u>**Class-Wide Impact Can Be Proven With Common Evidence**</u>

Plaintiffs' common evidence also can prove Class-wide impact in the form of overcharge

---

[32] *E.g.*, Ex. 85, AAHEDWI00630685-732 at 697 █████████████
████████████████████████████████████████████████████████████

[33] Dr. Romano also opined that "'All Plans' contract provisions are not necessary to achieve or maintain clinical integration that benefits patients and communities." Ex. 5, Romano Rpt. ¶17.

[34] *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995); *see also Messner*, 669 F.3d at 815-16 ("common questions clearly predominate in regard to whether [defendant] violated federal antitrust law"); *Kleen Prods., LLC v. Int'l Paper*, 306 F.R.D. 585, 593-94 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (similar); *Fond Du Lac*, 2016 WL 3579953, at *6 (similar); *Panache Broad. of Pa., Inc. v. Richardson Elecs., Ltd.*, 1999 WL 342392, at *5 (N.D. Ill. May 14, 1999), *mod. on other grounds*, 2001 WL 290408 (N.D. Ill. Mar. 22, 2001) (Where the "bulk of Plaintiffs' allegations pertained to conduct under [certain] agreements" and the alleged "conduct arose out of the ... agreements" then "questions regarding Defendants' conduct are common.").

injury, a prototypical form of antitrust injury.[35]  A plaintiff suffers antitrust injury from even a single overcharge.[36]  Plaintiffs "do not need to prove that every ... purchase by a class member during the class period was affected by the conspiracy.  A class member has a claim if *any* purchase during the class period was affected by the conspiracy."  Class-wide impact does *not* require that each and every class member has been injured; classes often include class members who turn out to be uninjured.[37]

Plaintiffs' burden at class certification is "not to prove the element of antitrust impact." *Messner*, 669 F.3d at 818 (internal quotation and citation omitted).  Rather, Plaintiffs need to "demonstrate that the element of antitrust impact **is capable of proof at trial through evidence that is common to the class rather than individual to its members**."  *Id.* (citations omitted) (emphasis added); *see Turkey*, 2025 WL 264021, at *2 ("'all that is necessary to show predominance'" is for plaintiffs to demonstrate "that it is possible to use common evidence that, if believed, would show that all or nearly all class members suffered antitrust injury") (quoting *Messner*, 669 F.3d at 818).  Plaintiffs readily meet this standard with their overwhelming record and expert evidence, all common to the Class, that AAH engaged in unlawful conduct that caused prices to be substantially inflated—███████████████████████—and that all or virtually all Class members paid higher prices as a result.  In addition, unlike other antitrust cases,

---

[35] *See Hanover Shoe*, 392 U.S. at 494.

[36] *See, e.g., id.*; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("Zenith's burden of proving the fact of damage under s 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.").

[37] *E.g., Kleen Prods.*, 831 F.3d at 927; *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (affirming class certification despite potential uninjured class members); *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668-69 (9th Cir. 2022) (en banc) (court need not decide on class certification whether the class includes a *de minimis* number of uninjured class members); *Automatic Card Shufflers*, 2026 WL 892509, at *22 (similar) (citing *Kohen* 571 F.3d at 677; *Messner,* 669 F.3d at 823-24)*.*

23



(Ex. 1, LR1 ¶¶49-50, 52), eliminating the individual variation that defendants often argue can defeat predominance.

### i. Plaintiffs' Common Evidence Includes Evidence of High Prices and the Nature of the Market

Plaintiffs' common record and economic evidence shows that AAH's prices were inflated because of the All Plans provision, and that the Class was overcharged. Dr. Dranove opined that the Challenged Conduct reduced competition and caused prices to be higher. Ex. 3, DR1 §§III.D, IV, VII. Both Dr. Dranove and Dr. Leitzinger analyzed record evidence and third-party analyses showing that AAH's rates were significantly inflated market-wide. *Infra* §II.D; Ex. 1, LR1 §§V.A, VI; Ex. 2, Leitzinger Rebuttal ("LR2"), §VIII; Ex. 3, DR1 §§ VI.D, VII.

Dr. Dranove and Dr. Leitzinger also found that the nature of the Challenged Conduct and the nature of the market showed that the inflated prices would be widespread and unavoidable. Ex. 1, LR1 §VIII; Ex. 2, LR2 §VIII; Ex. 3, DR1 §§VI.D, VII. ████████ ████████ Ex. 3, DR1 ¶¶83-85. ████████ ████████ Ex. 1, LR1 ¶¶49-50, 52. ██ ████████ ████████ *Id.* ¶¶49-54. ████████ ████████ *Id.* ¶¶50, 55 & at Table 2. Accordingly, there was little or no room for Class members to avoid overcharges. *Id.* ¶¶49-55.

This sort of structural market analysis is widely recognized evidence of class-wide impact. *See*, *e.g.*, *Kleen Prods.*, 831 F.3d at 927 (the structure of the market is a common issue that can

support a finding of class-wide impact).[38]  Indeed, an analysis that "prices generally move together over time," such that if defendants were able to "artificially inflate prices, this ... would have resulted in all or nearly all class members paying a higher price," is itself "sufficient to show that antitrust impact can be proven on a class-wide basis."  *Fond Du Lac*, 2016 WL 3579953, at *8.

### ii.        Plaintiffs' Robust, Class-Wide Quantitative Evidence

Dr. Leitzinger also reliably employed a robust two-step regression analysis that further demonstrates Class-wide injury.  Ex. 1, LR1, §VIII.C; Ex. 2, LR2, §VIII.  Courts have found that such an analysis is "broadly accepted" and supports a finding that common issues predominate with respect to antitrust injury.[39]  This common quantitative evidence is capable of proving "first, that class members paid artificially inflated prices and, second, that 'this price inflation occurred to substantially all class members.'"[40]  Predominance is met because the question is fundamentally Class-wide: a jury either finds common impact or not.  *Olean*, 31 F.4th at 681 ("If the jury found [plaintiffs' model] reliable, then [plaintiffs] would have succeeded in showing antitrust impact on a class-wide basis, an element of their antitrust claim."); *Black v. Occidental Petrol. Corp.*, 69 F.4th 1161, 1184 (10th Cir. 2023) ("[A] failure of proof on the element of antitrust impact would end the litigation for all.").

Regression analysis is a "commonly accepted mechanism" for proving class-wide impact. *Fond Du Lac*, 2016 WL 3579953, at *9; *see Kleen Prods.*, 306 F.R.D. at 602 (regression analysis

---

[38] *See also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (crediting expert opinion that market structure was conducive to cartelization and common impact); *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *In re CRT Antitrust Litig.*, 308 F.R.D. 606, 627 (N.D. Cal. 2015) (similar).

[39] *E.g.*, *In re Broiler Chicken Growers Antitrust Litig. (No. II)*, 2024 WL 2117359, at *29 (E.D. Okla. May 8, 2024) ("*Broiler Chicken (No. II)*"); *Turkey*, 2025 WL 264021, at *17 (similar);  *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (similar); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-48 (D.N.J. 2015) (similar).

[40] *Restasis*, 335 F.R.D. at 15 (citation omitted).

"is common in antitrust cases, where the plaintiffs use it to show that an alleged 'conspiracy' has a statistically significant impact on the dependent variable—usually price.") (citing Daniel L. Rubinfeld, *Reference Guide on Multiple Regression,* in REFERENCE MANUAL ON STATISTICAL EVIDENCE 305-07 (3d ed. 2011)).[41]  A regression can reliably control for variables that might have affected prices, isolate the effect of the Challenged Conduct, and determine whether and to what extent prices were inflated due to the Challenged Conduct.  Ex. 1, LR1 ¶26; *see, e.g.*, *Fond Du Lac*, 2016 WL 3579953, at *9 (noting regression analysis is capable of "eliminat[ing] factors other than anti-competitive conduct that could have affected the price [at issue] in order to discover whether there was a correlation between the alleged anti-competitive conduct and price ... and then [use that] model  to measure the estimated overcharge that all or nearly all class members paid."). "[T]he Seventh Circuit has recognized that courts afford wide 'latitude to experts employing regression analysis, a proven statistical methodology used in a wide variety of contexts.'"[42]

### a) Step 1: The Challenged Conduct Inflated Prices

Dr. Leitzinger employed a standard "yardstick" regression analysis to measure the effect of the Challenged Conduct on prices paid by the Class by comparing those prices (the "treatment group") to prices not affected by the Challenged Conduct (the "control group").  Ex. 1, LR1 ¶28. Like regressions generally, yardstick analyses are widely accepted.[43]  After controlling for other market supply and demand factors that could affect pricing, the yardstick comparison allows for the estimation of the prices the Class would have been paid absent the Challenged Conduct.  *Id.*

Dr. Leitzinger's primary model compares ███████████████████████████

---

[41] *See also Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 615 (E.D. Wis. 2000).

[42] *Turkey*, 2025 WL 264021, at *19 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013)) (cleaned up)).  *See Broiler Chicken*, 2022 WL 1720468, at *10 ("Regression analysis is a widely accepted method").

[43] The "'yardstick approach is a well-established methodology' in antitrust actions."  *Moehrl*, 2023 WL 2683199, at *8 (citation omitted); *17 (yardstick challenge does not defeat certification).

 The model found that the Challenged Conduct inflated prices ▮▮▮▮▮▮▮ over the Class Period for AAH's Healthcare Services. Ex. 1, LR1 ¶40 & at Ex. 4. His overcharge finding is statistically significant at the 99% level—the highest level of statistical confidence—and his model has an adjusted r-squared of 0.93, meaning that it is so well-specified that it explains 93% of the variation in prices ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶40, 61. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶41-42. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Finally, Dr. Leitzinger performed a second yardstick regression analysis that compared the rates of AAH and Ascension, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id.* ¶¶43-44. Using this second benchmark, Dr. Leitzinger found a ▮▮ overcharge, which is directionally consistent with the primary model and (as expected) ▮▮▮▮▮

▮▮▮▮▮▮▮▮ *Id.* ¶45. AAH's disagreement with the variables Dr. Leitzinger used in his regression (which yielded results confirmed by record evidence) lack merit (Ex. 2, LR2 §V) but regardless provide no basis to deny class certification.[44]

---

[44] *E.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.") (Brennan, J., concurring in part); *Manpower*, 732 F.3d at 808 (similar); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 2016 WL 756568, at *3 (E.D. Wis. Feb. 26, 2016) ("economist need not account for every possible variable in order for a regression analysis to be admissible"); *Turkey*, 2025 WL 264021, at *17 (similar); *Broiler Chicken*, 2022 WL 1720468, at *10 (similar).

**b)      Step 2: There was Class-wide price inflation**

Dr. Leitzinger employed a widely used statistical methodology called "in sample prediction" to test whether there was widespread impact, which found empirical evidence that **_98 percent_** of Class members paid a price in excess of the predicted but-for price on at least one (typically more) transaction.  Ex. 1, LR1 ¶60.  This methodology "is the type of market-wide economic analysis [that] has been accepted by many courts to show predominance as to antitrust impact." *Turkey*, 2025 WL 264021, at *9 (citation omitted).[45]  Dr. Leitzinger's robust findings confirm Class-wide impact even when the model incorporates various potential adjustments to Dr. Leitzinger's methodology that were baselessly suggested by AAH's expert.  *See* LR2 §§II, V, VIII; Memo. In Supp. of Pls.' Mot. To Exclude Opinions Offered By Mr. Jonathan Orszag.

Documentary evidence about market structure and the uniformity of AAH's conduct is additional compelling proof of Class-wide impact.



(Ex. 1, LR1 ¶¶49-50, 52),

[46]

[45] *Broiler Chicken*, 2022 WL 1720468, at *10, *13 (common impact where "97.1% of customers paid an actual price that exceeded the but-for price at least once"); *Olean*, 31 F.4th at 676-82; *Broiler Chicken (No. II)*, 2024 WL 2117359, at *30; *Le v. Zuffa, LLC*, 2023 WL 5085064 (D. Nev. Aug. 9, 2023); *In re Pkg. Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019); *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *7-9 (N.D. Cal. Nov. 14, 2018).

[46] Indeed, courts have held that "regression analysis can be an appropriate tool to demonstrate class-wide impact even when the market involved diversity in products, marketing, and prices" and "even when prices are individually negotiated" by each class member—even where the class members included "nearly every entity in the United States that serves chicken." *Broiler Chicken*, 2022 WL 1720468, at *12, *15; *see Turkey*, 2025 WL 264021, at *9-10, *14-15.

### c. Aggregate Damages Are Provable Through Common Evidence

The predominance requirement is satisfied where aggregate Class damages can be reliably measured using Class-wide evidence and methodology. *Kleen Prods.*, 831 F.3d at 928-29. Reasonable damages estimates are sufficient "where the theory of harm is that the entire market price of a product was inflated as a result." *Kleen Prods.*, 306 F.R.D. at 605, *aff'd*, 831 F.3d 919.[47]

Dr. Leitzinger's damages calculations satisfy Rule 23(b)(3). He calculated aggregate damages by applying the ███ overcharge from his primary regression model to the Class member payments during the Class Period. Ex. 1, LR1 ¶¶46-48. Courts routinely find common issues predominate based on similar calculations. *E.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *15 (N.D. Ill. July 22, 2024) ("courts handling antitrust class actions routinely endorse the practice of using regression models to ... measure damages on a classwide basis.") (collecting cases); *Turkey*, 2025 WL 264021, at *25 (same); *UEBT v. Sutter* Class Order at 25-30 (common issues predominate as to damages calculated by Dr. Leitzinger's regression analysis).

### 6. Rule 23(b)(3)'s Superiority Requirement is Met

Rule 23(b)(3)'s final requirement is superiority—*i.e.*, that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Given "the breadth of most antitrust classes" and "the significant cost" of litigating antitrust cases, the "superiority requirement is easily met in most antitrust cases." 6 Newberg & Rubenstein on Class Actions §20:54 (6th ed. 2025). Non-exclusive superiority factors to consider

---

[47] *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946) ("jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly"); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563-64 (1931) (similar); *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible"); *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982) (similar; citing cases).

are: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Generally, a class action is superior "to try[ing] thousands of separate cases alleging the same misconduct using the same proof." *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1099 (W.D. Wis. 2021). Here, the Class presents identical legal and factual questions about AAH's contracts, market power, and the anticompetitive effects of the All Plans provision. The best method for adjudicating the identical claims of thousands of Class members, with numerous common questions, is through a single class action case.[48]

Superiority is also satisfied because, while Class members suffered meaningful harm, individual damages are generally insufficient to support the large costs of antitrust litigation on an individual basis.[49] There is no other pending litigation challenging the All Plans Provision on behalf of Class members, enabling this case to efficiently resolve all eligible claims. And the Eastern District of Wisconsin is the appropriate forum for all Class members to bring this litigation, as the Challenged Conduct was centered here, Network Vendor contracts were negotiated here, and affected providers and patients are here.

## IV. CONCLUSION

Plaintiffs respectfully request that the Court certify the proposed Class and appoint the proposed Class Representatives and Class Counsel.

---

[48] *See Messner*, 669 F.3d at 815 n.5 (finding it unnecessary to rule on superiority: "[t]here are so many common issues of law and fact relating to the issue of Northshore's liability, however, that the superiority requirement likely poses no serious obstacle to class certification here").

[49] *See Butler*, 727 F.3d at 801 ("[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation.").

Dated: June 2, 2026

Respectfully submitted,

*/s/ David F. Sorensen*
Eric L. Cramer
David F. Sorensen
Caitlin G. Coslett
Michaela L. Wallin
Sarah Zimmerman
BERGER MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com
ccoslett@bergermontague.com
dsorensen@bergermontague.com
mwallin@bergermontague.com
szimmerman@bergermontague.com

Jamie Crooks
Michael Lieberman
Yinka Onayemi
FAIRMARK PARTNERS, LLP
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Tel: (619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
yinka@fairmarklaw.com

Timothy Hansen
James Cirincione
John McCauley
HANSEN REYNOLDS, LLC
301 N. Broadway, Suite 400
Milwaukee, WI 53202
Tel: (414) 455-7676
thansen@hansenreynolds.com
jcirincione@hansenreynolds.com
jmccauley@hansenreynolds.com

*Counsel for All Plaintiffs*

Kevin M. St. John
BELL GIFTOS ST. JOHN LLC

5325 Wall Street, Suite 2200
Madison, WI 53718
Tel: (608) 216-7990
kstjohn@bellgiftos.com

*Counsel for Uriel Pharmacy, Inc., Uriel Pharmacy Health and Welfare Plan*

32

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 2, 2026, a true and correct copy of the foregoing, with redactions for information designated as confidential, was filed with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record. In addition, a true and correct copy of the sealed version was served upon counsel of record for AAH via email.

Dated: June 2, 2026

/s/ David F. Sorensen
David F. Sorensen